# EXHIBIT 3

Videotaped Deposition of

# Officer Cameron Leahy

February 22, 2023

Gonzalez

vs.

City of Alameda



www.aptusCR.com | 866.999.8310



**Page 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARIO GONZALEZ, Deceased, through
his Successor in Interest, M.G.C.,
a minor through his mother and
Next Friend Andrea Cortez, individually
and as successor in interest for
MARIO GONZALEZ, Deceased,

      Plaintiffs,

vs.                   Case No.
                   4:21-cv-09733-DMR

CITY OF ALAMEDA, a public entity;
FORMER CITY OF ALAMEDA INTERIM
POLICE CHIEF RANDY FENN, in his
individual and official capacities;
ALAMEDA POLICE OFFICERS ERIC
MCKINLEY, JAMES FISHER, and CAMERON
LEAHY, and DOES 1-10, Jointly and
Severally,

      Defendants.
_____/

Related With: No. 22-cv-00718-DMR

EDITH ARENALES, Plaintiff,

vs.

CITY OF ALAMEDA, et al., Defendants.
_____/

     VIDEO DEPOSITION OF OFFICER CAMERON LEAHY

        Wednesday, February 22, 2023

          In Oakland, California

REPORTED BY:

DEBRA J. SKAGGS, CSR 7857

JOB NO. 10115298

**Page 2**

APPEARANCES

FOR PLAINTIFFS:
  HADDAD & SHERWIN LLP
  BY: MICHAEL J. HADDAD, ATTORNEY AT LAW
    BRIAN HAWKINSON, ATTORNEY AT LAW
  505 Seventeenth Street
  Oakland, California 94612
  (510) 452-5500 Fax: (510) 452-5510

FOR DEFENDANTS:
  BERTRAND FOX ELLIOT OSMAN & WENZEL
  BY: GREGORY M. FOX, ATTORNEY AT LAW
    THOMAS LY, ATTORNEY AT LAW
  The Waterfront Building
  2749 Hyde Street
  San Francisco, California 94109
  (415) 353-0999 Fax: (415) 353-0990
  gfox@bfesf.com tly@bfesf.com

ALSO PRESENT:
  NEIL GEORG, Videographer, Aptus Court Reporting

REMOTE APPEARANCES

FOR PLAINTIFF IN THE RELATED ACTION:
  POINTER & BUELNA, LLP
  BY: PATRICK M. BUELNA, ATTORNEY AT LAW
    TY CLARKE, ATTORNEY AT LAW
  155 Filbert Street, Suite 208
  Oakland, California 94607
  pbuelna@lawyersftp.com tclarke@lawyersftp.com

FOR ALAMEDA POLICE DEPARTMENT:
  NISHANT JOSHI, CHIEF OF POLICE
  SERGEANT JEFFREY PARK
  LIEUTENANT ALAN KUBOMAYA

ZOOM HOST AND CO-HOST:
  IVANIA NAVARRETE, Haddad & Sherwin, LLP
  NEIL GEORG, Aptus Court Reporting
          --oOo--

**Page 3**

INDEX

                   PAGE

PROCEEDINGS                  4

EXAMINATION BY:

  Attorney Haddad           5

          --o0o--

EXHIBITS

PLAINTIFFS' EXHIBITS:         PAGE

EXHIBIT 4 - 1 page - Color copy of a screenshot of
Officer Leahy's body camera      74

EXHIBIT 5 - 3 pages - Public record of Officer Leahy's
yearly compensation for the years 2019, 2020, and
2021               94

      --o0o--

MARKED SECTIONS BY ATTORNEY FOX

      PAGE/LINE

      24/15

      30/11

      --o0o--

**Page 4**

    ---oOo---

    BE IT REMEMBERED that, pursuant to Notice, on Wednesday, February 22, 2023, commencing at the hour of 10:04 A.M., thereof, as noticed by HADDAD & SHERWIN LLP, 505 Seventh Street, Oakland, California, was before me, DEBRA J. SKAGGS, CSR No. 7857, Certified Shorthand Reporter in and for the State of California.

    --o0o--

    PROCEEDINGS

    THE VIDEOGRAPHER:  We are going on the record at 10:04 A.M., on February 22, 2023.

    This is the deposition of Officer Cameron Leahy in the matter of Gonzalez, et al versus City of Alameda, et al.  Case number is 4:21-cv-09733-DMR.

    My name is Neil Georg; I'm the videographer. The court reporter is Debra Skaggs.  We are both representing Aptus Court Reporting.

    Counsel, would you please identify yourselves for the record.

    ATTORNEY HADDAD:  Michael Haddad, along with Brian Hawkinson for the minor Plaintiff, Little Mario.

    ATTORNEY FOX:  And the estate?

    ATTORNEY HADDAD:  And the estate.

    ATTORNEY FOX:  Gregory Fox for --

    ATTORNEY BUELNA:  Hello --

Officer Cameron Leahy

Page 5

ATTORNEY FOX:  Oh.  Go ahead, Patrick.

ATTORNEY BUELNA:  Good morning.  Pat Buelna for the Plaintiff Edith Arenales.

ATTORNEY FOX:  Greg Fox for Officer Leahy and the other Alameda Defendants.

ATTORNEY LY:  Thomas Ly for Defendants.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

OFFICER CAMERON LEAHY, produced as a witness herein in the above-entitled action, who, being by me first duly sworn or having affirmed, was thereupon examined and testified as a witness in said action.

--o0o--

EXAMINATION

BY ATTORNEY HADDAD:

Q.      All right.  Well, good morning again.  Thanks for being here today.

Have you ever sat for a deposition before?

A.      I have not been deposed before, no.

Q.      Have you testified in court before?

A.      Yes, I have.

Q.      So your testimony here is under oath, and it has the same force and effect as courtroom testimony.

Do you understand that?

Page 6

A.      Yes.

Q.      Okay.  So you basically have to follow the same kind of rules that we have to not talk over each other so that we can get an accurate transcript.  Okay?

A.      Understood.

Q.      Unlike in court, there is no judge here.  So if your attorney objects to one or two of my questions, you generally still have to answer that question unless Mr. Fox tells you not to.  Okay?

A.      Yes.

Q.      All right.

ATTORNEY FOX:  And I'd like the reporter to send me the notification letter.  I'll make arrangements for Officer Leahy to review the transcript.  If there are any changes, or corrections, or other comments, we'll send a written response back by page and line to the reporter with a copy to all attorneys of record.

THE REPORTER:  Okay.  Thank you.

ATTORNEY HADDAD:  Q.  What have you reviewed in preparation for today?

A.      So I've reviewed my training record; as well as the interview transcripts for the statements that I gave during the sheriff's office investigation; as well as the administrative investigation conducted by the Renne Public Law Group --

Page 7

(Reporter clarification.)

THE WITNESS:  Renne Public Law Group.

ATTORNEY FOX:  R-e-n-n-e.

THE WITNESS:  -- as well as the body camera footage of this incident.

ATTORNEY HADDAD:  Q.  Yours as well as the other two involved officers?

A.      That is correct.

Q.      When did you review that body camera footage most recently?

A.      About two days ago.

Q.      How many interviews did you give about this incident?

A.      Three, I believe.

Q.      So the first one would have been for the sheriff's office; right?

A.      Yes.

Q.      And then two of them were for the Renne Law Firm investigation?

A.      That is correct.

Q.      What happened between interview number two and number three, as far as you know, that caused them to want to interview you a third time?

A.      I was not provided with much of an explanation other than they had some supplemental questions.

Page 8

Q.      And so for all of those interviews, you understood that those were important investigations; right?

A.      Absolutely.

Q.      And you understood that it was important to be accurate in the information you provided them; correct?

A.      Yes.

Q.      You knew you had to be truthful, of course; right?

A.      Yes.

Q.      And you knew you had to give complete answers to the questions that were asked of you; right?

A.      Yes.

Q.      In fact, at least in the second Renne interview, the interviewer there made a point of giving you a lot of open-ended opportunities to say whatever you felt needed to be said about what happened; right?

A.      I believe so.

Q.      And having had a chance to review the transcripts of your interviews, have you noticed any information that you provided that was wrong?

A.      No.

Q.      And is there anything that you think is important that you didn't have an opportunity or didn't think to say in any of those three interviews?

Page 9

A. Nothing comes to mind.

Q. When did you go to the police academy?

A. I attended the police academy from August of 2017; I graduated in February of 2018.

Q. And when did you start working for the Alameda Police Department?

A. As a sworn officer?

Q. Yeah.

A. Or --

Q. Let's start with sworn officer.

A. Okay. My swear-in date with APD was February 12, 2018.

Q. I understand that you worked on a different basis before that. What was that basis?

A. So I was a -- hired initially as a police recruit. So I was sponsored by the police department to go to the basic police academy. I started initially, I believe, sometime in June of 2017. And I was working assigned to the personnel-in-training department, just basically buying some time until the academy had started.

Q. So you were -- it was only about two months, it sounds like; correct?

A. Correct. Roughly. Maybe between two, two and a half months.

Page 10

Q. Then there was a probationary period once you became a sworn officer?

A. Yes.

Q. How long was that?

A. Two years.

Q. And when did you finish that probation?

A. That would have been February 12, 2020.

Q. Did you receive additional training from the department during your probation?

A. I mean, I went through the field training program. And much like most officers, attended occasional update courses; was sent to some outside schools for certifications for certain things. But -- so in that respect, yes.

Q. How long did field training last?

A. Approximately four and a half months.

Q. So did -- was there additional training or supervision provided to you during the rest of your probation period?

ATTORNEY FOX: After FTO?

ATTORNEY HADDAD: Yeah.

THE WITNESS: I mean, we're always being supervised and provided training. A lot of it has to do with, you know, continued -- learning your day-to-day job. You start reviewing your reports; whatnot. I

Page 11

mean, the training is ongoing. So I'm -- in terms of formal cla- -- are you referring to formal classes?

ATTORNEY HADDAD: Q. No.

A. Or just --

Q. What I'm getting at is during your probation period, were you subject to additional supervision or training different from what a nonprobationary officer would receive?

A. No.

Q. Have you worked for any other law enforcement agency?

A. So when I was in college, I worked as a student worker for the campus police department. I attended college at the California Maritime Academy, which is a part of the CSU system located in Vallejo, California.

During my time there, I worked as a student worker -- student employee for the campus police department in a -- more of an administrative role just helping with paperwork. So occasionally sitting at the front counter; that type of thing.

Q. Did police work interest you as a career at an early stage in your life?

A. No. Not at all.

Q. By the time you were in college, was that

Page 12

something you were thinking about doing?

A. Not until I had started working as a student worker for the campus police department. Prior to that, I had no interest in -- in this type of law enforcement.

Q. Do you have any military background?

A. I have never served in the U.S. Military. I did spend some time throughout high school and college as a volunteer in the United States Air Force Auxiliary. So their patrol. I did that from, I believe, my freshman year of high school through my second year of college or so.

Q. What high school did you graduate from?

A. The Alameda Science and Technology Institute.

Q. Oh, so you're from Alameda?

A. I am.

Q. Okay. And what's your highest level of education?

A. I have a bachelor's degree.

Q. From where?

A. The California Maritime Academy.

Q. In what?

A. Global studies and maritime affairs.

Q. Have you had any ancillary duties with the Alameda Police Department?

ATTORNEY FOX: It's a little vague.

Officer Cameron Leahy

Page 13

ATTORNEY HADDAD:  Q.  Well, other than patrol officer, have you had any additional duties?

A.    Currently I have a couple.  I am a member of the CNT, or Crisis Negotiations Team; as well as was recently selected to become a member of our Major Accident Investigations Team, or MAIT, as we refer to it.  I also served for a short period of time on the department's recruiting team.  I believe that's it.

Q.    Did you get your training for the CNT team after the Gonzalez incident?

A.    I did.  I was selected prior, but did not have an opportunity to attend the FBI's negotiation course until after this incident.

Q.    Did you go through the academy with Officer McKinley?

A.    I did not.

Q.    Were you and he hired around the same time?

A.    I believe, if my memory serves me correctly, he began about five or six months after I did.

Q.    I think you mentioned in one of your interviews that you and Officer McKinley are good friends?

A.    We are.

Q.    What does that mean?  Do you socialize/hang out together after work?

Page 14

A.    Occasionally.

Q.    What about you and Officer Fisher?  Do you socialize outside of work?

A.    I have not socialized outside of work with Officer Fisher.

Q.    What was your age at the time of the Mario Gonzalez incident?

A.    I believe at that time I was 25, if I'm not mistaken.

Q.    How tall are you?

A.    Approximately 6 feet.

Q.    And about how much did you weigh back then?

A.    With or without all of my equipment?

Q.    Let's start without.

A.    Without.  About 170 pounds.

Q.    And with?

A.    Maybe 200.  It's about 30 pounds of gear that we carry.

Q.    It's pretty typical for officers in your department to have about 30 pounds of gear?

A.    Give or take.  Some officers elect to carry more equipment than is required.

Q.    Do you?

A.    A few things.

Q.    What do you carry beyond what's required?

Page 15

A.    Mostly additional medical supplies that I carry.  Additional tourniquets, chest seals -- and the only other thing that I carry that's not required is an extra rifle magazine.

ATTORNEY FOX:  An extra?

THE WITNESS:  Rifle magazine.

ATTORNEY FOX:  Thank you.

ATTORNEY HADDAD:  Q.  And what less lethal tools or weapons were you carrying on the day of the incident?

A.    So I had my Taser; my OC pepper spray; my baton.  I would lump handcuffs into that category; I carry two pairs of handcuffs.  And then in terms of physical equipment, that would be it.

Q.    Now, when you were in the academy, one of the methods of training that you received was through learning domains; right?

A.    Yes.

Q.    And in fact they gave you an entire set of learning domains, I think on a CD or electronically at some point, didn't they?

A.    Electronically, yes.

Q.    Did they explain to you why they wanted you to have those?

A.    For a handful of reasons, the first one being

Page 16

that was the material that we were being taught and had to cover and tested on during the academy.  So we needed to be able to study and reference those throughout the training.

I was also informed that the learning domains at the time would -- separate from our -- any future departmental training, but would be kind of the standard that we were -- you know, we were trained at so we could reference those learning domains at a later date.

Q.    And those were POST Learning Domains; right?

A.    Correct.

Q.    And as we all know, POST stands for the California Commission on Peace Officer Standards and Training; right?

A.    Yes.

Q.    And it's your understanding that POST sets the standards in training for law enforcement officers in this State; right?

A.    Correct.

Q.    So let me ask you about something from Learning Domain 20, Version 2.  This was published before you went to the academy -- excuse me.

(Interruption in the deposition.)

ATTORNEY HADDAD:  Q.  It was last revised in 2006, but I want to ask you if part of what I'm

Page 17

going to read from here is consistent with what you were trained later on.  Okay?

A.    Okay.

Q.    So I'm going to turn to page 6-9.  This is talking about the "Duty to Intervene," and there is a subheading called "Lawful Resistance."  And this says "Although Penal Code Section 834a states that the person being arrested must submit to an arrest.  If unlawful or unreasonable force is used to effect the arrest, the person being arrested may lawfully resist to overcome that force," and then it lists a number of California statutes that support that.

I'll show it to you.

A.    (Pause for review.)

Okay.

Q.    Is the training that you just read on page 6-9 of the learning domain I described consistent with your training?

A.    Yes.

Q.    So you were trained about use of force starting in the academy, and then have been trained in that repeatedly since you've been a sworn officer --

A.    Excuse me.

Q.    -- is that right?

A.    Yes.

Page 18

Q.    And is it accurate that one of the things that you're trained in is that an officer is allowed to use force that is objectively reasonable under the totality of the circumstances you face?

A.    Yes.

Q.    And as an officer you're only allowed to use force against a person that's necessary to achieve some lawful duty; right?

A.    Yes.

Q.    You're not allowed to use force that is unnecessary under the circumstances; right?

A.    Correct.

Q.    And in any sort of force decision, you're supposed to consider a lot of different factors in the totality of the circumstances; right?

A.    Yes.

Q.    But some of the main ones include the severity of the crime that you're dealing with; right?

A.    That is one of them, yes.

Q.    And another main factor to consider is whether the person is actively resisting or attempting to flee; right?

A.    Yes.

Q.    And then an important factor is whether the person poses an immediate threat to you or someone else;

Page 19

right?

A.    That is again one of the factors, yes.

Q.    You've been trained in what an immediate threat is; right?

A.    Yes.

Q.    An immediate threat is a threat that you're facing right in front of you at that moment; right?

A.    Correct.

Q.    It's an actual threat; not a potential threat. Correct?

A.    In -- if we're speaking in terms of the immediacy, yes.

Q.    You're also trained to consider alternatives to any use of force that you may consider using; right?

A.    When feasible, yes.

Q.    And that you're trained, in general, to select the minimal and necessary level of force to achieve your lawful ends; right?

A.    Yes.

Q.    You're also trained in the standard for deadly force; right?

A.    Correct.

Q.    And that standard had changed a little bit in the year or so before the Gonzalez incident.  Do you recall that?

Page 20

A.    Yes.

Q.    So you were allowed to use deadly force when you were facing an imminent threat of death or serious bodily injury; right?

A.    Yeah, if we or somebody else -- yes.

Q.    Okay.  And then you had training about what an imminent threat would be; right?

A.    I did.

Q.    And that training included that an imminent threat is a threat that's immediate and requires your instant attention and reaction; right?

A.    Yes.

Q.    Did you ever use deadly force against Mario Gonzalez at any time?

A.    No, I did not.

Q.    Did you ever see the need to use deadly force against him?

A.    No.

Q.    Before the Mario Gonzalez incident, had you been trained about deescalation?

A.    Yes.

Q.    In fact your department had some policies that addressed deescalation.  Do you recall those?

A.    I wouldn't be able to recite the policy number, but yes.

Page 21

Q.      Yeah.

In Policy Number 466, entitled "Crisis Intervention Incidents" -- that policy dealt with people in crisis.  Do you recall that -- such a policy?

A.      Yes.

Q.      And a person in crisis is a person whose level of distress or mental health symptoms have exceeded the person's internal ability to manage his or her behavior or emotions; right?

ATTORNEY FOX:  Do you want to show him the document or --

ATTORNEY HADDAD:  Q.  If you need to see it, I'll show it to you.

A.      Sure.

Q.      Would you like to see it?

A.      Yes, please.

Q.      The definition I'm looking at is under Section 466.1.1: "Person in Crisis."

A.      (Pause for review.)

Yes.

Q.      Okay.

This goes on to explain.  "A crisis can be precipitated by any number of things including an increase in the symptoms of mental illness, despite treatment compliance; or noncompliance with treatment,

Page 22

failure to take prescribed medications, or any other circumstance or event that causes the person to engage in erratic, disruptive, or dangerous behavior that may be accompanied by impaired judgment."

Is that your understanding of the definition as well?

A.      Yes.

Q.      And you're not trained to make clinical diagnoses of people's mental illness, are you?

A.      No.

Q.      But you are trained to recognize signs and symptoms of mental illness or other mental disturbances; right?

A.      Yes.

Q.      And sometimes a person might have a mental illness or emotional disturbance, and they may also be intoxicated on something; right?

A.      Yes.

Q.      And that can be impossible for you to sort out the actual cause of the person's impaired judgment in that situation; right?

A.      Sometimes.

Q.      And a person in crisis can include somebody who has impaired judgment and disruptive behavior caused by intoxication; right?

Page 23

A.      So in my training, although persons experiencing mental health crises can be under the influence of certain things, I was not trained that those two things are necessarily always tied together.

Q.      I'm not saying that they're tied together, but I'm just saying that whatever you recognize that somebody is behaving in an erratic, disruptive, or dangerous manner accompanied by impaired judgment -- that means that they fit the definition of a person in crisis; right?

A.      Again, sometimes.

Q.      And it doesn't really matter if the cause of that is mental illness, emotional distress, or substance abuse because the behavior reflects a person in crisis; right?

A.      It can.

Q.      That's what you've been trained; right?

A.      Yes.

Q.      So on a later part of that same policy, Section 466.6, it talks about deescalation.  I'll show this to you in a second, but it says "Officers should consider that taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis."

