UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MARIO GONZALEZ, Deceased, through
his Successor in Interest, M.G.C.,
a minor through his mother and
Next Friend Andrea Cortez, individually
and as successor in interest for
MARIO GONZALEZ, Deceased,

     Plaintiffs,

     vs                Case No. 4:21-cv-09733-DMR

CITY OF ALAMEDA, a public entity;
FORMER CITY OF ALAMEDA INTERIM
POLICE CHIEF RANDY FENN, in his
individual and official capacities;
ALAMEDA POLICE OFFICERS ERIC
MCKINLEY, JAMES FISHER, and CAMERON
LEAHY, and DOES 1-10, Jointly and
Severally,

     Defendants.

## **Expert Report of John J. Ryan**

1. My name is John Ryan. I have been actively involved in police practices and law enforcement since 1981. I was an active police officer for twenty years in Providence, Rhode Island. In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

1

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island. In that capacity I was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter. In that capacity I author and edit the institute's legal update service for law enforcement. This update service and an archive of all articles that I have written can be found at and www.llrmi.com. Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

5. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations. As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

6. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges. Training I have provided are detailed in my CV.

7. I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002. During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the

2

Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of the Department's Administrative Staff.  During most of my career I also took an active role in researching and authoring department policy.

8.  Since my retirement in June of 2002, I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers.   Participants in these courses have come from thousands of law enforcement agencies around the United States.  Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands. These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

9.  The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

10. The programs on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well

as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

11.  As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill.  In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

12. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation.  I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

13. As part of my litigation consulting practice, I am retained eighty to eighty-five percent of the time by the defense of law enforcement officers or agencies and fifteen to twenty percent of the time by plaintiffs.

14. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

15. I have reviewed the following materials to date regarding this case: See Schedule D

16. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. I recognize that there may be additional documentation as the case progresses. If additional material is produced, I shall be prepared to supplement this report.

17. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

18. The law enforcement event reviewed in this report occurred on April 19, 2021, in the City of Alameda, California. The law enforcement response to this event which occurred at a public park, specifically Scout Park was prompted by two 911 calls. One of the callers indicated that a male subject was talking to himself, was unlikely doing anything wrong, but was scaring his wife and making his dogs bark by his presence. A second caller reported that the man in Scout Park had Walgreens' baskets and appeared to be breaking security devices off of alcohol bottles. The event began shortly after 10:40 in the morning and involves the interaction between Alameda Police Officers and their ride-along and Mr. Mario Gonzalez who died during the encounter.

<u>911 Call</u>

19. A male caller, Jeffrey D'Ambly reported that there was a man in his front yard kind of talking to himself and that the man did not have a mask on. D'Ambly said he went outside and his dogs were barking and that the man talked to him but was not making any sense. D'Ambly said his address was 802 Oak Street. Upon questioning by the call taker, D'Ambly said that the man was not in his front yard but by a fence adjacent to his yard and that his dogs did not like him. D'Ambly said he did not think the man was actually doing anything wrong, but he was talking to himself and hanging out. D'Ambly said the man was tweaking but was not doing anything wrong but was just scaring his wife.

20. James Cramer reported that there was a man at the park with two Walgreens shopping baskets with alcohol in them and he looked like he was breaking the security tags. Cramer said it was Scouts Park at the corner of Oak and Cowell. Cramer described the subject as 5'6" 250 lbs., Hispanic or Indian. Crammer reported that the subject had been loitering for a half an hour.

<u>Deposition of Officer James F. Fisher</u>

21. Fisher stated that his first law enforcement job began in November of 2010 with the Alameda PD. (7). Fisher testified that he has worked for the APD for his whole career. (8).

22. Fisher stated the following about his training on de-escalation before the Gonzalez incident: "Before the Mario Gonzalez incident, 2016. I guess it could start in the academy. It was a different term back then. I believe they called it verbal judo. So it evolved from verbal judo as a form of de-escalation, in other words, being able to communicate, being able to bring, in essence, a very common stability to a possibly chaotic scene. The ability to communicate with somebody is extremely important because, A, it helps mitigate any type of liability of something that can escalate into a use of force, or it also helps us to obtain information that we need to further investigation. So de-escalation is extremely important to us, and I think

6

from the time I have been a police officer, it's always been stressed. It's something that's always been within our training . . . Whether it's tactical communication, de-escalation, CIT training. All of the trainings that we attend, it always has to -- you know, those – those types of change -- it's all about communicating. But what people forget is communication is a two-way street. So if one person is doing all the talking and you're not getting a response, you're not eliciting a response or you're going ignored or somebody is just refusing to listen to you, then it kind of becomes null and void at that point, and you just do your best." (17-18).

23. Fisher stated the following about training on compression or restraint asphyxia prior to the Gonzalez incident: "It would have been through defensive tactics training, which would have been in June of 2020. And I think the era prior to that as well, it was brought up as well. It seemed like it was a transition to where it was becoming very -- I would say the -- the -- I guess the dog piling, like, that used to be realized a long time ago was pretty much being changed to being very -- a lot more specific in what your role is during an arrest with somebody, if the incident happened to go to the ground . . . To where one person will control one arm, another officer will control another arm, and then you ·would want to control the legs with another officer. So we want to limit it to three officers, absolutely staying away from the neck, staying away from the spine, and attempting to limit any weight that's on the top of the back." (20-21).

24. Fisher stated the following about monitoring a person for signs of respiratory distress: "I would say it goes back to basic first aid of ABCs, making sure they have an airway, making sure they're breathing, minus -- you know, you're not going to be able to check a pulse. You're going to be able to observe those two. So you could be looking for a chest rise and fall, and you might be having a conversation with that person. They might be answering questions.

Distress, I think, is something that is -- could be considered subjective because anybody who has an allergic reaction can have some sort of respiratory distress or, you know, some of that nature. So you know, you would have -- you would have to really know what, I guess, you're looking at or listening to to know if somebody is in respiratory distress, unless there is very specific signs of the person possibly going unconscious or just their resp -- their respirations may be very fast. They may be hyperventilating. There's a lot of different things that can go into that. Wheezing . . . You know, where an airway could be -- some sort of upper airway obstruction. There's a lot that goes into that, and I think it -- being able to identify any one thing is -- it could be difficult." (25).

25. Fisher stated the following about what caused him to go over to the scene: "I was dispatched to it as a cover unit. But I was already on my way there, I should say, to the station . . . I had started making my way from Bay Farm, the beat I was working, sector I was working, to the Alameda Police Department to obtain authorization to go get fitted for a new vest over at Gulls in Oakland. So it was very close to the next shift coming on, so I started kind of making my way over there, and then I got dispatched as a cover unit to that call." (40).

26. Fisher stated the following about the information that he knew about the call as he was heading to it: "The information that I remember was, I want to say, had to do something with -- I thought it was a suspicious person, like a 912 person, call for service that was possibly under the influence of an unknown." (41).

27. Fisher acknowledged that a week went by between when the incident occurred and when he gave his first statement about it. (42).

28. Fisher testified to the following regarding whether Officer McKinley filled him on what had happened when Fisher arrived at the scene: "When I first arrived on scene and began walking

8

down the pathway, my -- my sole job is a cover officer. That way, he can conduct his investigation while I could essentially keep the scene safe. So I didn't – I didn't say much and he didn't have much dialog with me. So I just kind of tried to listen." (44).

29. Fisher stated the following about what Officer McKinley asked him to do before he got to the scene: "He asked me to go to Walgreens to check to see if there was any walkouts, I believe is the term . . . Which I interpreted at some point to be a theft that possibly could have occurred." (44).

30. Fisher reported the following about what he did when he got to the Walgreens: "I parked out front, the front main entrance, activated my BWC. I walked in. It was kind of busy at that time of day. And I contacted, I believe it was a manager and a clerk. I don't remember which register it was. And based off of the description that Officer McKinley had given me, I asked if they had anybody that matched the description that possibly committed a theft or something of that nature, and I was told no. I know there's BWC footage of it. But after that, I walked out." (45).

31. Fisher stated the following about if he saw any weapons: "I couldn't see any weapons because he had a sweatshirt on and, obviously, that was concealing his waistband, and I can't see inside his pockets." (47-48).

32. Fisher stated the following about whether Gonzalez had anything in his hands: "When I got there, I believe he was leaning over and trying to twist on a cap or a security cap or something on one -- a bottle in one of the baskets that I observed, which caused me concern." (48).

33. Fisher testified as follows about if he saw any evidence that Gonzalez seemed confused: "Yes. I was picking up on things that definitely caught my attention. The first thing was the – the alcohol and the -- I should say, the alcoholic beverage that I saw, or beverages, the bottles that

I saw in the Walgreens baskets with the security caps on and one with the cap off, which looked like it had some missing. At one point, I remember observe -- the conversation was very difficult for me to hear. I don't know if it was because of the distance or the angle that I was at. But there was a lot of mumbling from Mario, and at one point I remember he wasn't -- some of the things I was hearing, he wasn't making any sense to me. He wasn't answering questions, like basic questions. Like I think one of them was just trying to get his name. He couldn't answer that question. Another thing I picked up on was when he lost balance and kind of bounced into a pine tree, which caused me concern because, you know, I didn't – when you're dealing with somebody who is possibly or showing signs of alcohol intoxication, you don't want them to fall . . . So there were things that I was cueing in and picking up on, more or less trying to make these observations. And everything to me at the time, and based off of what I was seeing on that scene and basically his behavior, in addition to his responses and the fact that he seemed to be having some difficulty keeping his balance, he was resting against a tree, he fell off balance, kind of bounced against it, I definitely was thinking public intoxication." (49-50).

34. Fisher testified that he did not see Gonzalez drinking alcohol. (51). Fisher stated the following about if he could smell alcohol on Gonzalez's breath: "During that time, I was wearing a mask, so I never was within, I would say 5 to 6 feet maybe. I think when I first got there, I might have been a little bit further away from him then." (51).

35. Fisher testified to the following about if he took over verbal interaction with Gonzalez at some point: "I don't know if I necessarily took over the verbal interaction, but I did try to interject to – and said something." (55).

36. Fisher stated the following about if there was consideration of calling the Mobile Crisis Response Team: "No . . . Nothing to me indicated, based off of what I was observing and taking in everything from that particular scene, made me indicate there was any type of mental health issue or mental health crisis that was happening at that point in time. The only -- the only thing that the -- I was observing was signs and symptoms of alcohol intoxication." (55-56).

37. Fisher further testified to the following about signs and symptoms of alcohol intoxication he perceived: "Well, basically unable to put any type of rational sentence together, mumbling, talking off topic. His balance was off. He, you know, he had bounced into a pine tree behind him, or rested against it. There was a large quantity of alcoholic beverage there. Some had been -- was missing from one bottle, which was in his vicinity, within arm's reach, and he was actually handling one of the bottles as I got there, as far as twisting the cap on and off. There was nobody else in the park. So everything to me was indicating there was no -- it was all the objective signs and symptoms of alcohol intoxication at that point." (56).

38. Fisher acknowledged that at some point he went hands on to arrest Gonzalez for public intoxication. (58). Fisher stated the following about whether Gonzalez was being arrested for any other crime: "Just the public intoxication." (59).

39. Fisher stated the following about what caused him to have probable cause to believe that Gonzalez was unable to take care of himself due to alcohol such that the crime of public intoxication was occurring: "Pretty much, he was in a -- well, the elements of the crime were in a public place, under the influence of alcohol or a drug, and unable to care for his own safety or the safety of others. So based off of my observations, when it came to determining whether or not he could care for his own safety, he couldn't even articulate to any -- Officer

11

McKinley or myself what his name was. He was making absolutely no sense. He was mumbling his -- he was off balance at times. There was a large quantity of an alcoholic beverage or liquor within the baskets.  Based off of that alone, not being able to really be oriented to where his – his surroundings, being next to a very highly traveled main thoroughfare on Otis, where there's a lot of vehicle traffic that goes quite fast, I didn't think that he would be able to care for his own safety based off of those observations that I made." (60-61). Fisher testified to the following about whose decision it was to arrest Gonzalez: "It was Officer McKinley's. Ultimately, he was the primary officer." (62).

40. Fisher described which arm he grabbed testifying, "It would have been his right arm." (63). Fisher stated the following about how long it took him to get Gonzalez's hand behind his back in a position to be handcuffed: "It didn't seem like it took very long, maybe one to three or five seconds, maybe." (64).

41. Fisher stated the following about what occurred next: "It seemed like very shortly after, there was -- it just became a big struggle and he started kind of -- I was -- I was holding the -- I had a very -- I would say, a good secure hold, and I want to say I heard ·Officer McKinley -- he was saying something to the effect of like, hey, you know, just put your arm behind your back, or something like that. And I looked over and I saw that his left arm, part of his arm was still kind of extended straight and out like that and he was resisting Officer McKinley." (65-66).

42. Fisher continued, "At that point, we just -- he started to resist more and became more -- more of a -- now we're -- really, it's just more of a general control at that point because we don't have the physical control of, I guess, holding him in one place because now he's moving wherever he wants to go and I kind of feel like I'm just being pulled with him. And he's still refusing to put his left arm behind his back as I'm trying to de-escalate the situation by being

12

very calm, being very polite, asking him, please put his arm behind his back, like, hey, don't do this Mario, things to that effect. I was just trying to stay as calm as I can as he started to resist more and more." (66).

43. Fisher testified to the following about the decision to take Gonzalez to the ground: "Yes. I believe I verbalized it, if I'm not mistaken, that it -- we're not able to handcuff him on the ground. And I want to believe it was somewhere like three to four minutes that we tried to handcuff him standing, and we just were not able to do it. And actually, at one point I had my handcuffs out and I thought we were going to be able to handcuff him, but then he continued to resist in a very aggressive manner and I actually don't even know what happened to my handcuffs to this day. So I lost them. So yes, it was determined that it was probably the safest and most effective way to get a position of advantage to put Mr. Mario Gonzalez onto the ground." (67).

44. Fisher testified to the following about falling to the ground: "I would say that the order went, we – I attempted a leg sweep, which failed. At one point I lost control of his right arm, and during that time, I want to say that there was a point in time where I didn't have control of that right arm. And I was retrying to reestablish control of his right arm, a general control, and it was very difficult to do. He was basically moving a lot. He was being very – his movements were very aggressive at one point, to where his elbow came up and almost hit me in my face. And then during that time, I never had, I would say, even a general control of his right arm because we both – we just fell together. I didn't trip him. I don't know how we fell. If I'm not mistaken, we didn't – he didn't just fall onto his stomach prone. I want to say it was more of a -- almost like he -- it happened so fast, but it was almost like he -- his knees just kind of buckled and he just went that way, because I ended up on my right shoulder, partly. I want to

say, like, part of my right leg was underneath his body and I actually was trying to reach out and grab his arm at one point because I had no control over it, again. But I don't know how we fell. We just fell." (68-69).

45. Fisher reported the following about what happened when everyone was on the ground: "Again, a lot of my focus, I was trying to, A, remove the portion of my lower body that was underneath Mr. Gonzalez by shifting my hips outwards. So I had to essentially use my left leg as kind of a catalyst to get some kind of momentum to twist my hips, and then once I did that, my leg rested on his lower back for a brief moment, while I was trying to get my hip away from him while I'm reaching out trying to establish some sort of control of his right arm . . . At that point, I was able to get up and essentially rest, I would say, this portion, maybe my chest portion, on a portion of his back, kind of like as a point-to-point contact with my -- on the balls of my -- I'm basically on my toes, trying to use my strength to pull his arm back." (69-70).

46. Fisher testified to the following about whether he was aware that Officer McKinley was essentially sitting on Gonzalez's buttocks: "At one point, I remember looking up to check to make sure Officer McKinley was okay. I had -- I – I felt like I had eye contact, or I looked at him, saw that he was okay, and it looked to me he was on his knees at one point, with his arms reaching underneath Mario's body as if he was trying to do a two-on-one rock-out, which is a defensive tactics in order to -- where you use momentum in the strength of your arms to kind of pop the arm out by using both arms." (72).

47. Fisher testified to the following about if he was aware of a third person holding down Gonzalez: "Yeah. So at some point, I saw a body laying across the legs.  I had no idea who it was. Out of -- it could have been out of my peripheral. But I really had no control of his right

arm, and that was my focus. So there was somebody there, but I didn't know who it was." (73-74).

48. Fisher testified to the following if he put other weight on Gonzalez's back: "Yes. I rotated my body around his head. A lot of the weight was supported between my knees, feet, and a point of contact, the chest, as I kind of rotated around. And then I attempted to rotate back the opposite way as -- as fast as I could in an attempt to conduct a -- what's called a 360 arm sweep, to where my left arm would underhook his right arm. And using my momentum, I would be able to kind of force that right arm to his lower back in order to get in a position of advantage to handcuff him. It was -- I was extremely exhausted at that point. I remember coming around and basically it was just everything -- all the strength that I had, and I believe I was even grunting in doing it, to force his arm back." (74-75).

49. Fisher stated the following about if he only put his knee or shin on Gonzalez's shoulder: "Yes. That was my sole focus, was to try to make sure that it stayed there. I was trying not to, I would say -- I was very focused on keeping my -- my shin and knee on the shoulder and doing everything I could to prevent it from even, I would say, moving close to the spine. But a lot of the times, if you're moving around, skin kind of moves around as you -- you know, we're all kind of malleable, and so things could go one way or another." (76).

50. Fisher testified to the following about if he heard sounds that sounded like gasping: "Exhaling?  Inhaling? I heard -- I heard breathing that was indicative of resistance, of physical exertion." (80).

51. Fisher stated the following about if he put weight anywhere on Gonzalez's back after the handcuffing: "Focusing on the shoulder." (81). Fisher stated the following about what part of his body he placed on the shoulder: "It would have been my right knee and shin." (81).

15

52. Fisher stated the following about the reason that he put weight on the shoulder after the handcuffing: "Because we still only had general control, where he could still move his legs and move his body. We did not -- I don't believe that we had physical control at that point, after the determination was made to utilize the wrap, so." (81).

53. Fisher testified as follows about whether he saw any other officer place weight on Gonzalez's body after the handcuffing: "I know Officer McKinley was holding his left shoulder. But it looked like he had his hands more of a -- like resting on his -- it was awkward. It's awkward to describe. I would have to refer to the body-worn camera to kind of describe it. It was kind of weird. It was almost like he was resting like this and talking to him. And then I know Leahy was -- I don't know if he was just holding his legs down with his hands or if he was using his legs and his hands, but I know that out of my peripheral I could see him holding his legs or some sort of his body with his strength. I don't know if it was his hands or knees or legs." (87).

54. Fisher acknowledged that at some point he said to other officer "He's lifting me up." (88).

55. Fisher testified, "I was being lifted up into the air . . . He was -- I don't know -- I don't recall if he was bringing his knees up to his chest or his, like, waist in, but my knee was on his shoulder, his right shoulder. My right knee was on his right shoulder. And whatever -- whatever he did, if he rolled or if he tried to kind of posture or bring his knees up, he created some sort of gap or something. He -- he lifted me up in the air and then he came back down." (88-89).

56. Fisher stated the following about what happened when he said, "No weight, no weight, no weight.": "After I had said that, Officer McKinley began to what appeared to be straddle him around the buttocks area again, by lifting, I think it was his right leg over his waist, over Mario's waist. And I immediately said, "No, no, no, weight."· I used my hand to basically

16

block and wave and say, "No, no, no, no weight on his back, no weight," or whatever I said." (91).

57. Fisher testified to the following about why he said, "No weight, no weight, no weight": "Because I was very cognizant of staying away from the neck, staying away from the spine, and trying to do everything I could in my power to keep any type of weight on his back -- off of his back." (91).

58. Fisher acknowledged that he heard Leahy say twice that Leahy did not want to lose [control of] what he had. (100). Fisher said that one of the statements by Leahy was made right after Fisher suggested rolling Gonzalez on his side. (101). Fisher reported that he never looked down to see what Leahy was referring to, stating, "I was focused on my role." (101). Fisher said it was his intention to keep Gonzalez in the handcuffed prone restraint until the WRAP was brought, "based off of his level off resistance and the fact that we still only had—there was still something going on with Officer Leahy and the reason why he felt the need to reply to me in that aspect of 'I don't want to lose what I got,' I had to trust what he said. There was something still going on actively down below his waist there, I didn't know about." (102).

59. Fisher stated the following about if Gonzalez attempted to strike him: "He almost elbowed me in the face . . . When he was still standing, yes." (105). Fisher stated the following about whether this was an intentional attempt to elbow him: "I can't speculate, but he still came very close." (105). Fisher testified that Gonzalez never struck him and never made any verbal threats against him. (111-112).

60. Fisher testified to the following about whether he provided first aid to Gonzalez: "I tried to hold his head stable and basically hold it a C-Spine to where the airway was open." (115).

17

61. Fisher testified to the following about if he ever advised dispatch that Charly Clemmons was in a ride-along with him: "No . . . Again, it was common practice that was -- Mr. Clemmons rode along with me occasionally, and I believe that common practice started way before I got there and to that date. It wasn't -- it was with multiple officers and other personnel in the department." (119).

62. Fisher stated the following about injuries he sustained as a result of this incident: "I had bruising on my knees. I had a laceration on my -- I believe it was my right shin. And I had a small abrasion, I believe that was on my right upper cheek somewhere . . . The bruising was me focusing on -- my knees were just hitting the ground constantly. The laceration, I don't know where the small laceration comes from. And I don't know where the small abrasion on my check came from." (122). Fisher stated that he did not seek any medical care. (122).