Right here.

Page 24

A.      (Pause for review.)

Yes.

Q.      Is that consistent with your training too?

A.      Yes, it is.

Q.      So your department empowers you with the discretion to take no action in response to a person in crisis even if that person may have committed some relatively minor crime; right?

A.      Depends on the circumstance.

Q.      But you do have that power in your discretion; right?

A.      Not in every situation, no.

Q.      When would you not have the power to take no action and just monitor a situation?

A.      So if it's determined that somebody is under the influence of an intoxicating substance to the point where they're unable to care for themselves or others, our policy does not permit us to conduct a cite and release type of situation of that person.

There is a handful of situations for misdemeanors in particular -- maybe two or three -- where the discretion to conduct that cite and release and just let that person be on their way and not take any further action -- that our ability to do that is limited.

Officer Cameron Leahy

Page 25

Q.    Okay.

ATTORNEY FOX:  Mark the transcript.

(Marked portion: Page 24, Line 15.)

ATTORNEY HADDAD:  Q.  Because if a person is intoxicated to the point where they're actually a danger to themself, then for you to just walk away could allow them to be in danger; right?

A.    Correct.

Q.    **How are you trained to decide if a person is a danger to themselves?**

A.    So a lot of that in my training has to do with their ability to articulate some sort of plan of self-care.  So are they oriented to, you know, the basic things that an individual maybe not suffering from intoxication or something to that effect would be oriented.

Time of day; you know, location: where are they.  Asking certain questions, like, "Who is the president?"; stuff like that.  As well as, you know, asking individuals -- and this is all part of deescalation as well.  But asking individuals "You know, what's your plan for the rest of the day?"  You know, can that person articulate a plan to reasonably care for themselves?

"Oh, I'm" -- "I'm headed home."

Page 26

"Okay, where is home?"  They can articulate where home is.

You know, "Is there" -- you know -- "anybody that you're going to be with later that can potentially assist keeping an eye on you?"

Those types of questions along with recognizing the objective signs of intoxication -- these are all pieces that go into our assessment of somebody's ability to care for themselves.

Q.    Okay.

A.    And I'll add to that.

As well as the events and circumstances leading up to our contact with that person.  If it's a call for service, what events precipitated that call for service is also part of what we use to inform these decisions.

Q.    Okay.

**Your department also has a Handcuffing Restraints Policy, number 30- -- 306.  And 306.4 states, quote, "Although recommended for most arrest situations, handcuffing is discretionary and not an absolute requirement of the department," unquote.**

**You're familiar with that part of the policy?**

A.    Yes, I am.

Q.    **Could deciding not to handcuff somebody in an**

Page 27

emotional or mental health crisis be a reasonable means of deescalation?

ATTORNEY FOX:  It's vague as to the underlying facts.

But if you're able to respond, you may.

THE WITNESS:  These situations are very situationally specific, and an assessment has to be made case by case.

ATTORNEY HADDAD:  Q.  Uh-huh.

But there can be some situations where it would be appropriate not to handcuff somebody; right?

ATTORNEY FOX:  Calls for speculation.

But if you're able to respond, you may.

THE WITNESS:  There are certain situations, yes.

ATTORNEY HADDAD:  Q.  And that can be another way of deescalating a situation: to not handcuff somebody; right?

A.    Potentially.  In my experience I've also found handcuffs to also be a deescalation tool in certain situations as well.  So I think that coin goes both ways.

Q.    Okay.

Section 306.7.1 has guidelines for use of leg restraints -- let me show this to you.

Page 28

A.    (Pause for review.)

Thank you.

Q.    **Okay.  So in the subsections that talk about things such as limit the number of officers on top of the subject while in prone position; it talks about the recovery position -- are those -- is this training meant to apply any time a person is handcuffed in a prone position?**

A.    That is not my understanding.

Q.    **What's your understanding of when this section of the policy is supposed to apply?**

A.    So my understanding, as that policy reads, is specifically when placing someone in some sort of leg restraint device; whatever that might be.  There is different types, but my understanding is that's specifically where this policy -- those subsections are meant to address.

Q.    **And would these subsections of this Policy 306.7.1 also apply when you're placing someone in leg restraints manually?  Using your own physical force rather than a mechanical restraint?**

A.    Can you clarify what you mean by "manually?"

Q.    **Yeah.  Like I said, using your own physical hands and force --**

A.    Okay.

Page 29

Q.    -- rather than a mechanical restraint.

A.    No.  My understanding is no.

Q.    Now, when I asked Officer Fisher and Officer McKinley about whether this training warning about the prone position, and advising about the recovery position -- whether that training applies any time a person was restrained in a prone position, they both explained "yes, that did apply any time a person was in a prone position."  Not necessarily this policy, but that training in general.

A.    The training in general, yes.  But your question specifically in regards to leg restraints --

Q.    Yeah --

A.    -- is what I was referring to.

Q.    -- I understand.

A.    Yeah.

Q.    And I'm kind of expanding it.

A.    Okay.

Q.    Okay.
So now, were you trained in general, any time that you have restrained somebody in a prone position -- meaning facedown on the ground --

A.    Uh-huh.

Q.    -- that you should limit the number of officers on top of the subject while in the prone

Page 30

position?

A.    Yes.

Q.    And an officer should position themselves on the shoulder blades and legs to avoid pressure on the spine.

A.    Excuse me.
Yes.

Q.    In fact, were you trained that you should avoid pressure on the back -- anywhere on the back of a person in a prone position when possible?

A.    When possible, avoiding the head, neck, or spine, yes.  The shoulder blades were really that only portion of, I guess, the rear part of the upper body that we were trained to put pressure.

Q.    What was --

ATTORNEY FOX:  Mark -- mark the transcript.
(Marked portion: Page 30, Line 11.)

ATTORNEY HADDAD:  Q.  According to your training, why were you supposed to avoid pressure on the spine of a person?

A.    Because, pursuant to my training, any pressure -- extended pressure on the individual's head, neck, or spine could have the potential to limit or restrict the individual's ability to breathe.

Q.    And was it explained to you the mechanism of

Page 31

how pressure on the spine could impair a person's ability to breathe?

A.    My understanding is that the -- there is the potential for the individual's lungs not to be able to completely expand during breathing.

Q.    And did you learn that a person who is obese and forced into a prone position may have even more difficulty breathing than somebody who is not obese?

A.    Yes.

Q.    And that, basically, could be just the commonsense idea that their belly fat can push into their chest cavity and impair the respiration of their lungs as well; right?

A.    I'm -- my medical training is limited, so I wouldn't say that's necessarily common sense.  But I was trained that yes, if somebody is obese, to be a little bit more aware of these concerns.

Q.    You have to be even more careful of their respiration and ability to breathe if an obese person is held in a prone position; right?

A.    Yes.

Q.    Because they're more at risk of restraint asphyxia; right?

A.    Potentially.

Q.    Now, this is not meant to be tricky or

Page 32

anything; it's kind of obvious.
But is it your understanding that a person's lungs are basically anatomically throughout most of a person's chest; not just right under the spine?

A.    Yes.

Q.    So why would it be acceptable to put pressure on a person's -- another part of -- strike that.
So according to your training, why is it acceptable to put pressure on another part of a person's back -- meaning the shoulder blades -- versus the spine when both could be right behind the person's lungs?

ATTORNEY FOX:  Calls for speculation.
To the extent you understand the question and you're able to respond, you may.

THE WITNESS:  So my understanding of that training is that it is generally a safer position or area to apply only the amount of pressure necessary to control the person's level of resistance.  And it's also -- putting pressure along someone's spine requires a certain amount of pressure throughout their -- the majority of their back, you know, because the spine runs down that middle portion.  Whereas the shoulder blades are -- don't have that same concern.
And so my training teaches me that generally it is a safer position to be in when there is a

Page 33

legitimate necessity for a certain amount of pressure to control that person.

ATTORNEY HADDAD: Q. Okay. I follow you.

Is it also your training that any pressure on a person's back in the prone position, especially when the person is obese, is risky?

ATTORNEY FOX: The question is incomplete. Risky at what?

ATTORNEY HADDAD: Q. Risky to impair their breathing.

A.    I think any use of force has an inherent amount of risk.

Q.    Yes, but we're talking in particular about the danger of restraint asphyxia, so let me rephrase the question.

A.    Okay.

Q.    Is it your training that putting pressure anywhere on a person's back in a prone position, especially if they're obese, risks restraint asphyxia?

A.    Yes, the potential is there.

Q.    And the longer a person is held in a prone position, especially if they're obese, the greater the risk that they will suffer restraint asphyxia; right?

A.    Yes.

Q.    And that's why you're also trained in the

Page 34

recovery --

A.    Excuse me.

Q.    You're trained in the recovery position; right?

A.    Yes.

Q.    And what is that?

A.    So my understanding of the recovery position again is that it's generally a safer position. Where if someone is placed on their side with special attention to preserving their airway, that it's a safer position for someone to be on the ground, but not in a -- in that prone position.

Q.    Are you trained in how to get someone into a recovery position even if they're handcuffed?

A.    Yes.

Q.    In fact, normally they're placed in a recovery position after they're handcuffed; right?

A.    I'd say normally after people are handcuffed, they're stood up -- if they were on the ground -- stood up and walked to a patrol car. I would say normally our -- in my experience, the process of handcuffing someone does not normally result in going to the ground.

Q.    Are you trained to place someone into a recovery position as soon as possible after a prone restraint?

Page 35

ATTORNEY FOX: The question is vague as to "prone restraint."

If you understand it, you may answer.

THE WITNESS: It depends on what the officers on scene decide the next steps are.

ATTORNEY HADDAD: Q. Well, your office -- your department doesn't give you open discretion to do whatever you think is best; they usually tell you some guidelines at least, don't they?

A.    Generally, yes. But they don't fit every scenario.

Q.    But as they're teaching you to avoid the deadly outcome of restraint asphyxia, don't they teach you that after handcuffing a person facedown in a prone position, you should put them into a recovery position as soon as you can?

A.    When it's safe to do so, yes.

Q.    When you're restraining a person in a prone position, you're also trained to continually monitor the person's respiration and ability to breathe; right?

A.    Yes.

Q.    To look for signs of labored breathing, for example; right?

A.    Yes.

Q.    What are some signs and symptoms of labored

Page 36

breathing in that scenario?

A.    They could include gasping for air; saying things like "I can't breathe." One indication would be if a person is -- you know, goes from communicating with you or physically struggling and then not. You know, there would be an indication that there is a medical concern there.

Excuse me.

Keeping, as best you can, a visual on the individual's mouth and nose; noticing chest rise and deflation of the lungs, or the absent -- or the lack thereof. Those would be some of those indicators.

Q.    Have you been trained that a person can talk to you and still have some labored breathing?

A.    Yes.

Q.    Have you been trained that a person who is having some level of asphyxia from prone restraint can be expected to squirm and move around to try to get into a better position to breathe?

ATTORNEY FOX: The question is vague as to what you mean by "some level of asphyxiation [sic]."

But if you understand it, you may respond.

THE WITNESS: Can you repeat the question, please?

ATTORNEY HADDAD: Q. Yeah.

Page 37

Have you been trained that a person whose breathing is being impaired by prone restraint, can be expected to squirm and move around to try to get into a better position to breathe normally?

A.    I don't recall specific training on that, but it makes a certain level of common sense.

Q.    Have you ever heard of a case from the Ninth Circuit from 2003 called Drummond versus City of Anaheim that deals with compression asphyxia?

A.    The specific name of the case does not ring a bell, but the facts might.

Q.    Okay.  Well, one of the statements in the case that the court wrote was: where officers continue to press their weight on an arrestee's neck and torso as he lay handcuffed on the ground, that was capable of causing death or serious injury.

Have you ever been trained that that kind of conduct could cause death or serious injury?

A.    Yes.

Q.    Have you been trained in the definition of what deadly force is?

A.    Yes.

Q.    What is that?

A.    Any force that has a substantial likelihood of causing death or serious bodily injury.

Page 38

Q.    Right.

And in fact, POST defines it as a substantial risk of causing death or serious bodily injury.

Is that basically what you're saying?

A.    Yes.

Q.    Now, in the course of your job, sometimes you have to make split-second decisions; right?

A.    Yes.

Q.    Do you believe that your department prepares you to make those split-second decisions lawfully and properly?

A.    Yes.

Q.    And how do they train you to make really quick decisions sometimes on life-and-death matters?

A.    Through our training and field experience.  I mean, that starts from day one of the academy; through your field training with your field training officer; and then continued -- kind of on-the-job training, if you will, during your time as a solo patrol officer working with your sergeant; being sent to various classes on use of force; continuing education-type classes.  This type of training to help us make these decisions is definitely ongoing.

Q.    And you're trained to value the sanctity of human life; right?

Page 39

A.    Absolutely.

Q.    And so -- are you also trained that whenever you're doing something that places someone else's life at risk, you're supposed to take whatever precautions you can to protect that person's life?

A.    Yes.

Q.    Okay.  Let's take a break right now.

THE VIDEOGRAPHER:  The time is 10:49 A.M.  We are now off the record.

(Recess: 10:49 A.M. to 10:57 A.M.)

THE VIDEOGRAPHER:  The time is 10:57 A.M.  We are back on the record.

ATTORNEY HADDAD:  Q.  Okay.  So leading up to the Gonzalez incident on April 19, 2021.  What time did you start your shift?

A.    7:00 -- 7:00 A.M.

Q.    And can you recall what you did on your shift before this call?

A.    Other than getting my breakfast, I think I responded to one prior call for service, which -- I think it was a request for assistance by the fire department who was dealing with a combative individual -- being combative with them.  I believe that was the only other call for service I responded to, but don't quote me on that.

Page 40

Q.    Okay.  Is it -- so did you --

ATTORNEY FOX:  He can't quote you, but she will.

THE WITNESS:  Oh.

ATTORNEY HADDAD:  Q.  Did you start your shift and then have breakfast?

A.    So I usually -- well, when I was working day-shift patrol, I would usually eat a little something before leaving the house, and then get something else after starting my shift.

Q.    I see.  Okay.

A.    Yeah.

Q.    Okay.  So what was the first thing that you can recall hearing about this incident?

A.    So I remember a radio call going out for Officers McKinley and Fisher to respond to that area of the south end of Oak Street.  I don't remember paying particular attention to what the details of that call were other than some sort of disturbance call.

And I remember -- I believe Officer McKinley advised on the radio he got there first, and Officer Fisher was still coming from the part of town that he was working, and advised Officer McKinley that he was going to be a moment.

And then I remember Officer McKinley

Page 41

advising -- our kind of radio lingo is "Out on 1," meaning I'm, you know, in contact with the individual.

I don't remember the particulars of the dispatched call for service, though.

Q.    Were you just driving around patrolling while you were listening to these radio transmissions?

A.    Yes -- well, in fact, I -- initially yes, I was working the opposite side of town out towards the old naval base. And then at some point I decided to start driving back towards the police department to use the restroom because our options are limited out on the field.

Q.    It sounds like it was a pretty quiet morning in terms of calls. Is that fair to say?

A.    I believe -- I believe so.

Q.    So heading back towards the department, you're also kind of heading towards the location of the incident; right?

A.    Yes.

Q.    By the way, did you receive any information over your Mobile Data Terminal in your car?

A.    So --

ATTORNEY FOX:  The question is vague as to time.

ATTORNEY HADDAD:  Q.  At any time.

Page 42

A.    Yeah -- yes. Every call for service citywide populates on every patrol officer's MDT.

Q.    Uh-huh.

A.    So the call for service and its location did appear on my computer in my car, but I don't -- I don't remember whether or not I clicked on it to read the details.

Q.    Okay. What caused you to decide to go over to the location?

A.    So it's common practice for us, especially given our limited resources and the limited number of patrol officers that we have working -- particularly that time of the day -- to, you know, slowly, in a nonemergency or expeditious way, just slowly start gravitating to where other officers are in contact with people just to make sure that they don't need any further assistance.

And so sometimes what that will look like is, for example, I drive by a scene where maybe another officer or two are handling a call for service, and without even getting out of my patrol car, use a hand signal or some other way of communication just asking if they need my help, and if they don't, then you just keep on driving. And so that was my intent, was let me swing by this location. Because we have -- I think at the

Page 43

time in service on the street, we only had four -- four cops citywide. And so my intent was well, I can take a slight detour; it's not particularly out of the way while I'm on my way to the police department and make sure Officer McKinley -- because Officer Fisher hadn't arrived yet -- so make sure Officer McKinley doesn't need any assistance. And as long as he says -- kind of gives me that -- you know -- that thumbs-up, if you will, go ahead and head back to the station and use the restroom.

Q.    Okay. So what did you see when you got there?

A.    Well, nothing initially because where they were situated when I parked my patrol vehicle, I couldn't actually see where they were. But I saw Officer Fisher's patrol vehicle parked on Otis Drive -- I knew that the quickest way to get to that location would have been on Otis Drive; not actually looping around on to Oak Street --

(Reporter clarification.)

THE WITNESS:  Yeah -- looping around on to Oak Street.

And so when I parked on Otis Drive -- and this is after I had become a little bit more concerned about what was going on. But after I had parked on Otis Drive, I observed Officer Fisher's patrol car parked

Page 44

there with the passenger door open but nobody in the vehicle, which was super alarming to me because it's not common for officers to leave our patrol vehicles unsecured, with our gear and equipment in them, with the door open and nobody about the area. So that was my initial observation.

ATTORNEY HADDAD:  Q.  Was it especially concerning that it was the passenger door when, to your knowledge, Officer Fisher was alone in his patrol car?

A.    So I was aware that the -- that Mr. Clemmons was with Officer Fisher that morning.

Q.    How did you know that?

A.    Because -- if I'm not mistaken -- we all start our shift at the same time; go to our morning briefings at the same time and get our patrol vehicles ready at the same time. And I believe I recall seeing Mr. Clemmons that morning. And I knew that it was not uncommon for the two of them to get their morning coffee together.

Q.    So you saw him where? At the station?

A.    I believe so.

ATTORNEY FOX:  Saw who? Saw who?

ATTORNEY HADDAD:  We were talking about Clemmons and Fisher.

Page 45

ATTORNEY FOX:  Thank you.

THE WITNESS:  So --

ATTORNEY FOX:  Clemmons?  Fisher?  Both?

ATTORNEY HADDAD:  Yeah.

ATTORNEY FOX:  Okay.

THE WITNESS:  So don't quote me on that, but I --

ATTORNEY FOX:  She is.

THE WITNESS:  I'm sorry.  It's a figure of speech.

ATTORNEY FOX:  Yeah, I know.

THE WITNESS:  It was not uncommon for me to see Mr. Clemmons in the mornings before my shift before they would go get coffee, he and Officer Fisher.  So I'm not sure -- I don't recall if I saw Mr. Clemmons at the station that morning or if I'm confusing it with another day.  But I did not -- or I don't -- I wouldn't be able to tell you for certain.

ATTORNEY HADDAD:  Q.  Okay.  Typically around that time, how many days a week would you see or be aware that Charlie Clemmons was riding along with Officer Fisher?

A.     Maybe one or two.

Q.     And your shifts back then, I think, were 10-hour shifts?

Page 46

A.     Yes.  They still are.

Q.     So would you be four days on; three days off?

A.     Yes.

Q.     So it sounds like maybe about half -- half of the days you were aware that Mr. Clemmons was riding along with Officer Fisher?

A.     I think it varied week by week depending on Mr. Clemmons's schedule and whatnot.

Q.     Okay.

A.     What days he was supposed to be working. Because I was aware that he was one of our parking techs.  So.

Q.     To your knowledge, was it also something that Officer Fisher did sometimes: to start his shift but then get coffee right away?

A.     Um -- I --

ATTORNEY FOX:  What you know; don't guess.

THE WITNESS:  I don't know.  I don't know what his typical routine was.

ATTORNEY HADDAD:  Q.  Because you just said a minute ago that it was your belief that Charlie Clemmons and Officer Fisher were going to ride out together and then go get coffee after Fisher started his shift; right?