<u>Deposition of Officer Eric McKinley</u>

63. McKinley stated that he started with the Alameda PD on July 9, 2018. (11).

64. Officer McKinley testified that the County had a Mobile Crisis Response Team which he had utilized about five previous times. (15-16). McKinley acknowledged that so long as a person was not physically combative and willing to engage in some communication, that could be a situation where you could have called the Mobile Crisis Response Team "if they were available." (18). McKinley said that hours for the Mobile Crisis Response Team was Monday to Thursday 11:00 a.m. to 4:00 p.m. (18). McKinley agreed that the incident that led to the death of Gonzalez happened on Monday, April 19, 2021, beginning at approximately 10:45 a.m. (18).

65. McKinley agreed that the persons working the Mobile Crisis Response Team did not wear uniforms and that sometimes people in crisis are more willing to speak with somebody who is not law enforcement. (19-20).

66. McKinley stated the following about his training on de-escalation prior to the Gonzalez incident: "That it was a useful tool to gain compliance and to avoid the use of force, that it was safer for everyone, the person that we're contacting, bystanders and police officers, that given the time and the distance to safely do so, that it was preferred, other -- preferred to use that instead of, you know, some -- some use of force." (30).

67. McKinley stated the following about training on avoiding asphyxia: "So anything that's going to prevent or limit or reduce the amount of oxygen that they're able to profuse in their lungs, whether that be by restricting the movement of their chest, expansion and retraction of their chest, their throat, basically their airway, mouth and nose, if that's obstructed or -- or covered or anything like that." (33).

68. McKinley further testified to the following about training on asphyxia: "That we should -- when we have control of a subject, once -- once they're in a state that they're able to be controlled, that we should remove any weight that we've placed on their backs, that any -- any weight that we place on their backs shouldn't be all on the spinal cord or across the neck." (33).

69. McKinley stated that he did not use his TASER on Gonzalez and stated the following about why he did not use the TASER: "I determined, based on the level of resistance and his strength, and also the composition of his body and the clothing he was using, that when I had the opportunity to use it, that it would not be effective. And, in fact, it would have prevented

19

-- it would have presented more of a safety concern because I would have ·had to release the control I had on his left arm to deploy it." (53).

70. McKinley testified to the following about the first information he received about the person who turned out to be Gonzalez: "I was dispatched to the south end of Oak Street for a person who was talking to himself as a Hispanic male wearing a tan vest, and that they were concerned that he might be having some sort of mental crisis, psychiatric crisis . . . I believe that there was additional information that he was possibly intoxicated." (58).

71. McKinley testified to the following about if he knew of any crime as he was driving to the scene: "I knew about the possibility of a crime, yes . . . The possibility of being intoxicated to the point of unable to care for yourself or others." (59).

72. McKinley stated the following about what he observed as he walked up: "I observed Mr. Gonzalez was wearing a jacket that was inside-out. He was combing a hat that he was wearing on his head with a -- with a handheld comb. And he was talking to himself and he was sort of shuffling around near a couple of grocery store baskets." (62).

73. McKinley described the following about seeing an open container: "Yep. It was an open plastic -- it looked like a one-gallon bottle of clear liquor, something like vodka. The bottle was dented around the shoulder of the -- of -- of the bottle, which is right at the base of the neck of the bottle, and there was about two cups of liquid missing from it. It was standing upright in the basket that was closest to Mr. Gonzalez." (63-64). McKinley testified to the following about whether Gonzalez was holding the bottle: "He was not holding the bottle." (64).

74. McKinley reported the following about initiating a conversation with Gonzalez: "I introduced myself. I told him why I was there and I asked him how he was doing. And my goal there was

to, you know, assess his response to me and build rapport so that I could have a further conversation with him and determine the best course of action . . . I told him that somebody called and was concerned that he wasn't feeling well." (64).

75. McKinley testified that he did not observe a weapon on Gonzalez's person. (65). McKinley stated the following about if he observed any apparent threat from Gonzalez: "· So I noticed he was wearing baggy clothing. His waistband was covered. And there were lots of objects. I wasn't able to inventory them all, but there was at least a glass -- another glass bottle in the basket that was nearest him." (65).

76. McKinley provided the following about what happened next: "I tried to have a conversation with him. It became apparent that he was unable to complete sentences. He would start a sentence and then immediately change his course of thought and start talking about something else. And a lot of what he was saying wasn't substantial. It was -- he was saying something about somewhere over there and, you know, just then, and not really using any defining words in his speech . . . I tried to find out his name. I explained again why -- you know, what my plan was, to identify him, to make sure that he was not feeling like hurting himself or someone else, that he was safe to be in the park, that he wasn't going to continue drinking in the park, and that -- that would be the -- you know, my preferred resolution to our contact." (66).

77. McKinley stated the following about if he even knew for sure that the open container was Gonzalez's: "Based on my training and experience, his – his proximity to that container led me to have reasonable suspicion that it was his." (67).

78. McKinley stated the following about having a suspicion that the alcohol was stolen: "Because the -- the glass bottle still had the -- a store security cap on it, which is routinely removed at the purchase point, or the point of sale. And I had noticed while I was speaking with Mr.

Gonzalez that he was fondling little black and gray plastic bits. And just based on my experience with those caps, I know that people will typically destroy them to defeat them and remove the cap so they can access the alcohol inside, and it looked like what he was holding was the remains of the security cap that was most likely on the clear plastic bottle." (69).

79. McKinley testified to the following about what he did to investigate whether Gonzalez stole the alcohol: "I provided his description to Officer Fisher as he was responding, and asked him to stop at the Walgreens that was immediately across the street and inquire with staff inside if there had been any recent alcohol thefts or thefts in general with Mr. Gonzalez's description." (70).

80. McKinley testified to the following about what Officer Fisher relayed to him: "That -- that he advised there was an -- he said something to the effect of negative, that there were no -- referring that there were no recent walkouts with Mr. Gonzalez's description." (70).

81. McKinley stated the following about whether Officer Fisher assumed questioning of Gonzalez when he arrived at the scene: "Not immediately. So he listened to my conversation with Mr. Gonzalez for a while, which I feel brought him up to speed with what was going on and my -- my situation and Mr. Gonzalez's situation, and then he assumed communication with Mr. Gonzalez to, you know, try another approach, to try to gain his compliance." (79).

82. McKinley acknowledged that it was his decision to arrest Gonzalez. (79). McKinley testified to the following about what crime Gonzalez was being arrested for: "We were detaining him in handcuffs for public intoxication, 647(f)." (80). McKinley acknowledged that he had not done a breathalyzer test or a field sobriety test on Gonzalez at this point. (80).

83. McKinley testified as follows about the non-verbal signal that he gave to Officer Fisher to arrest Gonzalez: "I held up my left hand and grabbed my left wrist with my right hand?" (81).

84. McKinley testified that he did not call the Mobile Crisis Response Team because they were not yet on duty. (83).

85. McKinley described what happened when he and Officer Fisher went hands-on with Gonzalez: "Next. So I walked up to Mr. Gonzalez while he was standing on that small stump, to his left side. Officer Fisher approached his right side. Officer Fisher grabbed on to his right arm and hand, and I grabbed the left, and we both attempted to bring Mr. Gonzalez's hands behind his back as we were explaining what was happening." (85).

86. McKinley described why he was not able to get Gonzalez's left wrist in a position to handcuff using a control hold, stating: "It was a number of factors. The first was that he was immediately resisting by making his arm ridged and keeping it toward the front of his body, and the other was that his bulky clothing was covering his wrist down to his knuckles and so I was unable to grab his hand, well, the rest of his hand, just because of the size that it was, was difficult to hold on to." (86).

87. McKinley testified to the following about what Gonzalez was doing as McKinley was trying to get his left arm into handcuffing position: "Many things. He kept trying to pull his left arm in front of him. At one point he looked over his shoulder and indicated something behind him. I don't -- I don't know what he was talking about. It seemed like he was trying to grab his waistband with his -- with his left hand, and he was bending over at the waist, trying to pull away from us." (87).

88. McKinley testified to the following about whose decision it was to tackle Gonzalez: "It was both of our decisions. Officer Fisher voiced it first, but I had come to the same conclusion at approximately the same time." (87).

89. McKinley agreed the only crimes that he was investigating were misdemeanors at the most. (89).

90. McKinley acknowledged that an open container in public is only an infraction and not even a misdemeanor. (89). McKinley stated the following about whether an open container in public is a cite and release offense: "Yes. Unless they're already in custody for another crime." (89).

91. McKinley testified to the following about how he and Officer Fisher got Gonzalez to the ground: "We had attempted leg sweeps that were ineffective, and my understanding at the time was that eventually Officer Fisher was able to leg sweep him to the ground. I don't know what happened on that side because I was focused on what I was doing on my side of Mr. Gonzalez." (89).

92. McKinley stated the following about what happened when the officers and Gonzalez went to the ground: "I attempted to get Mr. Gonzalez's left hand behind his back. And in order to do that and to keep him from being able to roll over, I mounted him by placing my knees on either side of his hips and placed my weight on his buttocks, and from there, I pulled his left arm behind his back." (91).

93. McKinley further stated the following about what he did to control Gonzalez on the ground: "I used my strength to pull his arm behind his back and keep it there while Officer Fisher moved his other arm to his back, and we were able to place the handcuffs on. And then after that, I used my hand or my elbow to hold Mr. Gonzalez's elbow in place. There was also a moment when Officer Fisher stated, 'We have no weight on his back.' Mr. Gonzalez was still trying to roll over, so my understanding of Officer Fisher's statement was that it was a concern that Mr. Gonzalez would be able to roll over without some additional force being applied, so

I briefly placed my left knee over his lower left hip area and placed a small amount of my weight on that." (95).

94. McKinley testified to the following about what part of Officer Fisher's body was used to put weight on Gonzalez's right shoulder: "I believe he used an arm at one point, and then also his chest at one point, chest to shoulder contact." (98).

95. McKinley further testified to the following about what else he saw: "So I didn't see this, but I -- I knew that it was occurring because it was behind me. Mr. Clemmons came and, at my request, controlled -- or attempted to control Mr. Gonzalez's legs, and at some point he was replaced by Officer Leahy when he arrived on scene." (98).

96. McKinley testified to the following about if he could tell whether Gonzalez's face was being pressed into wood chips: "I was on my -- on my knees when I had my head down alongside his head, and I was watching – watching his head move, and -- and his lips were opening and closing as he was speaking. They weren't being pressed into the ground. I could see his face. I could see his nose." (100-101).

97. McKinley stated the following about who handcuffed Gonzalez: "I did. It was -- I mean -- but it took both of us to do it. But I -- I was the one that physically manipulated the handcuffs in place." (103).

98. McKinley described the following about physical resistance from Gonzalez: "Yeah. Mr. Gonzalez was still trying to pull both of his hands forward under him. Either to stand up or to access his waistband, I don't know. He was still trying to roll over away from us. And there -- there didn't appear to be any physical movement restrictions, like range of motion, that was preventing us from using one pair of handcuffs." (103).

99. McKinley reported the following about physical resistance: "Yeah. He was -- he was kicking his legs around and -- and lifting his hips up . . . I could -- I could feel his -- his whole body moving as a result of his legs being -- his legs kicking around, and Officer Leahy also said that he was still kicking and asked Mr. Gonzalez to stop kicking." (104).

100.    McKinley described what happened after Gonzalez was handcuffed, testifying: "I double-locked the handcuffs, checked them for tightness, advised over the police radio that we had him detained but we still needed another officer, and I moved off of his buttocks and situated myself along his left side so I could continue to talk to him and try to calm him down and monitor his breathing." (106).

101.    McKinley described what other officers were doing after Gonzalez was handcuffed: "Officer Fisher was holding Mr. Gonzalez's left -- or I'm sorry, right elbow. And as I mentioned, I knew that Officer Leahy was on Mr. Gonzalez's legs, but my attention was on Mr. Gonzalez's face and what he was -- just trying to have a conversation with him." (106).

102.    McKinley testified to the following about why Gonzalez was not placed into a recovery position after he was handcuffed: "Officer Leahy indicated that he would have lost control of Mr. Gonzalez's legs before we had a chance to start applying the wrap, and I determined that that wasn't safe to -- to lose the control that we had, and there was no other indication that it was necessary." (109).  McKinley said that Gonzalez had done nothing "maliciously" to try to hurt McKinley but based on Leahy's response about not wanting to lose control, McKinley did not try to put Gonzalez in a recovery position. (109-110). McKinley said he never asked Leahy why they could not turn Gonzalez on his side. (110).

103.    McKinley testified that Gonzalez did not strike him during the entirety of the encounter. (119). McKinley testified that Gonzalez did not make any threatening movements

as if attempting to strike him. (120). McKinley testified that Gonzalez did not make any verbal threats. (120).

104.　　McKinley stated the following about how he figured out that Gonzalez was unresponsive: "I looked and listened, and he had stopped talking and stopped moving." (121).

105.　　McKinley testified: "I rolled him onto his side to look at him, and I -- I told Officer Fisher, "He's going unresponsive." . . . I checked for a pulse, couldn't find one. His jacket had kind ridden up to his shoulder blades a little bit more, and so to make sure that I could check his pulse properly, I ripped his jacket open a little bit and checked again. I did not find a pulse, so I rolled him onto his back and began chest compressions." (122).

106.　　McKinley testified to the following about what injuries he sustained: "I had small abrasions on my hands and -- and a laceration and some -- some red marks on my forearm." (124).

107.　　McKinley testified that he was not found to have been in violation of policy or practice in connection with this incident. (126).

## Deposition of Officer Cameron Leahy

108.　　Leahy stated that his swear-in date with the APD was February 12, 2018. (9).

109.　　Leahy testified to the following about if he used deadly force on Gonzalez: "No, I did not." (20).

110.　　Leahy stated the following if he was trained to avoid pressure on the back of a person in a prone position: "When possible, avoiding the head, neck, or spine, yes. The shoulder blades were really that only portion of, I guess, the rear part of the upper body that we were trained to put pressure." (30).

27

111.     Leahy stated the following about his training on the recovery position: "So my understanding of the recovery position again is that it's generally a safer position. Where if someone is placed on their side with special attention to preserving their airway, that it's a safer position for someone to be on the ground, but not in a -- in that prone position." (34).

112.     Leahy testified to the following about when he first heard of this incident: "So I remember a radio call going out for Officers McKinley and Fisher to respond to that area of the south end of Oak Street. I don't remember paying particular attention to what the details of that call were other than some sort of disturbance call. And I remember -- I believe Officer McKinley advised on the radio he got there first, and Officer Fisher was still coming from the part of town that he was working, and advised Officer McKinley that he was going to be a moment. And then I remember Officer McKinley ·advising -- our kind of radio lingo is "Out on 1," meaning I'm, you know, in contact with the individual. I don't remember the particulars of the dispatched call for service, though." (40-41).

113.     Leahy stated the following about what he saw when he got to the scene: "Well, nothing initially because where they were situated when I parked my patrol vehicle, I couldn't actually see where they were. But I saw Officer Fisher's patrol vehicle parked on Otis Drive -- I knew that the quickest way to get to that location would have been on Otis Drive; not actually looping around on to Oak Street -- Yeah -- looping around on to Oak Street. And so when I parked on Otis Drive -- and this is after I had become a little bit more concerned about what was going on. But after I had parked on Otis Drive, I observed Officer Fisher's patrol car parked there with the passenger door open but nobody in the vehicle, which was super alarming to me because it's not common for officers to leave our patrol vehicles unsecured, with our gear and equipment in them, with the door open and nobody about the area. So that

was my initial observation." (43-44). Leahy noted that he knew that Clemmons was with

Officer Fisher and that Clemmons would ride with Fisher one or two days a week. (45).

114.    Leahy continued, "So eventually as I'm looking for them in the park area, I see the two

officers, Mr. Clemmons – and Mr. Clemmons struggling to control an individual on the

ground, kind of in the driveway area of that last house on the south end of Oak Street . . . And

-- so they had, you know, not been responding to their radio initially -- just about right as

when I was -- when I -- I didn't mention this earlier; I just remembered. But right as I was

pulling -- maybe a block or two out, I heard Officer McKinley, I believe, advise that they still

wanted another unit to respond. So I knew that there was -- and that was the first radio

transmission from them after the clicks of the radio with no response. So I knew that there

was still the request for another officer. When I saw Mr. Clemmons involved in the physical

restraint of the suspect, that was a huge red flag for me because not only is he not a police

officer, but his age as well. I was concerned that -- you know, why is he involved in this." (53-

54).

115.    Leahy stated the following about how Officer McKinley transmitted for another unit:

"Verbatim I don't recall. I think he said something to the effect of "One detained, but we still"

-- "I still want another unit."" (54).

116.    Leahy testified that Officer McKinley did not ask for a Code 3 unit and he did not

indicate that there was any sort of emergency. (54).

117.    Leahy described what he did when he arrived, stating: "So my first action was to

relieve Mr. Clemmons because he wasn't a sworn officer." (55). Leahy testified that Gonzalez

was face down and that, "Officer McKinley was on the left side of Mr. Gonzalez, and Officer

Fisher was on the right side of Mr. Gonzalez." (55). Leahy stated the following about what

portion of Officer Fisher's body was touching Gonzalez's body: "I believe he had a -- his knee on the shoulder blade area of Mr. Gonzalez's right shoulder blade . . . On the back portion of his -- yes, on top of his shoulder blade." (55).

118.　　　Leahy stated the following about what position Charlie Clemmons was in: "So it looked to me as though Charlie had his chest laying over the top -- or over the back portion of Mr. Gonzalez's calves -- calf area." (56).　Leahy testified that Gonzalez "was actively attempting to break free of their control. (56).

119.　　　Leahy described the the movements that Gonzalez was making testifying: "Sure. So he was attempting -- he was bending at the knees, kind of pushing upwards or up towards the sky against Mr. Clemmons's chest; he was bucking upwards at the hips, and kind of moving his upper body, but I couldn't see specifically how or what he was doing. There was movement with his upper body, though. That -- and I knew that because Offic- -- both of the two officers were still struggling to control him and were actively talking to him; giving him commands; still trying to deescalate -- those were my initial observations." (56).　Leahy said that before he arrived, Gonzalez was already handcuffed behind his back.　(56-57).　Leahy testified that as he went to the other officers' aid, he made observations of the liquor bottles and Walgreens' baskets, notwithstanding seeing the struggle on the ground. (58-59).

120.　　　Leahy reported: "So I vaguely recall Charlie warning me of how strong -- or how resistive he was being at the legs, and be -- "Be careful," or "Are you sure you've got it"; something like that . . And so as Charlie began to stand up, I took control of -- or attempted to take control of Mr. Gonzalez's legs." (59).　While Leahy's statement to Clemmons indicating that Leahy would take over is clearly captured on the BWC, there is no statement

from Clemmons captured. Leahy could not explain why Clemmons' statements were not captured in the BWC recordings. (60).

121.    Leahy described controlling Gonzalez's legs, reporting: "So I immediately took over the attempt to control his legs, but as I stated in previous interviews, I never felt that I had full control of his legs." (61).

122.    Leahy testified that he did not ask any other officers what was going on and stated the following as to why he did not ask: "The level of resistance that I specifically was being faced with at the legs appears to me that the struggle was very much still ongoing. And Officer McKinley, I recall, was still actively trying to talk to Mr. Gonzalez and deescalate the situation; trying to calm him down so that we could move on to the next steps. Ultimately the goal was to get him up and get him into a patrol car, and -- so no, I did not have an opportunity to stop that conversation and ask what was going on. I'm also aware of certain case laws that allow us as officers to act -- as a cover officer, act, you know, at the direction of other officers not having been on scene from the entirety of the event. So." (61-62). Leahy acknowledged that the other officers did not direct him to do anything.

123.    Leahy described the following about how he began to restrain Gonzalez: "So when I took over the control of the legs from Mr. Clemmons, I recall using my knees and shins, placing them over -- in a perpendicular manner – over Mr. Gonzalez's calves. And I immediately began working to cross his ankles because not only does it allow a greater level of control of the legs when the ankles are crossed, but it's also the first step in the application of the WRAP restraint device. And I did hear Officer McKinley mention something about the WRAP -- I did hear Officer McKinley mention something about the WRAP as I was taking over control of the legs, so I began trying to cross his ankles." (64). Leahy acknowledged that

31

while crossing Gonzalez's ankles, he also was kneeling on Gonzalez's calves. (65). Leahy agreed that in prior statements he said that Gonzalez was lifting him off the ground, however he could not say to what degree. (66).

124.    Leahy testified that when Fisher asked if he could do a figure-four Leahy's response was, "I don't want to lose what I've got." (66-67). Leahy said that he was referencing the percentage of control he had on Gonzalez's legs. (67). Leahy agreed that Gonzalez was prone, handcuffed, heavy-set, and that Leahy did not know how long Gonzalez had been in that position. (67). Leahy said that he was aware through training that alcohol is a respiratory depressant. (68),

125.    Leahy stated the following about whether it sounded like Gonzalez was in respiratory distress: "No. As I mentioned in one of my prior interviews, the sounds that he was making, I attributed to that of a -- you know, somebody who is playing sports. When they are -- when they're exerting themselves so physically, they make certain noises. Much like how a tennis player hits the racket -- or hits the ball with the racket so hard, they make a physical noise. The reason why I correlated that -- or made that connection was because a lot of those sounds that Mr. Gonzalez was making were happening in direct ·conjunction with me being lifted off the ground. Those two things made me believe that they were sounds of physical exertion trying to more or less kick me or buck me off of him." (69-70).