A.     Again -- and I clarified -- that I don't

Page 47

recall specifically if that was the day in question here or another day, but that was a somewhat regular occurrence.

Q.     Well, when you saw Officer Fisher's passenger side door open, was it your assumption that Charlie Clemmons had been with him and may have left that door open?

A.     That -- that wasn't my initial thought.  I was confused initially as to why the passenger door was open.

Q.     Uh-huh.  Okay.

So what did you do when you saw the door open?

A.     So I parked my patrol vehicle right in front of his.

Q.     Uh-huh.

A.     I exited my car; activated my camera.  I may have activated it, actually, just prior to getting out of my car.  And I initially just started walking kind of through the area of Scout Park, which was that little city park right at that south end of Oak Street.  And I was walking at a normal pace, just trying to figure out where they were.  I thought about getting on the radio and asking "Where are you guys?" but there had already been some radio communication issues and concerns which prompted me to get there quickly.  So I didn't want to

Page 48

get on the radio and take up that radio time in case they needed to transmit some emergency traffic.

Q.     Okay.  So was the first thing that caused you some concern was seeing the passenger door open on Officer Fisher's patrol car?

A.     That was not the first thing that caused my concern related to this incident, no.

Q.     What was the first thing?

A.     The radio traffic.

Q.     And what was it?

A.     So I recall hearing both Officer Fisher and McKinley -- or at least one of the two -- cueing their microphone button to transmit outwards, but not transmitting anything.

And my training and experience teaches me that that's a huge red flag in terms of officer safety when officers are trying to transmit radio traffic, but they're not.  I am taught and trained that typically means that there is some sort of physical altercation taking place.

And then after those failed radio transmissions, I heard dispatch try to raise the officers on the radio, because they noticed the failed radio transmissions as well, and they still were not responding.

Officer Cameron Leahy

Page 49

So that was -- that was the first moment related to this call for service where I grew concerned. And at the same time that I actually put myself out on the radio saying -- you know, I was pretty close to saying "I'll be in or out," I -- dispatch was actually also sending me to the call. We kind of -- we call it "stepping on each other" when two radios are trying to transmit at the same time. So that happened simultaneously.

And -- so at that point from about the area of Grand Street and Otis, I responded to their location "Code 3" because I was confident that there was some sort of physical altercation.

Q. So you're saying you had your lights and sirens on as you pulled up?

A. I did.

Q. Yet you got out just walking?

A. Because I couldn't find them. Yeah.

I didn't want to start running in the opposite direction not knowing where they were, so I was -- it was incumbent upon me to figure out where they were first and then respond.

Q. Initially you mentioned that you heard a transmission click, and then you started describing multiple. How many was it?

Page 50

A. Approximately three or four.

Q. Three or four times you heard the click of someone hitting the transmit button with no information?

A. Correct.

Q. What does that sound like on the radio?

A. So -- almost a little staticky. You can hear on the radio when somebody has an open microphone. The best way I can describe it is it sounds kind of like an open static/faint static. Not like a black-and-white television static-type thing, but it's a pretty distinct open sound. And then on our radio is actually -- both in the car and our handheld radios that we carry on us -- it will show when somebody is transmitting. It shows the ID number of the radio that's transmitting. It's a long code, so I don't -- I can't tell you which one at which time was transmitting. But -- so it's not -- it's both an audio cue and a visual cue.

Q. Did you see a visual cue in your car?

A. Yes.

Q. And when there was that apparent pressing of a transmit button, did you hear any sounds of a struggle in the background?

A. No, because -- they were -- they were brief. So it wasn't a -- when you click the mike, it doesn't stay open for an extended period of time. As soon as

Page 51

you release that mike, it stays open for maybe an additional second and then turns back off.

Q. Right. So it might be on for a second or two; right?

A. Potentially.

Q. And you didn't hear any struggle sounds --

A. No.

Q. -- in the back?

A. No.

ATTORNEY FOX: So make sure you let him finish.

THE WITNESS: Sorry. I apologize.

ATTORNEY FOX: And then you'll have to explain later on the record what a black-and-white TV is.

ATTORNEY HADDAD: Q. Did you inform anyone over the radio that you were going Code 3?

A. I did not.

Q. Why not?

A. Because our policy requires that we do it if it's safe or feasible to do so. Given the seriousness of officers not responding to radio calls from dispatch, I, as I mentioned before, did not want to take up the radio for -- and prevent their ability from transmitting important information. So I elected not to advise on the radio that I was driving Code 3.

Page 52

Q. As you were heading over there, you were thinking that this was going to be some sort of 647(f) or theft situation; right?

A. I did not know that.

Q. You've explained that in at least one of your statements that you thought there was a petty theft aspect to this.

A. So I heard that the -- so I guess we should clarify the timeline. Because initially when I started heading in that direction, I was not particularly aware of any of the details of the call. I did hear at one point Officer McKinley ask Officer Fisher to respond to the Walgreens just across the street from Scout Park to see if there were any -- I don't know how he described it on the radio: thefts, or petty thefts, or something to that effect. I remember hearing that. And so that was while I was already on my way. So I knew that there was the potential -- maybe that's kind of where Officer McKinley's head was thinking or maybe he was conducting some sort of petty theft investigation. But that's where I think the timeline matters because when I initially started driving in that direction, I didn't know that yet.

Q. All right. Sometime -- sometime en route you started to think there may be a petty theft aspect to

Page 53

this; right?

A.    Potentially.

Q.    Okay.

So you get there; you initially start walking out of your car.  What causes you to increase your pace?

A.    So eventually as I'm looking for them in the park area, I see the two officers, Mr. Clemmons -- and Mr. Clemmons struggling to control an individual on the ground, kind of in the driveway area of that last house on the south end of Oak Street.

Q.    Uh-huh.

A.    And -- so they had, you know, not been responding to their radio initially -- just about right as when I was -- when I -- I didn't mention this earlier; I just remembered.

But right as I was pulling -- maybe a block or two out, I heard Officer McKinley, I believe, advise that they still wanted another unit to respond.  So I knew that there was -- and that was the first radio transmission from them after the clicks of the radio with no response.

So I knew that there was still the request for another officer.  When I saw Mr. Clemmons involved in the physical restraint of the suspect, that was a huge red flag for me because not only is he not a police

Page 54

officer, but his age as well.  I was concerned that -- you know, why is he involved in this.  And so --

Q.    Can I stop you there?

A.    Yes.

Q.    You're giving very long answers --

A.    I'm sorry.

Q.    -- it's better if we can proceed by question and answer.

A.    Sure.  Sure.

Q.    Okay.

What exactly was McKinley's transmission and how he asked for another unit?

A.    Verbatim I don't recall.  I think he said something to the effect of "One detained, but we still" -- "I still want another unit."

Q.    He didn't ask for a Code 3 unit, did he?

A.    He did not.

Q.    He didn't indicate there was any sort of emergency, did he?

A.    No.

Q.    So you're -- now you're walking getting -- or now you're moving towards them and you see that Charlie Clemmons is involved.

A.    Yes.

Q.    Do you notice -- I think you -- strike that.

Page 55

You explained in prior interviews that you noticed that the officers' clothes looked disheveled?

A.    Correct.

Q.    Did you see Officer Fisher's camera just kind of hanging by the wire, no longer clipped to his chest?

A.    I did.

Q.    What did you do next?

A.    So my first action was to relieve Mr. Clemmons because he wasn't a sworn officer.

Q.    And was Mario Gonzalez facedown at that time?

A.    Yes, he was.

Q.    And where were the other two officers?

A.    Officer McKinley was on the left side of Mr. Gonzalez, and Officer Fisher was on the right side of Mr. Gonzalez.

Q.    And what part of Officer Fisher's body was touching what part of Mario Gonzalez's body?

A.    I believe he had a -- his knee on the shoulder blade area of Mr. Gonzalez's right shoulder blade.

Q.    On his back; right?

A.    On the back portion of his -- yes, on top of his shoulder blade.

Q.    Okay.  And what about Officer McKinley?  What part of his body was touching some part of Gonzalez's body?

Page 56

A.    I don't recall specifically what part of his body was touching Mr. Gonzalez.

Q.    In what position did you see Charlie Clemmons?

A.    So it looked to me as though Charlie had his chest laying over the top -- or over the back portion of Mr. Gonzalez's calves -- calf area.

Q.    And what was Mr. Gonzalez doing at that point?

A.    So he was actively attempting to break free of their control.

Q.    You're describing for me a -- your speculation of his motive.  Can you describe physically the movements that you saw him make?

A.    Sure.  So he was attempting -- he was bending at the knees, kind of pushing upwards or up towards the sky against Mr. Clemmons's chest; he was bucking upwards at the hips, and kind of moving his upper body, but I couldn't see specifically how or what he was doing.  There was movement with his upper body, though.  That -- and I knew that because Offic- -- both of the two officers were still struggling to control him and were actively talking to him; giving him commands; still trying to deescalate -- those were my initial observations.

Q.    Where was -- were his arms?

ATTORNEY FOX:  Whose arms?

Case 4:21-cv-09733-DMR   Document 76-3   Filed 05/09/23   Page 17 of 48   Gonzalez vs.
City of Alameda

Officer Cameron Leahy

Page 57

ATTORNEY HADDAD:  Q.  Mario Gonzalez's arms.

A.   Behind his back.  He was in handcuffs prior to my arrival.

Q.   Oh, okay.  Well, how is a heavyset man, who is laying facedown with officers holding him down, going to be able to stand up with his arms handcuffed behind him?

A.   Not only my training but my experience in the field as well, teaches me that people who are handcuffed in a prone position still have the ability to get up.

Q.   Including heavyset, out-of-shape people?

A.   Yes.

Q.   Has that ever happened to you?

A.   Yes.

Q.   At that point did you know what the officers were arresting Mario Gonzalez for?

A.   I did not.

Q.   By then you -- in addition to your initial suspicion about petty theft, you also saw those baskets of liquor with the -- the theft caps on them; right?

A.   I believe there was one that still had the security cap intact.  The other one, I believe, was removed, and there was a portion of the substance of that bottle had been removed from the container.  I don't know how.  I mean, I had assumed it was ingested,

Page 58

but it was not a full bottle; the one that was open. And the -- those baskets, I believe, had the Walgreens logo on them.

Q.   So it's more evidence in your mind that this event started on the basis of some sort of theft investigation; is that right?

ATTORNEY FOX:  You're asking -- you're asking was that his state of mind?

ATTORNEY HADDAD:  Yeah.

ATTORNEY FOX:  Okay.

THE WITNESS:  Theft, and the -- because of the open container, I -- my suspicions regarding 647(f) began to grow.

ATTORNEY HADDAD:  Q.  Now, is it your testimony that as you -- you're approaching the situation -- seeing two officers and another City employee that -- who you know in an active, physical altercation with a man on the ground -- and you're looking at bottles in baskets to see which one is open?

A.   So my job as a police officer and my training is to observe -- to be able to be observant to these types of details even in high-stress situations, so yes.

Q.   Okay.  So you were able to double-task -- or multitask, and observe the bottles in the baskets and

Page 59

also what was happening on the ground; right?

A.   As I walked -- as I approached them, yes.

Q.   So from the videos, I believe you said something to Charlie to inform him that you were there and you could take over for him; right?

A.   Yes.

Q.   Do you remember what you said?

A.   I don't.

Q.   Well, what happened after you said that?

A.   So I vaguely recall Charlie warning me of how strong -- or how resistive he was being at the legs, and be -- "Be careful," or "Are you sure you've got it"; something like that.

ATTORNEY FOX:  Who is being resistive?

THE WITNESS:  Mr. Gonzalez.

ATTORNEY FOX:  Thank you.

THE WITNESS:  And so as Charlie began to stand up, I took control of -- or attempted to take control of Mr. Gonzalez's legs.

ATTORNEY HADDAD:  Q.  Now, I've reviewed both the cameras and the transcript prepared by the City of all of the voices on the cameras.

A.   Uh-huh.

Q.   I didn't hear any statement by Charlie Clemmons saying what you're saying.

Page 60

A.   Okay.

Q.   Did you review those cameras, videos, and also the transcript to see if your recollection is recorded there?

A.   I did review those two things, but I was not paying particular attention to that brief conversation between myself and Mr. Clemmons.

Q.   Is it possible in retrospect that you didn't have that conversation with Mr. Clemmons where he warned you about the resistance of Mario Gonzalez?

A.   I -- I recall that conversation taking place.

Q.   Any reason why it shouldn't have shown up on any of the recordings?

A.   I -- I mean, unless somebody else was speaking loudly or over us at that time -- you know, kind of drowning out maybe -- that happens often on body camera footage where you can't hear what somebody else is saying because of other noise being picked up on the microphone.  But I -- I don't -- I don't have a particular answer for you.

Q.   Okay.  So Charlie Clemmons got up off of Mario Gonzalez's legs; right?

A.   Yes.

Q.   How much time went by before you were able to get down and control his legs?

Officer Cameron Leahy

Page 61

A.    So I immediately took over the attempt to control his legs, but as I stated in previous interviews, I never felt that I had full control of his legs.

Q.    How long did it take you, after he got up, to get down and try to control his legs?

A.    It was immediate.

Q.    Well, we have to factor in time for him to basically get out of the way before you can get down in there; right?  Some seconds must have gone by, didn't they?

A.    It was -- my recollection is that it kind of happened simultaneously.

Q.    Did you attempt to ask the other officers what was going on?

A.    No.

Q.    Why not?

A.    The level of resistance that I specifically was being faced with at the legs appears to me that the struggle was very much still ongoing.  And Officer McKinley, I recall, was still actively trying to talk to Mr. Gonzalez and deescalate the situation; trying to calm him down so that we could move on to the next steps.  Ultimately the goal was to get him up and get him into a patrol car, and -- so no, I did not have an

Page 62

opportunity to stop that conversation and ask what was going on.

I'm also aware of certain case laws that allow us as officers to act -- as a cover officer, act, you know, at the direction of other officers not having been on scene from the entirety of the event.  So.

Q.    Did the other officers direct you to do anything?

A.    No.

Q.    So you were -- you just got involved without knowing what this was all about or what the other officers wanted you to do; is that right?

ATTORNEY FOX:  Compound.

ATTORNEY HADDAD:  Q.  You can answer.

ATTORNEY FOX:  He's asking you two questions.  If you can answer both; or one; or the other, go ahead.

THE WITNESS:  Okay.  Can you ask me the first portion again, please?

ATTORNEY HADDAD:  Q.  You got involved without knowing anything about what led up to that point; right?

A.    I wouldn't say I didn't know anything.  My observations on scene were very informative from the moment that I got out of my patrol car to the moment I took over attempting to control his legs.

Page 63

Q.    You don't know how they got on the ground, do you?

A.    No.

Q.    You don't know exactly what crime they were suspecting Mario of, or maybe no crime; right?

A.    Because of the way that I'm trained and having worked with these two officers for quite some time, I was confident/had no hesitation that there was a lawful reason for the arrest and, therefore, the subsequent use of force.

Q.    Right.  But one of the factors you're supposed to consider in a use of force is the severity of the crime; right?

A.    Yes.

Q.    You didn't know anything about the severity of the crime, did you?

A.    There was no way for me to in that moment.

Q.    Okay.  In fact you didn't know whether the whole thing might have started because Mario was possibly 5150 or mentally incapacitated in some way; right?

A.    I did not.  Again, my observations led me down a different path of thinking.

Q.    You also started to get involved in the altercation without any direction from the other two

Page 64

officers; right?

A.    Correct.

Q.    And can you describe physically how you began to try to restrain Mario Gonzalez?

A.    Yes.

So when I took over the control of the legs from Mr. Clemmons, I recall using my knees and shins, placing them over -- in a perpendicular manner -- over Mr. Gonzalez's calves.  And I immediately began working to cross his ankles because not only does it allow a greater level of control of the legs when the ankles are crossed, but it's also the first step in the application of the WRAP restraint device.  And I did hear Officer McKinley mention something about the WRAP --

(Reporter clarification.)

THE WITNESS:  No, "I did."

I did hear Officer McKinley mention something about the WRAP as I was taking over control of the legs, so I began trying to cross his ankles.

ATTORNEY FOX:  So you're doing very well, but she's asking you to slow down --

THE WITNESS:  Okay.

ATTORNEY FOX:  -- just a little bit.

ATTORNEY HADDAD:  Q.  Now, you were kneeling on the back of his calves; right?

Officer Cameron Leahy

Page 65

A.    Correct.

Q.    And you're trained that kneeling on the back of a person's calves is a pressure point for the person; right?

A.    It can be.

Q.    It's a pain compliance position, isn't it?

A.    Not by itself, no.  There is a technique where we specifically drive, like the point of our knee, into the back of somebody's calves to apply that, you know, pressure point and pain compliance technique.  But that's not an accurate description of any time we put pressure on the back of somebody's calves.

Q.    But in applying that pressure point technique, you've been trained that there are nerves in the back of people's calves that create pain when someone kneels on them; right?

A.    Yes.

Q.    And in training, you're also aware that whether you put your knees or your shins on the back of somebody's calves that's powered by your body weight, is painful; right?

A.    It can be.

Q.    Now, while you're kneeling on his calves, you're also saying that you're attempting to cross his ankles; right?

Page 66

A.    Yes.

Q.    Well, how do you do that when you're putting your own weight on his calves?

A.    When the legs are together in a parallel way, it is possible -- through my training and experience I know this to be true -- that it is possible to simultaneously, while having pressure on the calves, to cross the ankles.  It -- what it requires is that you slightly lift the outside lower extremity to get it over the other ankle.

Q.    You explained that in your -- in your statement a few times, that you were actually being lifted off the ground by Mr. Gonzalez; right?

A.    Yes.

Q.    Was that when you were kneeling across his calves?

A.    Yes.

Q.    How far off the ground was he able to lift his calves in order to lift you?

A.    I don't know specifically.

Q.    Was he doing it with both legs?

A.    Yes.

Q.    And at one point, I believe it was Officer Fisher who asked you to try a figure-four -- do you recall that?

Page 67

A.    I do.

Q.    And your response was what?

A.    "I don't want to lose what I've got."

Q.    What did you have at that point?

A.    A certain percentage of control of his legs.

Q.    How much?

A.    I don't know that I could put that into a percentage for you.

Q.    Now, he's already handcuffed; right?

A.    Yes.

ATTORNEY FOX:  Who is "he"?

ATTORNEY HADDAD:  Mr. Gonzalez, obviously.

ATTORNEY HADDAD:  Q.  And he's prone; right?

A.    Yes.

Q.    And he's obviously obese; right?

A.    Heavier set.

Q.    Yep.

You don't know how long he's been in that position at that point, do you?

A.    No.

Q.    He's been through a struggle, which you've also been trained is an additional risk factor for asphyxia; right?

A.    Yes.

Page 68

Q.    He may or may not be intoxicated on some substance, which can be an additional risk factor for asphyxia; right?

A.    I don't recall specific training that the drugs and alcohol are necessarily by themselves indicative of asphyxia.

Q.    Have you been trained that alcohol is a respiratory depressant?

A.    Yes.

Q.    And -- okay.  It stands to reason that if a person's intoxicated on alcohol and experiencing respiratory depression, it may place them at increased risk of asphyxia; right?

A.    I suppose.

Q.    Did you look up to see whether Mario Gonzalez may be experiencing some respiratory problems?

A.    So I didn't have a view of his -- his face because of the way that -- because of where I was positioned and where the two officers that were controlling his upper body were portioned -- positioned -- I could not see Mr. Gonzalez's face.

Q.    Did you check in with the other officers to ask them to make sure that he could breathe okay?

A.    So I knew that that's what Officer McKinley was doing.

Page 69

Q.        How did you know that?

A.        Because he was continually speaking with Mr. Gonzalez.  And actually at one point doing as best he could to, like, get down to Mr. Gonzalez's level.  Like, I was aware that Officer McKinley was being cognizant of his face and ability to breathe.