126.    Leahy testified that Gonzalez never struck him. (70). Leahy testified that he never saw Gonzalez strike anybody else. (70). Leahy said that when Leahy can be heard telling Mario to stop kicking that "this is when he was actively thrusting upwards lifting me off the ground. I used the terminology 'kicking' because it's one that most people would understand…So he was thrusting his—so at this point his ankles—or his heels, rather, are pointed upwards

towards the sky and he was thrusting them up towards his upper body." Leahy said that Mario was actively lifting his feet off the ground. (70-71). Leahy said Gonzalez was lifting both feet off the ground, "While lifting me off the ground," violently. (71).

127.    Without making a credibility determination, I would note that the objective evidence, Leahy's BWC video, does not depict any of the violent resistance and kicking that Leahy has described.

128.    A number of screen shots which are demonstrative of the real time video provide some examples: Leahy holding leg with his hands and no movement showing.



129.

130.    Gonzalez's foot flat on ground not moving:



131.



132.

133.    While there are times where because of the two-dimensional fixed perspective of

Leahy's BWC, each time Gonzalez's foot appears, it is the same flat position on the ground

and there is no evidence of thrusting or kicking.

134.



135.

136.    In fact, when Leahy was telling Gonzalez to stop kicking, one of Mario Gonzalez's

feet is clearly still in the same position flat on the ground.



137.

138.    As the directive to stop kicking is repeated, Leahy's hand (fingers) can be seen holding

Gonzalez's foot.



139.

140.    It is noted that when Leahy was asked by Fisher if the officers should move Gonzalez

on his side and Leahy responded in the negative, again that he did not want to lose what he

had, Gonzalez foot can still be seen motionless on the ground.



141.

142.     Leahy testified: "I was kneeling across his calves.  My—when I wasn't being lifted

off the ground and we were actually on the ground, my shins were atop his calves and the

balls of my feet were on the ground…I had my left hand on top of his ankles so that he couldn't

uncross them, and then I believe I had my right hand on the back of one of his knees.  I don't

recall which one." (73-74).

143.     Leahy testified that right up to the point where McKinley stated that Gonzalez was

going non-responsive, "I was still experiencing attempts to push upwards with his legs."

144.     Leahy testified to the following about how long it was from when he started kneeling

on Gonzalez's legs to when Leahy got up: "I think after reviewing the video, it was roughly

two minutes." (79).

145.     Leahy stated the following about what he did to provide resuscitative efforts: "So I

administered two doses of Narcan not knowing what he might have on board. My training

teaches me that there really isn't a negative or a harmful medical effect to giving Narcan when

it's not needed. So that was my first lifesaving action, was one dose -- I did the first dose of Narcan; waited a short period of time to see if there was any visual response. I did not observe one, so I administered a second dose. And then at one point I was tasked with taking over chest compressions." (84-85).

146.    Leahy stated the following about an injury he claims he sustained in this incident: "I had several scrapes and scratches and bruises on the lower portion of my shins, kind of closer to my ankles. Because where we were situated was right where the concrete driveway transitioned into that kind of mulched area. And so unfortunately every time that I was being lifted off the ground by Mr. Gonzalez, and then subsequently hitting the ground when he stopped -- momentarily stopped that resistance, the bottom portion of my leg was hitting that edge of the concrete driveway." (91-92).

147.    Leahy stated that he did not seek any medical treatment for injuries as a result of this incident. (92).

<u>30(b)(6) Deposition of Russell Wise</u>

148.    Wise testified that officers are trained how to recognize behaviors or symptoms of mental illness. (22).

149.    Wise testified to the following about a change to Policy 300 since the Gonzalez incident: "One of the main changes, if the subject is in the prone position and you get them in handcuffs, you're to -- or you should immediately place them in the recovery position. I don't know if you know what the recovery position is, but it is essentially trying to put them on their left side, so that way you're not compressing their airways, they're able to breathe, if they regurgitate or vomit, they have a clear airway. And then from there, you know, get them possibly in an upright, seated position. The other changes to it is, if you are in the -- the suspect

or subject is in the prone position and the resistance is so great and you're unable to place them in handcuffs, you shall consider other techniques. One would be, you, know discontinuing or disconnecting from the subject; de-escalation, maybe using what we call diffusers for pain compliance, your OC pepper spray, Taser, depending on crime, baton. But, again, the whole goal in that is to avoid positional asphyxiation or restricting the airway of that subject when they're in the prone position." (52).

150.    Wise testified to the following about if, prior to the incident, officers were trained that a handcuffed subject should be shifted to a recovery position: "That was the training. If you look at the Advanced Officer Course of 2020, okay, and you look on the bottom or the last page of it, we talk about people who are in the prone, limiting the amount of officers on the subject, monitoring their vital signs. Okay? And if there's any way it's going to be on their shoulder blades, two officers on each shoulder blade, controlling both arms, one officer on the legs. Okay? Once they gain control or they're placed in The WRAP restraint system, we want them in an upright, seated position, so, again, we're trying not to restrict their breathing or their airway." (53-54).

151.    Wise testified to the following about whether shifting a person into a recovery position was not included into the Use of Force Policy until after the Gonzalez incident: "Well, we do teach it. Okay? I'm glad you brought that up. We did teach it at that time. Okay? Again, we can't get them in that recovery position or the upright, seated position until they're effectively under control. Okay? So, yes, that was amended, but that was in June of 2022 and that was after the investigation of Mario Gonzalez was completed by the independent investigator, the DA's office and the sheriff's department. This is something that Chief Joshi felt that needed to be addressed. It was addressed on our training bulletin. Immediate training was conducted at

that time. Even though we talked about it, we more emphasized on it in our training outlines."
(54-55).

152.     Wise testified to the following about whether officers are trained to constantly monitor
a person's breathing when the person is on the ground: "Yes. And the way I equate it is like
having surgery. You have a surgeon that's working on the body, that would be the officers
trying to gain control of the arms and legs. And the person that's monitoring the vital signs,
that is the anesthesiologist. His job or her job is to maintain visual aid and looking at them
and assessing, are they breathing, you know? Are they in distress? Is this a medical
emergency?" (66).

153.     Wise stated the following about if his training to officers prior to the Gonzalez incident
included reminders that if a person is obese they can more prone to asphyxia during restraint:
"The only training I provided, again, was putting them in the upright, seated position. I'm
governed by POST. So if POST comes out with an issue or something that they want to
address, say, take it -- in this, someone who is obese and in a prone position might restrict
their airway, they would tell us when I turn in -- or when I submit my training outline. Or
when I do my defensive tactic instructor updates up in Sacramento, that would be something
that would come up, maybe a case law or an incident that occurred or some type of lawsuit
and that's where we would address that." (85).

154.     Wise testified as follows about if his department provided training prior to the
Gonzalez incident that if a person is obese then having them prone in and of itself could
potentially cause some breathing impairment: "Not that I'm aware of." (86).

155.     Wise testified to the following if after the Gonzalez incident officers are now trained
to put an individual in a recovery position anytime there's been a forceful prone restraint:

"That's correct. If you look at that policy and the training bulletin, they are to immediately, once they are handcuffed, to put them in a recovery position. If they aren't able to achieve handcuffing, they shall consider different techniques, like I said, de-escalation, diffusers, OC, Taser, baton or disengagement." (112).

### Deposition of Charlie Clemmons

156.     Clemmons testified that he is a parking tech, and that in this job does the following: "Write tickets – parking tickets. Any kind and all." (12-13).

157.     Clemmons testified to the following about when he started doing ride-alongs with Alameda police officers: "Since I started in the jail . . . I had -- in the jail, it was because we had four in the staff working at a time. And when it would get slow, somebody would come in and go "Hey, do you want to" -- ask one of us; any one of us -- "Do you want to go for a ride-along," and most of the jailers that didn't want to go, I'd go. So it started – that started it, and then I just stayed with it." (18-19).

158.     Clemmons stated the following about if he's ever been told that officers are supposed to get permission from a sergeant before taking him on a ride-along: "Well that, I know. And 90 percent of the time I'd say every sergeant knows I've done it, and I've been doing it. In fact, it's all the way up to captains now that I've been riding along with since the beginning." (24).

159.     Clemmons stated the following about the call: "41 -- I think I heard McKinley -- 31 -- he had the call, and I think it was just for an ordinary – and then James was going, and I think he was called as cover." (32).

160.     Clemmons testified to the following about what he saw and heard while sitting in the car: "I remember McKinley standing there talking to him. And then when James got out, he walked over and just stood back kind of to the side, and then they were talking. And then as

they moved -- like, I'm looking at you; that's a direct view -- McKinley was to the left; Fisher

was right about there -- they moved back towards the middle, and that's when I could hear

McKinley saying things to him, like "What's your name" -- he kept asking him what his name

was. And then I just kind of phased [sic] out; I wasn't really paying attention because it just

seemed like a regular -- you know -- like I said, he seemed like he was drunk or something. I

heard him a couple times; he just wasn't making sense. I go "Eh, he's just drunk." (36-37).

161.    Clemmons further recalled the following: "I saw them -- I think it was James had his

wrist, and they were talking and saying something – "please something-something." And then

I'm watching, and then I started watching it closely because McKinley was taking the other

wrist. And then I saw them. They weren't really, like, fighting; just kind of moving around.

And then all of a sudden they lost control because of his size, and -- [makes a sound] -- they

went to the ground." (37).

162.    Clemmons stated the following about what it was about this incident that made him

get involved: "It just -- I don't know. To me it was like he had more power than -- James is a

pretty strong guy, but Mario just looked like he was going to be a handful for the two of them."

(39).

163.    Clemmons described what he saw when he got to the officers and Gonzalez, stating:

"They were on the ground, and Officer McKinley asked me if I could take his legs." (40).

Clemmons stated the following about if he saw Officer Fisher kneeling on Mario's back at

some point: "No. The only time I looked is when I first got there, and then I got on the legs

and I was facing the other way." (43).

164.    Clemmons testified that he personally laid across Gonzalez's legs by putting his chest

across the legs. (43). Clemmons stated the following about what part of the legs: "The – right

behind the knees. Both knees." (43). Clemmons described the movements of Gonzalez's legs, stating: "He was just moving them around, pushing all around. Like, you know, pushing forward. And he was just -- it's hard to explain. He was so big. Whenever he moved his legs, he moved everything." (43).

165.     Clemmons testified to the following about how long he was laying across Gonzalez's legs: "For me, time goes pretty fast. It might have been a lot longer, but it seemed to me like it was maybe three, four minutes." (46).

166.     Clemmons described what he was able to see while he was in the position on Gonzalez's legs, reporting: "The only time I looked up was when I heard James say "Oh, he's lifting me." And I -- laying like this, I looked that way and I could see James up on his knees up in the air." (46).

167.     Clemmons stated the following about if he could hear noises that Gonzalez was making: "Just mumbling and not making sense. As I said in there, I believe, Officer McKinley really, to me, made a lot -- he was trying to get him to calm down more. In fact a couple times, I even said "Mario, just relax." And McKinley even asked him his birthday, and I remember him all of a sudden just stopping and going something-something numbers." (48).

168.     Clemmons testified as to what occurred when Leahy arrived stating: "Officer Leahy showed up, and he says "Charlie, I've got it." So I got up." (49).

169.     Clemmons reported the following about the position that Officer Leahy got in: "I believe he was just holding him down. I don't even know if he laid across him. I don't believe he figure-foured him." (49).

170.     Clemmons stated the following about if he ever recalled seeing Officer Leahy kneel across Gonzalez's lower legs: "No. I -- when Leahy took -- I just got out of the way and got up and walked back to the car." (49).

171.     Clemmons acknowledged his previous statement where he said that when he got up and walked away it looked like the struggle was over and he agreed it appeared that things were under control.  (51).  It is noted that Fisher, McKinley, and Leahy remained on top of the prone, handcuffed, Mario Gonzalez for an additional two minutes.  Clemmons stated the following about if he looked back and saw anything else that happened after he walked away: "Not that I remember looking back. I just remember going to the car." (52).

172.     Clemmons stated the following about how he became aware that Gonzalez was having a medical event: "I had heard them yelling probably a couple of minutes later . . . I had heard them yelling "Mario, Mario" and then -- was it -- someone said "Get AFD."· And then after that, it was just all -- everybody running around. They were doing CPR, and I knew there was something wrong." (52).

173.     Clemmons testified that after the incident he was put in a truck with Fisher and McKinley. (53).

174.     Clemmons stated the following about a sergeant putting them in the truck: "Yeah, he was in there. He only left for a minute. And he got everybody in, and then he says "Okay, nobody talks to anybody" and just "We're going." And then he was -- they were yelling this and that; this and that. I wasn't paying attention, really.  You've got to do this; you've got to do that. And then we were separated right away." (54).

175.     Clemmons testified that he was separated from the officers when they got to the station. (54).

### BWC Videos

### McKinley BWC

176.     McKinley can be seen approaching Gonzalez and asking him to the effect of what is going on and that someone called indicating that Gonzalez might not be feeling well, to which Gonzalez responds that he is feeling "alright."  Gonzalez indicated that something was going on but did not say what was going on. McKinley asked Gonzalez a second time if he was feeling okay and Gonzalez responded affirmatively.  McKinley asked Gonzalez if he felt like hurting himself to which Gonzalez responded, "it's not that."  McKinley in response asked what is it then? Gonzalez responded that something was going on. Gonzalez can be seen picking items up the ground.  McKinley then requested via radio that another officer check with Walgreens to see if they had any walkouts. On the radio McKinley described Mario Gonzalez as 5'5" and about 250 lbs.

### Fisher BWC

177.     In the Walgreens Video (Fisher), employees indicated they had a prior theft of Ensure, but when Fisher asked if they had any theft by a subject weighing 250 lbs., the employees said no.  Fisher can be heard putting over the air, that it was negative for a theft at Walgreens with respect to Mario. (COA (Gonzalez) 000087 [Officer Fisher 3].

### McKinley BWC

178.     Fisher can be heard over the radio indicating that Walgreens was negative and McKinley responded via radio an acknowledgment. McKinley asked Gonzalez where he got all of the stuff that was present in proximity to Gonzalez and further asked where Gonzalez bought the alcohol.  McKinley introduced himself and asked Gonzalez his name, and Gonzalez responded, "Mario."  Mario then moved and said "I guess that's it." McKinley

responded telling Mario to keep his hands out of his pockets and then directed, "Hold on. So we're going to talk because I'm concerned about this open container and everything so just leave that there." In the background another officer, [Fisher] can be seen walking up the walkway to the park.

179.     McKinley then told Mario to the effect of here's the plan, I have to identify you so I can make sure you don't have any warrants or anything like that and you let me know that you won't be drinking in our parks and then we can be on our merry way. McKinley than began asking if Gonzalez had an ID on him. McKinley then said "If you can't do that then I'm going to have to take you." At that point Officer Fisher began conversing with Gonzalez and asking if Gonzalez had an ID with him. Fisher indicated that the officers just needed the ID so they could write down who they had talked to.

180.     It is noted that notwithstanding reports that Mario was losing his balance and bounced off a pine tree, Mario can be seen, steady on his feet getting onto a circular cut off piling while holding both feet together and remaining in place without showing any signs of unsteadiness.



181.

182.     Both officers can then be seen moving in with each taking hold of one of Mario's arms

and Fisher almost immediately can be seen with handcuffs out.

183.



184.



185.

186.     Gonzalez can be heard saying, I didn't do nothing.  Gonzalez also said that he had not

stolen anything. One of the officers repeatedly says, Mario, please don't resist us. Fisher can

be seen and heard calling for an additional officer. One of the officers, seemingly McKinley

repeatedly tells Mario to put his hand behind his back.  It can be seen that the officers get both

of Gonzalez's hands behind his back but the hands are not close enough for handcuffing.

McKinley can be seen not only holding Gonzalez's left hand but also holding on to a pair of

sunglasses that had dropped.

187.     McKinley's video depicts Gonzalez being taken to the ground and Fisher moving his

knee from the ground to Gonzalez's back.



188.



189.

190.    Fisher is then depicted moving and positioning his body (chest) to Gonzalez's back.



191.



192.

193.    An officer can be heard asking if someone has the legs and there is an affirmative response.   Fisher can be seen continuing to lay across Gonzalez's back as the officers attempted to get control of Mario's right arm that was under the weight of Mario and Fisher.



194.

195.     Fisher can be seen moving briefly to the side of Gonzalez with pressure on Gonzalez's

shoulder but almost immediately return with pressure to Gonzalez's back.



196.



197.



198.

199.        At approximately 17:57:01, the ratchet of the handcuff can be heard and at 17:57:04

McKinley can be seen utilizing his handcuff key.



200.

201.     After handcuffing was accomplished, Fisher can be seen remaining with his arm across

Gonzalez's back while Gonzalez remained in a prone position.



202.

203.     It is clear from the objective video, that Fisher's arm that is pressuring Gonzalez's

back is down the center of the Gonzalez's back.



204.

205.     Fisher changed his body position, and the video clearly depicts Fisher leveraging more

pressure on Gonzalez.



206.

207.    One of the officers, [McKinley] asks at approximately 17:57:28 what are we going to do? Keep him pinned down and we'll get the WRAP here". Fisher responded "yeah."  At that time Fisher can be seen with pinning Gonzalez down with pressure on the center of Gonzalez's back as Gonzalez remains in the prone position.



208.

209.     Fisher can then be seen moving his knee onto Gonzalez's back while Gonzalez

remained prone and handcuffed. The first screen capture shows the knee off Mario. The

second shows the movement of Fisher's knee across Mario's shoulder.  The third screen

capture depicts the knee in position beyond the outside edge of the shoulder and also depicts

the gloved hand and arm of an officer with pressure on Gonzalez's back, presumably

McKinley.

210.



211.





212.

213.     The video clearly depicts Fisher's foot in the air and off the ground thus clearly showing that all weight is displaced onto Gonzalez.



214.

215.    As the handcuffed Gonzalez remained in a prone position, the video makes clear that

in addition to the pressure from Fisher's knee, McKinley also had his arm holding Gonzalez

down.



216.

217.    Leahy, can be seen approaching at 17:58:33 while Clemmons, the ride-along is also

on top of Gonzalez.



218.

219.     At approximately 17:58:45, after Gonzalez moved, Fisher can be seen picking his knee

up and moving it more toward the center of Gonzalez's back.



220.

221.     An officer can be heard telling someone to grab the WRAP.  Fisher and McKinley

continued maintaining pressure on Gonzalez's back.  It is noted that in accord with the

materials and video, Leahy had taken over for Clemmons in holding Mario Gonzalez's legs at this point.



222.

223.    At 17:59:02, Fisher can be seen leaning forward and placing additional body weight on Gonzalez using his forearm while in a bent over position. A line has been added to show Fisher and McKinley's positions in relation to the center of Gonzalez's back with Gonzalez's head as a reference point.



224.

225.     At 17:59:07, the video makes clear that in addition to the above pressure on Rodriguez's back, Fisher also maintained pressure on Gonzalez with his knee.



226.

227.    The video makes clear that the pressure to the center of Gonzalez's back was not incidental but instead was maintained for a period of time as Gonzalez remained handcuffed and prone.



228.



229.



230.

231.      At approximately 18:00:09, McKinley asks, "you think we can roll him on his side?"

Leahy responded, "I don't want to lose what I got man." Meanwhile at 18:09:18 Fisher kept

pressure on the center of Gonzalez's back.



232.

233.     At approximately 18:00:26, one of the officers stated, we have no weight on his chest. Fisher then waved his hand across Gonzalez's back and an officer can be heard saying no weight at which point both McKinley and Fisher had removed their arms from the center of Gonzalez's back.  It is noted that during this discussion Fisher still had a knee on Gonzalez and pressure on Gonzalez's back with his hand.



234.

235.     Seven seconds later, McKinley can be seen turning the unresponsive Gonzalez over to check his condition.



236.

237.      From a timeline standpoint, Mario Gonzalez was prone with two officers and a civilian holding him down and at least one officer putting pressure on his back at 17:55:34.  At 17:57:01 Gonzalez was in prone restraint and handcuffed with pressure on his back. The pressure from Fisher remained throughout the restraint process and from the point of 17:57:44 another officer also had pressure on Gonzalez's back.  Based on further screenshots depicting McKinley with weight on Gonzalez's back and the viewpoint of the video this is presumed to be McKinley. At 18:00:27, Fisher is still placing pressure on Gonzalez's back notwithstanding the fact that at 18:00:09 it was suggested to Fisher that Gonzalez be moved to his side, a trained rescue position that facilitates rather than restricts breathing.  In total, Gonzalez was held in handcuffed prone restraint with pressure on his back for approximately three minutes and forty-eight seconds.

<u>Opinions</u>

238.      It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting, and training on

law enforcement practices nationwide, that the decision to place Mario Gonzalez in handcuffs by Officer McKinley and Officer Fisher was inconsistent with generally accepted policies, practices, training and industry standards.

239.    Officers throughout the United States are trained that there are two distinct justifications for depriving a citizen of liberty relating to the investigation of criminal activity. The first of these justifications is commonly referred to as a "Terry Stop" or investigative detention.  Officers are trained that these stops do not require probable cause to believe the person has committed a crime, but rather are justified on a lesser degree of proof, specifically "reasonable suspicion."[1]  It is noted that, during a reasonable suspicion-based detention, officers are trained that the purpose is to confirm their suspicion through the development of probable cause or dispel their suspicion.[2]  California POST Learning Domain 15 instructs: "Reasonable suspicion is the standard used to justify a detention.  It exists when an officer has sufficient facts and information to make it reasonable to suspect that criminal activity may be occurring, and the person to be detained is connected to the activity."  Consistent with training given to officers nationwide, California POST Learning Domain 15:3 instructs officers: "A detainee is not obligated to answer any question an officer may ask during a lawful detention. The refusal to answer questions alone does not provide probable cause for escalating a detention to an arrest."  It is noted that in states where there is a stop and identify statute, a person lawfully detained may face criminal charges for refusing to identify themselves but not for failing to provide an identification card.