Q.        You could hear Mario Gonzalez gasping at some point; right?

A.        No.

Q.        You could hear him answering the questions with one-syllable or two-syllable responses; right?

A.        Yes.

Q.        It didn't sound to you like he was in any sort of respiratory distress?

A.        No.  As I mentioned in one of my prior interviews, the sounds that he was making, I attributed to that of a -- you know, somebody who is playing sports.  When they are -- when they're exerting themselves so physically, they make certain noises.  Much like how a tennis player hits the racket -- or hits the ball with the racket so hard, they make a physical noise.

The reason why I correlated that -- or made that connection was because a lot of those sounds that Mr. Gonzalez was making were happening in direct

Page 70

conjunction with me being lifted off the ground.  Those two things made me believe that they were sounds of physical exertion trying to more or less kick me or buck me off of him.

Q.        Did Mario Gonzalez ever kick you?

A.        I didn't allow him.

Q.        He never struck you, did he?

A.        No.

Q.        You never saw him strike anybody else, did you?

A.        I did not.

Q.        Did he ever say he was trying to hurt you?

A.        No.

Q.        Now, there is a transcript that the City made from the different radios --

A.        (Coughing.)  Excuse me.

Q.        -- and at one point you can be heard saying, quote, "Stop kicking, Mario.  Stop.  Stop kicking," unquote.

Are you familiar with that point?

A.        Yes.

Q.        What was happening then?

A.        So this is when he was actively thrusting upwards lifting me off the ground.  I used that terminology "kicking" because it's one that most people

Page 71

would understand.

Q.        Was he kicking with his feet?

A.        So he was thrusting his -- so at this point his ankles -- or his heels, rather, are pointed upwards towards the sky, and he was thrusting them up and towards his upper body.

Q.        Okay.  So he was actually lifting his feet off the ground?

A.        Yes.

Q.        Both feet?

A.        Yes.

While lifting me off the ground.

Q.        Was he doing that violently?

A.        Absolutely.

Q.        And how was he able to lift both feet off the ground violently, repeatedly, while you were still kneeling across his calves?

A.        I don't know.  I equate his level of strength to what I've experienced in the past with people who are under the influence of methamphetamine.

Q.        You've described the strength that allowed him to continue kicking -- at the point where you were saying "stop kicking" -- as "superhuman"; is that right?

A.        Yes.

Q.        "Yes"?

Page 72

A.        Yes.  I recall that.

Q.        Are you one of those officers who says "stop resisting" or "stop kicking" even when that's not happening?

A.        Absolutely not.

Oh.  I'm sorry.

ATTORNEY FOX:  I'm just -- are you saying in this incident, or is that a practice of his?

ATTORNEY HADDAD:  Q.  Practice.

A.        Absolutely not.

Q.        Did you do that in this incident?

A.        No.

Q.        That would be dishonest, wouldn't it?

A.        Absolutely.

Q.        About ten seconds after saying "stop kicking," didn't you say "I don't want to lose what I've got"?

A.        I don't know how much time elapsed.

Q.        Okay.  Shortly after that, isn't that what you said: "I don't want to lose what I've got"?

A.        So again I don't know the order of that.  My re- -- my saying "I don't want to lose what I've got" was in direct response to what Officer Fisher asked me.

Q.        And what he asked you was, quote, "You think we can roll him on his side?" unquote; right?

A.        Yes.

Page 73

Q.    He was asking you your opinion about whether you thought all of you could roll him on his side; right?

A.    Yes.

Q.    And you essentially told him "No"; is that correct?

A.    Correct.

Q.    Are you aware that both Officer Fisher and Officer McKinley have testified that they kept holding down Mario Gonzalez in the prone position because of your answer to Officer Fisher's question?

A.    I was not aware of that, no.

Q.    And -- so when you said "I don't want to lose what I've got" in response to Officer Fisher asking can we roll him on his side -- again, what was it that you believed you had that was necessary to maintain at that point?

A.    Again, a certain level of control of his legs.

Q.    And physically how were you doing that?

A.    The same as I described earlier.

Q.    Still kneeling across his calves?

A.    So at -- yes, at that point I was kneeling across his calves. My -- when I wasn't being lifted off the ground and we were actually on the ground, my shins were atop his calves and the balls of my feet were on

Page 74

the ground.

Q.    And were you using your arms or hands to maintain his control as well?

A.    So I had -- yes. I had my left hand on top of his ankles so that he couldn't uncross them, and then I believe I had my right hand on the back of one of his knees. I don't recall which one.

Q.    Now, approximately ten seconds or so after saying "I don't want to lose what I've got" the second time, do you see on the videos that you actually lift your hand off of him to point to a pedestrian?

A.    Yes.

Q.    And what was he doing at that point? Was he still kicking?

A.    He was still -- I -- there was pressure up. Yeah, I think at that point I wasn't being lifted off the ground anymore, though.

Q.    I think we're on to Exhibit 4 now, so we'll mark this as Exhibit 4.

(Plaintiffs' Exhibit 4 marked for identification.)

ATTORNEY HADDAD:  Q.  So Exhibit 4 shows a person's right hand pointing. Is that your hand?

A.    I believe that is.

Q.    Do you see that foot laying sideways on the

Page 75

ground at the bottom of the shot?

A.    Yes.

Q.    Is that Mario Gonzalez's foot?

A.    Yes.

Q.    And it's laying right against the concrete on the side of the foot; right?

A.    Yes.

Q.    How long had his foot been in that position, approximately?

A.    I don't know.

Q.    How is he able to kick you up when his foot is laying on the side against the sidewalk?

A.    Because the mechanism in which he was kicking upwards was by bending at the knee.

Q.    But if he was bending at the knee, wouldn't his toe have been pointed and the top of his foot bent against the ground?

A.    In the moment where I was actively being lifted, maybe. Like I said earlier when I was pointing at the lady to go around us, I don't believe that in that instant I was being lifted off the ground. I wasn't -- I wasn't being lifted off the ground and held there. We were -- it was very much an up-and-down-type thing.

Q.    You felt comfortable enough at that point to

Page 76

remove one of your hands from controlling Mario Gonzalez to point for that pedestrian lady; right?

A.    Apparently.

Q.    Yet at that point did you inform the other officers that they could turn him on his side?

A.    No.

Q.    Why not?

A.    Because at this same moment -- I believe it was Sergeant Mrak who was the first officer to get there -- or the first next unit to get there. And at -- just before or after, I asked the lady to go around us -- the civilian or the pedestrian to go around us -- I asked Sergeant Mrak to get the WRAP restraint device out of Vehicle 111, which was Officer McKinley's patrol vehicle parked -- it was the closest patrol vehicle next to us. So -- because the next step in this process was to apply the WRAP, it made the most sense to keep him in that position for just a few seconds longer while the WRAP could be retrieved.

Q.    You were aware that when a person has multiple risk factors for restraint asphyxia, extra seconds can be a matter of life or death; right?

A.    I was aware to be cognizant of the amount of time in the prone position.

Q.    How much time went by between when you said

Page 77

the second time "I don't want to lose what I've got" and it was obvious to all of you that Mario was unresponsive?

A. I don't recall.

Q. You haven't looked at that on the video?

A. I have, but I didn't specifically take note and write that down anywhere, or commit it to memory.

Q. How much time do you think you've spent studying those videos?

A. Several hours.

Q. At some point -- strike that.

Not too long after you said "I don't want to lose what I've got," did you hear Officer Fisher say something like --

A. Excuse me.

Q. -- "We have no weight on his chest"?

A. I don't -- no, I'm not sure if that was before or after.

Q. According to this transcript it was after.

A. Okay.

ATTORNEY FOX: Well, do you want to show him the transcript?

ATTORNEY HADDAD: Q. If you need to see it, I'll show it to you.

ATTORNEY FOX: Yeah, why don't we show it to

Page 78

him.

THE WITNESS: Sure.

ATTORNEY HADDAD: Q. It's highlighted.

A. (Pause for review.)

Q. You can see here.

A. Uh-huh.

(Pause for review.)

Okay.

Q. Okay.

So when you heard Officer Fisher say something like "No weight on his back," what did you think he meant by that?

A. So I believed that he was communicating to all of us, and for the purposes of his body camera, that we were not placing -- consistent with our training, we were not placing weight in the areas we were trained to avoid.

Q. To avoid restraint asphyxia; right?

A. Yes.

Q. And af- -- sometime after that statement, did you hear Officer McKinley say "He's going nonresponsive"?

A. At a certain -- yes, at some point.

Q. What were you experiencing from Mario Gonzalez at that point?

Page 79

A. So right up until that point, I was still experiencing attempts to push upwards with his legs.

Q. Was he still moving his feet around continuously?

A. I don't recall.

Q. So were you kneeling across his calves and lower legs for about two minutes from the time that you started doing that until you got off of him?

ATTORNEY FOX: It's compound. Legs; calves and lower legs? Both together; separately?

ATTORNEY HADDAD: Q. I'm trying to get the timeline here.

A. Sure. Sure.

Q. From when you started kneeling across Mario Gonzalez's legs until you got up, was that about two minutes?

A. I think after reviewing the video, it was roughly two minutes.

Q. At some point did you believe that Mario Gonzalez may have some sort of mental health problems while you were on the scene?

A. No.

I suppose it was a possibility.

Q. (Pause.)

In your first Renne interview at page 5390,

Page 80

you were asked:

"What was it about what you observed that led you to believe that perhaps he might have been experiencing a mental health crisis?"

And you answered, quote:

"Again, tying it back to primarily his statements that he was making, you know, some of the noises he was making, and how he wasn't able to answer questions. He was extremely agitated by our presence and the, you know, attempt to take him into custody. I've experienced that on mental health calls before," unquote.

So does that refresh your memory that you were thinking that he could have been having a mental health issue at the time?

A. It refreshes my memory that it was a possibility, yes. I did not rule it out.

ATTORNEY FOX: Would you like to show him the transcript?

ATTORNEY HADDAD: We've just gotten past that point, but I read it exactly.

ATTORNEY FOX: I'm sure you did.

Page 81

ATTORNEY HADDAD:  Q.  Now, up to that point you've explained that your department had provided you with a significant amount of recent training about the dangers of restraint asphyxia; right?

A.    (Nods head.)  Yes.

Q.    And in your interview you explained a couple times that that was in part due to what happened in the George Floyd incident; right?

A.    Yes.

Q.    And was that explicitly mentioned to you in the course of the Alameda Police Department training; that "This is to make sure that what happened in George Floyd doesn't happen on our watch," kind of thing?

A.    Not explicitly like that, no.

Q.    Was George Floyd's name mentioned in the course of that training that you recall?

A.    I don't recall specifically.

Q.    But it was something that was on your mind even in the course of this incident; that you didn't want this to end up like a George Floyd situation, right?

A.    I didn't want it to end up as an in-custody death.

Q.    At page 5401 of your first Renne interview,

Page 82

you said, quote:

        "What I will say is particularly, we
        are trained now more than ever -- and
        I think it's in response to the
        George Floyd case -- never to keep
        somebody in a prone position longer
        than you have to, and that is
        something that I was aware of this
        entire time."
        Let me show it to you.

A.    (Pause for review.)
        Yes.

Q.    Was that accurate?

A.    Yes.

Q.    So you were trained never to keep somebody in a prone position longer than you have to; right?

A.    Correct.

Q.    In response to the George Floyd case; right?

A.    I think that was part of it -- part of the department's training.
        Or part of the reason for the department's training.

Q.    On the previous page, 5400, you said:

        "Specifically in the prone position,
        we are specifically trained in our

Page 83

        defensive tactics courses to avoid
        any pressure whatsoever whether it's
        by a knee, by an elbow; it doesn't
        matter.  Any pressure whatsoever to
        the head, neck, or spine."
        That's what you said there.

A.    (Pause for review.)
        Yes.

Q.    Okay.  That's accurate?

A.    Correct.

Q.    And so --

A.    When it -- when it can be avoided.

Q.    According to your training, why was it so important to avoid any pressure whatsoever to the head, neck, or spine?

A.    Because of the concerns around restraint asphyxia.

Q.    And according to your training -- mechanically, how does pressure on those parts of the person's body lead to restraint asphyxia?

A.    As I mentioned earlier, it can limit one's ability to exchange oxygen in the lungs.

Q.    By putting pressure on the back, it can prevent the chest from expanding as it needs to in order to breathe; right?

Page 84

A.    Yes.

Q.    Do you have any personal experience -- either from childhood; playing with other kids; or football or sports -- where you have been at the bottom of a pile and experienced weight on your back, making it hard to breathe?

A.    No.

Q.    Why don't we take another short break, and then I'll finish up.

        ATTORNEY FOX:  Good.

        THE VIDEOGRAPHER:  The time is 11:53 A.M.  We are now off the record.

        (Recess: 11:53 A.M. to 12:01 P.M.)

        THE VIDEOGRAPHER:  The time is 12:01 P.M.  We are back on the record.

        ATTORNEY HADDAD:  Q.  When you got off of Mario Gonzalez's legs and he was turned over, did you see some woodchips stuck to his face?

A.    I don't recall seeing woodchips.

Q.    Did you participate in any sort of medical or resuscitative efforts?

A.    Yes.

Q.    What did you do?

A.    So I administered two doses of Narcan not knowing what he might have on board.  My training

Page 85

teaches me that there really isn't a negative or a harmful medical effect to giving Narcan when it's not needed. So that was my first lifesaving action, was one dose -- I did the first dose of Narcan; waited a short period of time to see if there was any visual response. I did not observe one, so I administered a second dose.

And then at one point I was tasked with taking over chest compressions.

Q. How did you administer the Narcan? Is it a syringe or a shot?

A. No. It's a nasal application, and I administered one in each nostril.

Q. Okay.

A. I also advised dispatch over the radio that we were starting CPR. And I met with -- when the fire department arrived, I met with paramedics to inform them that the two doses of Narcan were given, and lead them to where we were conducting the lifesaving efforts.

Q. Did you give a public safety statement at the scene?

A. I don't recall. I spoke with the sergeant briefly, but I don't recall the details of that conversation.

Q. Do you mean Sergeant Mrak?

A. Yes.

Page 86

I do recall that she tasked me with conducting a neighborhood check.

Q. Oh. So then you went and talked to some potential witnesses?

A. I did.

Q. Did you talk to the people whose house the original call came from?

A. I talked to one individual in that household.

Q. Was that the husband or the wife?

A. I believe the husband.

Q. And where did you have that conversation?

A. Just inside his front door area -- entryway.

Q. At the time you were talking with him, did you inform him that Mario Gonzalez had gone into distress and was unresponsive?

A. I don't recall.

Q. Do you know if he knew that or not?

A. I do not know.

Q. What did he tell you?

A. Well, I made it a point consistent with how I'm trained when doing these as witness statements, to not be leading; leave a -- very general, open questions because I didn't want to in any way bias his response.

He explained the initial reasons for the call for service having to do with his wife being

Page 87

uncomfortable, and I believe his kids, in the front yard area. He mentioned observing, I believe, the altercation go to the ground. And I recall him explaining that he didn't see anything that he felt was unreasonable or unwarranted.

That's -- other than trying to obtain video footage -- because I didn't know that there was a camera in the driveway area of the property -- I don't recall the details of that statement. I also have not been able to -- I have never seen that portion of my body camera footage, so this is all just my independent recollection.

Q. Okay. Did he inform you or did you ask whether he had any sort of police training?

A. No.

Q. Did you think that he had any competence to opine on the reasonableness of your tactics?

A. I didn't know.

(Reporter clarification.)

THE WITNESS: Correct.

ATTORNEY HADDAD: Q. Did you talk with Charlie Clemmons any more at the scene?

A. I don't believe so.

Q. Did you see where he went after he walked away from -- strike that.

Page 88

Did you see where he went after he got up from Mario?

A. I knew that he walked away, I assumed, back to the patrol vehicle -- Officer Fisher's patrol vehicle. At one point I recall him coming back and looking for his cell phone, I think. But that was -- I didn't have any further conversation with him.

Q. Did you talk with Officer Fisher at the scene about the events that had just happened?

A. I don't believe so.

Q. What about Officer McKinley?

A. On scene -- other than I was there when he was explaining that Mr. Gonzalez went from being very resistive and combative to unresponsive very quickly. Almost like a -- like a light switch analogy or whatnot. I was present for -- I think he was telling the paramedic that. But no, I didn't -- other than a brief conversation about administering the Narcan -- no, I don't -- we didn't discuss the incident.

Q. Did you ever attempt to search him or pat him down for any weapons?

A. No, I did not.

Q. Did you see anybody else do it?

A. No.

Q. Did you ever say to anybody else, including

Page 89

medical personnel, "Be careful; he hasn't been searched yet"?

A.    No.

Q.    Anything like that?

Did you hear anybody say anything like that?

A.    I don't think so.

Q.    Do you recall seeing his shorts being partially pulled down during -- in the course of the struggle?

A.    Partially.

Q.    Were you ever -- strike that.

Did you ever believe that he had any weapons on him?

A.    I believed it was possible.

Q.    But you had no objective facts to believe that he had a weapon, did you?

A.    Other than his baggy clothing, no.

Q.    And in fact when his shorts started to get pulled down, there was really nowhere for him to conceal a weapon in the waistband; right?

A.    I don't agree with that. I think -- I mean, it's absolutely possible; people concealing weapons in pockets or in the front of the waistband when he was prone. So the back, I agree. Visually I could see that there was no weapon in the back of his waistband.

Page 90

Q.    If you had a concern that he was armed in the front of his waistband, you could have reached under and felt there; right?

A.    No --

Q.    Why not?

A.    -- not during the struggle.

Q.    Why not?

A.    Because it would have required me to relinquish what portion of control I had of his legs, which would not have been safe to do.

Q.    What about that time that you were pointing for that pedestrian lady? Couldn't you have used your right hand then to feel along his waistband and see if he had a weapon?

A.    It would have required me to somehow lift his waist up to get in the front of his waistband.

Q.    But I thought you said that he was often bucking and raising his waist? Wasn't he?

A.    He was, yes.

Q.    Couldn't you have felt there then?

A.    Not while being bucked.

Q.    Did you ride back to the police station afterward with anybody else?

A.    I was given a ride by Sergeant Frank Peterson.

Q.    Were any of the other involved individuals in

Page 91

the car on your way back?

A.    No.

Q.    And when you got back to the station, where did you go?

A.    I was sequestered in the APD Traffic office.

Q.    Who else was in there?

A.    Sergeant Peter- -- I believe Sergeant Peterson. Maybe one other person, but I don't recall who.

Q.    Did you ever go back to the scene to look for witnesses, or evidence, or anything like that?

A.    No, not once I left the scene.

Q.    Were you injured in the course of this incident?

A.    I was.

Q.    What was your injury?

A.    I had several scrapes and scratches and bruises on the lower portion of my shins, kind of closer to my ankles. Because where we were situated was right where the concrete driveway transitioned into that kind of mulched area. And so unfortunately every time that I was being lifted off the ground by Mr. Gonzalez, and then subsequently hitting the ground when he stopped -- momentarily stopped that resistance, the bottom portion of my leg was hitting that edge of the concrete

Page 92

driveway.

Q.    Didn't you receive injuries from a prior call that day?

A.    Not that I'm aware of.

Q.    I thought that you talked about that in one of your statements?

A.    I --

Q.    With an out-of-control, mentally disturbed woman?

A.    I don't recall claiming any injuries from that incident, no.

Q.    No? Okay.

Did you seek any medical help for any injuries sustained in the Gonzalez incident?

A.    I did not.

Q.    Did you ever talk to the police chief about your involvement in this?

ATTORNEY FOX:  Outside the presence of legal counsel?

ATTORNEY HADDAD:  Right.

THE WITNESS:  So yes, I spoke with the chief -- the interim chief at the time about this incident, but I don't recall if my attorney was present at the time.

ATTORNEY HADDAD:  Q.  Was anybody in your

Page 93

department critical about anything that you did here after the fact?