---

[1] See e.g.. See e.g.; The Law Officers Pocket Manual, Miles, Richardson, and Scudellari, Routledge Publishing 2021.§ 2:8; See also Quick Reference Legal Guide for Law Enforcement, Critical Legal Tasks in Law Enforcement 2008-2009, Jack Ryan, PATC Books, 2009 P. 10.
[2] See e.g.; The Law Officers Pocket Manual, Miles, Richardson, and Scudellari, Routledge Publishing 2021.

240.     Based upon the objective videos, it is clear that prior to making any attempt to physically detain Gonzalez, Officer Fisher at McKinley's request had gone to Walgreens, spoken to employees and determined that no theft of alcohol had taken place. As such, any law enforcement justification for detaining Gonzalez on suspicion of a theft had been dispelled and a detention for that purpose would be contrary to generally accepted law enforcement policy, practices, training, and industry standards.

241.     While Gonzalez's conduct was strange and some of his conversation did not make sense, there was no indication that Gonzalez was a danger to himself or others.  Though some of his answers showed signs that he was disoriented, he responded that he felt alright and did not want to hurt himself.

242.     Based on the objective video and what any officer should have recognized as a person in a potential crisis, the Mobile Crisis Response Team should have been called to the scene. It is noted that it was minutes before 11:00 a.m. on a Monday when McKinley decided to put Gonzalez in handcuffs, a clear use of force and exercise of enforcement authority.  As noted by McKinley, the Mobile Crisis Response Team came to work at 11:00 a.m.   As noted, even by the original call, Gonzalez had been hanging at the park for a long period of time.  Neither Fisher nor McKinley could point out any threat made by Gonzalez.   Thus, there was no need rush the event.  In training use of force instructors nationwide on use of force, one of the major points made by myself and other instructors is that officers who have a self-imposed sense of urgency often overreact or otherwise create the use of force event by their rushed response. Here, based on the 911 calls and the objective video there was no law enforcement need for an immediate enforcement action.  As such, the Mobile Crisis Response Team should have been called.

68

243.    McKinley described his plan after observing Gonzalez testifying, "I tried to find out his name. I explained again why -- you know, what my plan was, to identify him, to make sure that he was not feeling like hurting himself or someone else, that he was safe to be in the park, that he wasn't going to continue drinking in the park, and that -- that would be the -- you know, my preferred resolution to our contact." (McKinley 66).   Assuming this to be McKinley's plan, the only thing that did not occur was Gonzalez giving identification or his full name when asked for it.

244.    Other than the presence of alcohol in his proximity, there was no indication that the officers observed him drinking the alcohol.  At no time on the BWC video was Mr. Gonzalez actually holding any of the alcohol.   In testimony McKinley acknowledged that possession of open alcohol was an infraction and was a cite and release offense unless the subject was in custody for another crime.

245.    Officers throughout the United States are trained that the second justification for deprivation of liberty of a citizen is when an officer has probable cause to believe that the subject has committed a criminal offense.  Additionally, training and texts make clear that: "All arrests-whether with or without a warrant –must be based on probable cause.  You must have sufficient knowledge of facts and circumstances that would lead a reasonable police officer to conclude that the suspect probably committed the crime."[3]  Officers are informed that the way to ensure that the facts they have developed meet the generally accepted policies, practices, training and legal mandates trained to officers is to seek an arrest warrant before physically making the arrest.

---

[3] See, See e.g.; The Law Officers Pocket Manual, Miles, Richardson, and Scudellari, Routledge Publishing 2021.

246.    All officers are trained on the concept of "totality of circumstances" when considering reasonable suspicion or probable cause.  Simply stated, an officer looks at a number of factors, some of which standing alone would not support any law enforcement action, but when grouped together with the other facts in totality, action is justified.

247.    Officer Fisher, who did not make the decision to arrest indicated that he believed there was probable cause to arrest for public intoxication.  Fisher stated the following about what caused him to have probable cause to believe that Gonzalez was unable to take care of himself due to alcohol such that the crime of public intoxication was occurring: "Pretty much, he was in a -- well, the elements of the crime were in a public place, under the influence of alcohol or a drug, and unable to care for his own safety or the safety of others. So based off of my observations, when it came to determining whether or not he could care for his own safety, he couldn't even articulate to any -- Officer McKinley or myself what his name was. He was making absolutely no sense. He was mumbling his -- he was off balance at times. There was a large quantity of an alcoholic beverage or liquor within the baskets.  Based off of that alone, not being able to really be oriented to where his – his surroundings, being next to a very highly traveled main thoroughfare on Otis, where there's a lot of vehicle traffic that goes quite fast, I didn't think that he would be able to care for his own safety based off of those observations that I made." (Fisher 60-61).

248.    McKinley acknowledged that it was his decision to arrest Gonzalez. (79). McKinley testified to the following about what crime Gonzalez was being arrested for: "We were detaining him in handcuffs for public intoxication, 647(f)."[4] (80). McKinley acknowledged

---

[4] https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?sectionNum=647.&lawCode=PEN

647(f) Who is found in any public place under the influence of intoxicating liquor, any drug, controlled substance, toluene, or any combination of any intoxicating liquor, drug, controlled substance, or toluene, in a condition that

that he had not done a breathalyzer test or a field sobriety test on Gonzalez at this point. (80). Based on the objective video, other than the mere presence of alcohol there was no indication that Gonzalez's conduct was related to alcohol or drugs and the officers had taken no steps to establish evidence that the conduct was so related.  Additionally, Mr. D'Ambly reported his belief that Gonzalez was hanging around and doing nothing wrong.  While Cramer reported his suspicion of a theft from Walgreens, that suspicion was dispelled when Fisher went to Walgreens and determined that no such crime had occurred.

249.    All law enforcement officers are trained that a pre-condition to a use of force or arrest is proper enforcement authority.   It is my opinion, based on the foregoing, that Officer McKinley and Officer Fisher lacked any enforcement authority which would make the physical contact and the decision on handcuffing Gonzalez consistent with generally accepted policies, practices, training, or industry standards.  McKinley's indication that the officers were "detaining" Gonzalez for 647 (f) would be indicative an intention to detain and investigate further.  Gonzalez had remained in the same general location and made no threats to the officers.  The decision to handcuff during a detention must be supported by an articulable safety threat to the officers during the continuation of the investigation.  Based on the objective video and the testimony of the officers there was no articulable threat that justified such an escalation.

---

they are unable to exercise care for their own safety or the safety of others, or by reason of being under the influence of intoxicating liquor, any drug, controlled substance, toluene, or any combination of any intoxicating liquor, drug, or toluene, interferes with or obstructs or prevents the free use of any street, sidewalk, or other public way.

250.    Even if a trier of fact were to determine that a detention in handcuffs or an arrest was justified under the facts here, any use of force during the restraint process of any arrestee must be consistent with generally accepted policies, practices, training and industry standards.

251.    It is my opinion, based upon my specialized background, education, training, and experience, as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the use of force by McKinley, Fisher, and Leahy was contrary to generally accepted policies, practices, training, and industry standards.

252.    There are several basic concepts trained to officers and embodied in policy and practice that must be applied to any use of force analysis.

253.    Officers throughout the United States are trained in two formulas with respect to use of force decision-making and justification.  The first of these formulas is a three-part test that parallels the mandates announced by the United States Supreme Court in *Graham v. Connor*.[5] The training directs officers to consider the seriousness of offense; whether or not the subject poses an immediate physical threat to the officer or anyone else; and finally, whether the subject is actively resisting or attempting to evade arrest by flight.  I would note that California POST Learning Domain 20, cites to the same considerations in training for all California officers.

254.    I would note at the outset that according to Officer McKinley, Gonzalez was being "detained" for public intoxication.  "Detained" is a term used in law enforcement to indicate that the subject is not yet subject to arrest but instead is being detained for further investigation.  As such, the offense was extremely minor.  Officers are trained that because

---

[5] This formula is derived from *Graham v. Connor*, 490 U.S. 386 (1989) and can be found in law enforcement training lesson plans as well as Use of Force policies throughout the United States

the government interest is lower in a detention when compared to arrest, the level of force justified, from a proportionality standpoint, is lower.   Here, it is clear that to the extent there was any offense, the offense was at the lowest level.

255.      From the standpoint of whether Mario Gonzalez posed and immediate physical threat to any of the officers, Fisher testified that Gonzalez never struck him and never made any verbal threats against him. (Fisher 111-112).   McKinley testified that he did not observe a weapon on Gonzalez's person. (McKinley 65). McKinley stated the following about if he observed any apparent threat from Gonzalez: "So I noticed he was wearing baggy clothing. His waistband was covered. And there were lots of objects. I wasn't able to inventory them all, but there was at least a glass -- another glass bottle in the basket that was nearest him." (McKinley 65). McKinley further testified that Gonzalez did not strike him during the entirety of the encounter. (119). McKinley testified that Gonzalez did not make any threatening movements as if attempting to strike him. (120). McKinley testified that Gonzalez did not make any verbal threats. (120).  Additionally, according to the testimony of Clemmons, when he got off Mario Gonzalez and walked away, he believed that the officers had the situation under control and that the struggle was over.

256.      In dealing with proper levels of force several factors are considered to include Officer/Offender size and ability; number of persons present i.e. number of deputies versus number of hostile subjects; availability of weapons; environment; and threat to third parties.  It is noted that California POST Learning Domain 20 on use of force specifically cites factors such as the availability of assistance i.e. the number of officers present and the availability of backup units as factors with respect to an officer's consideration on force. Here, there were two officers and a civilian ride-along present before there was any attempt to take physical

control of Gonzalez.  Even after the arrival of an additional officer, Officer Leahy arrived, Gonzalez was kept in prone restraint, with his hands cuffed behind his back, and pressure being put on his back.

257.    While there was no apparent attempt to evade arrest by flight, it is clear that the officers had initial difficulty in getting Gonzalez's hands behind his back. Once Gonzalez was taken to the ground however, any resistance may not have been intentional but instead may have been Gonzalez's natural reaction of fighting for breath.  In training officers throughout the United States, I train officers that when a person is prone and breathing is impaired, resistance may actually be caused by lack of oxygen (fighting for oxygen) rather than a desire to resist or conscious non-compliance. Here, the officers made a conscious decision that was verbalized between McKinley and Fisher to maintain the obviously obese Mario Gonzalez in prone restraint with pressure on him, even after he was handcuffed behind his back and there was a civilian ride-along on Gonzalez's legs.

258.    The second formula was the "Use of Force Continuum."  While agencies utilized different force continuum models, all of the models recognize that officers have various subject control tactics available to them and that these tactics range from a low-level intrusions, such as officer presence and verbal commands, to the highest level which is deadly force. It should be recognized that even in those agencies which still use of force continuum, the continuum is not a ladder which must be climbed step by step.  Instead, it is a presentation of various force options, each of which must be objectively reasonable under the circumstances with which the officer is faced.  It is noted that due to confusion over application of such continuums, law enforcement is moving away from this concept and simply train "force options."  It is

recognized that many law enforcement agencies are moving away from the so-called "continuum" and moving toward a "Graham" decision making model.

259.    It is noted that all three officers acknowledged in testimony to placing body weight on Gonzalez to hold him down.  It is clear from the objective video that Gonzalez was pinned to the ground in a prone position for almost three minutes and forty-eight seconds after the handcuffing process was completed.  This was not the type of split-second decision-making event that is contemplated by law enforcement training.  Here, the officers had Gonzalez handcuffed and prone and were making choices among alternatives and verbalizing those choices to each other.

260.    Officers throughout the United States are trained on the dangers of asphyxiation during the restraint process.  I make this an integral part of all of the use of force training I conduct including the Force Certification program I conduct for Use of Force Trainers, Use of Force Investigators, and Use of Force Analysts.

261.    Officers are taught that no person should be left in a prone position once mechanical restraint has been accomplished even when no pressure is placed on the person.  Instead, officers are directed to place the restrained person in a rescue position, identified as those positions that get the subject's weight off of their stomach so that breathing will be facilitated rather than impaired.  The common rescue position that allows officers to control a voluntary or involuntary subject is to roll the subject on his or her side such that the legs can be stacked and held to the ground and the persons upper body can be held without impairing the ability to breathe.  The additional recommended rescue position of a subject is to place the subject in an upright seated position while ensuring that they are not bent forward over their stomach. Here, there was a complete failure by Fisher, McKinley, and Leahy to move Mario Gonzalez

to a recovery position.  As noted, even when McKinley suggested  the option of moving Gonzalez onto his side, Fisher rejected the option and McKinley took no steps to intervene.

262.    Law enforcement officers are trained on compression asphyxia, positional asphyxia, and mechanical asphyxia. Compression asphyxia is prone restraint with downward pressure from officers which impairs breathing. Positional asphyxia, which includes simple prone restraint longer than necessary to accomplish handcuffing, or placement in a body position that compromises the ability to breathe. Mechanical asphyxiation includes the use of devices such as handcuffs and hobble cords in a manner that impairs breathing.  In training it is noted that there are many instances where there is a combination of these three variations that places the subject in danger of sudden in-custody death.  A training example that I use is when an arrestee is left in a prone position while handcuffed and then an officer leverages the subject's legs toward their buttocks utilizing a figure-four technique thereby deploying maximal restraint and placing the subject at extreme risk. I would note that I have also audited training where the three types are all trained as positional asphyxia or  simply restraint asphyxia.

263.    The concepts related to asphyxia during the restraint process are not new to law enforcement.  In 1995, nearly three decades ago, the National Law Enforcement Technology Center, United States Department of Justice, published a bulletin titled, "Positional Asphyxia—Sudden Death" for police, sheriffs, and correctional officers.  The bulletin noted the "Basic Physiology of a Struggle A person lying on his stomach has trouble breathing when pressure is applied to his back. The remedy seems relatively simple: get the pressure off his back. However, during a violent struggle between an officer or officers and a suspect, the solution is not as simple as it may sound. Often, the situation is compounded by a vicious cycle of suspect resistance and officer restraint: ■ A suspect is restrained in a face-down

position, and breathing may become labored. ■ Weight is applied to the person's back—the more weight, the more severe the degree of compression. ■ The individual experiences increased difficulty breathing. ■ The natural reaction to oxygen deficiency occurs—the person struggles more violently. ■ The officer applies more compression to subdue the individual.[6] The bulletin noted: "Certain factors may render some individuals more susceptible to positional asphyxia following a violent struggle, particularly when prone in a face-down position:  a. Obesity.  B. Alcohol and high drug use.  c. An enlarged heart (renders an individual more susceptible to a cardiac arrhythmia under conditions of low blood oxygen and stress). The risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind-the-back handcuffing combined with placing the subject in a stomach-down position. The bulletin provided guidelines nearly three decades ago on avoiding or diminishing these deaths: "**Advisory Guidelines for Care of Subdued Subjects:** To help ensure subject safety and minimize the risk of sudden in-custody death, officers should learn to recognize factors contributing to positional asphyxia. Where possible, avoid the use of maximally prone restraint techniques (e.g., hogtying). To help minimize the potential for in-custody injury or death, officers should: ■ Follow existing training and policy guidelines for situations involving physical restraint of subjects. ■ As soon as the suspect is handcuffed, get him off his stomach. ■ Ask the subject if he has used drugs recently or suffers from any cardiac or respiratory diseases or conditions such as asthma, bronchitis, or emphysema. ■ Monitor subject carefully and obtain medical treatment if needed. ■ Be trained to recognize breathing difficulties or loss of consciousness and immediately transport the

---

[6] https://www.ojp.gov/pdffiles/posasph.pdf

individual to the emergency room, or call for an emergency medical team (EMT) unit if such signs are observed. ■ Obtain medical care upon subject's request. ■ If the subject is turned over to a detention facility, inform the facility's custodians of any preexisting medical conditions (cardiac, respiratory) or that the subject requested or needed medical treatment because of respiratory difficulty or because he became unconscious."[7]

264.    Thus, for nearly thirty years it has been recognized that resistance during the restraint process is involuntary and caused by a lack of oxygen, that persons who are obese or using alcohol are more susceptible to death.  For these nearly thirty years the USDOJ has advised officers to get the subject off his stomach as soon as he is handcuffed.   Here, the officers verbalized a conscious decision to leave Mario Gonzalez on his stomach and, in accord with the objective video, place downward pressure on his body, pinning him to the ground.  These actions have been contrary to law enforcement practice and training for decades.

265.    The USDOJ Bulletin published in 1995 included the already existing New York City Police Department's Guidelines to Preventing Deaths in Custody.[8]

---

[7] https://www.ojp.gov/pdffiles/posasph.pdf
[8] https://www.ojp.gov/pdffiles/posasph.pdf

NYPD's Guidelines to Preventing Deaths in Custody

■ As soon as the subject is handcuffed, *get him off his stomach*. Turn him on his side or place him in a seated position.

■ If he continues to struggle, *do not sit on his back*. Hold his legs down or wrap his legs with a strap.

■ Never tie the handcuffs to a leg or ankle restraint.

■ If required, get the suspect immediate medical attention.

■ Do not lay the person on his stomach during transport to a station house or hospital. Instead, place him in a seated position.

■ An officer should sit in the rear seat beside the suspect for observation and control.

The New York City Police Department (NYPD) has developed a training tape on positional asphyxia. The Department has agreed to make the tape available to interested law enforcement agencies. To request a complimentary copy, please send your written request on departmental letterhead, and a blank VHS tape, to the Deputy Commissioner of Training, NYPD, 235 East 20th Street, New York, New York 10003.

266.

267.    In 2003, the Ninth Circuit Court of Appeals recognized that "Under similar circumstances, in what has come to be known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers."[9]  The Court stated what had already been well-known by law enforcement for years: that such force was "severe and, under the circumstances, capable of causing death or serious injury."  The Ninth Circuit went on: "The compression asphyxia that resulted appears with unfortunate frequency in the reported decisions of the federal courts, and presumably occurs with even greater frequency on the street. Indeed, the Anaheim Police Department was sufficiently concerned about compression asphyxia that in a training bulletin, it specifically warned its officers of the danger of kneeling on a detainee's neck or back almost one year before the incident that sent Drummond into a coma." I would note that I make *Drummond* an integral part of my training on Use of Force throughout the United States.

268.    In January of 2016, LEXIPOL, a private company that provides policies and training to law enforcement agencies across the country and which has been a major provider for California agencies did one of their daily briefings on the "Law Enforcement Response to Positional Asphyxia."   The briefing contained the following: "Hopefully you are already aware of the dangers of positional asphyxia. **Positional asphyxia** is a serious condition that can become life threatening with little warning. It's important to understand which people are at risk and what you can do to prevent this from happening. An important part of prevention is to know the risk factors. **People who are obese**, **or who are under the influence of alcohol** or drugs are most likely to be affected. If a person you place in restraints has been involved in a violent struggle with you and

---

[9] *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056, 1063 (9th Cir. 2003), *cert. denied*, 542 U.S. 918 (2004).

other officers or deputies they are also at risk. **Positional Asphyxia becomes more likely when the person is <u>restrained</u> with their arms behind the back and in a stomach-down position. This is a risk no matter if they are on the ground or in the back of a patrol car or transport van. <u>To prevent positional asphyxia, get a person off their stomach and into the seated position as soon as practical. In the patrol car, make sure they are in an upright position and check their status frequently</u>**. Make frequent wellbeing checks and make sure they are not allowed to lay face down for any length of time. If the use of leg restraints was necessary, then the person should be continually monitored." (emphasis added). [10]

269.    I would note that I have been training officers on the dangers of prone restraint, positional asphyxia, compression asphyxia, and mechanical asphyxia for nearly thirty years. The use of force by Fisher, McKinley, and Leahy by placing pressure on Gonzalez's body as well as leaving him prone after handcuffing was contrary to training and policy principles that have been well understood by law enforcement for nearly three decades.  All three officers should have intervened with each other's conduct to stop the manner in which Gonzalez was being restrained.

270.    It is my opinion, based upon my specialized background, education, training and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that Officer McKinley, Officer Fisher, and Office Leahy, consciously disregarded and intentionally violated generally accepted law enforcement policies, practices, training, and industry standards when they intentionally

---

[10] https://www.lexipol.com/resources/todays-tips/law-enforcement-response-to-postional-asphyxia/

pinned Mario Gonzalez, a prone handcuffed subject to the ground in a manner that they recognized was contrary to their own training.

271.    The involved officers, in accord with their testimony were aware of the dangers of restraint asphyxiation and the methods of avoiding these deaths.  Notwithstanding their training and awareness of the danger and the utilization of a recovery/rescue position to overcome the danger, the officers, twice during this restraint process, verbally made conscious decisions to keep Mario Gonzalez pinned in prone restraint while handcuffed behind his back even after it was suggested by Fisher that he moved to his side in the second instance. Additionally, they kept him in this position after Clemmons was relieved by Leahy and Clemmons noted that it appeared the officers had control and the struggle was over.  All officers are trained that when the threat level dissipates, so must the use of force.  More importantly, officers are trained that once a subject is restrained in handcuffs, they should be moved to a recovery position getting their weight off their stomach.  As noted, based on the discussions captured on the video, this was a conscious disregard of law enforcement training and practice.