A.    Not that I'm aware of.

Q.    How long were you placed on leave after this?

A.    Approximately 13 months.

Q.    Was that paid leave?

A.    Yes.

Q.    If you had your conduct in this incident to do over again, would you do anything differently?

A.    No.

Q.    If everything that Mario Gonzalez did was done by a woman, would you still do everything the same?

A.    Yes.

Q.    If everything that Mario Gonzalez did was done by a pregnant woman, would you do everything the same?

A.    Probably not.

Q.    What would you do different?

A.    I'm not sure. I think hindsight is 20/20. I think that every situation is different, but there would be a whole new set of concerns if somebody was obviously pregnant.

Q.    If Mario Gonzalez -- strike that.
      If everything that Mario Gonzalez did was done by a teenage girl, would you have done everything the same?

Page 94

A.    Yes.

Q.    Okay. Let's mark this as Exhibit 5.
      (Plaintiffs' Exhibit 5 marked for identification.)

ATTORNEY HADDAD:  Q.  Public entities in California have to report all of the compensation paid to all public employees, so yours is publicly available; that's how we got this. I just want to go through this quickly.
      In 2019, this shows that the City reported that you earned a total pay of $129,606. Does that sound accurate?

A.    I believe so.

Q.    Let's look at 2020.
      It shows that the City reported that you were paid $141,394. Does that appear accurate to you?

A.    I believe so.

Q.    And in 2021, it shows that the City reported that you were paid $147,528. Does that appear accurate?

A.    I believe so.

Q.    And do you have any reason to doubt -- to doubt any of the financial information that appears for any of these three years: 2019, 2020, or 2021?

A.    No, not at this time.

Q.    Okay. Thank you.

Page 95

That's all I have right now.

ATTORNEY FOX:  Put that there.

THE WITNESS:  Yes.

ATTORNEY FOX:  Patrick, do you have any questions for Officer Leahy?

ATTORNEY BUELNA:  No.

ATTORNEY FOX:  Thank you.
      Are we off the record?

ATTORNEY HADDAD:  Yep.

ATTORNEY FOX:  All right --

THE VIDEOGRAPHER:  One moment.
      This concludes today's testimony. The time is 12:15 P.M. We are now off the record.
      (Off the video record: 12:15 P.M.)

THE REPORTER:  Can I get orders for the certified transcript on my record, please?
      Mr. Fox, your order, please, for the record?

ATTORNEY FOX:  I'd like to get -- as I told you off the record, I want to expedite this transcript and the other transcripts that have been taken in this case. I'd like to get them all by next Friday. I'd like them in a condensed format as well as a regular-sized format, and you can send them to us electronically.

THE REPORTER:  Okay. And Mr. --

Page 96

ATTORNEY FOX:  I can give you my associate's email address. You can send it to both of us.

THE REPORTER:  And Mr. Haddad, are you ordering anything other than the 0&1?

ATTORNEY HADDAD:  I'm sorry. Just one second.
      (Off the record: 12:16 P.M. to 12:16 P.M.)

ATTORNEY HADDAD:  We're getting our usual order. I mean, Aptus should have it, I believe.

THE REPORTER:  And are you going to want the expedite -- that's the main thing -- by Friday, the 3rd?

ATTORNEY HADDAD:  I don't think we need the expedite.

THE REPORTER:  Okay. You can always email Aptus and change that.

ATTORNEY HADDAD:  Okay. Thank you.

ATTORNEY BUELNA:  Madam Court Reporter?

THE REPORTER:  Yes, Patrick? Are you talking to me?

ATTORNEY BUELNA:  Yeah, I just want to make sure that you get my order on record. I would like to get a copy as well.

THE REPORTER:  I have it on the record.

ATTORNEY BUELNA:  And if -- it will -- and could you email -- so I don't want paper copies, but could you email the transcript to myself and then

**Officer Cameron Leahy**

**Page 97**

admin -- a-d-m-i-n --

THE REPORTER: Yes.

ATTORNEY BUELNA: -- @lawyers -- l-a-w-y-e-r-s -- FTP.com.

THE REPORTER: Okay. Sounds good.

ATTORNEY BUELNA: All right. Thank you very much. I'll put it in the Chat as well.

THE REPORTER: Are you going to want the expedite as well by the 3rd?

ATTORNEY BUELNA: Yeah, get me a copy as an expedite as well.

THE REPORTER: Okay.

(Whereupon, the deposition concluded at 12:17 P.M.)

--o0o--

**Page 98**

CERTIFICATE OF REPORTER

I, DEBRA J. SKAGGS, hereby certify that the witness in the foregoing deposition was by me remotely duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true, and correct report of said deposition and of the proceedings which took place;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of March, 2023.

_____

DEBRA J. SKAGGS, CSR No. 7857

---o0o---

**Page 99**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Gonzalez vs. City of Alameda

Date of Deposition: 02/22/2023

Job No.: 10115298

I, OFFICER CAMERON LEAHY, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.

Executed this _____ day of _____, 2023, at _____.

_____

OFFICER CAMERON LEAHY

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__,

by_____,    proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ (Seal)

**Page 100**

DEPOSITION ERRATA SHEET

Case Name: Gonzalez vs. City of Alameda

Name of Witness: Officer Cameron Leahy

Date of Deposition: 02/22/2023

Job No.: 10115298

Reason Codes:  1. To clarify the record.
                       2. To conform to the facts.
                       3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

www.aptusCR.com

**Officer Cameron Leahy**

**Page 101**

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____ Subject to the above changes, I certify that the
transcript is true and correct

_____ No changes have been made. I certify that the
transcript  is true and correct.


_____
                    OFFICER CAMERON LEAHY

**$**

**$129,606** 94:11

**$141,394** 94:16

**$147,528** 94:19

**-**

**---ooo---** 4:1

**--o0o--** 4:8 5:14 97:15

**0**

**0&1** 96:4

**1**

**1** 41:1

**10-hour** 45:25

**10:04** 4:4,11

**10:49** 39:8,10

**10:57** 39:10,11

**11** 30:17

**111** 76:14

**11:53** 84:11,13

**12** 9:12 10:7

**12:01** 84:13,14

**12:15** 95:13,14

**12:16** 96:6

**12:17** 97:14

**13** 93:5

**15** 25:3

**170** 14:15

**19** 39:14

**2**

**2** 16:21

**20** 16:21

**20/20** 93:18

**200** 14:17

**2003** 37:8

**2006** 16:25

**2017** 9:4,18

**2018** 9:4,12

**2019** 94:10,23

**2020** 10:7 94:14,23

**2021** 39:14 94:18,23

**2023** 4:3,11

**22** 4:3,11

**24** 25:3

**25** 14:8

**3**

**3** 49:12 51:16,25 54:16

**30** 14:17,20 30:17

**30-** 26:19

**306** 26:19

**306.4** 26:19

**306.7.1** 27:24 28:19

**3rd** 96:10 97:9

**4**

**4** 74:18,19,20,22

**466** 21:2

**466.1.1** 21:18

**466.6** 23:20

**4:21-cv-09733-dmr** 4:14

**5**

**5** 94:2,3

**505** 4:5

**5150** 63:20

**5390** 79:25

**5400** 82:23

**5401** 81:25

**6**

**6** 14:11

**6-9** 17:4,16

**647(f)** 52:2 58:12

**7**

**7857** 4:6

**7:00** 39:16

**8**

**834a** 17:7

**@**

**@lawyers** 97:3

**A**

**a-d-m-i-n** 97:1

**A.M.** 4:4,11 39:8,10, 11,16 84:11,13

**ability** 21:8 24:24 25:12 26:9 30:24 31:2,19 35:20 51:23 57:10 69:6 83:22

**able** 16:3 20:24 27:5, 13 31:4 32:14 45:17 57:7 58:22,24 60:24 66:18 71:15 75:11 80:10 87:10

**above-entitled** 5:10

**absent** 36:11

**absolute** 26:21

**absolutely** 8:4 39:1 71:14 72:5,10,14 89:22

**abuse** 23:14

**academy** 9:2,3,17,20 11:14 12:20 13:14 15:15 16:2,22 17:21 38:16

**acceptable** 32:6,9

**Accident** 13:6

**accompanied** 22:4 23:8

**accurate** 6:4 8:6 18:1 65:11 82:13 83:9 94:12,16,19

**achieve** 18:7 19:17

**act** 62:4

**action** 5:11,13 23:22 24:6,14,24 55:8 85:3

**activated** 47:16,17

**active** 58:17

**actively** 18:21 56:8, 21 61:21 70:23 75:18

**actual** 19:9 22:20

**Officer Cameron Leahy**

**add** 26:11

**addition** 57:18

**additional** 10:8,17 11:6 13:2 15:1,2 51:2 67:23 68:2

**address** 28:17 96:2

**addressed** 20:23

**admin** 97:1

**administer** 85:9

**administered** 84:24 85:6,12

**administering** 88:18

**administrative** 6:24 11:19

**advise** 51:24 53:17

**advised** 40:21,23 85:14

**advising** 29:5 41:1

**af-** 78:20

**affairs** 12:22

**affirmed** 5:12

**afterward** 90:23

**age** 14:6 54:1

**agency** 11:11

**agitated** 80:12

**ago** 7:11 46:21

**agree** 89:21,24

**ahead** 5:1 43:9 62:16

**air** 12:8 36:2

**airway** 34:10

**Alameda** 4:14 5:5 9:5 12:13,14,24 81:12

**alarming** 44:2

**alcohol** 68:5,7,11

**allow** 25:7 62:3 64:10 70:6

**allowed** 18:2,6,10 20:2 71:21

**altercation** 48:19 49:13 58:18 63:25 87:3

**alternatives** 19:13

**amount** 32:17,20 33:1,12 76:23 81:3

**Anaheim** 37:8

**analogy** 88:15

**anatomically** 32:3

**ancillary** 12:23

**ankle** 66:10

**ankles** 64:10,11,19 65:25 66:8 71:4 74:5 91:19

**answer** 6:8 35:3 54:8 60:20 62:14,16 73:11 80:11

**answered** 80:6

**answering** 69:10

**answers** 8:11 54:5

**anybody** 26:3 70:9 88:23,25 89:5 90:23 92:25

**anymore** 74:17

**APD** 9:11 91:5

**apologize** 51:12

**apparent** 50:20

**Apparently** 76:3

**appear** 42:5 94:16,19

**appears** 61:19 94:22

**application** 64:12 85:11

**applies** 29:6

**apply** 28:7,11,19 29:8 32:17 65:9 76:17

**applying** 65:13

**approached** 59:2

**approaching** 58:15

**appropriate** 27:11

**approximately** 10:16 14:11 50:1 74:8 75:9 93:5

**April** 39:14

**Aptus** 4:17 96:8,14

**area** 32:17 40:16 44:5 47:19 49:10 53:7,9 55:19 56:6 86:12 87:2,8 91:21

**areas** 78:16

**Arenales** 5:3

**armed** 90:1

**arms** 56:24,25 57:2,7 74:2

**arrangements** 6:13

**arrest** 17:8,9 26:20 63:9

**arrested** 17:8,10

**arrestee's** 37:14

**arresting** 57:16

**arrival** 57:4

**arrived** 43:6 85:16

**articulate** 25:12,23 26:1

**asked** 8:12 29:3 54:12 66:24 72:22, 23 76:11,12 80:1

**asking** 25:18,20,21 42:22 47:23 58:7

62:15 64:21 73:1,14

**aspect** 52:7,25

**asphyxia** 31:23 33:14,19,23 35:13 36:17 37:9 67:24 68:3,6,13 76:21 78:18 81:4 83:17,20

**asphyxiation** 36:21

**assessment** 26:8 27:7

**assigned** 9:19

**assist** 26:5

**assistance** 39:21 42:17 43:7

**associate's** 96:1

**assumed** 57:25 88:3

**assumption** 47:5

**atop** 73:25

**attempt** 61:1,14 80:13 88:20

**attempted** 59:18

**attempting** 18:21 56:8,13 62:25 65:24

**attempts** 79:2

**attend** 13:12

**attended** 9:3 10:11 11:14

**attention** 20:11 34:9 40:18 60:6

**attorney** 4:20,22,23, 24,25 5:1,2,4,6,16 6:7,12,19 7:3,6 10:20,21 11:3 12:25 13:1 15:5,7,8 16:24 21:10,12 25:2,4 27:3,9,12,16 30:16, 18 32:12 33:3,7,9 35:1,6 36:20,25

**Officer Cameron Leahy**

39:13 40:2,5 41:23, 25 44:7,23,24 45:1, 3,4,5,8,11,19 46:17, 20 51:10,13,15 56:25 57:1 58:7,9, 10,14 59:14,16,20 62:13,14,15,19 64:20,23,24 67:11, 12,13 72:7,9 74:22 77:21,23,25 78:3 79:9,11 80:21,23,25 81:1 84:10,16 87:21 92:18,20,23,25 94:5 95:2,4,6,7,9,10,18 96:1,5,7,11,15,16, 19,23 97:3,6,10

**attorneys** 6:17

**attributed** 69:16

**audio** 50:17

**August** 9:3

**Auxiliary** 12:8

**available** 94:8

**avoid** 30:4,9,19 35:12 78:17,18 83:1,14

**avoided** 83:12

**avoiding** 30:11

**aware** 31:17 44:11 45:21 46:5,11 52:10 62:3 65:18 69:5 73:8,12 76:20,23 82:8 92:4 93:3

---

**B**

**bachelor's** 12:18

**back** 6:16 14:12 30:9 32:10,21 33:5,18 39:12 41:10,16 43:9 45:24 51:2,8 55:20, 21 56:5 57:3 64:25

65:2,9,12,14,19 74:6 78:11 80:7 83:23 84:5,15 88:3,5 89:24,25 90:22 91:1, 3,10

**background** 12:5 50:22

**baggy** 89:17

**ball** 69:21

**balls** 73:25

**base** 41:9

**basic** 9:17 25:13

**basically** 6:2 9:20 31:10 32:3 38:4 61:9

**basis** 9:14 58:5

**baskets** 57:19 58:2, 19,25

**baton** 15:12

**began** 13:19 58:13 59:17 64:3,9,19

**behaving** 23:7

**behavior** 21:8 22:3, 24 23:14

**belief** 46:21

**believe** 7:14 8:18 9:18 12:9 13:8,18 14:8 38:9 39:23 40:20 41:15 44:17, 22 53:17 55:18 57:21,22 58:2 59:3 66:23 70:2 74:6,24 75:20 76:8 79:19 80:3 86:10 87:1,2,23 88:10 89:12,15 91:7 94:13,17,20 96:8

**believed** 73:16 78:13 89:14

**bell** 37:11

**belly** 31:11

**bending** 56:13 75:14, 15

**bent** 75:16

**best** 35:8 36:9 50:8 69:3

**better** 36:19 37:4 54:7

**beyond** 14:25

**bias** 86:23

**bit** 19:23 31:17 43:23 64:23

**black-and-white** 50:9 51:14

**blade** 55:19,22

**blades** 30:4,12 32:10, 22

**block** 53:16

**board** 84:25

**bodily** 20:4 37:25 38:3

**body** 7:4,9 30:13 55:16,17,24,25 56:2, 16,18 60:16 65:20 68:20 71:6 78:14 83:20 87:10

**bottle** 57:24 58:1

**bottles** 58:19,25

**bottom** 75:1 84:4 91:24

**break** 39:7 56:8 84:8

**breakfast** 39:19 40:6

**breathe** 30:24 31:2, 19 35:20 36:3,19 37:4 68:23 69:6 83:25 84:6

**breathing** 31:5,8

33:10 35:22 36:1,14 37:2

**Brian** 4:21

**brief** 50:23 60:6 88:17

**briefings** 44:15

**briefly** 85:22

**bruises** 91:18

**buck** 70:3

**bucked** 90:21

**bucking** 56:15 90:18

**Buelna** 4:25 5:2 95:6 96:16,19,23 97:3,6, 10

**button** 48:13 50:3,21

**buying** 9:20

---

**C**

**calf** 56:6

**California** 4:5,7 11:14,16 12:20 16:13 17:11 94:6

**call** 26:14 39:18,20, 24 40:15,18,19 41:4 42:1,4,20 49:2,6 52:11 86:7,24 92:2

**called** 17:6 37:8

**calls** 27:12 32:12 41:14 51:21 80:15

**calm** 61:23

**calves** 56:6 64:9,25 65:3,9,12,15,20,23 66:3,7,16,19 71:17 73:21,23,25 79:6,9

**camera** 7:4,9 47:16 55:4 60:16 78:14 87:7,11

**Officer Cameron Leahy**

**cameras** 59:21,22 60:2

**Cameron** 4:12 5:9

**campus** 11:13,18 12:3

**cap** 57:22

**capable** 37:15

**caps** 57:20

**car** 34:20 41:21 42:5, 21 43:25 44:10 47:16,18 48:5 50:12, 18 53:5 61:25 62:24 91:1

**care** 24:17 25:23 26:9

**career** 11:22

**careful** 31:18 59:12 89:1

**carry** 14:18,21,25 15:2,3,13 50:12

**carrying** 15:9

**case** 4:14 27:8 37:7, 10,12 48:1 62:3 82:5,18 95:21

**category** 15:12

**cause** 22:20 23:12 37:18

**caused** 7:22 22:24 42:8 48:3,6

**causes** 22:2 53:5

**causing** 37:16,25 38:3

**cavity** 31:12

**CD** 15:20

**cell** 88:6

**certain** 10:13 23:3 25:18 27:14,20 32:20 33:1 37:6

45:18 62:3 67:5 69:19 73:18 78:23

**certifications** 10:13

**certified** 4:6 95:16

**chance** 8:19

**change** 96:14

**changed** 19:23

**changes** 6:15

**Charlie** 45:21 46:22 47:5 54:22 56:3,4 59:4,10,17,24 60:21 87:22

**Chat** 97:7

**check** 68:22 86:2

**chest** 15:2 31:12 32:4 36:10 55:5 56:5,15 77:16 83:24 85:8

**chief** 92:16,22

**childhood** 84:3

**Circuit** 37:8

**circumstance** 22:2 24:9

**circumstances** 18:4, 11,15 26:12

**cite** 24:18,22

**city** 4:13 37:8 47:20 58:16 59:22 70:14 94:10,15,18

**citywide** 42:1 43:2

**civilian** 76:12

**cla-** 11:2

**claiming** 92:10

**clarification** 7:1 43:19 64:15 87:19

**clarified** 46:25

**clarify** 28:22 52:9

**classes** 11:2 38:21, 22

**Clemmons** 44:11,18, 25 45:3,13,15,21 46:5,22 47:6 53:7,8, 23 54:23 55:8 56:3 59:25 60:7,9,21 64:7 87:22

**Clemmons's** 46:8 56:15

**click** 49:24 50:2,24

**clicked** 42:6

**clicks** 53:20

**clinical** 22:8

**clipped** 55:5

**close** 49:4

**closer** 91:18

**closest** 76:15

**clothes** 55:2

**clothing** 89:17

**CNT** 13:4,9

**code** 17:7 49:12 50:15 51:16,25 54:16

**coffee** 44:19 45:14 46:15,23

**cognizant** 69:6 76:23

**coin** 27:21

**college** 11:12,14,25 12:7,11

**combative** 39:22,23 88:14

**comes** 9:1

**comfortable** 75:25

**coming** 40:22 88:5

**commands** 56:21

**commencing** 4:3

**comments** 6:15

**Commission** 16:13

**commit** 77:7

**committed** 24:7

**common** 31:15 37:6 42:10 44:3

**commonsense** 31:11

**communicating** 36:4 78:13

**communication** 42:22 47:24

**compensation** 94:6

**competence** 87:16

**complete** 8:11

**completely** 31:5

**compliance** 21:25 65:6,10

**compound** 62:13 79:9

**compression** 37:9

**compressions** 85:8

**computer** 42:5

**conceal** 89:19

**concealing** 89:22

**concern** 32:23 36:7 48:4,7 90:1

**concerned** 43:23 49:2 54:1

**concerning** 44:8

**concerns** 31:17 47:24 83:16 93:20

**concluded** 97:13

**concludes** 95:12

concrete 75:5 91:20, 25

condensed 95:22

conduct 24:18,22 37:18 93:8

conducted 6:24

conducting 52:19 85:18 86:1

confident 49:12

confident/had 63:8

confused 47:9

confusing 45:16

conjunction 70:1

connection 69:24

consider 18:14,20 19:13,14 23:22 63:12

consistent 17:1,17 24:3 78:15 86:20

contact 26:13 41:2 42:15

container 57:24 58:12

continually 35:19 69:2

continue 37:13 71:22

continued 10:24 38:18

continuing 38:21

continuously 79:4

control 32:18 33:2 53:8 56:9,20 59:18 60:25 61:2,3,6 62:25 64:6,11,18 67:5 73:18 74:3 90:9