272.    Without making credibility determinations, it is my opinion, based upon my specialized background, education, training and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices that there is evidence of the Code of Silence in the statements and testimony of the officers, particularly when contrasted with the objective video.

273.    The Code of Silence is exhibited by the reluctance of persons to come forward with negative information about another person. This concept exists to varying degrees within all walks of life and employee settings. It is more sinister in law enforcement for several reasons.

Police officers have powers over citizens that no one else in America has - to restrict liberty and to use force against a member of the public. Police officers are most often the only witnesses to other police officers' abuse of citizens' rights. The paramilitary nature of most police agencies creates a closer relationship amongst police officers.

274.     The Code of Silence can allow officers to be insulated from being held accountable for acts of misconduct knowing that fellow officers, usually the only witnesses to the police action, will not come forward with adverse testimony against a fellow officer.

275.     The Code of Silence has been memorialized and documented in law enforcement historically. The 1931 Wickersham Commission study under President Hoover spoke to its existence in law enforcement. The writings of Neiderhoffer in the late 1950's and 1960's further documented this issue in law enforcement. It has been an integral part of all national study commissions on police practices and local commissions, such as the 1991 Christopher Commission in Los Angeles, 1992 St. Clair Commission in Boston, and 1992 Koltz Commission of the Los Angeles County Sheriff's Office. It has been documented in the continuous commissions involving the New York Police Department since the days of Serpico and, most recently, the Mollen Commission. This concept and its negative effects has been documented in most leading and authoritative texts on police practices. I have written about the Code of Silence and have made it an integral part of the regular training I conduct within law enforcement.

276.     As part of that training, I include factors that investigators and administrators should consider to determine if a "code of silence" issue exists. These questions include: is what the officers say they are doing at a critical moment in the event contrary to reasonable practices? Is it an occurrence which should have alerted a reasonable officer and focused his or her

attention to the incident? Was the incident so obvious that a reasonable officer would have had to shut their eyes and ears to avoid being aware of and witnessing the event? Were officer(s) in a position to have seen or heard what was occurring but denied any knowledge? Is the officer, avoiding rather than denying? Affirmative answers to these questions are red flags that may indicate that a code of silence issue exists.

277.     While I specifically avoid making credibility determinations, I would point to the following bits of testimony as being consistent with evidence of a Code of Silence in the facts of this case:  Both, McKinley and Fisher who were both in close proximity and assisting in the control of the prone and  handcuffed Gonzalez while within a short distance to Leahy, both deferred to Leahy when he indicated a need to keep Gonzalez under control, yet neither observed what conduct supported this conclusion.  Leahy indicated his belief of a possible theft upon his arrival at the scene notwithstanding clear transmissions over the radio by Fisher to McKinley that there had been no theft at Walmart; Leahy's description of violent active resistance by Gonzalez that is not supported by the objective video or by the testimony of Clemmons who has reported that when Leahy took over the legs, he walked away and got in the car because it seemed to be under control; and Leahy's report that Clemmons warned Leahy of Gonzalez's strength and dangerousness, which is not captured on any officers' body-worn camera video.

278.     At this stage of my review, I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents, I will be prepared to render additional opinions or supplement the opinions stated within this report.

279.     At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

280.     My fees for these professional services are outlined in the attached retainer agreement.


This report is signed under penalty of perjury on this 18th day of July 2023, in Greenville, R.I.

s/*John J. Ryan*
John J. Ryan

# SCHEDULE A

## John "Jack" Ryan

700 N. Carr Rd, #595
Plainfield, Indiana 46168
Office (317) 386-8325
Cellular Phone: (401) 692-1555
FAX (317) 386-8228
Email: jackryan2@cox.net

## EDUCATION

| | |
|---|---|
| 1990-1994 | Juris Doctorate, Cum Laude, Suffolk University Law School |
| 1986-1990 | Master of Science, Administration of Justice, Salve Regina University |
| 1981-1986 | Bachelor of Science, Administration of Justice, Roger Williams University |

## EMPLOYMENT

2002-        Police Practices Consultant, Trainer, Auditor
2003-        Co-Director, Legal Liability Risk Management Institute
1993-2002   Adjunct Professor, Salve Regina University
            Administration of Justice Graduate Program
            Courses:

- Constitutional Issues in Law Enforcement
- Police Civil Liability
- Juvenile Justice
- Mental Health Law
- Managing Police Organizations
- Business Crime
- Contemporary Issues in the Administration of

Justice 1982-2002        Police Officer, Providence Police Department

1982-1985        Patrol Officer, Patrol Division
1985-1987        Patrol Officer, Tactical Division
1986- 1997       SWAT Team, as Patrol Officers, Sergeant, and Lieutenant
                 (1 of 4 Team Commanders)
1987-1988        Detective, Detective Division
1988-1992        Sergeant, Patrol Division
1992-1995        Lieutenant, Patrol Division
1995-2000        Director of Training
1995-2001   Department  Public  Information  Officer
1997-2001   Captain,  Administrative  Staff  Division
1998-2001   Director of Administration
2001-2002   Research and Policy
* As Director of Administration for the Providence Police Department-Supervisory
 Responsibilities included:

- Administrative Staff
- Advisor to Chief of Police and Internal Affairs
- Fleet Operations
- Human Resource Bureau
- MIS
- Property/Evidence
- Prosecution Bureau

# SCHEDULE A

- Public Information Office
- Record Bureau
- Training Division

1981-1982 Private Security/Retail

- Uniformed Security
- Retail Store Detective
- Night Supervisor overseeing uniform security as well as store detectives

## CERTIFICATIONS:

2009     Certified with TASER by the Muncie Indiana Police Department

## AWARDS:

1999     Salve Regina University, Alumnus, Distinguished Service Award
1994     American Jurisprudence Award, Trial Practice
1992     American Jurisprudence Award, Constitutional Law
1991     Moot Court Outstanding Performance Award

## LAW ENFORCEMENT ACHIEVEMENT AWARDS:

1996     Chief's Award, Off-Duty Shooting in Progress Arrest
1987     City Council Award, Off-Duty Breaking and Entering Arrest
1986     Rhea Archambault (Officer of the Year) Award
1982-2002   Over 35 Letters of Commendation

## PROFESSIONAL AFFILIATIONS:

Rhode Island Bar Association Fraternal
Order of Police Providence Police
Association
International Municipal Lawyers Association

## ADMITTED TO PRACTICE OF LAW:

State of Rhode Island, November 1994
District of Rhode Island Federal Court, June 1995

## VOLUNTEER ORGANIZATIONS:

Northern Rhode Island Vikings Junior Hockey Association, President 2002-2004 Northern
Rhode Island Vikings Junior Hockey Association, Board Member 1998-2003

## CASE CONSULTATIONS:

January 2014: Jenny Rebecka Royal v. City of Blythe, Superior Court of Richmond County,
Georgia, Civil Action File No: 2012RCCV735 (Deposed 2/24/17) (Defense) August 2014:
Johnathan Rose et al, v. County of Sacramento, et al, U.S. District Court Eastern District of
California, Case No. 2:13-cv-01339-TLN-EFB
(Testimony 9/22/17) (Plaintiff)
June 2015: Nathan Felts v. Valencia County, et al., U.S. District Court for the District of New
Mexico, No: 1:13-cv-1094 MCA/RHS, (Testimony 10/17/17) (Defense)
December 2015: Estate of Dillon McGee v. Madison County, Tennessee, et al., U.S. District,
U.S. District Court for the Western District of Tennessee Eastern Division, No.: 1:15-1069,
(Deposed 7/31/17) (Defense)
September 2016: Sacchetti, Manganelli, et al. v. Gallaudet University, et al., U.S. District Court
for the District of Colombia. Case No.: 1:15-cv-455-RBW (Deposed 6/19/17)(Plaintiff)

# SCHEDULE A

November 2016: Estate of Brunette, et al. v. City of Burlington, U.S. District Court of Vermont, No.: 2:15-cv-61. (Deposed 7/26/17)(Defense)

December 2016: Katherine Elizabeth Sikes, individually and as Administrator of the Estate of Gary Thomas Latimer v. City of Douglasville, a municipal Corporation of the State of Georgia; Chief Chris Womack, Mayor Harvey Persons, Damon Partin, and Officer Michael McDonald, U.S. District Court for the Northern District of Georgia, Atlanta Division. Civil Action No.: 1:15-cv-03111. (Deposed 5/10/17)(Defense) February 2017: Estate of Marquez Smart by Randall Smart & Brenda Bryant as Administrators of the Estate and Heirs of Deceased v. The City of Wichita, Wichita PD, Officers Lee Froese & Aaron Chaffee. U.S. District Court for the District of Kansas. No.: 2:14-cv-02111-EFM-JPO. (Deposed 8/29/17)(Defense)

March 2017: Sureshbhai Patel v. City of Madison, et al. U.S. District Court for the Northern District of Alabama. No. 5:15-cv-00253-VEH. (Deposed 7/28/17)(Defense) May 2017: Stephen Horn v. City of Covington, et al. U.S. District Court, Eastern District of KY-Covington. No.: 2:14-cv-73-DLB (Deposed 8/30/17)(Defense)

June 2017: Tyrone Zwiegart v. Clinton County, et al. U.S. District Court for the Southern District of Illinois. No.: 3:16-cv-01182-MJR-RJD. (Deposed 9/16/17)(Defense)

July 2017: Sandra Harris, Special Administrator of the Estate of David Harris, Deceased, v. Village of Calumet Park, et al. Circuit Court of Cook County, IL, County Department, Law Division. No.: 2014-L-009643. (Deposed 9/07/17)(Defense)

June 2017: Maria Touchet, Personal Representative for Estate of Rudy Baca v. Valencia County and Seth Chavez. New Mexico Thirteenth Judicial District Court. No.: D-1314- cv-201501125. (Deposed 10/30/17)(Defense)

July 2017: Chaundraya Goodwin, Admx. V. Ohio State Highway Patrol. No.: 2016- 00864. Court of Claims of Ohio. (Deposed 10/31/17)(Defense)

October 2017: Baltimore PD v. Officer Caesar Goodson. Trial Board (Employment Disciplinary Hearing). (Testimony 11/6/17)(Defense)

August 2016: Jamie Nelson, et al. v. City of Elizabethtown, et al., U.S. District Court, Western District of KY at Louisville, Case No.: 3:16-CV-429-DJH. (Deposed 12/4/17)(Defense)

April 2017: Megan McGuire v. Douglas County, et al. U.S. District Court-District of Nebraska. No.: 8:16CV4. (Deposed 2/1/18)(Defense)

November 2017: Derrick Wynn v. City of Griffin, et al. U.S. District Court for the Northern District of Georgia, Newnan Division. No. 3:16-cv-94-TCB. (Deposed 2/13/18)(Defense)

August 2017: Neuroth v. Mendocino County, et al. U.S. District Court – Northern District California. No.: 3:15-cv-03226-RS. (Deposed 3/12/18)(Plaintiff)

July 2017: Estate of John Livingston, Tyrone Bethune, Christine Broom, Michael Cardwell, Ryan Holloway, and Wesley Wright v. Kehagias. U.S. District Court, Eastern District of North Carolina. No.: 5:16-cv-906. (Deposed 4/12/18)(Defense)

March 2018: Moses Stryker v. The City of Homewood; Chief Jim Roberson; Jason Davis; Brian Waid; and Frederick Blake. U.S. District Court, Northern District of Alabama, Southern Division. No.: 2:16-cv-00832-VEH. (Deposed 4/17/18)(Defense) January 2018: Jon Luer, et al. v. St. Louis County, MO. U.S. District Court, Eastern District of Missouri. Case No.: 4:17-cv-767 NAB. (Deposed 5/22/18) (Defense) February 2017: Darren A. Dickerson v. County of Camden, et al., U.S. District Court, District of New Jersey. No.: 1:14-cv-06905. (Deposed 6/13/18)(Defense)

December 2017: Francois Severe v. City of Miami and Antonio Vicente Torres, IV. District Court for the Southern District of FL. No. 17-cv-22153-DPG. (Deposed 7/2/18)(Defense)

December 2016: Joshua Skinner v. Alexander Tower, Eric Shepard, Brian Claffy, and Michael DeFiore. U.S. District Court for the District of Vermont. Civil Case No.: 2:16- cv-127. (Deposed 7/23/18)(Defense)

February 2017: Thomas Pryor v. County of Camden, et al., Superior Court of New Jersey, Law Division, Civil Part. No.: L-2767-15. (Testimony 7/27/18)(Defense)

# SCHEDULE A

May 2016: Sheila Brawley, Mother and Next Friend of Rhaykeem D. Samuels, a minor, v. City of Madison, et al., Circuit Court Third Judicial Circuit Madison County, Illinois, Case No.:15-L-1505 (Deposed 8/15/18)(Defense)

January 2016: Clark v. Village of Grayslake, et al., Circuit Court of Lake County, (Deposed 8/17/18) (Defense)

May 2016: Robert Bryant v. Camden County Police Department, Jose Gonzalez, and Officer Jacob Levy, Superior Court of New Jersey, Law Division, Docket No.: L-3505-
15. (Testimony 9/6/18) (Defense)

April 2018: Anthony Wilson and Kimberly Wilson, the parents of Martez Wilson, and the Estate of Martez Wilson v. Douglasville, Officer Coylee Danley, Officer Andrew Smith, Sgt. Caldwell, EMT Sean Flack and paramedic Brian Porterfield. U.S. District Court, Northern District of Georgia. CAFN 1:17-cv-00634-ELR.
(Deposed 9/7/18)(Defense)

May 2018: Angela Ainley v. City of South Lake Tahoe, et al. Federal Court Eastern District of California. No. 2:16-cv-00049-TLN-CKD. (Deposed 9/12/18) (Plaintiff) January 2018: Cajun Snorton as administrator of the estate of Nicolas Thomas v. Smyrna Police Lt. Kenneth Owens, et al. U.S. District Court, Northern District of Georgia. No.: CAFN 1:17-cv-01036-RWS. (Deposed 9/14/18) (Defense)

May 2018: Estate of Tashi S.Farmer, et al. v. LVMPD, et al. U.S. District Court, District of Nevada. No.:2:17-cv-01946-JCM-PAL. (Deposed 10/19/18) (Defense)

October 2018: John Hernandez, et al. v. City of Sacramento, et al. Eastern District of California. No. 2:17-cv-02311-JAM-DB (Deposed 11/30/18) (Plaintiff)

October 2018: Carolyn Giummo, et al. v. Robert Olsen, et al. U.S. District Court for the Northern District of Georgia. Civ. A. No. 1:15-cv-03928-TCB.
(Deposed 12/7/18) (Defense)

November 2018: Bill Stanley, Administrator of The Estate of Brandon Stanley v. Bobby Joe Smith and David Westerfield. U.S. District Court, Eastern District of Kentucky, London Division. No.: 6:16-cv-00264-REW-HAI. (Deposed 12/20/18) (Defense)

July 2016: Tad Woods v. Geraldine Martinez, Twelfth Judicial District Court, State of New Mexico, Case No.: D-1215-CV-2013-00689. (Testimony 1/16/19) (Defense) July 2016: Bethany Anderson, et al. v. City of Westlake, OH, et al. Court of Common Pleas, Lorain County, OH. No.: 18-CV-194655. (Deposed 1/25/19) (Defense)

December 2018: Smith v. County of Santa Cruz, CA. No. 17-6594 LHK, S.S. v. County of Santa Cruz, CA. No. 17-5095 LHK. U.S. District Court – ND California.
(Deposed 3/8/19) (Plaintiff)

July 2014: Fraternal Order of Police v. City of Camden, et al., U.S. District Court for the District of New Jersey, Civil Action No.:1:10-cv-01502 (Testimony 3/18/19) (Defense) September 2018: Jamie Ann Cox, individually and as successor in interest for Humberto Rosario Martinez, Deceased, et al. v. City of Pittsburg, et al. U.S. District of N.D. Cal. No.: 3:17-cv-04246-RS.
(Deposed 3/25/19) (Plaintiff)

October 2017: Mario Alberto Madero, Jr., et al. v. City of Prairie Village, Kansas, et al. District Court of Johnson County, Kansas. No.: 18-CV140.
(Testimony 4/16/19) (Defense)

May 2017: Keith Childress, Sr., et al. v. LVMPD, et al. U.S. District Court, District of Nevada. No.: 2:16-cv-03039-JCM-NJK. (Deposed 4/18/19) (Defense)

December 2018: Amanda Hoskins/Jonathan Taylor v. Knox County, et al. U.S. District Court, Eastern Kentucky Division. No.: 17-cv-84. (Deposed 5/21/19) (Defense) December 2017: State of New Jersey v. P.O. Joseph P. Reiman. Superior Court of N.J., Criminal Division. Criminal Complaint # 1201-W-2017-000360.
(Testimony 5/22/19) (Defense)

March 2019: United States of America v. Nicholas Romantino. District Court of New Jersey, Camden Vicinage. Crim. No. 18-673 (RBK)
(Testimony 6/7/19 and 9/10/19) (Defense)

February 2018: Yvonne Mote, as Personal Representative of the Estate of Shane Watkins, deceased v. Steven Moody, et al. U.S. District Court for the Northern District of Alabama; Northwest Division. No.: 3:17-cv-00406-AKK. (Testimony 6/27/19) (Defense)

# SCHEDULE A

May 2018: Rashawn Quaneece Middleton, as Personal Representative of the Estate of Roy Howard Middleton, SR., deceased v. Sheriff David Morgan (Escambia), et al. U.S. District Court, Northern District of Florida, Pensacola Division. No. 3:17-cv-00346- MCR-GRJ. (Deposed 7/8/19) (Defense)

May 2018: Velvet Clowers v. Union City and John Does 1 through 4. Superior Court of Fulton County, GA. No.: 2017CV298022. (Deposed 8/14/19) (Defense)

February 2019: Roger Dean Gillispie v. City of Miami Township, et al. U.S. District Court, Southern District of Ohio, Western Division. No. 3:13-cv-00416-TMR-MRM. (Deposed 9/4/19) (Defense)

November 2018: Tiffany Washington, et al. v. Crystal Marlowe, et al. Jefferson Circuit Court, Kentucky. No.: 10-CI-001183. (Testimony 10/1/19) (Defense)

June 2018: Celia Sanchez and Oscar Salas, Statutory Death Beneficiaries of Erik Emmanuel Salas-Sanchez v. Mando Kenneth Gomez, Alberto Rivera, Pamela Smith and the City of El Paso, TX. U.S. District Court, Western District of Texas, El Paso Division. No. 3:17-cv-00133-PR. (Deposed 9/13/19) (Defense)

April 2019: Lisa G. Finch v. City of Wichita, Kansas. U.S. District Court for the District of Kansas. No.: 18-cv-1018-JWB-KGS. (Deposed 10/2/19) (Defense)

May 2018 Trinita Farmer v. Las Vegas Metropolitan Police Department, US District Court for the District of Nevada, Case No. 2:18-cv-00860-GMN-VCF (Deposed 10/25/19) (Defense)

August 2018 Fleming v. Albuquerque, Second Judicial District Court Bernalillo County, New Mexico, Case No. D-202-CV-2014-5954 (Testimony 11/8/19) (Defense) September 2018 Charles Mills v. William Clogston, III, Individually and in his Official Capacity as Scott County Deputy Sheriff, et al., Case No. 5:18-cv-00025-DCR (Deposed 1/22/20) (Defense)

March 2019 Joey Brockman v. City of Falmouth, Case No. 18-CI-00012 (Deposed 2/5/20) (Defense)

February 2020 Garrett Collick, et al., v. William Paterson University, et al., Case No. 2:16-cv-00471 (KM-JBC)(Deposed 2/6/20) (Defense)

June 2019 Patrick Cornely v. Camden County Corrections, Docket No. CAM-L-4671-17 (Testimony 2/25/20) (Plaintiff)

July 2019 Hurtado v. Cobb County, GA. Case No. 18-A-963-3 (Deposed 3/9/20)(Defense)

November 2019 Finley v. Loggains, City of Jonesboro. Case No. 3:18-cv-55-DPM (Deposed 4/30/20)(Defense)

January 2020 Nakiya Moran v. Calumet City, et al., Case No. 1:17-cv-02027 (Deposed 5/11/20 & 6/12/2020)(Defense)

December 2019 James Griffin v. Donald Wright, II, et al., Civil Action No. CV-2018- 903480 (Deposed 5/13/20)(Defense)

April 2020 Arterburn v. Eddy's Chevrolet Cadillac, LLC, Case No. 2018 CV 000683 (Deposed 6/8/20)(Plaintiff)

December 2019 Murrietta v. City of Fresno, Case No. 1:18-at-00152 (Deposed 6/29/20)(Plaintiff) January 2020 Lankford v. Plumerville, Case No. 4:19-cv-00619-JM (Deposed 7/14/20)(Defense) March 2020 Ghaisar v. U.S., Case No. 1:19cv1224 (Deposed 7/29/20)(Defense)

October 2018 Rudavsky v. City of South Burlington, Case No. 2:18-cv-25 wks (Deposed 8/27/20)(Defense)

February 2019 Herndon v. Henderson Police Department, et al., Case No. 2:19-cv-00018- GMN-NJK (Deposed 9/16/20)(Defense)

September 2020 Martin, et al. v. City of San Jose, et al., Case No. 3:19-cv-01227-EMC (Deposed 9/28/20)(Plaintiff)