controlling 68:20 76:1

conversation 60:6,9, 11 62:1 85:23 86:11 88:7,18

copies 96:24

cops 43:2

copy 6:17 96:21 97:10

correct 7:8,20 8:6 9:23,24 16:11,19 18:12 19:8,10,22 25:8 50:4 55:3 64:2 65:1 73:6,7 82:17 83:10 87:20

corrections 6:15

correctly 13:18

correlated 69:23

Coughing 70:16

counsel 4:18 92:19

counter 11:21

couple 13:3 81:7

course 8:8 13:12 38:6 81:12,17,20 89:8 91:13

courses 10:12 83:1

court 4:16,17 5:7,21 6:6 37:13 96:16

courtroom 5:24

cover 16:2 62:4

CPR 85:15

create 65:15

crime 18:18 24:8 63:4,5,13,16

crises 23:2

crisis 13:4 21:2,4,6, 18,22 22:23 23:10, 14,24 24:7 27:1 80:5

critical 93:1

cross 64:10,19 65:24 66:8

crossed 64:12

CSR 4:6

CSU 11:15

cue 50:17,18

cueing 48:12

Currently 13:3

custody 80:14

---

**D**

danger 25:6,7,10 33:14

dangerous 22:3 23:8

dangers 81:4

Data 41:21

date 9:11 16:9

day 15:9 25:17,22 38:16 42:13 45:17 47:1,2 92:3

day-shift 40:8

day-to-day 10:24

days 7:11 45:20 46:2, 5,10

deadly 19:20 20:2,13, 16 35:13 37:21

dealing 18:18 39:22

deals 37:9

dealt 21:3

death 20:3 37:16,18, 25 38:3 76:22 81:24

Debra 4:6,16

decide 25:9 35:5 42:8

decided 41:9

deciding 26:25

decision 18:13

decisions 26:16 38:7, 10,14,23

deescalate 56:22 61:22

deescalating 27:17

deescalation 20:20, 23 23:20 25:21 27:2, 20

Defendants 5:5,6

defensive 83:1

defines 38:2

definitely 38:23

definition 21:17 22:5 23:9 37:20

deflation 36:11

degree 12:18

department 9:6,16,19 10:9 11:13,19 12:3, 24 14:20 20:22 24:5 26:18,22 35:7 38:9 39:22 41:10,16 43:4 81:2,12 85:16 93:1

department's 13:8 82:20,21

departmental 16:7

depending 46:7

depends 24:9 35:4

deposed 5:20

deposition 4:12 5:19 16:23 97:13

depressant 68:8

depression 68:12

describe 50:8 56:11

64:3

**described** 17:17 52:14 71:21 73:20

**describing** 49:24 56:10

**description** 65:11

**despite** 21:24

**details** 40:18 42:7 52:11 58:23 85:22 87:9

**detained** 54:14

**determined** 24:15

**detour** 43:3

**device** 28:14 64:13 76:13

**diagnoses** 22:9

**different** 9:13 11:7 18:14 28:15 63:23 70:15 93:17,19

**differently** 93:9

**difficulty** 31:8

**direct** 62:7 69:25 72:22

**direction** 49:20 52:10,22 62:5 63:25

**discretion** 24:6,10,22 35:7

**discretionary** 26:21

**discuss** 88:19

**disheveled** 55:2

**dishonest** 72:13

**dispatch** 48:22 49:5 51:21 85:14

**dispatched** 41:4

**disruptive** 22:3,24 23:7

**distinct** 50:10

**distress** 21:7 23:13 69:14 86:14

**disturbance** 22:16 40:19

**disturbances** 22:12

**disturbed** 92:8

**document** 21:11

**doing** 12:1 39:3 56:7, 17 64:20 66:21 68:25 69:3 71:13 73:19 74:13 79:8 86:21

**domain** 16:21 17:17

**domains** 15:17,20 16:5,9,10

**door** 44:1,5,8 47:5,6, 9,12 48:4 86:12

**dose** 85:4,6

**doses** 84:24 85:17

**double-task** 58:24

**doubt** 94:21,22

**drive** 42:19 43:15,17, 22,25 65:8

**driveway** 53:9 87:8 91:20 92:1

**driving** 41:5,10 42:24 51:25 52:22

**drowning** 60:16

**drugs** 68:5

**Drummond** 37:8

**due** 81:8

**duly** 5:11

**duties** 12:23 13:2

**duty** 17:5 18:8

**E**

**earlier** 53:15 73:20 75:19 83:21

**early** 11:23

**earned** 94:11

**eat** 40:8

**edge** 91:25

**Edith** 5:3

**education** 12:17

**education-type** 38:21

**effect** 5:24 17:9 25:15 52:16 54:14 85:2

**efforts** 84:21 85:18

**either** 84:2

**elapsed** 72:17

**elbow** 83:3

**elect** 14:21

**elected** 51:24

**electronically** 15:20, 22 95:24

**else's** 39:3

**email** 96:2,13,24,25

**emergency** 48:2 54:19

**emotional** 22:16 23:13 27:1

**emotions** 21:9

**employee** 11:18 58:17

**employees** 94:7

**empowers** 24:5

**en** 52:24

**ends** 19:18

**enforcement** 11:10 12:4 16:17

**engage** 22:2

**entire** 15:19 82:9

**entirety** 62:6

**entities** 94:5

**entitled** 21:2

**entryway** 86:12

**equate** 71:18

**equipment** 14:13,22 15:14 44:4

**erratic** 22:3 23:7

**especially** 33:5,19,22 42:10 44:7

**essentially** 73:5

**estate** 4:22,23

**et al** 4:13,14

**event** 22:2 58:5 62:6

**events** 26:12,14 88:9

**eventually** 53:6

**evidence** 58:4 91:11

**exactly** 54:11 63:4 80:24

**EXAMINATION** 5:15

**examined** 5:12

**example** 35:23 42:19

**exceeded** 21:7

**exchange** 83:22

**excuse** 16:22 17:23 30:6 34:2 36:8 70:16 77:15

**exerting** 69:18

**exertion** 70:3

**Exhibit** 74:18,19,20, 22 94:2,3

exited 47:16

expand 31:5

expanding 29:17 83:24

expected 36:18 37:3

expedite 95:19 96:10, 12 97:9,11

expeditious 42:14

experience 27:19 34:21 38:15 48:15 57:8 66:5 84:2

experienced 71:19 80:14 84:5

experiencing 23:2 68:11,16 78:24 79:2 80:4

explain 15:23 21:22 51:13

explained 29:8 30:25 52:5 55:1 66:11 81:2,7 86:24

explaining 87:4 88:13

explanation 7:24

explicitly 81:11,15

extended 30:22 50:25

extent 32:13

extra 15:4,5 76:21

extremely 80:11

extremity 66:9

eye 26:5

**F**

face 18:4 68:17,21 69:6 84:18

faced 61:19

facedown 29:22 35:14 55:10 57:6

facing 19:7 20:3

fact 8:14 15:19 20:22 30:8 34:16 38:2 41:7 63:18 89:18 93:2

factor 18:20,24 61:8 67:23 68:2

factors 18:14 19:2 63:11 76:21

facts 27:4 37:11 89:15

failed 48:21,23

failure 22:1

fair 41:14

familiar 26:23 70:20

far 7:22 66:18

fat 31:11

FBI's 13:12

feasible 19:15 51:20

February 4:3,11 9:4, 12 10:7

feel 90:13

feet 14:11 71:2,7,10, 15 73:25 79:3

felt 8:17 61:3 75:25 87:4 90:3,20

field 10:10,15 38:15, 17 41:12 57:9

figure 45:9 47:21 49:21

figure-four 66:24

financial 94:22

find 49:18

finish 10:6 51:11 84:9

fire 39:21 85:15

Firm 7:19

first 5:11 7:15 15:25 40:13,21 48:3,6,8 49:1,22 53:19 55:8 62:17 64:12 76:9,10 79:25 81:25 85:3,4

Fisher 14:2,5 29:3 40:16,22 43:5 44:9, 12,25 45:3,14,22 46:6,14,22,24 48:11 52:12 55:14 66:24 72:22 73:8,14 77:13 78:10 88:8

Fisher's 43:15,25 47:4 48:5 55:4,16 73:11 88:4

fit 23:9 35:10

five 13:19

flag 48:16 53:25

flee 18:21

Floyd 81:9,14,21 82:5,18

Floyd's 81:16

follow 6:2 33:3

foot 74:25 75:3,6,8, 11,16

footage 7:5,9 60:17 87:7,11

football 84:3

force 5:24 12:8 17:9, 11,20 18:3,7,10,13 19:14,17,21 20:2,13, 16 28:20,24 33:11 37:21,24 38:21 63:10,12

forced 31:7

formal 11:2

format 95:22,23

found 27:19

four 10:16 43:1 46:2 50:1,2

Fox 4:22,24 5:1,4 6:9, 12 7:3 10:20 12:25 15:5,7 21:10 25:2 27:3,12 30:16 32:12 33:7 35:1 36:20 40:2 41:23 44:23 45:1,3, 5,8,11 46:17 51:10, 13 56:25 58:7,10 59:14,16 62:13,15 64:20,23 67:11 72:7 77:21,25 79:9 80:21, 25 84:10 92:18 95:2, 4,7,10,17,18 96:1

Frank 90:24

free 56:8

freshman 12:10

Friday 95:21 96:10

friends 13:22

front 11:21 19:7 47:13 86:12 87:1 89:23 90:2,16

FTO 10:20

Ftp.com. 97:4

full 58:1 61:3

further 24:24 42:17 88:7

future 16:6

**G**

gasping 36:2 69:7

gear 14:17,20 44:4

general 19:16 29:10, 11,20 86:22

Officer Cameron Leahy

**generally** 6:8 32:16, 24 34:8 35:10

**Georg** 4:15

**George** 81:9,13,16,21 82:5,18

**getting** 11:5 39:19 42:21 47:17,22 54:21 96:7

**girl** 93:24

**give** 7:12 8:11 14:21 35:7 85:19 96:1

**given** 42:11 51:20 85:17 90:24

**gives** 43:8

**giving** 8:15 54:5 56:21 85:2

**Global** 12:22

**go** 5:1 9:2,17 13:14 26:8 42:8 43:9 44:15 45:14 46:23 62:16 75:20 76:11,12 87:3 91:4,10 94:9

**goal** 61:24

**goes** 21:22 27:21 36:4

**going** 4:10 17:1,4 26:4 34:22 40:15,24 43:24 46:22 51:16 52:2 57:6 61:15 62:2 78:21 96:9 97:8

**Gonzalez** 4:13 13:10 14:7 19:24 20:14,19 39:14 55:10,14,15 56:2,7 57:16 59:15 60:10 61:22 64:4 66:13 67:12 68:15 69:3,7,25 70:5 73:10 76:1 78:24 79:20 86:14 88:13 91:22 92:14 93:11,14,22,

23

**Gonzalez's** 55:17,19, 24 56:6 57:1 59:19 60:22 64:9 68:21 69:4 75:3 79:15 84:17

**good** 5:2,17 13:21 84:10 97:5

**gotten** 80:23

**graduate** 12:12

**graduated** 9:4

**Grand** 49:11

**gravitating** 42:15

**greater** 33:22 64:11

**Greg** 5:4

**Gregory** 4:24

**grew** 49:2

**ground** 29:22 34:11, 19,22 37:15 53:9 58:18 59:1 63:1 66:13,18 70:1,24 71:8,12,16 73:24 74:1,17 75:1,17,21, 23 87:3 91:22,23

**Group** 6:25 7:2

**grow** 58:13

**guess** 30:13 46:17 52:8

**guidelines** 27:24 35:9

**guys** 47:23

—

**H**

—

**Haddad** 4:4,20,23 5:16 6:19 7:6 10:21 11:3 13:1 15:8 16:24 21:12 25:4 27:9,16 30:18 33:3,9 35:6

36:25 39:13 40:5 41:25 44:7,24 45:4, 19 46:20 51:15 57:1 58:9,14 59:20 62:14, 19 64:24 67:12,13 72:9 74:22 77:23 78:3 79:11 80:23 81:1 84:16 87:21 92:20,25 94:5 95:9 96:3,5,7,11,15

**half** 9:25 10:16 46:4

**hand** 42:21 74:4,6,11, 23 90:13

**handcuff** 26:25 27:11,18

**handcuffed** 28:7 34:14,17,18 37:15 57:7,9 67:9

**handcuffing** 26:18,21 34:21 35:14

**handcuffs** 15:12,13 27:20 57:3

**handful** 15:25 24:20

**handheld** 50:12

**handling** 42:20

**hands** 28:24 74:2 76:1

**hanging** 55:5

**happen** 81:14

**happened** 7:21 8:17 49:8 57:13 59:9 61:13 81:8,13 88:9

**happening** 59:1 69:25 70:22 72:4

**happens** 60:16

**hard** 69:21 84:5

**harmful** 85:2

**Hawkinson** 4:21

**head** 30:11,22 43:9 52:19 81:6 83:5,14

**headed** 25:25

**heading** 41:16,17 52:1,10

**health** 21:7 23:2,24 27:1 79:20 80:5,15, 17

**hear** 50:6,21 51:6 52:11 59:24 60:17 64:13,17 69:7,10 77:13 78:21 89:5

**heard** 37:7 48:22 49:23 50:2 52:8 53:17 70:17 78:10

**hearing** 40:14 48:11 52:16

**Heavier** 67:17

**heavyset** 57:5,11

**heels** 71:4

**held** 31:20 33:21 75:23

**Hello** 4:25

**help** 38:22 42:23 92:13

**helping** 11:20

**hesitation** 63:8

**high** 12:7,10,12

**high-stress** 58:23

**highest** 12:16

**highlighted** 78:3

**hindsight** 93:18

**hips** 56:16

**hired** 9:15 13:17

**hits** 69:20

**hitting** 50:3 91:23,25

**Officer Cameron Leahy**

**holding** 57:6 73:9

**home** 25:25 26:1,2

**hour** 4:3

**hours** 77:10

**house** 40:9 53:9 86:6

**household** 86:8

**huge** 48:16 53:24

**human** 38:25

**hurt** 70:12

**husband** 86:9,10

**I**

**ID** 50:14

**idea** 31:11

**identification** 74:21 94:4

**identify** 4:18

**illness** 21:24 22:9,12, 16 23:13

**immediacy** 19:12

**immediate** 18:25 19:3,6 20:10 61:7

**immediately** 61:1 64:9

**imminent** 20:3,7,9

**impair** 31:1,12 33:9

**impaired** 22:4,20,24 23:8 37:2

**important** 8:2,5,24 18:24 51:24 83:14

**impossible** 22:19

**in-custody** 81:23

**incapacitated** 63:20

**incident** 7:5,13 13:10,

13 14:7 15:10 19:24 20:19 39:14 40:14 41:18 48:7 72:8,11 81:9,20 88:19 91:14 92:11,14,23 93:8

**Incidents** 21:3

**include** 18:17 22:23 36:2

**included** 20:9

**including** 21:23 57:11 88:25

**incomplete** 33:7

**increase** 21:24 53:5

**increased** 68:12

**incumbent** 49:21

**independent** 87:11

**indicate** 54:18

**indication** 36:3,6

**indicative** 68:6

**indicators** 36:12

**individual** 25:14 39:23 41:2 53:8 86:8

**individual's** 30:22,24 31:4 36:10

**individuals** 25:20,21 90:25

**influence** 23:3 24:16 71:20

**inform** 26:15 51:15 59:4 76:4 85:16 86:14 87:13

**information** 8:6,21 41:20 50:3 51:24 94:22

**informative** 62:23

**informed** 16:5

**ingested** 57:25

**inherent** 33:11

**initial** 44:6 47:8 56:22 57:18 86:24

**initially** 9:15,17 41:7 43:12 47:9,18 49:23 52:9,22 53:4,13

**injured** 91:13

**injuries** 92:2,10,13

**injury** 20:4 37:16,18, 25 38:3 91:16

**inside** 86:12

**instant** 20:11 75:21

**Institute** 12:13

**intact** 57:22

**intent** 42:24 43:2

**interest** 11:22 12:4

**interim** 92:22

**internal** 21:8

**interruption** 16:23

**Intervene** 17:5

**Intervention** 21:3

**interview** 6:22 7:21, 23 8:15 79:25 81:7, 25

**interviewer** 8:15

**interviews** 7:12 8:1, 20,25 13:21 55:1 61:3 69:16

**intoxicated** 22:17 25:5 68:1,11

**intoxicating** 24:16

**intoxication** 22:25 25:15 26:7

**investigation** 6:23,24 7:19 52:20 58:6

**investigations** 8:2 13:6

**involved** 7:7 53:23 54:2,23 62:10,19 63:24 90:25

**involvement** 92:17

**issue** 80:18

**issues** 47:24

**J**

**job** 10:25 38:6 58:21

**judge** 6:6

**judgment** 22:4,20,24 23:8

**June** 9:18

**K**

**keep** 42:23 76:17 82:5,15

**keeping** 26:5 36:9

**kept** 73:9

**kick** 70:3,5 75:11

**kicking** 70:18,25 71:2,22,23 72:3,15 74:14 75:13

**kids** 84:3 87:1

**kind** 6:3 16:7 29:17 32:1 37:17 38:18 41:1,17 43:7 47:18 49:6 50:8 52:18 53:9 55:4 56:14,16 60:15 61:12 81:14 91:18, 20

**knee** 55:18 65:8 75:14,15 83:3

**kneeling** 64:25 65:2,

**Officer Cameron Leahy**

23 66:15 71:17 73:21,22 79:6,14

**kneels** 65:15

**knees** 56:14 64:7 65:19 74:7

**knew** 8:8,11 43:16 44:18 52:17 53:19,22 56:19 68:24 86:17 88:3

**know** 7:22 10:24 16:8,12 25:13,17,19,21,22 26:3 32:21 36:4,5 41:2 42:13 43:8 44:13 45:11 46:17,18 49:4 52:4,14,23 53:12 54:2 57:15,25 58:17 60:15 62:5,22 63:1,4,15,18 65:9 66:6,20 67:7,19 69:1,17 71:18 72:17,20 75:10 80:9,13 86:17,18 87:7,18