March 2019 Estate of Marco Gomez v. Village of Forest Park, et al., Case No. 18 CV 910 (Deposed 11/20/20)(Defense)

January 2020 McLemore v. Columbus Consolidated Gov't, et al., Case No. 4:19-cv- 00090-CDL (Deposed 12/4/2020)(Defense)

December 2020 Moore v. City and County of San Francisco, Case No. 3:18-cv-00634-SI (Deposed 12/22/20)(Plaintiff)

October 2020 Mobley v. Underwood, Case No. 0:19-cv-03223-JFA-SVH (Deposed 1/14/21)(Defense)

February 2020 Jok v. City of Burlington, Civil Action No. 2:19-CV-70 (Deposed 1/21/21)(Defense)

# SCHEDULE A

September 2020 Virgil v. City of Newport, Case No. 16-CV-222 (Deposed 2/24/21)(Defense)
February 2020 Mendez v City of Chicago, Case No. 1:18-cv-05560 (Deposed 3/18/21)(Plaintiff)
March 2021 Ramos - FCMS #200815-09122 (Testimony 4/8/21)(Defense)
April 2021 Anderson v Lyon County, Case No. 3:20-cv-00435-LRH-WGC (Deposed 4/20/21)(Defense)
October 2019 Lobato v LVMPD, Case No. 2:19-cv-01273-RFB-EJY (Deposed 4/27/21)(Defense)
July 2020 Andy Martin v City of San Jose, Northern District of California, Case No. 3:19-cv-01227-EMC (Testimony 5/18/21)(Plaintiff)
May 2021 Antwon Rafael Gallmon, Jr. v Forest Acres Police Department, Case No. 3:17-cv-00059-TLW-PJG (Deposed 5/26/21)(Defense)
January 2020 Meli v City of Burlington, Civil Action No. 2:19-cv-71 (Deposed 6/2/21)(Defense)
August 2020 O'Kelley v Pickens County, Civil Action No. 2:17-CV-0215-RWS (Deposed 8/10/21)(Defense)
May 2020 Crowe v Steward, Case No. 5:20-cv-00203-REW-MAS (Deposed 8/26/21)(Defense)
May 2021 Lucas v County of Fresno, Case No. 1:18-cv-01488-DAD-EPG (Deposed 10/01/21)(Plaintiff)
March 2021 Pizer v City of Rock Hill, Case No. 0:20-cv-03620-JMC-SVH (Deposed 10/27/21)(Defense)
February 2021 Estate of Napouk v LVMPD, Case No. 2:20-cv-01859-JCM-BNW (Deposed 11/3/21)(Defense)
July 2021 Estate of Soheil Antonio Mojarrad v. William Brett Edwards and City of Raleigh, NC, Civil Action No. 5:20-cv-397-FL (Deposed 11/8/21)(Defense) August 2021 Latimer v William Patterson University, Docket No. PAS-L-421_20 (Deposed 11/22/21)(Defense)
November 2020 Daniel Shaham, Dec. v California Highway Patrol, 2:17-cv-01075-TLN- JDP3 (Deposed 11/23/21)(Plaintiff)
February 2020 Tate v City of Chicago, No. 18 CV 07439 (Deposed 11/29/21)(Plaintiff) March 2019 Haines v Frank, Civil Action-Law December Term, 2017 No. 2017 (Testimony 12/1/21)(Defense)
March 2017 Pollard v Columbus Consolidated Government, et al., Civil Action File No: SC-19-CV-1150 (Deposed 12/15/21)(Defense)
December 2021 Steffel, et al. v The City of Jefferson, Missouri, et al., Case No. 20AC-CC00145 (Deposed 12/16/21)(Defense)
November 2020 Randall Johnson, Dec. v City of Redding, Case No. 2:19-cv-01722-JAM-DB (Deposed 12/20/21)(Plaintiff)
April 2021 Travis Scott King, et al. v Ronald Davis, et al., Case No. 3:19-cv-07722 VC (Deposed 1/3/22)(Plaintiff)
November 2021 Katie Whitworth v Mark Kling, et al., Case No. 4:21CV-00025 LPR (Deposed 1/10/22)(Defense)
October 2020 McCree v Chester Police Department, et al., Case No. 0:20-cv-00867- MGL- PJG (Deposed 2/14/22)(Defense)
September 2021 Haidon v Danaher, Case Action No.: 3:19-cv-00119 (SRU) (Deposed 2/25/22)(Defense)
April 2015: Ingram v. Camden County, et al., U.S. District Court, District of New Jersey, Civil Case No. 1:14-cv-05519 (Deposed 6/13/18)(Testimony 3/22/22)(Defense)
December 2020: Darnel Banks v. Cortez Maxwell and Country Club Hills, Case No. 19-cv-542 (Deposed 3/25/22)(Defense)
September 2021: Ahmad Norwood v. Calumet City, Case No.: 2018 L 010991 (Deposed 3/30/22)(Defense)
September 2021: Ryan Thomas v. Calumet City, Case No.: 2018 L 010798 (Deposed 3/30/22)(Defense)
December 2021: Tapia v. City of Albuquerque, Case No.: D-202-CV-2019-06610 (Deposed 3/31/22)(Defense)
May 2021: Pope, et al. v. Hill, et al., Civil Action No.: STSV2021000286 (Deposed 4/12/22)(Defense)
December 2021: Gomez v LVMPD, et al., Case No.: 2:20-cv-1589-RFB (Deposed 4/18/22)(Defense)
January 2021: Ford v Glasgow, Civil Action No. 20-CI-89 (Deposed 4/9/21)(Testimony 4/19/22)(Defense)

# SCHEDULE A

October 2021: Estate of Hale v Justin Swope, et al., Case No.: 5:20-CV-178-TBR (Deposed 5/23/22)(Defense)

September 2020: Ethan Marks v Minneapolis Police Officers, Case No.: 20-CV-01913 (Deposed 6/15/22)(Plaintiff)

March 2022: Eric Lurry v. City of Joliet, Case No.: 20-CV-4545 (Deposed 6/21/22) (defense)

August 2021: Tuggle (Cuevas) v City of Tulare, Case No.: 1:19-cv-01525-NONE-SAB (Deposed 7/19/22)(Plaintiff)

June 2019: AJA Seats, et al. v. Village of Dolton, et al. Circuit Court of Cook County, IL. No.: 2016-L-010353. (Deposed 8/20/19) (Testimony 8/2/22) (Defense)

January 2022: Thomas Barbosa, Dec. v. Shasta County, Case No.: 2:20-cv-02298-JAM-DMC (Deposed 8/18/22)(Plaintiff)

March 2021: Clark and Hardin v. Meade County, KY, Civil Action No.: 3:17-CV-00419-DJH (Deposed 8/23/22)(Defense)

May 2018: Estate of Luke Stewart v. City of Euclid, et al., Case No. 1:17-cv-02122 (Deposed 9/9/22)(Testimony 10/31/22)(Defense)

November 2021: State of Washington v Burbank; Collins and Rankine, Case Nos.: 21-1-01286-6; 21-1-01287-4; and 21-1-01288-2 (Testimony 11/23/22)(Plaintiff)

October 2022: Bruce Washington, et al. v Randy Smith, et al., Civil Action No.: 2:22-CV-632 (Deposed 11/28/22)(Defense)

June 2021: Danny Ojeda v Tucson Police Department, Case No.: C20202521 (Deposed 11/29/22)(Defense)

March 2022: The Estate of Eric Lurry, Jr. v City of Joliet, Case No.: 20-CV-4545 (Testimony 11/30/22)(Defense)

August 2022: Ariel Hill & Jamal Wood v City of Chicago, Case No.: 2017-L-7368 (Deposition 12/12/22)(Defense)

May 2022: Epps v Anderson County Sheriff's Office, Case No.: 8:22-cv-00934-TMC-KFM (Deposition 12/14/22)(Defense)

July 2022: Jaddo v City of Stamford, Case No.: 3:21-cv-00350 (Deposition 12/20/22)(Defense)

December 2021: Fair v LVMPD, et al, Case No.: 2:20-cv-01841-JCM-BNW (Deposition 1/19/23)(Defense)

June 2021: Coequyt v. Holien and City of Redwood, Case No.: 0:20-cv-01178-PJS-TNL (Testimony 1/25/23)(Plaintiff)

July 2022: Timothy Ellis v City of Providence, William Dukes, Jr. and Dustin Winstead, Case No.: 4:17-cv-00042-JHM-HBB (Deposition 1/27/23) (Defense)

November 2021: Estate of Byron Williams, et al. v LVMPD, et al., Case No.: 2:21-cv-01346 (Deposition 2/6/23) (Defense)

December 2022: James v City of Chicago, et al., Case No.: 21-cv-6750 (Deposition 2/10/23)(Plaintiff)

April 2021: Jeffrey Lilley v Wood County, et al., Case No.: 22-CV-08 (Deposition 2/14/23)(Plaintiff)

May 2019: Johnny Banks v. Shelby Hawkins and City of Shannon Hills. U.S. District Court Eastern District of Arkansas. No.: 2:18-cv-00039-BSM.
(Deposed 7/29/19)(Testimony 3/16/23)(Defense)

July 2022: Richter, et al. v City of Norwich, et al. Case No.: KNL-CV16-6032558-S (Deposition 3/21/23)(Defense)

February 2023: Tully v Lynch and Tully v Bloomfield. Case No.: USDC 1:22-CV-233 and NMDC D-1116-CV-202200176 (Deposition 3/27/23)(Defense)

January 2023: Pacheco v City of Stockton. Case No.: 2:20-CV-01404-TLN-KJN (Deposition 3/28/23)(Plaintiff)

## SCHEDULE B

# John "Jack" Ryan

700 N. Carr Rd, #595
Plainfield, Indiana   46168
Office (317) 386-8325
Cellular Phone: (401) 692-1555
FAX (317) 386-8228
Email:   jackryan2@cox.net

**PUBLICATIONS:**

- Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation (2007, 2010, 2013, 2016, 2018 and 2021 editions)
- Legal and Liability Risk Management Manual Guide -The Law and Best Practices of Successful Jail/corrections Operations (2009 and 2016 editions)
- Recent Developments in the Use of Force, Excessive Force by Law Enforcement, Touro Law Review, Vol. 24, Number 3 (2008)
- 25th Annual Section 1983 Civil Litigation, by Practicing Law Institute Video/Audio-The Unbiased Witnesses in Law Enforcement Litigation. Vol. 1, Section 8 (2008)
- Legal & Liability Issues in SWAT, Emergency Response and Special Operations (2006)
- Public Safety Media Relations (Manual and Guide) (2005)
- School Legal Update (2005)
- Critical Tasks in Law Enforcement, A Legal Guide for Officers and Supervisors (2005) (Annual)
- Arrest, Search & Seizure (2005) (Annual)
- Legal & Liability Issues for Hostage Negotiators (2005)
- Use of Force (2005)
- Administrative Investigations in Law Enforcement Agencies (2004)
- Law Enforcement Legal/Liability Update (2004)
- Civil Liability and Risk Management for Law Enforcement Agencies (2003)
- Case Law on Critical Tasks in Law Enforcement (2003)
- Legal Guide to Administrative Investigations (2003)
- Policy Development for Public Safety Agencies (2002)
- Legal and Liability Issues in Public Schools (2001)
- Rhode Island Law Enforcement Officers' Guide to Criminal Procedure (2000)
- Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings (2000)

**PUBLISHED ARTICLES:**

- Qualified Immunity, Suffolk Law Alumni Magazine, Suffolk University, Boston (2022)
- United State Court of Appeals for the Ninth Circuit Holds, Pre-Trial Detainees have Due Process Right to Adequate Safety Checks Video Monitoring is Insufficient-Direct View Safety Checks Required (2022)
- Neck Restraints, Choke Holds/Carotid Holds, What Law Enforcement Policy/Training Tells Us, The Medical/Scientific Debate, What the Cases Tell Us (2020)
- Law Enforcement Response to Unlawful Assemblies Protests and Riots (2020)
- Duty to Intervene Duty to Render Aid (2020)
- Prone/Restraint/Positional  Asphyxia/Compression  Asphyxia  (2020)
- Law Enforcement Practices During a Pandemic (2020)

# SCHEDULE B

- NYMIR Law Enforcement Newsletter, a publication of the New York Municipal Insurance Reciprocal. "Understanding Exculpatory Evidence and How it May Impact Convictions – The U.S. Supreme Court Provides Further Explanation of Brady v. Maryland," pp. 2, 6-7 (2018)
- 2006  Legal and Liability Risk Management Manual Guide – The Law and Best Practices of Successful Jail/Corrections Operations (2009 and 2016)
- Public Risk, published by the Public Risk Management Association, January 2006, Vol. 21, No. 2, "A Continuing Story Taser™ Policies for Police Departments Continue to Evolve," pp. 14-17 (2006)
- Public Risk, published by the Public Risk Management Association, March 2006, Vol. 21, No. 3, "Freeze" Off-Duty Firearms and Intervention: Avoiding Tragedy and Liability," pp. 16-18 (2006)
- Public Safety Media Relations (Manual and Guide) (2005)
- Administrative Investigations in Law Enforcement Agencies (2004)
- Crime and Justice International May/June Vol. 20, No. 80, "High Speed Vehicle Pursuit," pp. 30-34; "Developing Trends in Stop & Frisk" p. 35; "Fighting Words Directed at a Police Officer: Viability and Liability," pp. 36-37 (2004)
- Crime and Justice International July/August Vol. 20, No. 81, "Law Enforcement Liability Issues-Agency or Individual Officer's Response to Misconduct by Others May Create Agency or Individual Liability," pp. 29-30 (2004)
- Public Risk, published by the Public Risk Management Association, July 2004, Vol. 19, No. 6, "Handcuffs: How to Manage the Risk," pp. 14-17 (2004)
- The Law Enforcement Trainer published by American Society of Law Enforcement Trainers, Vol. 19, No. 3, May/June, "Training Liability in the Use of Deadly Force" pp. 24-28 (2003)

**2022 Legal Updates Archive**
- U.S. Supreme Court Update: Vega v Tekoh, No. 21-499 (June 2022)

**2021 Legal Updates Archive**
- U.S. Supreme Court Update: Rivas-Villegas v Cortesluna, No. 20-1539 (October 2021)
- U.S. Supreme Court Update: Bond v City of Tahlequah, No. 20-1668, Per Curiam Decision (October 2021)
- U.S. Supreme Court Update: Bond v City of Tahlequah, No. 20-1668, Petition for Certiorari (September 2021)
- U.S. Supreme Court Update: Torres v Madrid, No. 19-292 (March 2021)
- U.S. Supreme Court Update: Caniglia v Storm, No. 20-157 (May 2021)

**2020 Legal Updates Archive**
- U.S. Supreme Court Update: Kansas v. Glover, No. 18-566 (April 2020)
- U.S. Supreme Court Update: Ybarra v. City of Chicago, No. 946 F.3d 975 (7th Circuit 2020) (May 2020)

**2019 Legal Updates Archive**
- U.S. Supreme Court Update: DUI Blood Draw on Unconscious Driver (July 2019)
- U.S. Supreme Court Update: The Existence of Probable Cause to Arrest May Defeat a First Amendment Claim as a Matter of Law (June 2019)

**2018 Legal Updates Archive**
- An Unarmed Individual Has Been Shot – Is the Officer Always Wrong? (July 2018)
- United States Supreme Court: *Sause v. Bauer*, 138 S. Ct. 2561 (July 2018)
- The United States Supreme Court Decides Privacy Issues Related to Cellular Phone Records (June 2018)
- United States Supreme Court Decides that an Arrest with Probable Cause Can Still Violate the Arrestee's First Amendment Rights (June 2018)
- United States Supreme Court: The Automobile Exception Does Not Permit the Warrantless Entry of a Home or its Curtilage in Order to Search a Vehicle Therein (May 2018)

# SCHEDULE B

- United States Supreme Court: Possessor of Rental Car has Right to Privacy Even When No on Rental Agreement (May 2018)
- United States Supreme Court Grants Qualified Immunity in Case of Woman with Mental Impairment Shot by Officer (April 2018)
- The United State Supreme Court Grants Summary Judgment and Qualified Immunity to D.C. Officers in False Arrest Case (January 2018)

**2017 Legal Updates Archive**
- Understanding Exculpatory Evidence and How It May Impact Convictions: The United States Supreme Court Provides Further Explanation of Brady v. Maryland (2017)
- United States Supreme Court Rejects 9th Circuit Provocation Theory in Deadly Force Confrontation (2017)
- Using Force on Persons in Medical Emergencies: United States Court of Appeals for the 6th Circuit in a Published Decision Applies New Analysis (2017)
- U.S. Supreme Court Grants Appeal in Arrest Lawsuit (2017)
- U.S. Supreme Court Clarifies "Clearly Established Law" for Qualified Immunity in Deadly Force (2017)
- U.S. Court of Appeals for Fourth Circuit Finds Police Department Social Media Policy Unconstitutional & Punishment of Two Officers Under That Policy to be Unconstitutional (2017)
- U.S. Supreme Court to Examine Provocation Theory in Law Enforcement Shootings (2017)

**2016 Legal Updates Archive**
- Private Health Care Contractors May Also Be Liable for a Civil Rights Violation (2016)
- Reasonableness of Entry as Force When There Is a Use of Flash Bangs As Part of Entry (2016)
- Use of Restraint Chairs (2016)
- United States Court of Appeals for the 4th Circuit Decides Limitations on TASER™ Use (2016)
- US Supreme Court Finds Child's Statements to Teachers May Sometimes be Used Against Abuser Even Though Child is Unavailable for Cross-Examination (2016)
- US Supreme Court Finds That Evidence Seized During Unconstitutional Stop May Not Be Excluded (2016)
- US Supreme Court Distinguishes Breath Test from Blood Test under Implied Consent Statutes that Criminalize a Refusal-Warrantless Blood Test Violates Fourth Amendment (2016)
- US Court of Appeals Distinguishes Use of Force (TASER™) on Persons of Diminished Capacity (2016)
- US Supreme Court Finds That Electronic Control Weapons Are Protected Under the Second Amendment's Right to Bear Arms (2016)
- Mail Policy in Jails (2016)
- Jail Staff Not Deliberately Indifferent to Pre-Trial Detainee Medical Needs (2016)
- Post-TASER™ Confession: Is a Waiver Knowing and Voluntary? (2016)
- US Court of Appeals for the 4th Circuit Decides Limitations on TASER™ Use and Announces Use of Force Analysis When Dealing with Persons of Diminished Capacity (2016)

**2015 Legal Updates Archive**
- US Supreme Court: Shooting at Fleeing Vehicles (2015)
- US Supreme Court: Use of Force on Pretrial Detainees Judged by Objective Reasonableness Standard (2015)
- US Supreme Court: No Answer to Whether ADA Applies When Officers are Dealing with a Mentally Impaired, Violent and Armed Subject (2015)
- US Supreme Court: Absent Reasonable Suspicion Police Extension of a Traffic Stop in Order to Conduct a Dog Sniff Violates the Constitution's Shield Against Unreasonable Seizures (2015)

**2014 Legal Updates Archive**
- US Supreme Court: Are Knock and Talks Restricted to the Front Door of a Residence? (2014)

## SCHEDULE B

- US Supreme Court: Officers Must Act Reasonably Not Perfectly (2014)
- US Supreme Court: Cellular Device Search Incident to Arrest (2014)
- US Supreme Court: Shooting at Vehicle & 4th Amendment (2014)
- US Supreme Court: Summary Judgment in Use of Force Cases (2014)
- US Supreme Court: When Does an Anonymous Report Amount to Reasonable Suspicion? (2014)
- US Supreme Court Clarifies Consent and Co-Occupants (2014)

**2013 Legal Updates Archive**
- US Supreme Court: Can Officer Pursue Fleeing Misdemeanor Suspect into Home or Residential Curtilage (2013)
- US Supreme Court: Pre-Custody and Un-Mirandized Silence to Questions by Law Enforcement May Be Commented on by the Prosecutor at Trial (2013)
- Forced Blood Draw for DUI (2013)
- US Supreme Court: Narcotics Sniffing Dog & 4th Amendment Search (2013)
- US Supreme Court: K-9 Alert Establishes Probable Cause to Search Vehicle (2013)

**2012 Legal Updates Archive**
- US Supreme Court: Exigent Entry Based on Belief of Imminent Violence (2012)
- US Supreme Court: Intentional Violation of Miranda Rule and the Impact on Subsequent Warned Confession (2012)
- Taser™ Used to Subdue Non-Compliant 73-Year-Old (2012)
- US Supreme Court: Visual Strip Searches at Jail Intake of Persons Being Placed in General Population Need Not Be Supported by Reasonable Suspicion (2012)
- Facebook© and the First Amendment Rights of Police Officers (2012)
- US Supreme Court: A Convicted Prisoner May Not be in Custody for Miranda Purposes (2012)
- US Supreme Court: A Determination of Probable Cause by a Magistrate Will Generally Protect Officers/Investigators from Liability (2012)
- Fourth Amendment Protection Applies to Placing GPS on Vehicle (2012)
- How Eyewitness Identification Will Be Reviewed When There is No Improper Conduct by Law Enforcement (2012)