**knowing** 49:20 62:11,20 84:25

**knowledge** 44:9 46:13

## L

**l-a-w-y-e-r-s** 97:4

**labored** 35:22,25 36:14

**lack** 36:11

**lady** 75:20 76:2,11 90:12

**law** 6:25 7:2,18 11:10 12:4 16:17

**lawful** 17:6 18:8 19:18 63:8

**lawfully** 17:10 38:10

**laws** 62:3

**lay** 37:15

**laying** 56:5 57:6 74:25 75:5,12

**lead** 83:20 85:17

**leading** 26:13 39:13 86:22

**Leahy** 4:13 5:4,9 6:14 95:5

**learn** 31:6

**learning** 10:24 15:17,20 16:5,9,10,21 17:17

**leave** 44:3 86:22 93:4,6

**leaving** 40:9

**led** 62:20 63:22 80:3

**left** 47:6 55:13 74:4 91:12

**leg** 27:24 28:13,19 29:12 91:25

**legal** 92:18

**legitimate** 33:1

**legs** 30:4 59:11,19 60:22,25 61:2,4,6,19 62:25 64:6,11,18 66:4,21 67:5 73:18 79:2,7,9,10,15 84:17 90:9

**Let's** 9:10 14:14 39:7 94:2,14

**lethal** 15:8

**letter** 6:13

**level** 12:16 19:17 21:6 32:18 36:17,21 37:6 61:18 64:11

69:4 71:18 73:18

**life** 11:23 38:25 39:3,5 76:22

**life-and-death** 38:14

**lifesaving** 85:3,18

**lift** 66:9,18,19 71:15 74:10 90:15

**lifted** 66:13 70:1 73:23 74:16 75:19,21,22 91:22

**lifting** 70:24 71:7,12

**light** 88:15

**lights** 49:14

**likelihood** 37:24

**limit** 28:4 29:24 30:23 83:21

**limited** 24:25 31:14 41:11 42:11

**line** 6:16 25:3 30:17

**lingo** 41:1

**liquor** 57:20

**listening** 41:6

**lists** 17:11

**little** 4:21 12:25 19:23 31:16 40:8 43:23 47:19 50:6 64:23

**LLP** 4:4

**located** 11:15

**location** 25:17 41:17 42:4,9,25 43:16 49:11

**logo** 58:3

**long** 10:4,15 43:7 50:15 54:5 61:5 67:19 75:8 77:12 93:4

**longer** 33:21 55:5 76:18 82:6,16

**look** 35:22 42:18 68:15 91:10 94:14

**looked** 55:2 56:4 77:5

**looking** 21:17 53:6 58:19 88:5

**looping** 43:17,20

**lose** 67:3 72:16,19,21 73:13 74:9 77:1,13

**lot** 8:16 10:23 18:14 25:11 69:24

**loudly** 60:15

**lower** 66:9 79:7,10 91:18

**lump** 15:12

**lungs** 31:4,13 32:3,11 36:11 83:22

**Ly** 5:6

## M

**Madam** 96:16

**magazine** 15:4,6

**main** 18:17,20 96:10

**maintain** 73:16 74:3

**MAIT** 13:6

**Major** 13:5

**majority** 32:21

**making** 69:16,25 80:8,10 84:5

**man** 57:5 58:18

**manage** 21:8

**manner** 23:8 64:8

**manually** 28:20,22

**Officer Cameron Leahy**

**Mario** 4:21 14:6 20:13,19 55:10,17 57:1,16 60:10,21 63:5,19 64:4 68:15 69:7 70:5,18 73:10 75:3 76:1 77:2 78:24 79:14,19 84:17 86:14 88:2 93:11,14, 22,23

**maritime** 11:14 12:20,22

**mark** 25:2 30:16 74:19 94:2

**marked** 25:3 30:17 74:20 94:3

**material** 16:1

**matter** 4:13 23:12 76:22 83:4

**matters** 38:14 52:21

**Mckinley** 13:15,21 29:4 40:16,20,23,25 43:5,6 48:12 52:12 53:17 55:13,23 61:21 64:14,17 68:24 69:5 73:9 78:21 88:11

**Mckinley's** 52:19 54:11 76:14

**MDT** 42:2

**mean** 10:10,22 11:1 13:24 28:22 36:21 38:16 57:25 60:14 85:24 89:21 96:8

**meaning** 29:22 32:10 41:2

**means** 23:9 27:1 48:19

**meant** 28:6,17 31:25 78:12

**mechanical** 28:21 29:1

**mechanically** 83:19

**mechanism** 30:25 75:13

**medical** 15:1 31:14 36:6 84:20 85:2 89:1 92:13

**medications** 22:1

**member** 13:3,5

**memory** 13:18 77:7 80:16,19

**mental** 21:7,24 22:9, 12,15 23:2,13,24 27:1 79:20 80:5,15, 17

**mentally** 63:20 92:8

**mention** 53:14 64:14, 17

**mentioned** 13:20 49:23 51:22 69:15 81:11,16 83:21 87:2

**met** 85:15,16

**methamphetamine** 71:20

**methods** 15:16

**Michael** 4:20

**microphone** 48:13 50:7 60:19

**middle** 32:22

**mike** 50:24 51:1

**military** 12:5,6

**mind** 9:1 58:4,8 81:19

**minimal** 19:17

**minor** 4:21 24:8

**minute** 46:21

**minutes** 79:7,16,18

**misdemeanors** 24:21

**mistaken** 14:9 44:14

**Mobile** 41:21

**moment** 19:7 40:24 49:1 62:24 63:17 75:18 76:8 95:11

**momentarily** 91:24

**monitor** 24:14 35:19

**monitoring** 23:22

**months** 9:22,25 10:16 13:19 93:5

**morning** 5:2,17 41:13 44:12,15,18,19 45:16

**mornings** 45:13

**motive** 56:11

**mouth** 36:10

**move** 36:18 37:3 61:23

**movement** 56:18

**movements** 56:12

**moving** 54:22 56:16 79:3

**Mrak** 76:9,13 85:24

**mulched** 91:21

**multiple** 49:25 76:20

**multitask** 58:25

---

**N**

---

**name** 4:15 37:10 81:16

**Narcan** 84:24 85:2,4, 9,17 88:18

**nasal** 85:11

**naval** 41:9

**necessarily** 23:4 29:9 31:15 68:5

**necessary** 18:7 19:17 32:17 73:16

**necessity** 33:1

**neck** 30:11,23 37:14 83:5,15

**need** 20:16 21:12 42:16,23 43:7 77:23 96:11

**needed** 8:17 16:2 48:2 85:3

**needs** 83:24

**negative** 85:1

**negotiation** 13:12

**Negotiations** 13:4

**neighborhood** 86:2

**Neil** 4:15

**nerves** 65:14

**never** 12:6 61:3 70:7, 9 82:5,15 87:10

**new** 93:20

**Ninth** 37:7

**nods** 81:6

**noise** 60:18 69:22

**noises** 69:19 80:9

**noncompliance** 21:25

**nonemergency** 42:14

**nonprobationary** 11:7

**nonresponsive** 78:22

**normal** 47:21

**normally** 34:16,18,

**Officer Cameron Leahy**

20,22 37:4

**nose** 36:10

**nostril** 85:12

**note** 77:6

**notice** 4:2 54:25

**noticed** 4:4 8:20 48:23 55:2

**noticing** 36:10

**notification** 6:13

**number** 4:14 7:21,22 17:11 20:25 21:2,23 26:19 28:4 29:24 42:11 50:14

**O**

**Oak** 40:17 43:18,20 47:20 53:10

**Oakland** 4:5

**oath** 5:23

**obese** 31:6,8,16,19 33:6,19,22 67:16

**objective** 26:7 89:15

**objectively** 18:3

**objects** 6:7

**observant** 58:22

**observation** 44:6

**observations** 56:23 62:23 63:22

**observe** 58:22,25 85:6

**observed** 43:25 80:2

**observing** 87:2

**obtain** 87:6

**obvious** 32:1 77:2

**obviously** 67:12,16 93:20

**OC** 15:11

**occasional** 10:12

**occasionally** 11:20 14:1

**occurrence** 47:3

**Offic-** 56:19

**office** 6:23 7:16 35:6 91:5

**officer** 4:12 5:4,9 6:14 9:7,10 10:2 11:7 13:2,14,21 14:2,5 16:13 17:22 18:2,6 29:3 30:3 38:17,19 40:20,21, 23,25 42:20 43:5,6, 15,25 44:9,12 45:14, 22 46:6,14,22 47:4 48:5,11,16 52:12,18 53:17,23 54:1 55:4, 9,13,14,16,23 58:21 61:20 62:4 64:13,17 66:23 68:24 69:5 72:22 73:8,9,11,14 76:9,14 77:13 78:10, 21 88:4,8,11 95:5

**officer's** 42:2

**officers** 7:7 10:11 14:19,21 16:17 23:21 28:4 29:25 35:4 37:13 40:16 42:12,15 44:3 48:17, 23 51:21 53:7 55:12 56:20 57:6,15 58:16 61:14 62:4,5,7,12 63:7 64:1 68:19,22 72:2 76:5

**officers'** 55:2

**Oh** 5:1 12:14 25:25 40:4 57:5 72:6 86:3

**okay** 6:2,4,9,18 9:11 12:16 17:2,3,15 20:6 21:21 25:1 26:1,10, 17 27:23 28:3,25 29:18,19 33:3,16 37:12 39:7,13 40:1, 11,13 42:8 43:11 45:5,19 46:9 47:11 48:3 53:3 54:10 55:23 57:5 58:10,24 60:1,21 62:17 63:18 64:22 68:10,23 71:7 72:18 77:20 78:8,9 83:9 85:13 87:13 92:12 94:2,25 95:25 96:13,15 97:5,12

**old** 41:9

**on-the-job** 38:18

**once** 10:1 91:12

**one's** 83:21

**one-syllable** 69:11

**ones** 18:17

**ongoing** 11:1 38:23 61:20

**open** 35:7 44:1,5 47:5,7,10,12 48:4 50:7,9,11,25 51:1 58:1,12,20 86:22

**open-ended** 8:16

**opine** 87:17

**opinion** 73:1

**opportunities** 8:16

**opportunity** 8:24 13:12 62:1

**opposite** 41:8 49:19

**options** 41:11

**order** 66:19 72:20 83:24 95:17 96:8,20

**ordering** 96:4

**orders** 95:15

**oriented** 25:13,16

**original** 86:7

**Otis** 43:15,17,22,24 49:11

**out-of-control** 92:8

**out-of-shape** 57:11

**outcome** 35:13

**outside** 10:12 14:3,4 66:9 92:18

**outwards** 48:13

**overcome** 17:10

**oxygen** 83:22

**P**

**P.M.** 84:13,14 95:13, 14 96:6 97:14

**pace** 47:21 53:5

**page** 6:16 17:4,16 25:3 30:17 79:25 81:25 82:23

**paid** 93:6 94:7,16,19

**pain** 65:6,10,15

**painful** 65:21

**pairs** 15:13

**paper** 96:24

**paperwork** 11:20

**parallel** 66:4

**paramedic** 88:17

**paramedics** 85:16

**park** 47:19,20 52:13 53:7

**parked** 43:13,15,22,

**Officer Cameron Leahy**

24,25 47:13 76:15

**parking** 46:11

**part** 11:15 16:25 23:19 25:20 26:15, 23 30:13 32:7,9 40:22 55:16,17,24 56:1 81:8 82:19,21

**partially** 89:8,10

**participate** 84:20

**particular** 24:21 33:13 40:18 60:6,20

**particularly** 42:12 43:3 52:10 82:2

**particulars** 41:3

**parts** 83:19

**passenger** 44:1,8 47:4,9 48:4

**passively** 23:22

**pat** 5:2 88:20

**path** 63:23

**Patrick** 5:1 95:4 96:17

**patrol** 12:9 13:2 34:20 38:19 40:8 42:2,12,21 43:13,15, 25 44:3,10,16 47:13 48:5 61:25 62:24 76:14,15 88:4

**patrolling** 41:5

**pause** 17:14 21:19 24:1 28:1 78:4,7 79:24 82:11 83:7

**pay** 94:11

**paying** 40:17 60:6

**Peace** 16:13

**pedestrian** 74:11 76:2,12 90:12

**Penal** 17:7

**people** 21:3 34:18 42:16 57:9,11 70:25 71:19 86:6 89:22

**people's** 22:9 65:15

**pepper** 15:11

**percentage** 67:5,8

**period** 10:1,19 11:6 13:7 50:25 85:5

**permit** 24:18

**perpendicular** 64:8

**person** 17:7,10 18:7, 21,25 21:6,18 22:2, 15,23 23:9,14 24:6, 7,19,23 25:4,9,23 26:13 28:7 29:7,8 30:10,20 31:6,19 33:2,6,21 35:14,18 36:4,13,16 37:1 65:3 76:20 91:8

**person's** 21:8 22:20 31:1 32:2,4,7,9,11, 18 33:5,18 35:20 39:5 65:3 68:11 74:23 83:20

**personal** 84:2

**personnel** 89:1

**personnel-in-training** 9:19

**persons** 23:1

**Peter-** 91:7

**Peterson** 90:24 91:8

**petty** 52:6,15,20,25 57:19

**phone** 88:6

**physical** 15:14 28:20, 23 48:19 49:13 53:24 58:17 69:21

70:3

**physically** 36:5 56:11 64:3 69:19 73:19

**picked** 60:18

**pieces** 26:8

**pile** 84:4

**place** 34:23 48:20 60:11 68:12

**placed** 34:9,16 93:4

**places** 39:3

**placing** 28:13,19 64:8 78:15,16

**Plaintiff** 4:21 5:3

**plaintiffs'** 74:20 94:3

**plan** 25:12,22,23

**player** 69:20

**playing** 69:17 84:3

**please** 4:18 5:8 21:16 36:24 62:18 95:16, 17

**pockets** 89:23

**point** 8:15 15:21 24:16 25:5 41:9 49:10 52:12 56:7 57:15 62:21 65:3,8, 10,13 66:23 67:4,20 69:3,8 70:17,20 71:3,22 73:17,22 74:11,13,16 75:25 76:2,4 77:11 78:23, 25 79:1,19 80:24 81:2 85:7 86:20 88:5

**pointed** 71:4 75:16

**pointing** 74:23 75:19 90:11

**police** 9:2,3,6,15,16, 17 11:13,18,22 12:3, 24 41:10 43:4 53:25

58:21 81:12 87:14 90:22 92:16

**policies** 20:22

**policy** 20:24 21:2,3,4 23:19 24:18 26:19, 23 28:11,12,16,18 29:9 51:19

**populates** 42:2

**portion** 25:3 30:13,17 32:22 55:21 56:5 57:23 62:18 87:10 90:9 91:18,24

**portioned** 68:20

**poses** 18:25

**position** 28:5,6,8 29:5,6,7,9,21 30:1,3, 10 31:7,20 32:16,25 33:5,18,22 34:3,7,8, 10,12,14,17,24 35:15,19 36:19 37:4 56:3 57:10 65:6 67:20 73:10 75:8 76:18,24 82:6,16,24

**positioned** 68:19,21

**possibility** 79:23 80:20

**possible** 30:10,11 34:24 60:8 66:5,6 89:14,22

**possibly** 63:20

**POST** 16:10,12,16 38:2

**potential** 19:9 30:23 31:4 33:20 52:18 86:4

**potentially** 26:4 27:19 31:24 51:5 53:2

**pounds** 14:15,17,20

**power** 24:10,13

**powered** 65:20

**practice** 42:10 72:8,9

**precautions** 39:4

**precipitated** 21:23 26:14

**pregnant** 93:15,21

**preparation** 6:20

**prepared** 59:21

**prepares** 38:9

**prescribed** 22:1

**presence** 80:12 92:18

**present** 88:16 92:23

**preserving** 34:10

**president** 25:19

**press** 37:14

**pressing** 50:20

**pressure** 30:4,9,14, 19,22 31:1 32:6,9, 17,19,20 33:1,4,17 65:3,10,12,13 66:7 74:15 83:2,4,14,19, 23

**pretty** 14:19 41:13 49:4 50:10

**prevent** 51:23 83:24

**previous** 61:2 82:23

**primarily** 80:7

**prior** 12:3 13:11 39:20 47:17 55:1 57:3 69:15 92:2

**Probably** 93:16

**probation** 10:6,9,19 11:5

**probationary** 10:1

**problems** 68:16 79:20

**proceed** 54:7

**PROCEEDINGS** 4:9

**process** 34:21 76:16

**produced** 5:10

**program** 10:11

**prompted** 47:25

**prone** 28:5,7 29:5,7, 9,21,25 30:10 31:7, 20 33:5,18,21 34:12, 24 35:2,14,18 36:17 37:2 57:10 67:13 73:10 76:24 82:6,16, 24 89:24

**properly** 38:11

**property** 87:8

**protect** 39:5

**provided** 7:24 8:6,21 10:18,23 81:3

**public** 6:25 7:2 85:19 94:5,7

**publicly** 94:7

**published** 16:21

**pulled** 49:15 89:8,19

**pulling** 53:16

**purposes** 78:14

**pursuant** 4:2 30:21

**push** 31:11 79:2

**pushing** 56:14

**put** 30:14 32:6,9 35:15 49:3 65:11,19 67:7 95:2 97:7

**putting** 32:19 33:17 66:2 83:23

---

**Q**

---

**question** 6:8 29:12 32:13 33:7,15 35:1 36:20,23 41:23 47:1 54:7 73:11

**questions** 6:7 7:25 8:12 25:18 26:6 62:15 69:10 80:11 86:22 95:5

**quick** 38:13

**quickest** 43:16

**quickly** 47:25 88:14 94:9

**quiet** 41:13

**quite** 63:7

**quote** 26:20 39:25 40:2 45:6 70:18 72:23 80:6 82:1

---

**R**

---

**R-E-N-N-E** 7:3

**racket** 69:20,21

**radio** 40:15,21 41:1,6 47:22,24 48:1,9,17, 21,23,24 49:4 50:5, 7,11,14 51:16,21,23, 25 52:15 53:13,19, 20 85:14

**radios** 49:7 50:12 70:15

**raise** 48:22

**raising** 90:18

**re-** 72:21

**reached** 90:2

**reaction** 20:11

**read** 17:1,16 42:6 80:24

**reads** 28:12

**ready** 44:16

**really** 23:12 30:12 38:13 85:1 89:19

**rear** 30:13

**reason** 60:12 63:9 68:10 69:23 82:21 94:21

**reasonable** 18:3 23:23 27:1

**reasonableness** 87:17

**reasonably** 25:23

**reasons** 15:25 86:24

**recall** 19:25 20:23 21:4 37:5 39:17 40:14 44:17 45:15 47:1 48:11 54:13 56:1 59:10 60:11 61:21 64:7 66:25 68:4 72:1 74:7 77:4 79:5 81:17,18 84:19 85:21,22 86:1,16 87:3,8 88:5 89:7 91:8 92:10,23

**receive** 10:8 11:8 41:20 92:2

**received** 15:16

**recess** 39:10 84:13

**recite** 20:24

**recognize** 22:11 23:6

**recognizing** 26:7

**recollection** 60:3 61:12 87:12

**recommended** 26:20

Officer Cameron Leahy

**record** 4:10,19 6:17, 21 39:9,12 51:14 84:12,15 95:8,13,14, 16,17,19 96:6,20,22

**recorded** 60:3

**recordings** 60:13

**recovery** 28:6 29:5 34:1,3,7,14,16,24 35:15

**recruit** 9:16

**recruiting** 13:8

**red** 48:16 53:25

**refer** 13:6

**reference** 16:3,9

**referring** 11:2 29:14

**reflects** 23:14

**refresh** 80:16

**refreshes** 80:19

**regarding** 58:12

**regards** 29:12

**regular** 47:2

**regular-sized** 95:23

**related** 48:7 49:2

**relatively** 24:8

**release** 24:19,22 51:1

**relieve** 55:8

**relinquish** 90:9

**remember** 40:15,17, 20,25 41:3 42:6 52:16 59:7

**remembered** 4:2 53:15

**remove** 76:1

**removed** 57:23,24

**Renne** 6:25 7:2,18

8:14 79:25 81:25

**repeat** 36:23

**repeatedly** 17:22 71:16

**rephrase** 33:14

**report** 94:6

**reported** 94:10,15,18

**reporter** 4:7,16 5:7 6:12,17,18 7:1 43:19 64:15 87:19 95:15, 25 96:3,9,13,16,17, 22 97:2,5,8,12

**Reporting** 4:17

**reports** 10:25

**representing** 4:17

**request** 39:21 53:22

**required** 14:22,25 15:3 90:8,15

**requirement** 26:22

**requires** 20:10 32:19 51:19 66:8

**resist** 17:10

**resistance** 17:6 32:18 60:10 61:18 91:24

**resisting** 18:21 72:3

**resistive** 59:11,14 88:14

**resources** 42:11

**respect** 10:14

**respiration** 31:12,19 35:20

**respiratory** 68:8,12, 16 69:14

**respond** 27:5,13 32:14 36:22 40:16 49:22 52:12 53:18

**responded** 39:20,24 49:11

**responding** 48:25 51:21 53:13

**response** 6:16 23:23 24:6 53:21 67:2 72:22 73:14 82:4,18 85:5 86:23

**responses** 69:11

**rest** 10:18 25:22

**restrain** 64:4

**restrained** 29:7,21

**restraining** 35:18

**restraint** 28:14,21 29:1 31:22 33:14,19, 23 34:25 35:2,13 36:17 37:2 53:24 64:13 76:13,21 78:18 81:4 83:16,20

**restraints** 26:19 27:25 28:20 29:12

**restrict** 30:24

**restroom** 41:11 43:10

**result** 34:22

**resuscitative** 84:21

**retrieved** 76:19

**retrospect** 60:8

**review** 6:14 7:9 8:19 17:14 21:19 24:1 28:1 60:2,5 78:4,7 82:11 83:7

**reviewed** 6:20,21 59:20

**reviewing** 10:25 79:17

**revised** 16:24

**ride** 46:23 90:22,24

**riding** 45:21 46:5

**rifle** 15:4,6

**right** 5:17 6:11 7:16 8:3,9,12,17 15:17 16:10,14,18 17:24 18:8,11,15,18,22 19:1,4,7,14,18,21 20:4,7,11 21:9 22:13,17,21,25 23:10,15,17,25 24:8, 11 25:7 27:11,18 31:13,20,23 32:4,11 33:23 34:4,17 35:20, 23 38:1,7,25 39:7 41:18 46:15,24 47:13,20 51:3,4 52:3,24 53:1,13,16 55:14,19,20 57:20 58:6 59:1,5 60:22 61:10 62:12,21 63:5, 11,13,21 64:1,25 65:4,16,21,25 66:13 67:9,14,16,24 68:3, 13 69:8,11 71:23 72:24 73:3 74:6,23 75:5,6 76:2,22 78:18 79:1 81:5,9,22 82:16,18 83:25 89:20 90:3,13 91:19 92:20 95:1,10 97:6