**2011 Legal Updates Archive**
- Federal Liability for Pursuit (2011)
- Court Applies Graham in Deciding that Use of the TASER® was Unconstitutional (2011)
- Officers Being Recorded by Citizens While Working (2011)
- TASER® Probe Mode, Secondary Impact and Liability (2011)
- US Supreme Court: Prosecution Must Present Actual Forensic Analyst in Court (2011)
- US Supreme Court Clarifies Miranda Warnings and Juveniles (2011)
- US Supreme Court: Exclusionary Rule (2011)
- Fleeing from Law Enforcement in a Vehicle is a Violent Crime (2011)
- Indiana Supreme Court: A Person Cannot Resist Officer (2011)
- U.S. Supreme Court Clarifies Destruction of Evidence Exigency (2011)
- Picketing Funerals and the First Amendment (2011)
- Statements Taken During On-Going Emergency are Admissible at Trial (2011)

**2010 Legal Updates Archive**
- Use of Taser™ in Drive-Stun Mode on Protestors: Objectively Reasonable in 2nd Circuit (2010)
- 9th Circuit TASER® Case Re-visited (2010)
- Use of Force: Pre-Shooting Conduct and Suicide by Cop Cases (2010)
- US Supreme Ct: Search of Officer's Text Messages from Department Issued Pager Was Reasonable (2010) (Co-Authored with Lou Reiter)

**2009 Legal Updates Archive**
- US Court of Appeals for the Ninth Circuit Restricts the Use of TASER™ (2009)

# SCHEDULE B

- Michigan v Fisher: U.S. Supreme Court Clarifies Exigent Home Entries (2009)
- TASER™, the Target Zone, Policy & Training (2009)
- TASER™ International, Inc. Warns Against Targeting the Chest with Electronic Control Devices (2009)
- Taser® On Non-Compliant Arrestee (2009)
- Exam Violated Rights of White and Hispanic Firefighters (2009)
- Three 2009 U.S. Supreme Court Cases Impacting Law Enforcement (2009)
- Ashcroft v. Iqbal and Law Enforcement Supervisory Liability (2009)
- AZ v. Gant: Inventory Searches of Motor Vehicles (2009)
- AZ v. Gant: Commentary & Misinterpretations (2009)
- AZ v. Gant: Final Case Judgment & What It Means to Law Enforcement (2009)
- An Unreasonable Delay in Bringing a Suspect to Court May Render the Suspect's Confession Inadmissible (2009)
- US Supreme Court Changes Qualified Immunity Rules for Civil Rights Lawsuits Against Law Enforcement (2009)
- U.S. Supreme Court Further Diminishes Reach of Exclusionary Rule (2009)

**2008 Legal Updates Archive**
- Summary of Arguments: U.S. v. Herring, AZ v. Gant (2008)
- Preview of 2008-2009 U.S. Supreme Court Cases Impacting Law Enforcement (2008)
- Hostages & The Legal Duty to Protect (2008)
- Negotiator Liability (2008)
- Hostages & the Legal Duty to Protect (2008)
- An Investigator's Road Map to Out of Court Statements (2008)
- Managing Law Enforcement Liability Risk (2008)
- Handcuffing as Excessive Force (2008)
- Vehicle Checkpoints (2008)
- Supreme Court Decides Incident to Arrest –Vehicle Case (2008)
- Covert Video Surveillance (2008)
- Compelled Substance Abuse Testing (2008)
- Liability Exposure in Special Operations (2008)
- Sexual Misconduct, Sexual Harassment and Sexual Discrimination Series with Lou Reiter: Part 1: Introduction to Sexual Misconduct & Agency Liability (2008)
- Sexual Misconduct, Sexual Harassment and Sexual Discrimination Series with Lou Reiter: Part 2: Policy v. Custom / Operational Policy & Failure to Have a Policy (2008)
- Sexual Misconduct, Sexual Harassment and Sexual Discrimination Series with Lou Reiter: Part 3: Failure to Train & Failure to Supervise (2008)
- Sexual Misconduct, Sexual Harassment and Sexual Discrimination Series with Lou Reiter: Part 4: The Need for Policy and Training, and Avoiding Deliberate Indifference (2008)

**2007 Legal Updates Archive**
- Garrity Issues in Law Enforcement Series: Part 1: Garrity and the Administrative Interview (2007)
- Garrity Issues in Law Enforcement Series: Part 2: Immunity Granted Under Garrity (2007)
- Garrity Issues in Law Enforcement Series: Part 3: Compulsion as the Triggering Mechanism (2007)
- Garrity Issues in Law Enforcement Series: Part 4: Civilian Review Boards and Garrity (2007)
- Garrity Issues in Law Enforcement Series: Part 5: Are Off-Duty Incidents within the Scope of Garrity? (2007)
- Garrity Issues in Law Enforcement Series: Part 6: Once Immunized, Officer Must Tell the Truth (2007)
- What Happens When the Plaintiff Cannot Identify Which Officer Beat Him? (2007)
- Training Liability in Use of Deadly Force (2007)
- Supreme Court to Hear Incident to Arrest –Vehicle Case (2007)
- Cellular Phones/Digital Devices and Search Incident to Arrest (2007)

## SCHEDULE B

- Vehicle Stops: Does a Motorist Have a Privacy Interest in Their License Plate? (2007)
- Model Policy: Off-Duty Action (2007)
- U.S. Supreme Court Decides Passenger Privacy Case (2007)
- No Liability in Search Warrant Execution (2007)
- Persons with Disabilities (2007)
- Off-Duty Murder Not Under "Color of Law" Thus, No Agency Liability (2007)
- Georgia v. Randolph: Police Cannot Use the Consent of a Co-Occupant to Make Entry in Order to Search for Evidence to be used Against the Opposing Occupant Who Is Present and Objects to the Entry (2007)
- U.S. Supreme Court Decides on Scott v. Harris - Vehicle Pursuit Implications (2007)
- U.S. Supreme Court to Decide Privacy Interests of Passenger (2007)
- Court Dismisses Lawsuit Based Upon Death of Emotionally Disturbed Person (2007)
- Anticipatory Search Warrant: United States v. Grubbs (2007)
- Anonymous Calls and Reasonable Suspicion Standard (2007)
- Scott v. Harris: Summary of Oral Arguments (2007)
- Municipal Insurance Pool Not Liable: Robbery and Murder by Police Trainee (2007)
- Cocaine Discovered in Auto Leads to Probable Cause to Arrest All Occupants (2007)
- LEO's Duty to Protect Persons from 3rd Party Harm (2007)
- Ramming During Pursuit Viewed as Deadly Force (2007)
- Companion with Gun May Provide Reasonable Suspicion for Pat-Down (2007)

**2006 Legal Updates Archive**
- Duty of Officer's to Intervene when Observing an Excessive Use of Force (2006)
- The Law of Citizen Contacts and Stop and Frisk (2006)
- Positional Asphyxia (2006)
- Seizure at Gunpoint (2006)
- Pepper Spray (2006)
- Beanbag Rounds (2006)
- U.S. Supreme Court Upholds Canine Sniffs of Vehicles (2006)
- Liability Based on Agency or Individual Failure to Intervene (2006)
- Legal/Liability Issues in the Training Function (2006)
- Overview of Police Liability (2006)
- Deadly Force to Prevent the Escape of a Violent Felon (2006)
- Bite and Hold Canines: Warning Required Before Release (2006)
- Reasonableness of Handcuffing during a valid "Terry Stop" (2006)
- Focus on Liability Reduction and Better Performance (2006)
- Dealing with the Mentally Ill and Emotionally Disturbed in the Use of Force (2006)
- Use of Deadly Force: Pre-Shooting Conduct and the 21 Foot Rule (2006)
- Consent Searches of Motor Vehicles (2006)

**Other Articles**
- US Supreme Court Places New Restrictions on Search Incident to arrest in Vehicles (2009)
- "Use of Force-Policy and Training Considerations" (2004)

**From the LLRMI Jail/Corrections Article Archive**
- 8th Cir: A Foreseeable Suicide May Create Liability (2010)
- The United States Court of Appeals for the Ninth Circuit Upholds the Blanket Strip Search Policy of San Francisco County (2010)
- Strip Searches for Institutional Security in a Jail or Lock-up Setting (2009)
- 1st Cir: Strip Search in Jails / Detention Centers (2009)
- 2nd Cir: Strip Search in Jails / Detention Centers (2009)
- 3rd Cir: Strip Search in Jails / Detention Centers (2009)
- 4th Cir: Strip Search in Jails / Detention Centers (2009)

## SCHEDULE B

- 5th Cir: Strip Search in Jails / Detention Centers (2009)
- 6th Cir: Strip Search in Jails / Detention Centers (2009)
- 7th Cir: Strip Search in Jails / Detention Centers (2009)
- 8th Cir: Strip Search in Jails / Detention Centers (2009)
- 9th Cir: Strip Search in Jails / Detention Centers (2009)
- 10th Cir: Strip Search in Jails / Detention Centers (2009)
- 11th Cir: Strip Search in Jails / Detention Centers (2009)
- 9th Cir: Dental Care in Jails / Detention Centers (2009)
- 9th Cir: Jail (Officer) Failure to Follow Doctor's Orders (2009)
- 9th Cir: Strip Search and Self Surrender (2009)
- Classification of Arrestees Upon Entry into a Jail (2009)
- Duty to Protect Prisoners from Assault (2009)
- Handling Grievances in a Jail / Detention Setting (2009)
- Identity Verification (2009)
- Failure to Provide Medication in Jail / Detention Setting (2009)
- Inmate Mail – PLRA and Allegations of Rights Violations (2009)
- 9th Cir References 8th Amendment and Nutrition Requirements for Inmates (2009)
- Inmates and Freedom of Religion (2009)
- Strip Search Substitute / Subterfuge (2009)
- Use of Force in Jails / Detention Centers (2009)

**From the LLRMI Law Enforcement Model Policy Electronic Control Devices website**
- Model Policy - Electronic Control Devices (multiple years)
- In-Custody Deaths and Excited Delirium (2007)

**From LLRMI Legal Questions Answered website**
- Can Pointing a gun be considered a use of force? (2010)
- Off-Duty Carry by Reserve Officers (2009)
- Agency and Personal liability in failure to provide shooting training (2009)
- Involuntary Transport to Station for Identification (2008)
- Questioning a passenger during a traffic stop (2008)
- Bingo Hunting and Privacy Interests in License Plate (2008)
- Using Dog Sniff's for Probable Cause to Obtain Search Warrant (2008)
- Garrity application with EMS (2008)
- Truant Officer Questioning Student - at request of Superintendent (2007)
- Dorm Room Searches. Response at school-training.com (2007)
- "Fruits of the Poisonous Tree" - A Miranda Example (2007)
- Releasing Mug Shots to the Media (2007)
- Joint Liability in Multi-Agency Operations (2007)
- Miranda after confession given during non-custody interview (2007)
- No-Knock clause in search warrants (2007)
- Court requirements for police training on EDP's (2007)
- Responding to an Open House Party (2007)
- Officer with search warrant gets door shut in face... OK to enter? (2007)
- Miranda and Detention during Search Warrant Execution (2007)
- Creating a Use of Force Report (2007)
- Failure to Protect (2007)
- Interviewing/Interrogating Students on Campus (2007)
- Probable Cause, and taking a person to police stations (2007)
- Vehicle Search Consent (2007)
- Need for search warrant for vehicle towed to private lot (2007)
- Reasonable expectation of privacy in information supplied to a third party (2007)
- First Appearance Hearings & the 48/72 Hour Window - City & Officer Liability (2007)

## SCHEDULE B

- Citizen Complaint Recordings (2007)
- Hiring and the Probationary Period (2007)
- Permission to search during stop & Robinette decision (2007)


*** Note: articles published electronically on a weekly basis and archived- available at www.patc.com and www.llrmi.com

# SCHEDULE C

## John "Jack" Ryan

700 N. Carr Rd, #595
Plainfield, Indiana 46168
Office (317) 386-8325
Cellular Phone: (401) 692-1555
FAX (317) 386-8228
Email: jackryan2@cox.net

**CONFERENCE PRESENTATIONS/TRAINING SESSIONS:**

2023     LLRMI "Jail Operations and Best Legal Practices" Anchorage, AK April

2023     LLRMI 5 Day "Use of Deadly Force and Officer Involved Shooting" LaPlace, LA March

2023     Constitutional Review of the Griffin Police Department, Griffin, GA March

2023     Conway Police Department Training, Conway, SC. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" March

2023     Kentucky League of Cities, Frankfort, KY. "12 High Risk Critical Task" February

2023     Kentucky Association of Counties and Kentucky League of Cities, Frankfort, KY. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" February

2023     Michigan Chief of Police Conference, Grand Rapids, MI. "Managing Risk in Today's Environment" February

2022     Kentucky Jailers Conference, Lexington, KY. "Understanding Response to Resistance from an Administrative Standpoint" December

2022     Kentucky Sheriff's Association Conference. Owensboro, KY. "Current Law and Best Practices for a Profession Sheriff's Office" December

2022     Tennessee Law Enforcement Training Officers Association. Gatlinburg, TN. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" November

2022     LLRMI Use of Force Conference and Certification. Las Vegas, NV. "The Law and Best Practices with Respect to Law Enforcement Use of Force?" November

2022     LLRMI Jail/Correction Liability, Risk Management, and Legal Issues. Las Vegas, NV. "Emerging Legal Trends" November

2022     LLRMI Supervising, Managing, and Legal Issues for Protests, Demonstrations, and Civil Unrest Operations. Las Vegas, NV. "First Amendment Rights of Protestors Fourth Amendment Rights" November

# SCHEDULE C

2022    LLRMI National Internal Affairs Training & Certification. Las Vegas, NV. "Compelled Garrity Statements" November

2022    Georgia Local Government Risk Management Services – "Emerging Legal Trends" October

2022    Tennessee County Services Association Conference – "Entity Liability – How Policies, Custom, Training and Supervision Impacts Your Entity" October

2022    Clearwater Florida National Internal Affairs Conference – "Legal Updates in Internal Affairs Investigations" September

2022    Minot North Dakota Police Seminar – "Use of Force" September

2022    FBINAA Leadership Seminar – "Mastering Leadership, Supervisor Liability" August

2022    United Counties Council of Illinois Conference – "Emerging Legal Trends" July

2022    Tennessee Association of Chiefs of Police – "Emerging Legal Trends" July

2022    Vermont League of Cities and Towns – "Law Enforcement Independent Civilian Oversight"

2022    Maryland Municipal League Police Executive Association – "Decision Making" April

2022    International Municipal Lawyers Association – "The Law Enforcement Response to Assemblies/Protests/Unlawful Assemblies/Riots" April

2022    LLRMI Use of Force Conference and Certification "Training Officers, Lesson Plans, Policy Development, Officer Safety and Community Expectations Reducing and Influencing Agency Liability" – April

2022    LLRMI  National Internal Affairs Training and Certification Conference. Franklin, TN "Compelled (Garrity) Statements" April

2022    Legal and Liability Risk Management Institute Online Virtual Training – "Use of Force" March

2022    Springdale Police Department Training "Use of Force/De-Escalation" February

2022    Southern Illinois Criminal Justice Summit "Policing Demonstrations, Protests, and Civil Unrest" February

2022    Georgia Sheriffs' Association "New Sheriff's Conference", February

2021    LLRMI National Internal Affairs Training & Certification. Las Vegas, NV. "Investigating Citizen Complaints for Field Supervisors" December

2021    LLRMI 5 Day Mastering Performance Supervision, Leadership and Management. Las Vegas, NV. "What Police Reform and Accountability Means to Supervisors" December

2021    CRL Conference "Staying Ahead of the Losses: Policies, Training and Supervision that Stays Ahead of the Risks" November

2021    CRL Conference "The Changing Environment of Law Enforcement and How It Impacts Coverage, Claims and Risk Control" November

# SCHEDULE C

2021    Alabama Municipal Attorney Association, Gulf Shores, AL. "Use of Force Training Policy in the Reform Movement" October

2021    Law Enforcement Liability Risk Management Conference, Franklin, Tennessee, "Staying Ahead of Liability: Policing in the Reform Movement" October

2021    Platte County Sheriff's Office. Kansas City, MO. "Emerging Law Enforcement Legal Trends: Policing in the Reform Movement" October

2021    Local Government Insurance Trust, Maryland, "The Law and Best Practices of Successful Police Operations" September

2021    Illinois Mobile Team Unit 9, "Implicit Bias – De-Escalation – Procedural Justice: A Call for Change in Law Enforcement Training and Operations" June

2021    Arkansas City Attorney's Association Virtual CLE: - "Analyzing the Derek Chauvin Trail" June

2021    Legal and Liability Risk Management Institute Online Virtual Training – "Policing in Police Reform Times" June

2021    Kentucky Jailers Association. Bowling Green, KY. "Legal Update for Law Enforcement and Jails" June

2021    CRL Conference "De-Escalation: Training, Policy and How De-Escalation is Impacting Use of Force" May

2021    LLRMI Tactical, SWAT & Emergency Response Operations Seminar. St. Louis, MO. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" May

2021    LLRMI National Internal Affairs Training and Certification Conference. Smyrna, TN. "Garrity in Today's Changing Environment" April

2021    LLRMI Jail/Correction Risk Management, Liability and Loss Control Conference. Smyrna, TN. "Emerging Legal Trends for Jails and Correction" April

2021    LLRMI Tactical, SWAT & Emergency Response Operations Conference. Smyrna, TN. "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" April

2021    West Michigan Tactical Officers Association "SWAT Liability" March

2021    CRL Conference "Current State of Law Enforcement Reform Post- George Floyd" March

2021    Southern Illinois Criminal Justice Training Program. Effingham, IL. "Implicit Bias" March

2021    Central Illinois Police Training Center. Peoria, IL. "Implicit Bias" March

2021    Southwestern Illinois Law Enforcement Commission. Belleville, IL. "Policing Demonstrations, Protest and Civil Unrest" March

2021    Kentucky Sheriff's Association Annual Conference. Bowling Green, KY. "Emerging Legal Trends and Best Law Enforcement Practices" February

# SCHEDULE C

2021    Legal and Liability Risk Management Institute Online Virtual Training – "Procedural Justice and Legitimacy of Authority" January

2021    Legal and Liability Risk Management Institute Online Virtual Training – "Managing Demonstrations, Protests, Civil Disobedience, Legal and Liability Issues" January (1.5 hours)

2020    Legal and Liability Risk Management Institute Online Virtual Training – "De-Escalation – Reducing Intensity" December (1.5 hours)

2020    Georgia Sheriffs' Association Emerging Legal and Liability Trends "What Every Sheriff Needs to Know" December

2020    Tennessee Trainers Association Conference, "Current Issues Impacting Law Enforcement" November

2020    Madison Police Department Legal Update Training November

2020    CRL Risk Control Conference "Political Unrest, Cultural Movement" October

2020    Practising Law Institute- "Use of Force" October

2020    SWAT Training, Providence Police Department September

2020    CRL Conference "Police Reform, Implicit Bias, Procedural Justice, De-Escalation and Legislative Action on Police Reform" September

2020    VRSA Duty to Intervene in Unreasonable Force/Duty to Render Aid During a Use of Force Event Webinar August (1 hour)

2020    IMPG Online Presentation- "How Current Events are Impacting and Shaping Law Enforcement" August (1 hour)

2020    Legal and Liability Risk Management Institute Online Webinar Training- "How Current Events are Impacting and Shaping Law Enforcement" August (2 hours)

2020    Legal and Liability Risk Management Institute Online Webinar Training- "Law Enforcement Personnel and Implicit Bias During Interactions with Citizens and Suspects" July (1.5 hours)

2020    VRSA Carotid Restraint Webinar July (1.5 hours)

2020    TML: How Current Events Are Affecting Police Tactics and Policies Webinar July (1.5 hours)

2020    VRSA Arrestee Restraint Webinar July (1.5 hours)

2020    Nampa, Idaho. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" June

2020    Policing Demonstrations, Protest and Civil Unrest Webinar Training June (2 hours)

2020    TML: Crowd Control Webinar June (1 hour)

2020    SWAT Training, Providence Police Department June (2 hours)

4

# SCHEDULE C

2020    CLM, A Member of the Institutes Online Webinar Training- "Covid-19 & Correctional Facilities: Mitigating both Transmission and Liability" April (1 hour)

2020    Legal and Liability Risk Management Institute Online Webinar Training- "Covid-19 Law Enforcement Operations in the Midst of a Pandemic" April (1 hour)

2020    Legal and Liability Risk Management Institute Online Webinar Training- "Use of Force: Moving Forward" April (1 hour)

2020    Lexington, South Carolina. "SWAT & Emergency Response Operations" March

2020    Smithfield, Rhode Island. "Arrest, Search and Seizure" February

2020    Danville, Virginia. "Arrest, Search and Seizure" February

2020    Champaign, Illinois. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" February

2020    Champaign, Illinois. "ILEAS Policing Demonstrations, Protest and Civil Unrest" February

2020    San Diego, California. Civil Rights & Governmental Tort Liability Seminar. "Litigation Skills Workshop" January

2019    Dawsonville, Georgia. "Emerging Legal Trend & Liability Management for Tactical, SWAT & Emergency Response Operations" December

2019    Charlotte, North Carolina. County Reinsurance Annual Conference. "Emerging Issues Related to Law Enforcement Liability and Risk Management" November

2019    Sandy, Utah. LLRMI Tactical, SWAT & Emergency Response Operations Seminar. November

2019    Las Vegas, Nevada. "Supervision Leadership" October

2019    Las Vegas, Nevada. "Lost Control Risk Management" October

2019    Las Vegas, Nevada. "Advanced Internal Affairs" October

2019    Lafayette County Sheriff's Office, Missouri. "Emerging Legal Trends for Law Enforcement" & "Legal Update for Law Enforcement and Jails" October