**ring** 37:10

**rise** 36:10

**risk** 31:22 33:12,23 38:3 39:4 67:23 68:2,13 76:21

**risks** 33:19

**risky** 33:6,8,9

**role** 11:19

**roll** 72:24 73:2,15

**roughly** 9:24 79:18

**route** 52:24

**routine** 46:19

**rule** 80:20

**rules** 6:3

**running** 49:19

**runs** 32:21

---

**S**

---

**safe** 35:17 51:20 90:10

**safer** 32:16,25 34:8, 10

**safety** 48:16 85:19

**sanctity** 38:24

**sat** 5:19

**saw** 43:14 44:21,23 45:15 47:4,12 53:23 56:12 57:19 70:9

**saying** 23:5,6 36:2 38:4 49:4,5,14 59:25 60:18 65:24 70:17 71:23 72:7,15,21 74:9

**says** 17:6 23:21 43:7 72:2

**scenario** 35:11 36:1

**scene** 35:5 42:19 62:6,23 79:21 85:20 87:22 88:8,12 91:10, 12

**schedule** 46:8

**school** 12:7,10,12

**schools** 10:13

**Science** 12:13

**Scout** 47:19 52:13

**scrapes** 91:17

**scratches** 91:17

**seals** 15:2

**search** 88:20

**searched** 89:1

**second** 8:14 12:10 23:21 51:2,3 74:9 77:1 85:6 96:5

**seconds** 61:10 72:15 74:8 76:18,21

**section** 17:7 21:17 23:20 27:24 28:10

**security** 57:22

**see** 20:16 21:12,15 40:11 43:11,14 45:13,20 50:18 52:14 53:7 54:22 55:4 56:3,17 58:19 60:3 68:15,21 74:10, 25 77:23 78:5 84:18 85:5 87:4,24 88:1,23 89:24 90:13

**seeing** 44:17 48:4 58:16 84:19 89:7

**seek** 92:13

**seen** 87:10

**select** 19:16

**selected** 13:5,11

**self-care** 25:13

**send** 6:13,16 95:23 96:2

**sending** 49:6

**sense** 31:15 37:6 76:17

**sent** 10:12 38:20

**separate** 16:6

**separately** 79:10

**sequestered** 91:5

**sergeant** 38:20 76:9, 13 85:21,24 90:24 91:7

**serious** 20:3 37:16, 18,25 38:3

**seriousness** 51:20

**served** 12:6 13:7

**serves** 13:18

**service** 26:14,15 39:20,24 41:4 42:1, 4,20 43:1 49:2 86:25

**set** 15:19 67:17 93:20

**sets** 16:16

**Seventh** 4:5

**severity** 18:17 63:12, 15

**sheriff's** 6:23 7:16

**SHERWIN** 4:4

**shift** 39:15,17 40:6,10 44:15 45:13 46:14, 24

**shifts** 45:24,25

**shins** 64:7 65:19 73:24 91:18

**short** 13:7 84:8 85:4

**Shorthand** 4:6

**Shortly** 72:18

**shorts** 89:7,18

**shot** 75:1 85:10

**shoulder** 30:4,12 32:10,22 55:18,19, 22

**show** 17:13 21:10,13 23:20 27:25 50:13 77:21,24,25 80:21 82:10

**shown** 60:12

**shows** 50:14 74:22 94:10,15,18

**sic]** 36:21

**side** 34:9 41:8 47:5 55:13,14 72:24 73:2, 15 75:6,12 76:5

**sidewalk** 75:12

**sideways** 74:25

**signal** 42:22

**significant** 81:3

**signs** 22:11 26:7 35:22,25

**simultaneously** 49:9 61:13 66:7

**sirens** 49:15

**sitting** 11:20

**situated** 43:13 91:19

**situation** 22:21 23:23 24:12,14,19 27:17 52:3 58:16 61:22 81:21 93:19

**situationally** 27:7

**situations** 24:20 26:20 27:6,10,14,21 58:23

**six** 13:19

**Skaggs** 4:6,16

**sky** 56:15 71:5

**slight** 43:3

**slightly** 66:9

**slow** 64:21

**slowly** 42:13,14

**socialize** 14:3

**socialize/hang** 13:24

**Officer Cameron Leahy**

**socialized** 14:4

**solo** 38:19

**somebody** 20:5 22:23 23:7 24:15 26:25 27:11,18 29:21 31:8,16 50:7, 13 60:14,17 69:17 82:6,15 93:20

**somebody's** 26:8 65:9,12,20

**someone's** 32:19

**somewhat** 47:2

**soon** 34:24 35:16 50:25

**sorry** 45:9 51:12 54:6 72:6 96:5

**sort** 18:13 22:19 25:12 28:13 40:19 48:19 49:13 52:2,20 54:18 58:5 69:13 79:20 84:20 87:14

**sound** 50:5,11 69:13 94:11

**sounds** 9:23 41:13 46:4 50:8,21 51:6 69:16,24 70:2 97:5

**south** 40:17 47:20 53:10

**speaking** 19:11 60:14 69:2

**special** 34:9

**specific** 27:7 37:5,10 68:4

**specifically** 28:13,16 29:12 47:1 56:1,17 61:18 65:8 66:20 77:6 81:18 82:24,25

**speculation** 27:12 32:12 56:10

**speech** 45:10

**spend** 12:7

**spent** 77:8

**spine** 30:5,12,20,23 31:1 32:4,10,19,21 83:5,15

**split-second** 38:7,10

**spoke** 85:21 92:21

**sponsored** 9:16

**sports** 69:18 84:4

**spray** 15:11

**squirm** 36:18 37:3

**stage** 11:23

**stand** 57:7 59:17

**standard** 16:7 19:20, 23

**standards** 16:13,17

**stands** 16:12 68:10

**start** 9:5,10 10:25 14:14 39:15 40:5 41:10 42:14 44:14 46:14 49:19 53:4

**started** 9:17,21 12:2 46:24 47:18 49:24 52:9,22,25 58:5 63:19,24 79:8,14 89:18

**starting** 17:21 40:10 85:15

**starts** 38:16

**state** 4:7 16:18 58:8

**stated** 61:2

**statement** 59:24 66:12 78:20 85:19 87:9

**statements** 6:22 37:12 52:6 80:8

86:21 92:6

**states** 12:8 17:7 26:19

**static** 50:9

**static-type** 50:10

**static/faint** 50:9

**staticky** 50:6

**station** 43:9 44:21 45:16 90:22 91:3

**statutes** 17:12

**stay** 50:25

**stays** 51:1

**step** 64:12 76:16

**stepping** 49:7

**steps** 35:5 61:24

**stood** 34:19

**stop** 54:3 62:1 70:18 71:23 72:2,3,15

**stopped** 91:23,24

**street** 4:5 40:17 43:1, 18,21 47:20 49:11 52:13 53:10

**strength** 71:18,21

**strike** 32:7 54:25 70:9 77:11 87:25 89:11 93:22

**strong** 59:11

**struck** 70:7

**struggle** 50:21 51:6 61:20 67:22 89:9 90:6

**struggling** 36:5 53:8 56:20

**stuck** 84:18

**student** 11:13,17,18 12:2

**studies** 12:22

**study** 16:3

**studying** 77:9

**stuff** 25:19

**subheading** 17:6

**subject** 11:6 28:5 29:25

**submit** 17:8

**subsections** 28:3,16, 18

**subsequent** 63:9

**subsequently** 91:23

**substance** 23:13 24:16 57:23 68:2

**substantial** 37:24 38:2

**suffer** 33:23

**suffering** 25:14

**super** 44:2

**superhuman** 71:23

**supervised** 10:23

**supervision** 10:18 11:6

**supplemental** 7:25

**supplies** 15:1

**support** 17:12

**suppose** 68:14 79:23

**supposed** 18:14 28:11 30:19 39:4 46:10 63:11

**sure** 21:14 42:16 43:5,6 45:15 51:10 54:9 56:13 59:12 68:23 77:17 78:2 79:13 80:25 81:13 93:18 96:20

**suspect** 53:24

**suspecting** 63:5

**suspicion** 57:19

**suspicions** 58:12

**sustained** 92:14

**swear** 5:8

**swear-in** 9:11

**swing** 42:24

**switch** 88:15

**sworn** 5:11 9:7,10 10:2 17:22 55:9

**symptoms** 21:7,24 22:12 35:25

**syringe** 85:10

**system** 11:15

—————

**T**

—————

**tactics** 83:1 87:17

**take** 14:21 22:1 24:6, 13,23 39:4,7 43:2 48:1 51:22 59:5,18 61:5 77:6 80:13 84:8

**taken** 95:20

**talk** 6:3 28:3 36:13 61:21 86:6 87:21 88:8 92:16

**talked** 86:3,8 92:5

**talking** 17:5 33:13 44:24 56:21 86:13 96:17

**talks** 23:20 28:5

**tall** 14:10

**Taser** 15:11

**tasked** 85:7 86:1

**taught** 16:1 48:18

**teach** 35:13

**teaches** 32:24 48:15 57:9 85:1

**teaching** 35:12

**team** 13:4,6,8,9

**technique** 65:7,10,13

**Technology** 12:13

**techs** 46:12

**teenage** 93:24

**television** 50:10

**tell** 35:8 45:18 50:15 86:19

**telling** 88:16

**tells** 6:9

**ten** 72:15 74:8

**tennis** 69:20

**Terminal** 41:21

**terminology** 70:25

**terms** 11:1 15:13 19:11 41:14 48:16

**tested** 16:2

**testified** 5:12,21 73:9

**testimony** 5:23,24 58:15 95:12

**Thank** 6:18 15:7 28:2 45:1 59:16 94:25 95:7 96:15 97:6

**Thanks** 5:17

**theft** 52:3,6,20,25 57:19,20 58:5,11

**thefts** 52:15

**themself** 25:6

**thereof** 4:4 36:12

**thing** 11:21 15:3 40:13 48:3,6,8 50:10

63:19 75:24 81:14 96:10

**things** 10:13 14:24 18:1 21:23 23:3,4 25:14 28:4 36:3 60:5 70:2

**think** 8:23,25 13:20 15:20 27:21 33:11 35:8 39:19,21 42:25 45:24 46:7 52:21,25 54:13,25 72:23 74:16,18 77:8 78:11 79:17 82:4,19 87:16 88:6,16 89:6,21 93:18,19 96:11

**thinking** 12:1 52:2,19 63:23 80:17

**third** 7:23

**Thomas** 5:6

**thought** 47:8,22 52:6 73:2 90:17 92:5

**threat** 18:25 19:4,6,9 20:3,7,10

**three** 7:14,22 8:25 24:21 46:2 50:1,2 94:23

**thrusting** 70:23 71:3, 5

**thumbs-up** 43:8

**tied** 23:4,5

**time** 7:23 9:20 11:17, 25 12:7 13:7,17 14:6,8 16:6 20:14 25:17 28:7 29:6,8,20 38:19 39:8,11,15 41:24,25 42:13 43:1 44:15,16,17 45:20 48:1 49:3,8 50:16,25 55:10 60:15,24 61:8 63:7 65:11 72:17 74:10 76:24,25 77:1,

8 79:7 80:18 82:9 84:11,14 85:5 86:13 90:11 91:21 92:22, 24 94:24 95:12

**timeline** 52:9,21 79:12

**times** 50:2 66:12 81:8

**today** 5:18 6:20

**today's** 95:12

**toe** 75:16

**told** 73:5 95:18

**tool** 27:20

**tools** 15:9

**top** 28:4 29:25 55:21 56:5 74:4 75:16

**torso** 37:14

**total** 94:11

**totality** 18:3,15

**touching** 55:17,24 56:2

**tourniquets** 15:2

**town** 40:22 41:8

**traffic** 48:2,9,17 91:5

**train** 38:13

**trained** 16:8 17:2,20, 21 18:2 19:3,13,16, 20 20:20 22:8,11 23:3,17 25:9 29:20 30:8,14 31:16 33:25 34:3,13,23 35:19 36:13,16 37:1,17,20 38:24 39:2 48:18 63:6 65:2,14 67:23 68:7 78:16 82:3,15, 25 86:21

**training** 6:21 10:8,10, 15,17,23 11:1,7 13:9 15:16 16:4,7,14,17

**Officer Cameron Leahy**

17:16,18 20:6,9 23:1 24:3 25:11 28:6 29:4,6,10,11 30:19, 21 31:14 32:8,16,24 33:4,17 37:5 38:15, 17,18,22 48:15 57:8 58:21 65:18 66:5 68:4 78:15 81:4,12, 17 82:20,22 83:13, 18 84:25 87:14

**transcript**  6:4,14 25:2 30:16 59:21 60:3 70:14 77:19,22 80:22 95:16,19 96:25

**transcripts**  6:22 8:20 95:20

**transitioned**  91:20

**transmission**  49:24 53:20 54:11

**transmissions**  41:6 48:22,24

**transmit**  48:2,13,17 49:8 50:3,21

**transmitting**  48:14 50:13,14,16 51:23

**treatment**  21:25

**tricky**  31:25

**true**  66:6

**truthful**  8:8

**try**  36:18 37:3 48:22 61:6 64:4 66:24

**trying**  47:21 48:17 49:7 56:22 61:21,22 64:19 70:3,12 79:11 87:6

**turn**  17:4 76:5

**turned**  84:17

**turns**  51:2

**TV**  51:14

**two**  6:7 7:7,11,18,21 9:22,24 10:5 15:13 23:4 24:21 42:20 44:19 45:23 48:12 49:7 51:3 53:7,17 55:12 56:19 58:16 60:5 62:15 63:7,25 68:19 70:2 79:7,15, 18 84:24 85:17

**two-syllable**  69:11

**tying**  80:7

**type**  11:21 12:4 24:19 38:22

**types**  26:6 28:15 58:23

**typical**  14:19 46:19

**typically**  45:19 48:18

---

**U**

---

**U.S.**  12:6

**Uh-huh**  27:9 29:23 42:3 47:11,15 53:11 59:23 78:6

**Ultimately**  61:24

**Um**  46:16

**unable**  24:17

**uncomfortable**  87:1

**uncommon**  44:19 45:12

**uncross**  74:5

**underlying**  27:3

**understand**  5:25 9:13 29:15 32:13 35:3 36:22 71:1

**understanding**  16:16 22:5 28:9,10,12,15

29:2 31:3 32:2,15 34:7

**understood**  6:5 8:2,5

**unfortunately**  91:21

**unit**  53:18 54:12,15, 16 76:10

**United**  12:8

**unlawful**  17:8

**unnecessary**  18:11

**unquote**  26:22 70:19 72:24 80:15

**unreasonable**  17:9 87:5

**unresponsive**  77:3 86:15 88:14

**unsecured**  44:4

**unwarranted**  87:5

**up-and-down-type**  75:24

**update**  10:12

**upper**  30:13 56:16,18 68:20 71:6

**upwards**  56:14,15 70:24 71:4 75:14 79:2

**use**  17:20 18:2,6,10 19:14 20:2,13,16 26:15 27:24 33:11 38:21 41:10 42:21 43:9 63:9,12

**usual**  96:7

**usually**  35:8 40:7,8

---

**V**

---

**vague**  12:25 27:3 35:1 36:20 41:23

**vaguely**  59:10

**Vallejo**  11:15

**value**  38:24

**varied**  46:7

**various**  38:20

**vehicle**  43:13,15 44:2 47:13 76:14,15 88:4

**vehicles**  44:3,16

**Verbatim**  54:13

**Version**  16:21

**versus**  4:13 32:10 37:8

**video**  77:5 79:17 87:6 95:14

**videographer**  4:10,15 5:7 39:8,11 84:11,14 95:11

**videos**  59:3 60:2 74:10 77:9

**view**  68:17

**violently**  71:13,16

**visual**  36:9 50:17,18 85:5

**Visually**  89:24

**voices**  59:22

**volunteer**  12:8

---

**W**

---

**waist**  90:16,18

**waistband**  89:20,23, 25 90:2,13,16

**waited**  85:4

**Walgreens**  52:13 58:2

**walk**  25:6

Index: transcript–walk

**walked** 34:20 59:2 87:24 88:3

**walking** 47:18,21 49:17 53:4 54:21

**want** 7:23 16:25 21:10 47:25 49:19 51:22 54:15 67:3 72:16,19,21 73:13 74:9 77:1,12,21 81:21,23 86:23 94:8 95:19 96:9,19,24 97:8

**wanted** 15:23 53:18 62:12

**warned** 60:9

**warning** 29:4 59:10

**wasn't** 47:8 50:24 55:9 73:23 74:16 75:22 80:10 90:18

**watch** 81:14

**way** 24:23 27:17 41:20 42:14,22 43:3, 4,16 50:8 52:17 61:9 63:6,17,20 66:4 68:18 86:23 91:1

**ways** 27:22

**we'll** 6:16 74:18

**we're** 10:22 19:11 33:13 74:18 96:7

**We've** 80:23

**weapon** 89:16,20,25 90:14

**weapons** 15:9 88:21 89:12,22

**Wednesday** 4:3

**week** 45:20 46:7

**weigh** 14:12

**weight** 37:14 65:20

66:3 77:16 78:11,16 84:5

**went** 10:10 16:22 60:24 76:25 86:3 87:24 88:1,13

**whatnot** 10:25 46:8 88:15

**whatsoever** 83:2,4,14

**wife** 86:9,25

**wire** 55:5

**witness** 5:8,10,13 7:2,4 10:22 15:6 27:6,14 32:15 35:4 36:23 40:4 43:20 45:2,6,9,12 46:18 51:12 58:11 59:15, 17 62:17 64:16,22 78:2 86:21 87:20 92:21 95:3

**witnesses** 86:4 91:11

**woman** 92:9 93:12,15

**woodchips** 84:18,19

**work** 11:22 13:25 14:3,4

**worked** 9:13 11:10, 12,17 63:7

**worker** 11:13,18 12:3

**working** 9:5,18 12:2 38:20 40:7,23 41:8 42:12 46:10 64:9

**wouldn't** 20:24 31:15 45:17 62:22 72:13 75:15

**WRAP** 64:13,14,18 76:13,17,19

**write** 77:7

**written** 6:16

**wrong** 8:21

**wrote** 37:13

---

**Y**

**yard** 87:1

**Yeah** 9:8 10:21 20:5 21:1 28:23 29:13,16 36:25 40:12 42:1 43:20 45:4,11 49:18 58:9 74:16 77:25 96:19 97:10

**year** 12:10 19:24

**years** 10:5 94:23

**Yep** 67:18 95:9