2019    County Risk Sharing Authority, Ohio. "Legal Update: Emerging Trends in Law Enforcement" October

2019    Arkansas Association of Chiefs of Police Conference, Rogers, AR. "Emerging Legal Trends and Best Law Enforcement Practices" September

2019    Kentucky Sheriff's Association Annual Conference. Bowling Green, KY. "Emerging Legal Trends and Best Law Enforcement Practices" September

2019    Texas Association of Counties, multiple locations "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" August

## SCHEDULE C

2019    Kentucky Association Chiefs of Police Annual Conference. Owensboro, KY. "Law and Best Practices Update" July

2019    LLRMI Tactical, SWAT & Emergency Response Operations Seminar. Franklin, TN. "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" July

2019    SPIAA Training Conference, Kansas City, MO. "Law and Best Practices Update and the Impact of Liability on Officer Wellness." July

2019    LLRMI Liability Management for Tactical, SWAT & Emergency Response Operations Training Seminar. Fort Worth, TX. "SWAT Legal and Best Practices" July

2019    Rhode Island Bar Association Annual Meeting "Section 1983 Litigation" June

2019    Local Government Insurance Trust, Maryland. "Emerging Legal Trends and Best Law Enforcement Practices" June

2019    Michigan Municipal Risk Management Authority. Livonia, MI. "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" May

2019    Tennessee Trainers Association Conference, Franklin, TN. "Emerging Legal Trends and Best Law Enforcement Practices" May

2019    LLRMI Risk Management and Loss Control for Law Enforcement Conference, Cape Coral, FL "Law Enforcement Litigation and Legal Trends" May

2019    LLRMI Tactical, SWAT & Emergency Response Operations Seminar. Cape Coral, FL. "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" May

2019    Missouri Public Risk "Law and Best Practices for Patrol" and "Law and Best Practices for Investigative Operations" April

2019    Georgia Sheriff's Association "Mastering Supervisor and Liability Management" April

2019    New Jersey Police Chiefs Association "Legal Update and Contemporary Best Practices in Law Enforcement" April

2019    IMLA Mid-Year Seminar, Washington D.C. "Section 1983: Trending Issues and Hot Topics" March

2019    University of Georgia, Athens, GA "Law and Best Practices Update" March

2019    LLRMI Jail/Correction Risk Management, Liability and Loss Control Conference. Las Vegas, NV. "Emerging Legal Trends for Jails and Correction" February

2019    LLRMI Tactical, SWAT & Emergency Response Operations Seminar. Las Vegas, NV. "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" February

2019    IMLA Online Webinar "Use of Body Worn Camera Video at Trial" February

2018    LLRMI Liability Management for Tactical, SWAT & Emergency Response Operations Training Seminar. Grand Prairie, TX. "SWAT Legal and Best Practices" December

6

## SCHEDULE C

2018    KLC Instructor Simulator Conference "All Use of Force Training and Use of Force Shoot, Don't Shoot Decision Making" November

2018    Missouri Public Risk "Emerging Legal Trends and Best Law Enforcement Practices" November

2018    TN PRIMA "Legal Update" November

2018    Cookeville Police Department, TN "Supervisor Liability" November

2018    Virginia "The Law and Best Practices of SWAT Operations and Tactical Command" October

2018    Georgia Local Government Risk Management Services – Georgia Law Enforcement Training "Law and Best Practices of the High-Risk Critical Tasks in Law Enforcement Including Use of Force, Deadly Force, Dealing with Person of Diminished Capacity, Pursuits, and Special Operations" October

2018    Texas Commission on Law Enforcement Annual Conference "Emerging Legal Trends – Impact on Police Operations" October

2018    Midwest Public Risk Fall Conference, MO. "Emerging Legal Trends – Impact on Law Enforcement" October

2018    Kentucky Association of Counties "Emerging Legal Trends for Attorneys" October 2018Manassas Park Police Department, VA. "Emerging Legal Trends in Law Enforcement" October

2018    Arkansas Association of Chiefs of Police- "Emerging Legal Trends in Law Enforcement" September

2018    International Municipal Lawyers Association Webinar Training- "Officer Involved Shootings" August

2018    Twin River Management Group, Lincoln, RI. Casino Security Staff Training- "Active Shooter and Other Critical Incidents, Use of Force, Self-Defense, Citizen's Arrest, and Law and Best Practices." July

2018    LLRMI Emerging Legal Trends and Liability Management for Tactical, SWAT & Emergency Response Operations Training Seminar, Georgetown, TX. "SWAT Legal and Best Practices" July

2018    Michigan Association of Chiefs of Police- "Emerging Legal Trends in Law Enforcement" June

2018    RI Bar Association Annual Meeting "Officer Involved Shootings and Pursuits: Law, Litigation and Best Practices" June

2018    VML Insurance Programs, Virginia "Policing Demonstrations, Protest, and Civil Unrest" Legal, Liability Issues, First and Fourth Amendment Protections. May

2018    FBINAA Louisiana Chapter, "Legal Update: Emerging Trends in Law Enforcement". April

7

# SCHEDULE C

2018    South Dakota Police Chief's Association Joint Training Conference, Deadwood, SD. "Legal Update: Case Law Impacting Law Enforcement and Jail Operations". April

2018    LLRMI Risk Management and Loss Control for Law Enforcement Conference, Cape Coral, FL "Emerging Legal Updates Impacting Liability, Lawsuits, Policies and Procedures". April

2018    MCLE New England, Boston, MA. "Police Misconduct Litigation" March

2018    VML Insurance Programs, Virginia "Policing Demonstrations, Protest, and Civil Unrest" Legal, Liability Issues, First and Fourth Amendment Protections. March

2018    Hanover County Sheriff's Office, Hanover, VA "Legal Update: Emerging Trends in Law Enforcement" March

2018    Palm Beach Police Department, Palm Beach FL "Policing Demonstrations, Protest, and Civil Unrest" Legal, Liability Issues, First and Fourth Amendment Protections. March

2018    Alabama Association of Chiefs of Police Conference, Montgomery, AL "Legal Update: Emerging Trends in Law Enforcement" February

2018    VML Insurance Programs, Virginia "Policing Demonstrations, Protest, and Civil Unrest" Legal, Liability Issues, First and Fourth Amendment Protections. February

2018    "Law of Use of Force" University of Arkansas School of Law, Fayetteville, AR. February

2018    "Law Enforcement in the Current Environment of Protests, Video, and Lawsuits" Salve Regina University, Newport, RI. February

2018    Alabama Sheriffs Association "Emerging Legal Trends and Best Law Enforcement Practices" Montgomery, AL, January (8 hours)

2018    Legal and Liability Risk Management Institute Online Webinar Training- "Demonstrations, Mass Protests, and the Occupy Movement" January (1 hour)

2017    Legal and Liability Risk Management Institute Online Webinar Training- "Use of Force: Moving Forward" December (1 hour)

2017    Tennessee Association of Chiefs of Police- "Protest and Demonstrations: The Interplay Between First and Fourth Amendment Rights" December (6 hours)

2017    County Reassurance Conference- "Emerging Trends and Law Enforcement Liability" Phoenix, AZ, November (2 hours)

2017    International Municipal Lawyers Association- "Law and Best Practices in the Use and Implementation of Body Worn Cameras" October, Niagara Falls, NY (2 hours)

2017    Legal and Liability Risk Management Institute Jail/Correction Risk Management, Liability and Loss Control Conference- "Emerging Litigation and Legal Trends" October, Cape Coral, FL (5 hours)

2017    Vermont League of Cities Annual Conference- "Emerging Legal Trends" October (2 hours)

## SCHEDULE C

2017     Virginia Association of Chiefs of Police- "Emerging Trends in Law Enforcement"

2017     Kentucky Sheriffs Conference- "Emerging Trends in Law Enforcement"

2017     Kentucky Council on Crime & Delinquency- "Emerging Trends in Jails and Corrections"

2017     Twin River Management Group, R.I. – Security staff training. June (8 hours)

2016     Defense Research Institute, Austin, Texas

2015     International Municipal Lawyer's Association. Officer Involved in Shootings and Qualified Immunity Post Plumhoff

2015     IADLEST, International Association of Director of Law Enforcement Standards and Training. "Training Liability" and "Emergency Liability Trends"

2015     Georgia Jail Association's Annual Conference -High Risk Critical Task in the Jail Operation, Savannah Georgia

2015     Arkansas Association of Chiefs of Police Annual Meeting -Law and Best Practices for Policing in Trying Times.

2015     South Carolina Municipal Association's Annual Meeting for Elected Officials – Law Enforcement for Trying Times

2015     Texas Commission on Law Enforcement, training for 750 Law Enforcement trainers

2015     National Internal Affairs Investigators' Annual Conference – Law Enforcement Liability and the Interplay on the Internal Affairs

2013     Suffolk University Law School, "Policy in Trying Times" Boston Massachusetts

2013     Police K-9 Magazine, National Handler Instructor Training Seminar and Annual Conference for K-9

2013     Practising Law Institute- Annual Conference Section 1983 Civil Rights Litigation Program

2012     Developed a Training Program for Law Enforcement and attorneys dealing with Use of Force; Electronic Control Devices; and Sudden Custody Death.

2012     National Internal Affairs Investigation Association Annual Conference- Use of Force and Sudden in Custody Death

2012     Sheriff's Association New Sheriff's Conference Legal Update and Best Practices for Sheriffs

2012     Texas Commission Law Enforcement Officer on Standards and Education annual conference for Texas Trainers/ "Legal Issues for Law Enforcement Trainers"

2012     Practising Law Institute- "Mass Protest" 29th Annual Conference Section 1983 Civil Rights Litigation Program

2010     PRIMA, Law Enforcement Risk Management Program

## SCHEDULE C

2010      National Internal Affairs Investigators Association Annual Conference, Indianapolis, Indiana

2010      Annual Conference of the National Council of County Association Executives 2009
          Utah Highway Patrol – Law Enforcement Pursuit Operations

2009      Practising Law Institute- Annual Conference Section 1983 Civil Rights Litigation Program

2009      National Conference for Public Risk Managers.

2009      Continued training programs for Public Agency Training Council throughout the United States to include, Policy Development and Implementation, Arrest Search & Seizure, Use of Force, Civil Liability Issues, Liability Issues for Narcotics Officers, Legal Issues for Tactical Operations, Liability Issues in Public Schools and Internal Affairs

2009      Georgetown Law Center/Civil Rights Litigation, Session 1 "Strip Searches in Jails," Session 2 "Tasers"

2008      Practising Law Institute- Annual Conference Section 1983 Civil Rights Litigation Program

2008      Texas Commission on Law Enforcement Standards and Education "Liability Management for Law Enforcement Trainers"

2008      Association of American Law Schools Annual Conference- "Law Enforcement Policy and Training/Use of Force & Pursuit in the Aftermath of Scott v. Harris"

2007      Continued training programs for Public Agency Training Council throughout the United States to include, Policy Development and Implementation, Arrest Search & Seizure, Use of Force, Civil Liability Issues, Liability Issues for Narcotics Officers, Legal Issues for Tactical Operations, Liability Issues in Public Schools and Internal Affairs

2007      Georgetown Law Center/Civil Rights Litigation: Session 1 "Law Enforcement Policy and Training in Use of Force"; Session 2: "Law Enforcement- the ADA and Persons of Diminished Capacity."

2007      South Dakota Annual Conference for Chiefs and Sheriffs- "Legal Update on High Liability Issues in Law Enforcement"

2007      Pennsylvania Chiefs of Police- "Legal Update on High Liability Issues in Law Enforcement"

2007      International Municipal Lawyer's Association Annual Conference- "Garrity and the Administrative Interview"

2007      Practising Law Institute- "Use of Force" 24th Annual Conference Section 1983 Civil Rights Litigation Program

2007      25th Annual Section 1983 Civil Litigation, by Practising Law Institute Video/Audio-The Unbiased Witnesses in Law Enforcement Litigation. Vol. 1, Section 8

2006      Continued training programs for Public Agency Training Council throughout the United States to include, Policy Development and Implementation, Arrest Search & Seizure, Use of Force, Civil Liability Issues, Liability Issues for Narcotics Officers, Legal Issues for Tactical Operations, Liability Issues in Public Schools and Internal Affairs

## SCHEDULE C

2006    Georgetown Law Center/Civil Rights Litigation "Police Misconduct" §1983

2006    National Internal Affairs Investigators Association Annual Conference, Gatlinburg Tennessee "Use of Force and the Internal Affairs Process"

2006    Georgia Bar Association "ICLE", Atlanta Georgia "Evaluating Police Liability Claims"

2005    Legal and Policy Issues in the Use of Force- throughout United States

2005    Georgetown Law Center/ Civil Rights Litigation "Less-Lethal Force"

2005    Arrest, Search & Seizure, and Questioning-throughout United States

2005    Civil Liability and Risk Management in Law Enforcement-throughout United States

2005    Internal Affairs/Administrative Investigations- throughout United States

2005    PRIMA National Conference-Milwaukee "Use of Force" and "Critical Tasks in Law Enforcement"

2005    National Sheriff's Association Annual Conference-Louisville "Legal Issues in Administrative Investigations"

2005    National Leagues of Cities and Towns (Risk Consortium)-Seattle "Identifying Contemporary Risks in Law Enforcement Liability"

2004    Legal and Liability Issues in Public Schools, throughout United States

2004    Policy Development for Law Enforcement Agencies, throughout United States

2004    Civil Liability and Risk Management for Law Enforcement Agencies, throughout United States

2004    Legal Issues in Narcotics Operations, throughout United States

2004    Critical Legal Tasks for Patrol Officers, Illinois Mobile Training Unit

2004    Georgetown Law Center/Civil Rights Litigation-§ 1983

2004    Rhode Island Bar Association Annual Conference- "Stop in the Name of the Law"

2004    Oklahoma Attorney General's Annual Conference "Policy Summit" Policy session for Police Executives

2004    Texas Commission Law Enforcement Officer on Standards and Education annual conference for Texas Trainers/ "Legal Issues for Law Enforcement Trainers"

2003    Legal and Liability Issues in Public Schools, throughout United States

2003    Policy Development for Law Enforcement Agencies, throughout United States

2003    Civil Liability and Risk Management for Law Enforcement Agencies, throughout United States

## SCHEDULE C

2003    Advanced Internal Affairs, Myrtle Beach, SC, Las Vegas, NV.

2003    Georgetown Law Center/Civil Rights Litigation-§1983

2003    Georgia Internal Affairs Investigators Annual Conference

2003    Tennessee Chiefs' Association Conference Training
2003    Alaska Chiefs' Association/FBINAA Executive Development Conference

2003    Office of Corporation Counsel/Metropolitan Police, Washington D.C.

2003    International Law Enforcement Educators and Trainers Association Annual
        Conference/Chicago "Trainers and Use of Force Liability"

2002    Legal and Liability Issues in Public Schools, throughout the United States

2002    Policy Development for Public Safety Agencies, throughout the United States

2002    International Association of Law Enforcement Planners National Conference, Long
        Beach, California

2002    National Internal Affairs Investigators Association National Conference, Tampa, Florida

2001    Legal Issues in Use of Force Seminar, Salve Regina University

2001    Advanced Internal Affairs Seminar, Las Vegas

2000    Police Misconduct/Racial Profiling, Georgetown University Law Center

2000    International Crime Prevention, University of Warwick, UK.

2000    Criminal Procedure Update Seminar, Salve Regina University

1999    Law Enforcement Officers' Bill of Rights Seminar, Salve Regina University

1998    Police Media Relations Seminar, Salve Regina University

1997    Police Civil Liability Seminar, Salve Regina University

1995    Basic Training for Detectives, Rhode Island State Police

1993    Search and Seizure in Schools, Rhode Island Legal/Educational Partnership


**CURRICULUM DEVELOPMENT:**

2005    Jail Liability Issues

2005    Arrest, Search & Seizure, and Questioning

2004    Legal Issues/ Case Law Update for Narcotics Investigators

2004    Legal and Liability Issues for Tactical Commanders

2004    Investigation of Officer Involved Shootings

## SCHEDULE C

2003     Legal Issues in Administrative Investigations

2003     Civil Liability and Risk Management for Law Enforcement Agencies

2002     Policy and Procedure for Law Enforcement Agencies

2002     Legal and Liability Issues in Public Schools

1993     Graduate Course, Police Civil Liability

1993     Providence Police Academy Entry-Level, 22 Week Program Revamp

**Legal and Liability Risk Management Institute**

| CONSULTATION FEE SCHEDULE AND EXPENSE POLICY |
| --- |

Gonzalez v City of Alameda · Julia Sherwin, Attorney · Jack Ryan, Expert

**Preliminary discussions of cases:** We welcome telephonic discussions of potential cases. There is no charge for this service.

**Cases accepted for consultation:** There is a flat case development fee when cases are accepted for consultation, development, and preparation. This case development fee is non-refundable.

**FEE SCHEDULE:**                                               **$ 9,500.00**

The case development fee covers **all** work done in Providence, RI area. This includes document review and evaluation, discovery and investigation of additional materials, research, written reports and affidavits, telephone, and copying. It also includes all follow-up discussions and reviews of additional materials. If you desire to come to Providence, RI area for case conferences, there is no extra charge for this service or time and we will be glad to assist in making local arrangements. The case development fee also covers **brief** meetings with you and your associates when we are in your locale on other matters and our schedule permits. Written reports are prepared only when specifically requested by you or your firm.

We have a flat rate rather than an hourly fee structure for several reasons. First, a flat fee promotes a better professional relationship and allows you to understand the costs you and your firm will incur at the outset. Second, we want to be an integral part of your case development to the fullest extent appropriate. The fee is structured to encourage you to draw upon this involvement and experience and to utilize us fully. Only then can we give you the best possible advice and be able to fully assist in presenting your case. When you consider our involvement with your case, we don't want you to feel constrained by the thought that the meter is running. Our experience in police civil litigation cases offer strategies, tactics, and demonstrative trial aids makes us a valuable resource in preparation, discovery and case development. Our experience in conducting training on liability issues and police agency audits provides you with a source of current and pragmatic knowledge of police practices.

**Expanded cases:** are those, which require much more time and generally involve agency pattern and practice, negligent retention, wrongful termination and other personnel related matters. Such cases require extensive documentation review. - personnel records, administrative hearing transcripts, and/or administrative investigation files and adjudications. We can usually determine whether yours is an expanded case during our initial discussion or soon after the initial review of materials based on time.

Initials:___*TA*___

**Expedited cases:** are those cases in which a report or evaluation is required within two (2) weeks of the date Legal and Liability Risk Management Institute are retained in the matter and result in an additional $2,500 expedite fee.

Initials:___*TA*___

**Depositions, testimony, on-site inspections, and conferences:** We will normally try to arrange our travel schedule to ensure meeting with you and your associates prior to deposition or testimony. Depositions are very taxing on both the deponent and the person(s) conducting the deposition. Therefore, it is our policy limit a deposition day to a maximum of eight (8) hours including breaks.
**Depositions in Providence, RI area: $2500. per day or part thereof**
*__Deposition Fees must be paid prior to all depositions.__*

Initials:___*TA*___

**Work away from Providence, RI area: $2500.00 per day or part thereof plus a $1000.00 fee for travel days:**

Initials:___*TA*___

**Legal and Liability Risk Management Institute** _____ **2**

**Expenses at actual cost:** Airline travel will be at coach fare. When travel coincides with other business, costs are billed proportionally. Ground expenses, hotel, meals and incidentals are billed at actual cost. We reserve the right to require prepayment of these expenses.

Initials: _____

**Revised reports:** After final report has been accepted supplemental reports and review of additional material will be invoiced at $250.00 per hour.

Initials: _____

**Case Material:** Non-Digital will be digitized for case development at a rate of $200.00 per hour.

Initials: _____

**Payment requirements:** The case development fee is required before we review your material. Other fees and expense reimbursement are due when we arrive at your location unless other written arrangements are agreed upon. All bills are payable, in any other case, within 30 days of the work performed. We reserve the right to charge a fee of one percent (1%) per month on the outstanding balance. The tax identification number to be used for Legal and Liability Risk Management Institute/Law Enforcement Risk Management Group, Inc., Federal ID 81-0692135

**Professional relationship:** You are entering into a professional relationship with Legal and Liability Risk Management Institute for litigation consultant assistance with your case. **You and your firm, not your client or opposing litigants, are our client.** You and your firm are solely responsible for payment of our professional services. Any fee and/or expense incurred for deposition by the opposing side reverts to your firm if that entity fails to fulfill this obligation or if a court order reduces the fee or expense charge. Your firm is responsible for the increment should the court reduce the fee or expense charged. Please do not ask us to wait for reimbursement from your client. We also do not accept payment directly from your client unless prior arrangements have been agreed upon.

**Agreement:** This document constitutes a contract for our professional services in return for your agreement to reimburse us according to the terms and conditions of this document. The contract is governed by the terms and conditions set forth herein. This contract is intended to be enforceable under the laws of the State of Indiana or in the State in which the services are rendered, at the discretion of Legal and Liability Risk Management Institute.

AGREED TO:

5/27/21
_____          _____
Date                                                Signature

ACCEPTED:

May 26, 2021
_____          _____
Date                                                Legal and Liability Risk Management Institute

Legal and Liability Risk Management Institute
Law Enforcement Risk Management Group, Inc.
700 N. Carr Rd, #595, Plainfield, IN 46168
Federal ID 81-0692135
317-386-8325  www.llrmi.com

**Please send all material for review and case development to the Plainfield, IN address or electronically to: amanda.napier@llrmi.com**