1

2

3

4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7    MARIO GONZALEZ, et al.,                 Case No.  21-cv-09733-DMR

8                    Plaintiffs,             Case No.  22-cv-00718-DMR

9            v.

10   CITY OF ALAMEDA, et al.,                **ORDER ON DEFENDANTS' MOTIONS
                                             FOR SUMMARY JUDGMENT**
11                  Defendants.

12   EDITH ARENALES,

13                   Plaintiff,

14           v.

15   CITY OF ALAMEDA, et al.,

16                  Defendants.

17

18        These related cases arise out of the April 2021 death of Mario Gonzalez following his

19   detention by City of Alameda Police Officers Eric McKinley, James Fisher, and Cameron Leahy.

20   Plaintiff M.G.C., who is Mr. Gonzalez's minor child, filed a civil rights action under 42 U.S.C. §

21   1983 individually and as Mr. Gonzalez's successor-in-interest asserting constitutional violations

22   and related state law claims against Defendants City of Alameda ("Alameda"), former Alameda

23   Interim Police Chief Randy Fenn, and Officers McKinley, Fisher, and Leahy.

24        Plaintiff Edith Arenales, Mr. Gonzalez's mother, separately filed an action against the

25   same Defendants under 42 U.S.C. § 1983 alleging claims related to Mr. Gonzalez's death.

26        Defendants now move for summary judgment in both cases.  [Docket Nos. 70, 85

27   (*Gonzalez v. City of Alameda*, No. 21-cv-09733-DMR); 50, 61 (*Arenales v. City of Alameda*, No.

28   22-cv-00718-DMR).]  The court held a hearing on August 10, 2023 and ordered the parties to file

United States District Court
Northern District of California

United States District Court
Northern District of California

supplemental briefs addressing qualified immunity with respect to Plaintiffs' Fourteenth Amendment claims, which the parties timely filed.  [Docket Nos. 99 (*Gonzalez*), 67 (*Arenales*) (Minute Orders).]

For the following reasons, Defendants' motions for partial summary judgment on all Plaintiffs' Fourteenth Amendment claims are granted.  Defendants' motion for partial summary judgment on the Gonzalez Plaintiffs' remaining claims is granted in part and denied in part. Defendants' motion for partial summary judgment on Arenales's *Monell* claim is granted.

**A.    Factual Background**

The following facts are undisputed, unless otherwise noted.

At around 10:30 a.m. on Monday, April 19, 2021, McKinley, an Alameda police officer, was dispatched in response to a call about a Hispanic man wearing a tan vest, later identified as Mr. Gonzalez, who "was talking to himself" and "might be having some sort of mental crisis, psychiatric crisis" and/or "was possibly intoxicated."  McKinley Dep. 58, 61.  Upon arriving at the location, a wooded park, McKinley parked his car and turned on his body-worn video recorder ("bodycam").  According to McKinley, he exited the car and approached Mr. Gonzalez "quietly" to "get a better understanding of the circumstances that led somebody to call" the police.  He observed Mr. Gonzalez wearing a jacket that was inside out, using a comb on a hat he was wearing on his head, talking to himself, and "shuffling around near [two] grocery store baskets."  *Id.* at 61-62, 64.  He thought Mr. Gonzalez could have "a mental health disorder."  *Id.* at 62-63.  McKinley did not observe any weapons and had no information that Mr. Gonzalez was armed or had threatened anyone; however, he noticed that Mr. Gonzalez's waistband was covered by the baggy clothing he was wearing.  *Id.* at 65-66.  Mr. Gonzalez was 5'5" and weighed 284 pounds.  [Docket No. 70-2 (Fox Decl. Apr. 26, 2023) ¶ 8, Ex. G (Alameda County Coroner's Bureau Autopsy Report, "Autopsy") 9.]

McKinley observed an open container standing upright in the basket nearest to Mr. Gonzalez; it appeared to be a one-gallon bottle of clear liquor with about two cups of liquid missing from it.  McKinley Dep. 63-64.  There were other bottles of alcohol in the baskets, at least one of which was a glass bottle that still had an anti-theft store security cap on it.  *Id.* at 68-69.

Defendants submitted a video which displays synchronized bodycam footage from McKinley, Fisher, and Leahy along with a transcript of their dialogue.  [Docket No. 70-10 (Begault Decl. Apr. 24, 2023) ¶¶ 3-4, Exs. I (Video), J (Transcript).][1]  The video shows Mr. Gonzalez standing among some trees and bushes near what appear to be four cleanly sawed-off telephone poles of varying heights that resemble stumps and the two shopping baskets.  A curving sidewalk appears to be five or six feet away from Mr. Gonzalez on his right side, and a low white fence is approximately three or four feet away from him on his left side.  Video 1:09.  As McKinley approached Mr. Gonzalez, McKinley asked him how he was doing and told him, "[j]ust coming to check on you, make sure you're okay.  Somebody called and said you were, uh, maybe not feeling so great."  Mr. Gonzalez responded calmly that he was "feeling all right" but appeared confused.  Video 1:04-1:15.  The two began to converse but Mr. Gonzalez gave vague and irrelevant answers to McKinley's questions and his voice trailed off several times.  Mr. Gonzalez denied feeling like he was going to hurt himself but otherwise appeared unable to express himself clearly or coherently, although he appeared calm and not agitated.

McKinley testified that he was about eight to ten feet away from Mr. Gonzalez during their interaction.  McKinley Dep. 66.  He testified that he had not seen Mr. Gonzalez drinking alcohol but that he believed that Mr. Gonzalez was intoxicated based on his proximity to the open container of alcohol, "his slurred speech and his inability to connect his sentences," the odor of alcohol on his breath, and his "blood shot and watery eyes."  *Id*. at 67-68.

According to McKinley, Mr. Gonzalez was "fondling little black and gray plastic bits" while they were talking, which McKinley suspected "was the remains of the security cap that was most likely on the clear plastic bottle" of alcohol.  McKinley testified that based on what he observed, he believed that someone may have stolen the bottles of alcohol in the baskets near Mr. Gonzalez but admitted that he did not have probable cause to believe that Mr. Gonzalez had stolen the alcohol at that point.  *Id*. at 69.  After talking with Mr. Gonzalez for approximately two minutes, *see* Video, McKinley used his radio to ask Fisher to stop at the Walgreens that was across

[1] The Gonzalez Plaintiffs "[n]ote that the dialogue transcript appears to be inaccurate at times." Opp'n 1 n.1.  The court will note any relevant discrepancies.

United States District Court
Northern District of California

1    the street to ask if there had been "any walk-outs with [Mr. Gonzalez's] description," which he

2    gave as "about 5'5", probably 250 [pounds]."  Video 3:24; McKinley Dep. 70; Fisher Dep. 44.

3    McKinley and Mr. Gonzalez continued interacting for about two more minutes, with Mr. Gonzalez

4    speaking in a nonsensical way.  Fisher then radioed to McKinley, "negative."  Video 6:00;

5    McKinley Dep. 70; Fisher Dep. 45.  McKinley testified that after Fisher's call, he still believed

6    that someone may have stolen the alcohol in the baskets but that he "didn't have probable cause to

7    arrest [Mr. Gonzalez] for stealing the liquor" and admitted that it was possible that Mr. Gonzalez

8    had either found the bottles or that someone had given them to him.  *Id*. at 70-71.  Mr. Gonzalez

9    was unable to answer McKinley's questions about where the bottles had come from.  Video 6:01-

10   6:30.

11        McKinley observed Mr. Gonzalez balancing on one of the stumps on the ground and

12   thought that Mr. Gonzalez had "pretty good balance."  McKinley Dep. 71; *see* Video 2:38.

13   McKinley acknowledged that poor balance is something that officers check for when doing

14   sobriety tests, but testified that "standardized field sobriety tests are also used to primarily

15   determine multitasking ability . . . [a]nd Mr. Gonzalez was not multitasking.  He was not able to

16   have a conversation with [McKinley] while balancing on a tree stump."  McKinley Dep. 72.

17   McKinley "determined that [Mr. Gonzalez] was under the influence of alcohol," although he could

18   not rule out that he was having a mental health crisis.  *Id*. at 72-73.  McKinley testified that he

19   then "placed on hold" his investigation of the possible theft of the bottles "until [Mr. Gonzalez]

20   was safe" but that he "still had reasonable suspicion that [Mr. Gonzalez] stole the liquor."  *Id*. at

21   74-75.  He also testified that he had "reasonable suspicion to continue detaining" Mr. Gonzalez

22   based on "his intoxication, his inability to care for himself safely."  *Id*. at 75.  McKinley continued

23   interacting with Mr. Gonzalez and repeatedly asked for his name in order "to identify him to

24   determine if there was any outstanding warrants" or "any other reason to detain him[.]"  *Id*. at 74.

25   At one point Mr. Gonzalez responded, "Something Mario."  Video 7:33.

26        Fisher arrived a few minutes after his radio call to McKinley and approached the two men,

27   walking up from behind Mr. Gonzalez on his right side.  Video 8:00.  Fisher testified that he had

28   previously received a dispatch call that "had to do something with . . . a suspicious person . . . call

United States District Court
Northern District of California

for service that was possibly under the influence of an unknown." Fisher Dep. 40-41. Fisher

observed Mr. Gonzalez interacting with McKinley and described their interaction as "[a] little

low-key." *Id*. at 48. Fisher did not see any weapons. He could not see Mr. Gonzalez's waistband,

which was concealed by the clothing he was wearing. *Id*. at 47-48. Fisher testified that he noticed

the bottles of alcohol in the baskets near Mr. Gonzalez, including one that was partially empty. He

had trouble hearing McKinley's conversation with Mr. Gonzalez and testified that "there was a lot

of mumbling from [Mr. Gonzalez] and that "he wasn't making any sense" and "couldn't answer"

basic questions like providing his name. *Id*. at 49. Fisher also testified that he observed Mr.

Gonzalez lose his balance and "bounce[ ] into a pine tree." Based on his observations, Fisher

"definitely was thinking public intoxication." *Id*. at 49-50. The video does not appear to show

Mr. Gonzalez losing his balance or touching a tree after Fisher's arrival, although at one point Mr.

Gonzalez leaned against the low fence. *See* Video 7:08. At another point, Mr. Gonzalez stepped

onto one of the stumps and balanced on both feet briefly before stepping down. *Id*. at 10:03.

Fisher never saw Mr. Gonzalez drinking alcohol and did not get close enough to him to smell

alcohol. Fisher Dep. 51. Fisher also testified that he did not witness Mr. Gonzalez doing or

saying anything threatening. *Id*. at 55.

After Fisher arrived, McKinley told Mr. Gonzalez that they could be "on [their] merry

way" after Mr. Gonzalez identified himself. Mr. Gonzalez responded, "merry way? Merry-go-

round?" Video 8:50-55; McKinley Dep. 77. A short time later Fisher started speaking with Mr.

Gonzalez and asked him for identification. Video 9:06; McKinley Dep. 79. McKinley then

decided to place Mr. Gonzalez in handcuffs and arrest him for public intoxication under California

Penal Code section 647(f). McKinley admitted that he had not given Mr. Gonzalez a breathalyzer

or sobriety test but testified that based on his own training and experience, Mr. Gonzalez "was

under the influence of alcohol and he was unable to care for his own safety." McKinley Dep. 79-

80. Although McKinley testified that it was "not apparent" that Mr. Gonzalez's inability to care

for himself was "due to an underlying mental problem," he admitted that he "did not have the

training to rule out that a mental health issue may have been contributing to [Mr. Gonzalez's]

problems that [McKinley] was observing." *Id*. at 80-81.

1      For his part, Fisher testified that based on his observations of Mr. Gonzalez, he saw

2  nothing that indicated "there was any type of mental health issue or mental health crisis that was

3  happening at that point in time."  Fisher Dep. 55-56.  While admitting that Mr. Gonzalez's

4  "confusion and his difficulty putting sentences together . . . and answering rationally" could be

5  "signs and symptoms of a mental impairment," Fisher testified that "everything to [him] was

6  indicative of alcohol intoxication."  *Id*. at 56-57.  When asked to explain what caused Fisher to

7  believe that there was probable cause that Mr. Gonzalez was unable to care for his own safety due

8  to intoxication, Fisher testified that Mr. Gonzalez "was making absolutely no sense"; "was off

9  balance at times"; was near "a large quantity of an alcoholic beverage or liquor"; was "not . . . able

10  to really be oriented to . . . his surroundings"; and was "next to a very highly traveled main

11  thoroughfare . . . where there's a lot of vehicle traffic that goes fast."  *Id*. at 60-61.

12      McKinley made a nonverbal signal to Fisher to arrest Mr. Gonzalez by holding up his left

13  hand and grabbing his left wrist with his right hand.  McKinley Dep. 79, 81; Fisher Dep. 62-63;

14  Video 10:01.  Just over nine minutes after McKinley first started interacting with Mr. Gonzalez,

15  McKinley and Fisher moved in and made physical contact with Mr. Gonzalez.  McKinley Dep. 84.

16  They did not warn him that he was under arrest.  Video 10:10; McKinley Dep. 119; Begault Decl.

17  ¶ 6 (stating time interval between initial verbal contact and first physical contact with Mr.

18  Gonzalez was 9 minutes, 10 seconds).  McKinley grabbed Mr. Gonzalez's left arm, Fisher grabbed

19  his right arm, and the officers walked him forward a few steps then tried to force both of his hands

20  behind his back.  Video 10:10-10:16; McKinley Dep. 85.  In less than five seconds Fisher had

21  applied a rear wrist lock to Mr. Gonzalez's right wrist and got his right arm into position for

22  handcuffing.  Fisher Dep. 64-65; McKinley Dep. 85.  McKinley was unable to hold on to Mr.

23  Gonzalez's left wrist or get it into a position for handcuffing.  He testified that this was because

24  Mr. Gonzalez "was immediately resisting by making his arm ridged and keeping it toward the

25  front of his body" and because Mr. Gonzalez was wearing "bulky clothing" that was covering his

26  hand to his knuckles.  McKinley Dep. 85-86.  McKinley also admitted that he was holding on to

27  his sunglasses in one hand for "[s]everal seconds" while simultaneously trying to put Mr.

28  Gonzalez's left arm behind his back.  *Id*. at 86; Video 11:50.  He eventually tossed his sunglasses

1   away so that he could use both hands on Mr. Gonzalez.  McKinley Dep. 87.

2        The video depicts the officers repeatedly telling Mr. Gonzalez to put his arm behind his

3   back and Mr. Gonzalez keeping his left arm in front of his body, speaking to the officers in the

4   same tone that he had been using before, repeatedly saying, "[i]t's not that.  Video 10:16-12:24.

5   The officers told him to "relax" and to put his arm and hand behind his back, to which Mr.

6   Gonzalez responded, "I didn't do nothing" and "I didn't stole nothing."  Video 10:42-10:46;

7   Transcript 15.  According to McKinley, "[i]t seemed like he was trying to grab his waistband with

8   his . . . left hand, and he was bending over at the waist, trying to pull away from" the officers.

9   McKinley Dep. 87.  Neither officer told Mr. Gonzalez that he was under arrest.  Fisher Dep. 67.

10   At some point Fisher told McKinley, "[t]hink we might have to put him on the ground" and

11   McKinley responded in the affirmative.  Video 12:33; Transcript 19.  Both officers testified that

12   they attempted one or more leg sweeps to get Mr. Gonzalez on the ground because they could not

13   handcuff him while standing.    Fisher Dep. 67-68; McKinley Dep. 89-90.  At some point Fisher

14   lost control of Mr. Gonzalez's right arm.  He testified that Mr. Gonzalez "was basically moving a

15   lot" and "his movements were very aggressive, to where his elbow came up and almost hit

16   [Fisher] in [his] face," although Fisher did not know if that was intentional.  Fisher Dep. 68, 105.

17        McKinley, Fisher, and Mr. Gonzalez then fell onto the ground.  Video 12:57.  It is not

18   clear how they fell.  *See* Fisher Dep. 68-69 ("we just fell together.  I didn't trip him.  I don't know

19   how we fell."); McKinley Dep. 90.  By that time it had been just under three minutes since the

20   officers first made physical contact with Mr. Gonzalez.  Begault Decl. ¶ 6 (stating time interval

21   between first physical contact with Mr. Gonzalez until contact with the ground was 2 minutes, 50

22   seconds).

23        Charlie Clemmons, a current Alameda Parking Tech and former jailer and bouncer, had

24   been doing a "ride-along" with Fisher that morning.  Clemmons Dep. 10-12, 15, 29-30.

25   Clemmons had remained in Fisher's patrol car after they arrived at the park, about 50-60 feet away

26   from where McKinley, Fisher, and Mr. Gonzalez were standing.  *Id.* at 35.  Clemmons testified

27   that he started watching the three men closely when McKinley tried to take hold of Mr.

28   Gonzalez's wrist.  According to Clemmons, "it didn't look like they were fighting" and they were

United States District Court
Northern District of California

"just kind of moving around." *Id.* at 37-38. After they fell to the ground Clemmons got out of the patrol car and walked over to the men. *Id.* at 38.

Mr. Gonzalez ended up lying face down on the ground. Fisher testified that he did not think that Mr. Gonzalez just fell "onto his stomach prone" but that "it was almost like he—his knees just kind of buckled and he just went that way" when they fell to the ground. Fisher Dep. 68-69. Fisher tried to regain control over Mr. Gonzalez's right arm and twisted to get his right leg from underneath Mr. Gonzalez's body. He then rested his chest "on a portion of [Mr. Gonzalez's] back," putting some weight on his body, with the rest of his weight on his toes and Mr. Gonzalez face down on his stomach. Fisher Dep. 69-71; McKinley Dep. 91. Fisher "rotated [his] body" around Mr. Gonzalez's head with Fisher's body weight "supported between [his] knees, feet, and a point of contact, the chest." Fisher Dep. 74. Fisher testified that he placed his right shin and knee on Mr. Gonzalez's shoulder and tried to prevent his leg from "moving close to the spine." *Id.* at 76. Fisher used "all the strength that [he] had" to regain control of Mr. Gonzalez's right arm. Fisher Dep. 73-74. Fisher is 5'8" and weighed 185 pounds and wore gear weighing an additional 10-12 pounds. *Id.* at 10-11.[2]

McKinley testified that he attempted to get Mr. Gonzalez's left hand behind his back. To grab his hand while keeping Mr. Gonzalez from being able to roll over, McKinley "mounted" him by "placing [his] knees on either side of [Mr. Gonzalez's] hips" and placing his weight on Mr. Gonzalez's buttocks, with one leg on either side of Mr. Gonzalez. McKinley Dep. 91-92. McKinley is 6'3" and weighed 150 pounds. *Id.* at 21. He testified that while he was straddling Mr. Gonzalez, Mr. Gonzalez was lifting McKinley's entire body weight off the ground and that "[a]t moments" McKinley's entire body weight was on top of Mr. Gonzalez. *Id.* at 92-93. According to McKinley, as he and Fisher were trying to hold Mr. Gonzalez down "on his belly in a prone position," Mr. Gonzalez was trying to roll over to his side and McKinley used his body weight to prevent him from rolling during the struggle. *Id.* at 93-94. Fisher also testified that he tried to keep Mr. Gonzalez "in a prone position" to make sure that he did not "rock onto his side."

---

[2] At some point Fisher's bodycam got knocked off of his lapel and was between his chest and Mr. Gonzalez's back. Fisher Dep. 72.

Fisher Dep. 79.

Mr. Gonzalez was lying on his stomach when Clemmons walked over to McKinley, Fisher, and Mr. Gonzalez and McKinley asked Clemmons to "take his legs." Clemmons Dep. 38, 40. He saw Fisher "pulling [him]self out from underneath [Mr. Gonzalez]" and then pull Mr. Gonzalez's arm, holding Mr. Gonzalez down. *Id*. at 42. Clemmons saw Mr. Gonzalez moving his legs, "pushing all around," and Clemmons laid across his legs, placing his chest across the back of both of Mr. Gonzalez's knees. *Id*. at 43. Clemmons testified that even though Mr. Gonzalez was moving his legs, he was not kicking and was instead trying to "get his legs free." *Id*. at 44.

McKinley pulled Mr. Gonzalez's left arm behind him and was eventually able to handcuff Mr. Gonzalez with Fisher's assistance. McKinley Dep. 95, 103. The officers handcuffed Mr. Gonzalez less than two minutes after he fell to the ground. Begault Decl. ¶ 6 (stating time interval between when Mr. Gonzalez contacts the ground and handcuffing was 1 minute, 50 seconds); *see* Video 14:24.

It is undisputed that the officers continued to hold Mr. Gonzalez face down on the ground after he was handcuffed. Fisher testified that he placed his right knee and shin against Mr. Gonzalez's shoulder because the officers "still only had general control, where he could still move his legs and move his body" and that Mr. Gonzalez was "consistently resisting." Fisher Dep. 81-82. Fisher also "rested [his] right forearm along his back to control his right arm . . ." *Id*. at 87. The video appears to show Fisher leaning against Mr. Gonzalez's right side. *See* Video 14:33. At one point after Mr. Gonzalez was handcuffed, Fisher stated, "[h]e's lifting my whole body weight up," although he denied that his body was entirely on top of Mr. Gonzalez. Video 15:24; Transcript 23. Instead, Fisher testified, the majority of his weight was "being supported by [his] right toes, the balls of [his] toes . . ." Fisher Dep. 88-89.

McKinley testified that he moved off of Mr. Gonzalez's buttocks, situated himself along Mr. Gonzalez's left side, and used his hand or elbow "to hold Mr. Gonzalez's elbow in place." McKinley Dep. 95, 106. He also radioed that the officers had Mr. Gonzalez "detained but . . . still needed another officer." McKinley Dep. 106; Video 14:24; Transcript 21-22. McKinley and Fisher then talked about using a WRAP restraint device on Mr. Gonzalez and agreed that they

9

would "keep him pinned down, 'til we get the wrap here." Video 14:37-14:55; Transcript 22.[3]

McKinley testified that the plan was to use the WRAP on Mr. Gonzalez and that the officers continued to hold Mr. Gonzalez in a prone position after he was handcuffed in order "[t]o wait for the wrap to arrive." McKinley Dep. 112-14; Fisher Dep. 82, 102. Neither officer radioed for another officer to bring a WRAP to the scene. McKinley testified that he was "waiting for Officer Leahy to arrive to bring the wrap when he arrived on scene." McKinley Dep. 114. Leahy ultimately arrived without the WRAP but McKinley did not tell him to go back and get it or radio for anyone else to bring it. McKinley Dep. 114.

During this time, Mr. Gonzalez was making noise, saying some words and making grunting sounds. At one point he shouted "[t]hank you. Thank you." Video 14:19-15:10, 15:30. A few seconds later, McKinley told Mr. Gonzalez, "[i]t's okay. It's okay. What's your name?" Mr. Gonzalez responded, "Mario," and then says "Alberto" twice. His voice sounds weak, as if he was gasping or crying. Video 15:34-15:55.

When Leahy arrived, he believed that "some sort of physical altercation" was happening based on an attempted radio transmission from McKinley and/or Fisher. Leahy Dep. 48-49. He saw the two officers and Clemmons "struggling to control an individual on the ground." *Id.* at 53. Mr. Gonzalez was facedown in handcuffs, with Fisher on his right side and McKinley on his left. *Id.* at 55, 57. According to Leahy, Fisher's knee was "on the shoulder blade area of Mr. Gonzalez's right shoulder blade." Clemmons "had his chest laying over . . . the back portion of Mr. Gonzalez's calves." *Id.* at 55-56. Leahy testified that Mr. Gonzalez was "bending at the knees, kind of pushing upwards or up towards the sky against Mr. Clemmons's chest; he was bucking upwards at the hips, and kind of moving his upper body." *Id.* at 56.

Leahy "relieve[d]" Clemmons and "immediately took over the attempt to control [Mr.

---

[3] McKinley testified that a WRAP "is a restraint device that is used to control combative subjects that aren't safely restrained in handcuffs" and who are "thrashing or kicking." McKinley Dep. 112-13. "It's a fabric device with straps and buckles that goes over a person's shoulder and wraps around their ankles and . . . like a vest that goes over their . . . torso . . . [a]nd it has a strap that connects their ankles to the chest that's adjustable." *Id.*

Gonzalez's] legs." *Id*. at 55, 61.[4]  Leahy placed his knees and shins over Mr. Gonzalez's calves and began working to cross his ankles to prepare for application of the WRAP.  *Id*. at 64.  Leahy is 6' and weighed 170 pounds.  He was also wearing gear that weighed about 30 pounds.  *Id*. at 14.

Leahy testified that while he was kneeling across Mr. Gonzalez's calves, Mr. Gonzalez was lifting Leahy off the ground with both legs.  *Id*. at 66.  At some point, Fisher asked Leahy, "[c]an you figure four him?"  Video 16:18; Transcript 25.  Leahy responded, "I don't want to lose what I got," *see id*., which Leahy testified was in reference to "[a] certain percentage of control of his legs."  Leahy Dep. 66-67.  A short time later the video depicts Leahy saying "[s]top kicking, Mario.  Stop, stop kicking."  However, Leahy testified that Mr. Gonzalez never struck or kicked him.  *Id*. at 70; Video 17:19.

According to Leahy, when he was telling Mr. Gonzalez to stop kicking, Mr. Gonzalez "was actively thrusting upwards lifting [him] off the ground" and "violently" lifting his feet off the ground.  Leahy Dep. 70-71.  However, the bodycam footage appears to show that one of Mr. Gonzalez's feet was laying on the ground, hardly moving, for approximately 50 seconds during the time when Leahy told him to stop kicking.  *See* Video 17:09-17:59.  Additionally, Clemmons testified that when Leahy relieved him and Clemmons stood up, he walked back to the car because "[i]t looked like they had a little better control . . . everything looked okay.  No one was struggling; [Mr. Gonzalez] wasn't struggling.  No one was freaking out or nothing, and it looked fine[.]"  Clemmons Dep. 49-51.

A few seconds after Leahy told Mr. Gonzalez to stop kicking, Fisher asked, "[t]hink we can roll him on his side?" and Leahy again responded, "I don't want to lose what I got, man."  Video 17:34; Leahy Dep. 72-73; Transcript 26-27.  Neither McKinley nor Fisher questioned or responded to Leahy.  McKinley testified that the officers did not turn Mr. Gonzalez on his side "[b]ased on Officer Leahy's response."  McKinley Dep. 109-10.  Fisher testified that he did not look to Mr. Gonzalez's legs to see what was happening with Leahy because he was focused on

---

[4] Leahy testified that he "vaguely recall[s]" Clemmons warning him "of how strong—or how resistive [Mr. Gonzalez] was being at the legs" and telling him to "Be careful" or "something like that, although this is not reflected on Defendants' transcripts of the bodycam videos.  Leahy Dep. 59.

United States District Court
Northern District of California

controlling Mr. Gonzalez's right side.  Fisher Dep. 82-83.  According to Leahy, there was a point at which Mr. Gonzalez was no longer lifting Leahy off the ground and Leahy lifted one of his hands to point to a pedestrian and say, "[c]an you go around, ma'am?"  Leahy Dep. 74-75; Video 17:52; Transcript 27.  Leahy did not inform the other officers that Mr. Gonzalez could be moved to his side because, according to Leahy, "it made the most sense to keep him in that position for just a few seconds longer while the WRAP could be retrieved."  Leahy Dep. 76.

The video appears to show Fisher placing his right elbow and forearm on Mr. Gonzalez's back while McKinley has his right arm over the left side of his back.  Video 17:19-17:49.  A short time later, Fisher announced "[w]e have no weight on his chest."  Fisher Dep. 91; Transcript 27; Video 17:50.  Fisher testified that after he said that, McKinley began to straddle Mr. Gonzalez's waist again and Fisher said, "[n]o weight.  No weight.  No weight."  Fisher Dep. 91; Transcript 27; Video 17:55.  According to Fisher, he was relaying that he did not want anyone near Mr. Gonzalez's neck, spine, or back and was trying to "keep any type of weight . . . off of [Mr. Gonzalez's] back."  Fisher Dep. 91-92.  At the point that Fisher made the statement, "[w]e have no weight on his chest," the video appears to show McKinley's right elbow on Mr. Gonzalez's back, plus what appears to be Fisher's hand on the middle of his back.  Video 17:51.

During this time, including when the video depicts Fisher's elbow and forearm on his back, Mr. Gonzalez can be heard on the video making gagging, grunting, or shouting sounds.  Video 17:20-17:48.  When asked if he heard Mr. Gonzalez "gasping" while the officers were holding him down, Fisher testified that he "heard breathing that was indicative of resistance, of physical exertion."  Fisher Dep. 80.  McKinley testified that Mr. Gonzalez sounded "winded."  McKinley Dep. 99.  Leahy denied hearing sounds of respiratory distress; he testified that the sounds Mr. Gonzalez was making were like the sounds of "somebody who is playing sports."  Leahy Dep. 69.

About ten seconds after Fisher said, "no weight," McKinley said, "[h]e's going non-responsive."  Fisher Dep. 113; Transcript 28; Video 18:03.  McKinley testified that Mr. Gonzalez "had stopped talking and stopped moving."  McKinley Dep. 121.

After McKinley checked for a pulse and could not find one the officers rolled Mr.

1   Gonzalez onto his back.  McKinley Dep. 122; Fisher Dep. 114.  Once he was on his back, Fisher

2   tried to hold his head stable and keep his airway open and McKinley started chest compressions.

3   Fisher Dep. 115-16; McKinley Dep. 122.  Leahy administered two doses of Narcan.  Leahy Dep.

4   84-85.  Mr. Gonzalez became unresponsive three minutes and 45 seconds after he had been

5   handcuffed and 16 seconds after his "final vocalizations."  Begault Decl. ¶ 6.  He was transported

6   to the emergency room and pronounced dead at 11:45 a.m.  Autopsy 5.

7   　　　　The parties dispute Mr. Gonzalez's cause of death.  The Alameda County Coroner found

8   "[p]hysiologic stress of altercation and restraint," morbid obesity, and alcoholism to be

9   "significant conditions contributing to" his death but ultimately attributed the cause of death to the

10   "[t]oxic effects of methamphetamine."  *Id*. at 1.  According to the Alameda County Coroner, Mr.

11   Gonzalez had 907 ng/mL of methamphetamine in his system.  *Id*. at 6.  There was less than ".02

12   grams %" of ethanol in his system.  *Id*. at Autopsy at ECF p. 691.

13   　　　　Plaintiffs had an independent autopsy performed by Dr. Bennet I. Omalu, a forensic

14   pathologist.  Dr. Omalu concluded that Mr. Gonzalez died from restraint asphyxiation.  [Docket

15   No. 76 (Haddad Decl. May 9, 2023) ¶ 8, Ex. 6 (Omalu Autopsy) 5.]  Dr. Omalu concluded that

16   Mr. Gonzalez also had blunt force trauma of the head, face, trunk, and extremities.  He had

17   hemorrhage in the deep soft tissues of his back from blunt force trauma; severe, acute pulmonary

18   edema and congestion; and global, acute congestive brain swelling.  *Id*. at 2.  A second toxicology

19   report found no alcohol in Mr. Gonzalez's system.  *Id*. at ECF p. 29.

20   　　　　**B.**　　**Procedural History**

21   　　　　　　**1.**　　*Gonzalez*

22   　　　　M.G.C., by and through his guardian ad litem, Andrea Cortez, filed a complaint

23   individually and as Mr. Gonzalez's successor in interest on December 17, 2021.  He filed an

24   amended complaint (FAC) on January 10, 2022.  [Docket No. 11.]  For simplicity, the court refers

25   to M.G.C. in his individual capacity and as Mr. Gonzalez's successor in interest as the "Gonzalez

26   Plaintiffs."

27   　　　　The FAC alleges the following claims: 1) a section 1983 claim for violations of the Fourth

28   Amendment to the United States Constitution on behalf of Mr. Gonzalez, and a section 1983 claim

United States District Court
Northern District of California

13

for violation of M.G.C.'s familial associational rights under the First and Fourteenth Amendments, against McKinley, Fisher, and Leahy; 2) a section 1983 claim against Alameda and Fenn under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), on behalf of Mr. Gonzalez; 3) violation of California Civil Code section 52.1, the Bane Act, on behalf of Mr. Gonzalez and M.G.C. against McKinley, Fisher, Leahy, and Alameda; 4) negligence on behalf of Mr. Gonzalez against all Defendants; 5) assault and battery on behalf of Mr. Gonzalez against McKinley, Fisher, Leahy, and Alameda; and 6) false arrest and imprisonment on behalf of Mr. Gonzalez against McKinley, Fisher, Leahy, and Alameda.

In June 2023, the parties stipulated to dismiss Plaintiffs' *Monell* claim (claim two) and all claims against Fenn.  [Docket No. 84.]

### 2.     *Arenales*

Arenales filed a complaint on February 3, 2022 against the same Defendants alleging three claims for relief: 1) a section 1983 claim for violation of Arenales's Fourteenth Amendment familial associational rights against McKinley, Fisher, and Leahy; 2) a section 1983 claim under *Monell* against Alameda and Fenn; and 3) violation of California Civil Code 52.1 against Alameda, Fenn, McKinley, Fisher, and Leahy, by Arenales individually and as "co-successor in interest."  Compl. 15.[5]

In June 2023, the parties stipulated to dismiss Arenales's California Civil Code 52.1 claim (claim three) and all claims against Fenn.  [Docket No. 60.]

### 3.     Summary Judgment Motions

The court related the cases in March 2022.  Arenales later moved to consolidate the cases and M.G.C. opposed the motion.  The court denied the request to consolidate the case for trial and granted the request to consolidate the cases for discovery.  Although the court normally limits parties to only one motion for summary judgment, it also granted Defendants leave to file an early summary judgment motion solely on the issue of liability regarding the Fourteenth Amendment claim for interference with familial associational rights by M.G.C. and Arenales in order to

---

[5] Arenales's third claim for relief is erroneously labeled the "fourth cause of action."

United States District Court
Northern District of California

1  eliminate the risk of inconsistent rulings on the Fourteenth Amendment claims.  The court set a

2  briefing schedule and page limits for that motion.  [Docket Nos. 60 (*Gonzalez*), 43 (*Arenales*)

3  (Minute Order).]

4  After Defendants' motion for partial summary judgment on the Fourteenth Amendment

5  claims was briefed, the court concluded that no judicial or case management efficiency would be

6  gained by adjudicating the motion separately from any future motion(s) for summary judgment on

7  the remaining claims.  In particular, Plaintiffs' Fourteenth Amendment claims rest on the same

8  facts about the officers' conduct as the Fourth Amendment and related state law claims, and the

9  court determined that it makes sense to consider the facts relevant to these claims all at once, on

10  the same complete record following the close of fact discovery.  The court also noted that

11  Defendants requested leave to file an early summary judgment motion to potentially resolve

12  Arenales's case altogether but that the motion directly solely at her Fourteenth Amendment claim

13  would not accomplish that, given that she still had other claims at issue.  Accordingly, the court

14  ordered Defendants to file separate motions for summary judgment that did not include additional

15  argument on the Fourteenth Amendment claims, as those claims were already fully briefed.  The

16  court set a briefing schedule and page limits on those motions and set an August 10, 2023 hearing

17  on all motions.  [Docket Nos. 82 (*Gonzalez*), 58 (*Arenales*).]

18  Defendants timely filed motions for summary judgment in each case.[6]

19  **I.      LEGAL STANDARD**

20  A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

21  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden

22  _____

23  [6] The court set page limits for each set of motions, including ordering Defendants to file a
combined reply in support of the motion for partial summary judgment on the Fourteenth

24  Amendment claims that does not exceed 15 pages.  *See* Minute Order.  Defendants inexplicably
filed a 20-page reply.  [*See* Docket Nos. 79 (*Gonzalez*), 57 (*Arenales*).]  The court declines to

25  consider any pages beyond the page limits, including Defendants' objections to evidence on pages
19-20 of their reply brief in support of the motion for partial summary judgment on the Fourteenth

26  Amendment claims.  In any event, the court has reviewed Defendants' objections and finds they
are without merit.  Most challenge Plaintiffs' characterizations of the evidence and interpretation

27  of the video.  Defendants also argue that the Gonzalez Plaintiffs' autopsy and toxicology reports as
irrelevant and not authenticated.  These arguments are also with merit; the materials are relevant

28  for the reasons described in this opinion and were authenticated by counsel.  *See* Haddad Decl. ¶
8.

United States District Court
Northern District of California

of establishing the absence of a genuine issue of material fact lies with the moving party. *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The court must view the evidence in the light most favorable to the non-moving party.  *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  A genuine factual issue exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could return a verdict for the nonmoving party.  *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248).  The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of material fact exists.  *Devereaux*, 263 F.3d at 1076.  More than a "scintilla of evidence" must exist to support the non-moving party's claims.  *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477 U.S. at 252).  A showing that "there is some 'metaphysical doubt' as to the material facts as issue" will not suffice.  *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at 587).

## II.   DISCUSSION

The court first addresses Defendants' motion with respect to the claims solely at issue in *Gonzalez*.  It then turns to the Fourteenth Amendment claims at issue in both *Gonzalez* and *Arenales* and finally addresses Defendants' motion with respect to the *Monell* claim at issue in *Arenales*.

### A.  Fourth Amendment Unlawful Detention and Arrest Claims

#### 1.  Legal Standard

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  In *Terry*, the Supreme Court elaborated a three-tier structure of Fourth Amendment jurisprudence.  *See United States v. Erwin*, 803 F.2d 1505, 1508 (9th Cir. 1986) (summarizing *Terry*).  "The first tier consists of those law enforcement activities, such as police questioning conducted pursuant to valid consent, that do not constitute searches or seizures governed by the Fourth Amendment." *Erwin*, 803 F.2d at 1508.

"The second tier consists of limited intrusions such as pat-downs of the outer clothing (or 'frisks') and brief investigative detentions.  To justify these 'limited' searches and seizures, law enforcement officials must possess a reasonable, articulable suspicion that the suspect has recently committed a crime or is about to commit one." *Id.*  During a so-called *Terry* stop, police officers are entitled to employ reasonable measures to protect themselves and others in potentially dangerous situations.  *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056-57 (9th Cir. 1995).  However, "[i]nvestigative stops based upon suspicion short of probable cause are . . . constitutionally permissible only where the means utilized are the least intrusive reasonably available." *Kraus v. Pierce Cty.*, 793 F.2d 1105, 1108 (9th Cir. 1986).  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

"The third tier comprises 'full scale' searches or arrests requiring probable cause." *Erwin*, 803 F.2d at 1508; *Kraus*, 793 F.2d at 1108 ("Where more than a limited intrusion occurs, an arrest occurs and probable cause is required.").

#### 2.  Analysis

##### a.  Detention

Defendants first move for summary judgment on Mr. Gonzalez's unlawful detention claim

on the ground that the officers had reasonable suspicion to believe he had stolen the alcohol in the baskets and/or was intoxicated in public in violation of California Penal Code section 647(f).  Mot. 7.  In relevant part, section 647(f) provides that a person "[w]ho is found in any public place under the influence of intoxicating liquor, any drug, controlled substance, or toluene, in a condition that they are unable to exercise care for their own safety or the safety of others" is "guilty of disorderly conduct, a misdemeanor[.]"  Cal. Pen. Code § 647(f).

The Gonzalez Plaintiffs argue that as soon as Fisher informed McKinley that Walgreens had not reported any recent alcohol thefts, "any reasonable suspicion Defendants had to continue detaining Gonzalez for theft was gone."  Opp'n 10.  At the hearing, the Gonzalez Plaintiffs conceded that up until the point that McKinley received Fisher's radio call, Mr. Gonzalez's detention was supported by reasonable suspicion that he committed theft.  Therefore, the court analyzes the lawfulness of the detention from the point that McKinley heard back from Fisher that there had not been "any walk-outs" at the Walgreens by persons matching Mr. Gonzalez's description, up until the point the officers attempted to arrest him.

"The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  *Navarette v. California*, 572 U.S. 393, 396-97 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981)).  This standard "takes into account 'the totality of the circumstances—the whole picture.'"  *Id.* (citing *Cortez*, 449 U.S. at 417).  Viewing the evidence in the light most favorable to the Gonzalez Plaintiffs, the court finds that a reasonable jury could conclude that McKinley and Fisher lacked reasonable suspicion to continue Mr. Gonzalez's detention for possible theft after they learned that the nearby Walgreens had not experienced any thefts.  Although Mr. Gonzalez was standing near bottles of alcohol with security caps, McKinley admitted that it was possible that Mr. Gonzalez had either found the bottles or that someone had given them to him.  Moreover, he testified that he put his investigation of the possible theft "on hold."  McKinley Dep. 70-71, 75.  The Ninth Circuit has held that "[t]he whole point of an investigatory stop, as the name suggests, is to allow police to *investigate*."  *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002) (emphasis in original).  Defendants offer no argument

United States District Court
Northern District of California

or authority that Mr. Gonzalez's continued detention for possible theft was lawful even after McKinley stopped investigating that offense.  Summary judgment on this ground is accordingly denied.

A reasonable jury could also conclude that Mr. Gonzalez's continued detention for possible violation of section 647(f) was not supported by reasonable suspicion.  McKinley testified that he believed that Mr. Gonzalez was intoxicated based on his proximity to the open bottle of alcohol, "slurred speech and his inability to connect his sentences," the odor of alcohol on his breath, and his "blood shot and watery eyes."  McKinley Dep. 67-68.  McKinley also testified that he continued to detain Mr. Gonzalez due to "his intoxication" and "his inability to care for himself safely," *id*. at 75, but the record does not reflect the basis for McKinley's purported concerns about Mr. Gonzalez's safety.  Further, a reasonable jury could disbelieve McKinley's claim that he could smell alcohol on Mr. Gonzalez's breath since McKinley was eight to ten feet away from Mr. Gonzalez during their interaction, *id*. at 66, and Defendants' own toxicology report indicated that there was less than ".02 grams %" of ethanol in Mr. Gonzalez's blood.  Autopsy at ECF p. 691.

Fisher testified that he "definitely was thinking public intoxication" based on Mr. Gonzalez's inability to answer basic questions or make sense, proximity to an open container of alcohol, and loss of balance.  Fisher Dep. 49-50.  As to Mr. Gonzalez's ability to care for his own safety, Fisher listed the following concerns: he was not making sense, was off balance, was near "a large quantity of" alcohol, was not oriented to his surroundings, and was next to a thoroughfare with a lot of vehicle traffic.  *Id*. at 60-61.  However, McKinley testified that Mr. Gonzalez had "pretty good balance," and contrary to Fisher's testimony, the video does not show Mr. Gonzalez "bounc[ing] into" or touching a pine tree.  It also does not show Mr. Gonzalez approaching traffic, walking onto the street, or otherwise being unaware of his surroundings.  A reasonable jury could conclude that Fisher's concerns that Mr. Gonzalez could not care for his own safety were unfounded.

Additionally, McKinley testified that he lacked the training to rule out whether Mr. Gonzalez's confusion and demeanor was caused in part by a mental health issue.  Fisher admitted

19

1    that Mr. Gonzalez could be displaying "signs and symptoms of a mental impairment."  McKinley

2    Dep. 80-81; Fisher Dep. 56-57

3          Ultimately, viewing the evidence in the light most favorable to the Gonzalez Plaintiffs and

4    drawing all inferences in their favor, the court concludes that there are genuine disputes of fact

5    regarding the reasons for Mr. Gonzalez's appearance and comportment and whether he was unable

6    to care for his own safety.  Accordingly, summary judgment is denied on the claim for unlawful

7    detention against McKinley and Fisher.[7]

8                              **b.    Arrest**

9          Defendants next argue that Mr. Gonzalez's arrest was supported by probable cause.

10         "Under the Fourth Amendment, a warrantless arrest requires probable cause."  *United*

11   *States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692,

12   700 (1981)).  "Probable cause exists when officers have knowledge or reasonably trustworthy

13   information sufficient to lead a person of reasonable caution to believe that an offense has been or

14   is being committed by the person being arrested."  *Id.* (citing *Beck v. Ohio,* 379 U.S. 89, 91

15   (1964)).  "Alternatively, this court has defined probable cause as follows: when 'under the totality

16   of circumstances known to the arresting officers, a prudent person would have concluded that

17   there was a fair probability that [the defendant] had committed a crime.'"  *Id.* (citing *United States*

18   *v. Smith,* 790 F.2d 789, 792 (9th Cir. 1986)) (alteration in original).  While conclusive evidence of

19   guilt is not necessary under this standard to establish probable cause, "[m]ere suspicion, common

20   rumor, or even strong reason to suspect are not enough."  *McKenzie v. Lamb*, 738 F.2d 1005, 1008

21   (9th Cir. 1984) (citing *Henry v. United States*, 361 U.S. 98, 101 (1959)).  "Probable cause is

22   lacking if the circumstances relied on are susceptible to a variety of credible interpretations not

23   necessarily compatible with nefarious activities."  *Gasho v. United States*, 39 F.3d 1420, 1432 (9th

24   Cir. 1994) (citations omitted).

25         "Probable cause must be determined at the time the arrest is made.  Facts learned or

26

27   _____

     [7] At the hearing, the Gonzalez Plaintiffs clarified that they do not bring an unlawful detention
     claim against Leahy, who was not present during Mr. Gonzalez's detention but arrived after Mr.
28   Gonzalez was on the ground in handcuffs.  The Gonzalez Plaintiffs' Fourth Amendment claims
     against Leahy are based solely on wrongful arrest and excessive force.

United States District Court
Northern District of California

evidence obtained as a result of a stop or arrest cannot be used to support probable cause unless they were known to the officer at the moment the arrest was made." *Allen v. City of Portland*, 73 F.3d 232, 236 (9th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 482 (1963)). "Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008) (citing *McKenzie,* 738 F.2d at 1008).

Defendants argue that probable cause existed to arrest Mr. Gonzalez for any of the following three offenses: 1) stealing the bottles of alcohol; 2) violating section 647(f); and 3) violating California Penal Code section 148.  Mot. 8.

As to the theft of alcohol, McKinley testified that he made the decision to arrest Mr. Gonzalez and admitted that he lacked probable cause to arrest Mr. Gonzalez for the theft of the alcohol.  McKinley Dep. 69, 71, 79-80, 88, 118.  Defendants do not address this admission or explain why the court should disregard it.  A reasonable jury could conclude that the officers lacked probable cause to arrest Mr. Gonzalez for theft based on McKinley's testimony.

A reasonable jury could also conclude that the officers lacked probable cause to arrest Mr. Gonzalez for violating section 647(f) for the same reasons discussed above; namely, the existence of disputed facts regarding the reasons for Mr. Gonzalez's behavior and whether he was unable to care for his own safety.

As to California Penal Code section 148, that statute provides that a person "who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment" is guilty of a misdemeanor.  Cal. Penal Code § 148(a)(1).[8]  Defendants argue that probable cause supported arresting Mr. Gonzalez for violating section 148 for two reasons.  First, they claim that Mr. Gonzalez delayed and obstructed the officers' investigation of the possible theft of the alcohol and his potential intoxication by failing

---

[8] The elements of the crime of violating section 148(a)(1) are: "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." *Yount v. City of Sacramento,* 43 Cal.4th 885, 894-95 (2008) (citation and quotation marks omitted).

United States District Court
Northern District of California

to identify himself and answer the officers' questions.  However, when asked if he thought that Mr. Gonzalez "was being uncooperative" before "anything physical happened" between Mr. Gonzalez and the officers, McKinley testified that he did not believe that Mr. Gonzalez was "trying to be uncooperative," as follows:

> I believe that he just didn't understand.  He couldn't articulate because he didn't know how, based on his inebriation.  I don't think he was necessarily trying to be uncooperative.  At least verbally, he seemed—for most of my interaction with him, he seemed to be cooperative . . . verbally, he didn't seem—seem to be intentionally uncooperative.

McKinley Dep. 111-12.  A reasonable jury could consider this testimony and conclude that any failure by Mr. Gonzalez to identify himself and answer the officers' questions was *not* willful, as required by section 148(a)(1).

Next, Defendants argue that probable cause supported arresting Mr. Gonzalez for violating section 148 based on his physical resistance to the officers' attempts to handcuff and arrest him. Under California law, however, a conviction under section 148 "requires that the defendant's obstructive acts occur while the officer is engaging in 'the *lawful* exercise of his duties.'" *Sanders v. City of Pittsburg*, 14 F.4th 968, 971 (9th Cir. 2021) (emphasis in original) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005)).  In other words, "the lawfulness of the officer's conduct is an essential element of the offense of resisting, delaying, or obstructing a peace officer." *Smith*, 394 F.3d at 695.  "Under California law, an officer is not lawfully performing her duties when she detains an individual without reasonable suspicion or arrests an individual without probable cause." *Nuno v. Cnty. of San Bernardino*, 58 F. Supp. 2d 1127, 1134 (C.D. Cal. 1999). Accordingly, if a reasonable jury concludes that the officers lacked probable cause to arrest Mr. Gonzalez for theft or for violating section 647(f), it could find that they were not engaged in the lawful performance of their duties when arresting him and thus conclude that any arrest for violation of section 148 was unlawful.

Summary judgment is denied on the claim for unlawful arrest against McKinley, Fisher, and Leahy.

c.     **Leahy**

1        Finally, Defendants argue that Leahy is entitled to summary judgment on the Gonzalez

2    Plaintiffs' unlawful seizure claims because he was "not present during [Mr. Gonzalez's] detention

3    or attempted arrest" and "cannot be held liable on a 'team effort' theory which lumps all the

4    defendants together."  Mot. 8.

5        Generally, a government official is only liable for their own misconduct.  *Ashcroft v. Iqbal*,

6    556 U.S. 662, 677 (2009) ("In a § 1983 suit . . .where masters do not answer for the torts of their

7    servants—the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each

8    Government official, his or her title notwithstanding, is only liable for his or her own

9    misconduct.").  However, an officer may be liable for conduct where there has been "integral

10   participation . . . in the alleged constitutional violation."  *Torres v. City of Los Angeles*, 548 F.3d

11   1197, 1206 (9th Cir. 2008) (citing *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th Cir. 1996)).

12   "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of

13   a constitutional violation."  *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004).  It does,

14   however, require some fundamental involvement in the conduct that allegedly caused the

15   violation.  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007).  "A person

16   deprives another of a constitutional right within the meaning of section 1983, if he does an

17   affirmative act, participates in another's affirmative acts, or omits to perform an act which he is

18   legally required to do that causes the deprivation of which the plaintiff complains."  *Leer v.*

19   *Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (quoting *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.

20   1978)) (internal quotations and alterations omitted).  "The inquiry into causation must be

21   individualized and focus on the duties and responsibilities of each individual defendant whose acts

22   or omissions are alleged to have caused a constitutional deprivation."  *Id.* (citations omitted).  The

23   Ninth Circuit has rejected the "team effort" standard that allows a jury to consider defendants'

24   conduct together; the proper measure is "to base each individual's liability on his own conduct."

25   *Hopkins v. Bonvicino*, 573 F.3d 752, 769-70 (9th Cir. 2009) (holding that "integral participation"

26   requires "more participation" than where officer interviewed a witness, did not participate in the

27   unconstitutional search, and had conversations with officers who did conduct the search (citing

28   *Chuman*)); *see also Boyd*, 374 F.3d at 780 (rejecting "team effort" theory "because it allowed

United States District Court
Northern District of California

liability to attach to 'a mere bystander' who had 'no role in the unlawful conduct.'").

In this case, it is undisputed that as soon as Leahy arrived on the scene, he applied force to Mr. Gonzalez by holding down his legs while McKinley and Fisher restrained his upper body until he became non-responsive.  A reasonable jury could conclude that Leahy participated in Mr. Gonzalez's arrest based on his involvement in restraining him.  *See, e.g., Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1101 (N.D. Cal. 2017) (finding "at least a dispute of material fact" as to whether defendant was an integral participant in constitutional violation where he may have participated in the takedown of the plaintiff, "assisted the other officers in attempting to handcuff [the plaintiff]," and "was involved in the duration of the struggle" with the plaintiff).

**B.      Fourth Amendment Excessive Force Claim**

**1.  Legal Standard**

A claim of excessive force in the context of an arrest or investigatory stop implicates the Fourth Amendment right to be free from "unreasonable . . . seizures."  U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394 (1989).  Courts analyze claims of excessive force under an "objective reasonableness" standard.  *Bryan v. MacPherson*, 630 F.3d 805, 817 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 395).  The reasonableness inquiry in excessive force cases is an objective one: whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation and without the "20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id*. at 396 (citations and internal quotation marks omitted).

Because the reasonableness standard from *Graham* is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*.  The "most important single element"

is whether there is an immediate threat to safety.  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)).  These factors "are not exclusive.  Rather, [the court] examine[s] the totality of the circumstances and consider[s] 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  *Bryan*, 630 F.3d at 826 (citing *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).  Courts also consider the "'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state."  *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (internal citations omitted).

The Ninth Circuit has cautioned that in excessive force cases resulting in a death, courts must be "wary of self-serving accounts by police officers when the only non-police eyewitness is dead."  *Long v. City and Cty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  Accordingly, a court "must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts."  *Scott*, 39 F.3d at 915 (citations omitted).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury."  *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997).  "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."  *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted).  However, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."  *Scott*, 39 F.3d at 915.

### 2.    Analysis

Defendants argue that summary judgment is appropriate on the excessive force claim because Mr. Gonzalez refused to comply with the officers' orders, physically resisted handcuffing,

United States District Court
Northern District of California

1    and forcefully struggled against the officers.  They contend that "[t]he force the officers used in

2    trying to overcome [Mr. Gonzalez's] physical resistance was in direct correlation to [his]

3    continued resistance."  Mot. 12-13.

4       To assess the objective reasonableness of McKinley, Fisher, and Leahy's use of force, the

5    court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment

6    interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396

7    (citation and quotation omitted).

8                  **a.   Nature and Quality of Intrusion**

9       At the hearing, the Gonzalez Plaintiffs clarified that they challenge the force used to

10    handcuff Mr. Gonzalez as excessive, in addition to the "weighted restraint" the officers applied

11    while Mr. Gonzalez was on the ground.  *See* Opp'n 13.  Defendants did not move for summary

12    judgment on the claim of excessive force based on handcuffing.  Accordingly, the court will

13    evaluate only the force used on Mr. Gonzalez while he was on the ground.

14       The court "first assess[es] the quantum of force used to arrest [Mr. Gonzalez] by

15    considering 'the type and amount of force inflicted.'"  *Drummond ex rel. Drummond v. City of*

16    *Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (quoting *Deorle v. Rutherford*, 272 F.3d 1272,

17    1279 (9th Cir. 2001)).  McKinley and Fisher attempted to handcuff Mr. Gonzalez in connection

18    with his arrest.  After they were unable to get both of his hands behind his back for handcuffing,

19    they decided to "put him on the ground."  The three men fell to the ground and Mr. Gonzalez

20    ended up lying face down on his stomach.  The officers then used their body weight to hold Mr.

21    Gonzalez down while they struggled to pull his hands behind his back to handcuff him.  Fisher

22    testified that he rested his chest on a portion of Mr. Gonzalez's back with his weight on his toes

23    for some period of time, while McKinley straddled Mr. Gonzalez's hips and placed his weight on

24    Mr. Gonzalez's buttocks.  Both officers admitted that at some point during the struggle to

25    handcuff and restrain Mr. Gonzalez they placed their entire body weight on top of him.  After

26    relieving Clemmons, Leahy kneeled across Mr. Gonzalez's legs to prevent him from moving

27    them.  The officers eventually handcuffed Mr. Gonzalez but continued to hold him face down on

28    the ground, with McKinley and Fisher deciding that they would "keep him pinned down" until

they were able to place him in a WRAP.  At some point McKinley and Fisher considered rolling Mr. Gonzalez to his side but decided against doing so when Leahy told them "I don't want to lose what I got," referring to his control over Mr. Gonzalez's lower body and legs.  The officers kept Mr. Gonzalez on his stomach while applying some level of pressure to the back of his body for nearly four minutes after he was handcuffed until he went quiet and became unresponsive.

"Prevailing precedent in the Ninth Circuit is that law enforcement officers' use of body weight to restrain a 'prone and handcuffed individual[ ] in an agitated state' can cause suffocation 'under the weight of restraining officers,' therefore, such conduct may be considered deadly force." *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1155 (E.D. Cal. 2016) (citing *Drummond*, 343 F.3d at 1056-57).  "[K]nown as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Id*. (quoting *Drummond*, 343 F.3d at 1056-57 (collecting cases)).  In this case, it is undisputed that Mr. Gonzalez was lying facedown on his stomach for approximately five and a half minutes until he became unresponsive, and that he was in handcuffs for over three and a half minutes of that time. *See* Begault Decl. ¶ 6.  The parties dispute the amount of weight the officers were applying to Mr. Gonzalez's body during various points in time.  They also dispute the extent to which the officers applied any weight to his back after he was handcuffed.  For example, Fisher can be heard on the video saying, "[w]e have no weight on his chest" and telling McKinley, "[n]o weight.  No weight. No weight" when McKinley attempted to straddle Mr. Gonzalez's waist a second time.  However, just prior to those statements, the video appears to show Fisher's right elbow and forearm squarely on Mr. Gonzalez's back while Mr. Gonzalez was making gagging, grunting, or shouting sounds. *See* Video 17:19-17:55.

Additionally, there is a dispute about the cause of Mr. Gonzalez's death.  The Gonzalez Plaintiffs submitting evidence that he died from restraint asphyxiation and that he suffered blunt force trauma on his back.  Viewing the evidence in the light most favorable to the Gonzalez Plaintiffs, a reasonable jury could conclude that the force the officers used to keep Mr. Gonzalez in a prone position while he was lying on the ground constituted lethal force. *See Greer*, 229 F. Supp. 3d at 1104 (finding that defendant's application of continuous pressure on decedent's torso

United States District Court
Northern District of California

1    "in an attempt to control him" while he was in prone position "could constitute lethal force" under

2    *Drummond*); *Garlick*, 167 F. Supp. 3d at 1155 (holding that "eight to ten minutes of body-weight

3    pressure to a suspect's back . . . constitutes lethal force" under *Drummond*). *See also Bryan*, 630

4    F.3d at 825 n.6 ("'[l]ethal force' is force that creates a substantial risk of death or serious bodily

5    injury.").

6                 **b.**       **Governmental Interests at Stake**

7         To determine the governmental interests, the court must examine the non-exhaustive

8    factors set forth in *Graham*.  These factors include "the severity of the crime at issue, whether the

9    suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

10    resisting arrest or attempting to evade arrest by flight."  *Graham,* 490 U.S. at 396.

11                 **i.  Severity of the Crime**

12         The first *Graham* factor examines the severity of the crime.  Defendants contend that the

13    officers suspected Mr. Gonzalez had committed theft, public intoxication, and violation of section

14    148(a), all misdemeanors.  Therefore, it is undisputed that the officers did not suspect that Mr.

15    Gonzalez had committed a violent offense.

16              **ii.  Immediacy of the Threat to Safety**

17         The second *Graham* factor asks whether the suspect posed an immediate threat to the

18    safety of the officers or others.  It is the "most important" factor.  *See Bryan*, 630 F.3d at 826.  A

19    statement by an officer that they felt threatened by a suspect "is not enough; there must be

20    objective factors to justify such a concern."  *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)

21    (citation omitted).

22         Defendants assert that Mr. Gonzalez "forcefully struggle[d]" against the officers, "moving

23    his body, kicking his legs and fighting against attempts" to handcuff him, and that even after he

24    was handcuffed, he "continued to struggle and move around," including "violently kick[ing] his

25    legs" and moving with such force that he lifted Fisher and Leahy off the ground.  Mot. 12-13.

26    However, Fisher never saw Mr. Gonzalez attempt to strike or kick any officer.  Fisher Dep. 105.

27    Fisher testified that before they fell on the ground, Mr. Gonzalez almost elbowed Fisher in the face

28    but Fisher did not know if that was intentional.  *Id.*  Similarly, McKinley testified that Mr.

1   Gonzalez never struck him, made threatening movements, or made verbal threats, and Leahy

2   testified that Mr. Gonzalez never struck or kicked him.  McKinley Dep. 119-20; Leahy Dep. 70.

3         Additionally, McKinley and Fisher both testified that they could not see Mr. Gonzalez's

4   waistband because it was covered by his clothing, and McKinley testified that while he and Fisher

5   were trying to handcuff him while they were standing, "[i]t seemed like [Mr. Gonzalez] was trying

6   to grab his waistband with his . . . left hand."  McKinley Dep. 87.  However, after Mr. Gonzalez

7   fell on the ground, McKinley admitted that he did not "feel any sort of hard object, like a gun or a

8   weapon, in his waistband" while he was straddling Mr. Gonzalez.  *Id.* at 105.  Leahy testified that

9   he believed that it was "possible" that Mr. Gonzalez had weapons on his person but admitted that

10  he "could see that there was no weapon in the back of his waistband."  Leahy Dep. 89.  Moreover,

11  Mr. Gonzalez was already in handcuffs by the time Leahy arrived.  *Id.* at 57.

12        Based on the foregoing evidence, a reasonable jury could conclude that Mr. Gonzalez

13  posed little or no immediate threat to the officers' safety.

14                     **iii.  Active Resistance**

15        The Ninth Circuit has explained that "[r]esistance . . . should not be understood as a binary

16  state, with resistance being either completely passive or active.  Rather, it runs the gamut from the

17  purely passive protestor who simply refuses to stand, to the individual who is physically assaulting

18  the officer."  *Bryan*, 630 F.3d at 830.

19        The parties dispute whether Mr. Gonzalez was actively or passively resisting the officers.

20  As noted above, Defendants contend that Mr. Gonzalez was "forcefully struggling," moving his

21  body, and kicking his legs while he was on the ground both before and after he was handcuffed.

22  However, Clemmons testified that after Mr. Gonzalez was handcuffed and Leahy arrived,

23  Clemmons stood up and "everything looked okay.  No one was struggling; [Mr. Gonzalez] wasn't

24  struggling . . . it looked fine."  Clemmons Dep. 49-51.

25        Additionally, McKinley, Fisher, and Leahy admitted that they had been trained that

26  someone experiencing "some level of asphyxia . . . may physically squirm and struggle to try to

27  breathe better," McKinley Dep. 104; Fisher Dep. 27, or that it was "common sense" that a person

28  with impaired breathing could be expected to move around to get into a better position to breathe

United States District Court
Northern District of California

normally.  Leahy Dep. 37.  The Gonzalez Plaintiffs' police practices expert, John J. Ryan, contends that "[o]nce [Mr.] Gonzalez was taken to the ground . . . any resistance may not have been intentional but instead may have been [his] natural reaction of fighting for breath."  [Docket No. 86-1 (Ryan Decl. July 18, 2023) ¶ 257.]

In *Garlick*, the court found that the plaintiffs "raise[d] a critical genuine issue of material fact whether [the decedent] was passively, not actively, resistant" where the plaintiffs contended that "the officers' weight on [the decedent's] back restricted his breathing and that [the decedent's] movements trying to lift his chest and kicking his legs were not resistance but a sign of his struggle to breathe."  167 F. Supp. 3d at 1156-57.  The court noted that "[s]imilar cases turn on the fact-finder's determination of where on the spectrum of resistance a misdemeanor suspect falls," citing cases holding that failure to comply with or obey an officer's orders does not rise to the level of active resistance.  *Id*. at 1157 (citing, e.g., *Bryan*, 630 F.3d at 830 ("noncompliance does not constitute active resistance supporting a substantial use of force")).  The court agrees with the reasoning in *Garlick* and concludes that there are disputes of fact about the level of Mr. Gonzalez's resistance to the officers.  *See also Greer*, 229 F. Supp. 3d at 1105 (holding that the issue of whether the decedent resisted arrest was a jury question where "plaintiff's expert contends that [the decedent] could merely have been struggling for air while he was face down in a prone position with five officers on top of him.").

### iv.  Other Considerations

The Gonzalez Plaintiffs argue that other factors weigh in favor of finding the officers' use of force unreasonable.  They argue that the officers should have considered alternatives to using force, including contacting Alameda County's Mobile Crisis Response Team ("MCRT") for assistance.  Opp'n 13.  McKinley testified that the MCRT sent two-person teams of social workers to respond to certain calls about "nonviolent and compliant persons" to offer resources.  McKinley Dep. 15-17.  These resources included a "psychiatric call to John George [Hospital]" as well as transportation to a "housing situation or crisis house."  *Id*. at 16-17.  McKinley testified that the MCRT was available from 11 a.m.-4 p.m. Monday-Thursday and that he had personally used their services about five times.  *Id*. at 16, 18.  McKinley testified that he did not call the MCRT before

United States District Court
Northern District of California

arresting Mr. Gonzalez because "[t]hey were not yet on duty."  McKinley testified that he decided to arrest Mr. Gonzalez at approximately 10:45 a.m. and that he had been talking with Mr. Gonzalez for about ten minutes.  *Id*. at 81-83.  When asked why he did not wait fifteen minutes to call the MCRT or ask them to come early, McKinley testified, "I feel like it would have been ineffective" without elaborating.  *Id*. at 83-84.

The Gonzalez Plaintiffs also argue that Defendants should have rolled Mr. Gonzalez on his side immediately after he was handcuffed but deliberately chose not to, contrary to their training. Opp'n 13-14.  For example, Fisher acknowledged that he had been trained that "[o]nce secured the person should be placed in a seated or upright position and shall not be placed on his or her stomach for an extended period, as this could reduce the person's ability to breathe."  Fisher Dep. 33.  Leahy also acknowledged that placing someone on their side is "a safer position for someone to be on the ground" than in the prone position.  Leahy Dep. 34.

### c. Balancing the Intrusion on Mr. Gonzalez's Fourth Amendment Interests Against the Government Interests

To assess the objective reasonableness of McKinley, Fisher, and Leahy's use of force, the court must balance "the nature and quality of the intrusion on [Mr. Gonzalez's] Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (citation and quotation omitted).  Viewing the evidence in the light most favorable to the Gonzalez Plaintiffs and drawing all reasonable inferences in their favor, a jury could conclude that Mr. Gonzalez, who was not suspected of having committed a violent crime, did not pose an immediate threat to the officers' safety and was only passively resisting the officers, and that the officers had reasonable alternatives to using force or to maintaining Mr. Gonzalez in a prone position for over five minutes, including after he was handcuffed.  A reasonable jury could therefore ultimately conclude that the officers' use of force to maintain Mr. Gonzalez in a prone position while he was lying on the ground, and handcuffed for nearly four minutes, a not insignificant amount of time, was not reasonable under the circumstances.

United States District Court
Northern District of California

### 3.     Qualified Immunity

Defendants argue that they are entitled to qualified immunity on the excessive force claim.[9]

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Moss v. U.S. Secret Serv.*, 675 F.3d 1213, 1222 (9th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The qualified immunity analysis considers whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident.  *Pearson*, 555 U.S. at 232.  The court may exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.

Having found a genuine dispute of material fact as to the first question in the qualified immunity analysis, the court turns to the second question.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  The Supreme Court has cautioned that specificity in determining whether "the violative nature of *particular* conduct is clearly established . . . is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  *Mullenix*, 577 U.S. at 12 (quotation omitted).  "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 577 U.S. at 13).  While qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* at

---

[9] Defendants argue that "[e]ach of the officers is entitled to qualified immunity on the §1983 claims," Mot. 17, but discuss (and distinguish) only excessive force claims involving the application of weight on a suspect in a prone position.  *Id.* at 15-16.  Accordingly, the court limits its discussion of qualified immunity to the Gonzalez Plaintiffs' excessive force claim.

United States District Court
Northern District of California

1   1152 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  Finally, "[i]t is the plaintiff who bears the

2   burden of showing that the rights allegedly violated were clearly established."  *Shafer v. Cty. of*

3   *Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation

4   omitted).

5          The Gonzalez Plaintiffs argue that "Defendants have been on notice for 20 years that

6   where two officers placed their weight on a detainee's neck and torso as he lay prone on the

7   ground, such force was 'severe and, under the circumstances, capable of causing death or serious

8   injury.'"  Opp'n 17 (citing *Drummond*, 343 F.3d at 1056).  They argue that "[t]he parallel to the

9   present case is obvious: Defendants used deadly force on Mario Gonzalez after he was handcuffed

10  on the ground and no threat."  *Id.*

11         The facts of *Drummond* are as follows: Drummond was "hallucinating and in an agitated

12  state" when officers found him in a parking lot.  He was unarmed.  While waiting for an

13  ambulance to transport him to a medical facility, three officers decided to take him into custody

14  "for his own safety."  343 F.3d at 1054.  The officers "knock[ed] [him] to the ground" and cuffed

15  his hands behind his back as Drummond lay on his stomach.  *Id.*  Although Drummond offered no

16  resistance, two officers each placed their full body weight on his back using their knees, with one

17  officer placing a knee on his neck.  *Id.*  Drummond "repeatedly told the officers that he could not

18  breathe and that they were choking him" but the officers remained on top of him.  *Id.* at 1054-55.

19  Approximately 20 minutes after he was taken to the ground, officers bound his ankles, and one

20  minute later Drummond went limp and lost consciousness.  He sustained brain damage and is in a

21  permanent vegetative state.  *Id.* at 1055.

22         *Drummond* held that the force allegedly used by the officers "was severe and, under the

23  circumstances, capable of causing death or serious injury" and that the *Graham* factors for

24  assessing force "would have permitted the use of only minimal force once Drummond was

25  handcuffed and lying on the ground."  *Id.* at 1056, 1058.  The court concluded that "some force

26  was surely justified in restraining Drummond so that he could not injure either himself or the

27  arresting officers" but "after he was handcuffed and lying on the ground, the force that the officers

28  then applied was clearly constitutionally excessive when compared to the minimal amount that

was warranted." *Id*. at 1059.  It continued, "[t]he officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id*.

The court in *Garlick* relied in part on *Drummond* to deny qualified immunity to officers who applied weight to a restrained and prone individual's back for eight to ten minutes before he became unresponsive and died.  The officers found the decedent in *Garlick* passed out lying on the ground.  He appeared to be intoxicated and became agitated after an officer roused him.  167 F. Supp. 3d at 1127.  The officer was unable to handcuff the decedent and a violent struggle ensued. *Id*. at 1128-29.  Other officers arrived and pulled the decedent to the ground, where he remained, chest-down, while handcuffed behind his back.  *Id*. at 1130-34.  The decedent "was chest-down for approximately fifteen minutes, and of that time, he was restrained and prone on the ground for approximately eight to ten minutes with four officers applying body-weight pressure to his back." *Id*. at 1155.  The court held that "[p]revailing precedent in the Ninth Circuit is that law enforcement officers' use of body weight to restrain a 'prone and handcuffed individual[ ] in an agitated state' can cause suffocation 'under the weight of restraining officers,' therefore, such conduct may be considered deadly force," citing *Drummond*, 343 F.3d at 1056-57.  *Id*.  For purposes of qualified immunity, the court in *Garlick* held that as of the date of the incident in question, the law was clearly established "that using lethal force against a nonviolent misdemeanor suspect would be unconstitutional," citing *Tennessee v. Garner*, 471 U.S. 1 (1985), and that "multiple officers' alleged use of prolonged body-weight pressure to a suspect's back was known to be capable of causing serious injury or death," citing *Drummond*, 343 F.3d at 1056.  *Id*. at 1158.  Accordingly, the court held that the "relevant law [was] clearly established" because *Drummond* "clearly warned officers that when a suspect is handcuffed and prone on the ground, further restraint measures, if applied as alleged here, would be unconstitutional" and concluded that the officers were not entitled to qualified immunity.  *Id*.

Similarly, the court in *Greer* held that "*Drummond* created clearly established law on a particularized level sufficient to give fair and clear warning to officers" that the "use of prolonged pressure while [the decedent] lay on the ground in a prone position was substantially likely to

cause death or serious injury" and found that the officer was not entitled to qualified immunity. 229 F. Supp. 3d at 1107.

The court agrees with the reasoning of *Garlick* and *Greer*. A reasonable jury could find that Mr. Gonzalez, who was not suspected of having committed a violent crime, posed no threat to the officers once he was in a prone position and in handcuffs. At the time of Mr. Gonzalez's detention and arrest, the law was clearly established that the use of prolonged pressure on a suspect lying prone on the ground in handcuffs is capable of causing serious injury or death, and that the use of such force was not reasonable under the circumstances. *See Drummond*, 343 F.3d at 1058 ("[a] three *Graham* factors would have permitted the use of only minimal force once Drummond was handcuffed and lying on the ground."). Accordingly, Defendants are not entitled to qualified immunity. Summary judgment on the excessive force claim is denied. *See, e.g., Barrera v. Krause*, No. 22-15542, 2023 WL 2064512, at *1 (9th Cir. Feb. 17, 2023) (holding that *Drummond* placed defendants "on notice that, when [the decedent] was handcuffed and prone on the ground, additional restraint, as applied here, is constitutionally excessive.").

### C.   State Law Claims

#### 1.   California Civil Code section 52.1, Bane Act

The Gonzalez Plaintiffs assert a survival claim under the Bane Act based on the violation of Mr. Gonzalez's rights as well as a separate Bane Act claim on behalf of M.G.C. individually. Opp'n 19. Defendants move for summary judgment on both claims.

California's Bane Act allows a claim for violation of a plaintiff's state or federal civil rights when the violation is achieved through "threats, intimidation, or coercion." Cal. Civ. Code § 52.1. The Ninth Circuit has clarified that section 1983 and section 52.1 are not coextensive. *See Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018). A finding of a constitutional violation in an excessive force claim is sufficient to satisfy the "threat, intimidation, or coercion" element of section 52.1. *Id.* (citing *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766, 800 (2017). But "the Bane Act imposes an additional requirement beyond a finding of a constitutional violation." *Reese*, 888 F.3d at 1043. A plaintiff must show that an officer had a "specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id.* (quoting

*Cornell*, 17 Cal. App. 5th at 801).  Specific intent may be shown through an officer's "reckless disregard of constitutional [or statutory] prohibitions or guarantees."  *Cornell*, 17 Cal. App. 5th at 803.

With respect to the survival claim based on the violation of Mr. Gonzalez's rights, the same factual questions that preclude summary judgment on the excessive force claim also preclude summary judgment on this issue.  If a reasonable jury concludes that Mr. Gonzalez did not pose an immediate threat and was not actively resisting the officers, it could infer that the officers acted with reckless disregard sufficient for the Gonzalez Plaintiffs to prevail on his Bane Act claim.  Summary judgment is therefore denied on this claim.

As to M.G.C.'s own Bane Act claim, Defendants contend that M.G.C. has no standing to assert such a claim on his own behalf as a matter of law, citing *Bay Area Rapid Transit Dist. v. Superior Court* ("*BART*"), 38 Cal. App. 4th 141, 145 (1995).  Mot. 17.  In *BART*, the parents of a Black teenager shot and killed by a white police officer brought a Bane Act claim against the officer seeking damages on their own behalf for violation of their own "constitutional rights to parent and enjoy the society and companionship of their son."  38 Cal. App. 4th at 143.  The court held that the Bane Act "is simply not a wrongful death provision" and that it "clearly provides for a *personal* cause of action for the victim of a hate crime . . . i.e., that it is limited to plaintiffs who themselves have been the subject of violence or threats."  *Id*. at 144 (emphasis in original).  Accordingly, the court dismissed the claim.  *Id*.  Defendants argue that it is undisputed that the officers "used no force against M.G.C. personally, thus he has no standing to assert §52.1 claims on his own behalf[.]"  Mot. 18.

Here, the Gonzalez Plaintiffs confirm that M.G.C.'s Bane Act claim is based on the "violation of his own personal rights to familial association under the First and Fourteenth Amendments," which they claim "are proven by Defendants' deliberate indifference to his father, Mario Gonzalez's rights."  Opp'n 19.  This claim is foreclosed by *BART* because M.G.C. has not himself "been the subject of violence or threats."  "At most, [M.G.C. was] deprived of [his] substantive due process rights because of the acts of violence or threats of violence committed by Defendants against" a different person, Mr. Gonzalez.  *See Bresaz v. Cnty. of Santa Clara*, 136 F.

Supp. 3d 1125, 1138 (N.D. Cal. 2015). "This is the exact sort of 'derivative liability' claim that is *not* supposed to be actionable under the Bane Act." *Id.* (emphasis in original) (dismissing with prejudice parents' Bane Act claim based on violence committed against their son). The Gonzalez Plaintiffs offer no authority supporting M.G.C.'s Bane Act claim and do not distinguish *BART* as it applies to his personal claim. *See* Opp'n 19. Accordingly, as M.G.C. lacks standing to bring a Bane Act claim on his own behalf, summary judgment is granted on M.G.C.'s Bane Act claim.

### 2. Negligence, Assault & Battery, and False Arrest and Imprisonment Claims

The Gonzalez Plaintiffs' FAC also alleges negligence, assault and battery, and false arrest and imprisonment claims that are based on the same facts as the Section 1983 claims for unlawful detention and arrest and excessive force under the Fourth Amendment. *See* FAC ¶¶ 62, 68, 72-73. "Courts generally analyze these claims under the same rubric as § 1983 claims based on the Fourth Amendment." *Banks v. Mortimer*, 620 F. Supp. 3d 902, 935, n.13 (N.D. Cal. 2022) (citing *Garcia v. Cnty. of Merced*, 639 F.3d 1206, 1213 (9th Cir. 2011) (false arrest/false imprisonment); *Avina v. United States*, 681 F.3d 1127, 1131 (9th Cir. 2012) (assault and battery); *Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1048 (C.D. Cal. 2021) (negligence)). Since the court has already found triable issues of fact with respect to the Fourth Amendment unlawful detention and arrest claims and the excessive force claim, it reaches the same conclusion on the state law claims. *See Banks*, 620 F. Supp. 3d at 935 (denying summary judgment on state law claims "flow[ing] from the same facts as [plaintiffs'] § 1983 Fourth Amendment claims."). Summary judgment is accordingly denied on the negligence, assault and battery, and false arrest and imprisonment claims.

### 3. California Government Code section 820.2

Defendants argue that they are entitled to immunity under California Government Code section 820.2, which provides that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov't Code § 820.2. Mot. 20. In *Mendez v. County of Los Angeles*, 897 F.3d 1067, 1083-84 (9th Cir. 2018), the Ninth Circuit rejected a similar argument, noting that "the California Supreme Court has held that this immunity applies

only to policy decisions, not to operational decisions like the decision to enter the [plaintiffs'] residence here." (citing *Caldwell v. Montoya*, 10 Cal. 4th 972, 981 (1995)); *see also Sharp v. Cty. of Orange*, 871 F.3d 901, 920 (9th Cir. 2017) (holding that section 820.2 immunity "covers only 'policy' decisions made by a 'coordinate branch[ ] of government,' not 'operational decision[s] by the police purporting to apply the law.'" (quotation omitted)).  Section 820.2's discretionary immunity does not apply to the decision to arrest an individual when there is no probable cause or to the use of "unreasonable force when making an arrest or overcoming resistance to it."  *Conway v. County of Toulumne*, 231 Cal. App. 4th 1005, 1015 (2014).  Therefore, section 820.2 immunity does not apply.  Summary judgment based on section 820.2 immunity is denied.

### D.    Fourteenth Amendment Familial Association Claims[10]

Defendants argue that they are entitled to summary judgment on M.G.C. and Arenales's Fourteenth Amendment familial association claims because there is no evidence that any officer's conduct shocks the conscience.  Mot. 8.  They also argue that they are entitled to qualified immunity.  *Id.* at 13.[11]

#### 1.  Legal Standard

The Fourteenth Amendment states in relevant part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. "[A] parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child and . . . a child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest."  *Ochoa v. City*

---

[10] M.G.C.'s familial association claim is based on the First and Fourteenth Amendments.  FAC ¶ 38(c).  The Ninth Circuit recently observed that "the constitutional right to familial association . . . is entirely judge-made; it does not appear in the text of the Constitution itself," and that courts have not "been entirely clear regarding the source of the right; they have variously relied on the Fourteenth, First, and Fourth Amendments."  *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018).  Neither side asks the court to treat M.G.C.'s familial association claim under the First and Fourteenth Amendments as different claims subject to different standards.  Accordingly, the court refers to M.G.C.'s familial association claim as his Fourteenth Amendment claim.

[11] With respect to the briefing on the Fourteenth Amendment claims, the motions and reply briefs that Defendants filed in each case are identical.  Plaintiffs in each case filed separate opposition briefs, although their arguments are largely similar.  The court will note any relevant differences in the opposition briefs in the opinion.

United States District Court
Northern District of California

*of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) (cleaned up).  In order to show a violation of the right to familial association under the Fourteenth Amendment's due process clause, a plaintiff must establish that the officers' conduct "shocks the conscience."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

"There are two tests used to decide whether officers' conduct 'shocks the conscience.'" *Ochoa*, 26 F.4th at 1056.  "Which test applies turns on whether the officers had time to deliberate their conduct."  *Id.*  The "deliberate indifference" standard applies "if the situation at issue 'evolve[d] in a time frame that permits the officer to deliberate before acting.'"  *Id.* (quoting *Porter*, 546 F.3d at 1137).  "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical[.]"  *Lewis*, 523 U.S. at 851-53.  "Deliberation in this context 'should not be interpreted in the narrow, technical sense.'"  *Ochoa*, 26 F.4th at 1056 (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (explaining that "the Supreme Court had rejected the deliberate indifference standard even in cases where an officer giving chase could have deliberated while pursuing the suspect." (citing *Porter*, 546 F.3d at 1139-40))).

A different test applies to situations "that escalate so quickly that the officer must make a snap judgment."  *Porter*, 546 F.3d at 1137.  In those cases, the "purpose to harm" standard applies. This standard requires a plaintiff to make "a more demanding showing that [an officer] acted with a *purpose to harm* [the decedent] for reasons unrelated to legitimate law enforcement objectives." *Id.* (emphasis in original) (citing *Lewis*, 523 U.S. at 836).  "For example, a purpose to harm might be found where an officer uses force to bully a suspect or 'get even,'" *Wilkinson*, 610 F.3d at 554 (citation omitted), "or when an officer uses force against a clearly harmless or subdued suspect." *Ochoa*, 26 F.4th at 1056 (quotation marks and citations omitted).  The Ninth Circuit has explained that "when an officer encounters fast paced circumstances presenting competing public safety obligations, the purpose to harm standard must apply."  *Id.* at 1139.

"A court may determine at summary judgment whether the officer had time to deliberate (such that the deliberate indifference standard applies) or instead had to make a snap judgment because he found himself in a quickly escalating situation (such that the purpose to harm standard

1    applies), so long as the undisputed facts point to one standard or the other." *C.E.W. v. City of*

2    *Hayward*, No. 13-CV-04516-LB, 2015 WL 1926289, at *13 (N.D. Cal. Apr. 27, 2015) (quotation

3    marks and citation omitted). "By its nature, though, the determination of which situation [the

4    officer] actually found himself in is a question of fact for the jury, so long as there is sufficient

5    evidence to support both standards." *Id.* (alteration in original; quotation marks and citation

6    omitted).

7                    **2.       Analysis**

8            Defendants argue that the "purpose to harm" standard applies given the "uncertain,

9    evolving in-field contact" with Mr. Gonzalez. Mot. 9-10. They contend that Plaintiffs cannot

10   show that any of the officers' actions met this standard. They also argue that even if the deliberate

11   indifference standard applies, the evidence does not support a finding that the officers were

12   deliberately indifferent. *Id.* at 12-13. Plaintiffs ask the court to apply the deliberate indifference

13   standard on the ground that the officers had the opportunity for deliberation. They argue that even

14   if the purpose to harm standard applies, a jury could conclude that the officers' conduct satisfies

15   this more demanding standard. Opp'n 10, 12.

16           As discussed above, the officers in *Garlick* "applied weight to [the decedent's] back for

17   approximately eight to ten minutes" of a twenty-minute encounter, including during a period when

18   he was handcuffs. Once he was in handcuffs, he "was in hobbles and hogtied after another two or

19   three minutes." 167 F. Supp. 3d at 1170. The court held that "[b]ased on these undisputed facts,

20   once [the decedent] was in handcuffs the circumstances had de-escalated and officers could

21   deliberate whether to continue applying weight to his back." *Id.* at 1170-71. Accordingly, the

22   court held that the deliberate indifference standard applied to the plaintiffs' Fourteenth

23   Amendment claim as a matter of law. Similarly, in *Greer*, the decedent was "on the ground in a

24   prone position for approximately seven minutes while several officers, including [the defendant],

25   applied pressure to various parts of [the decedent's] body in an attempt to make him comply" with

26   their orders. 229 F. Supp. 3d at 1103. Video showed that the defendant "continuously applied

27   pressure to [the decedent's] torso" for over two and a half minutes while he repeatedly begged the

28   officers to "[g]et off [him]." *Id.* at 1097. The court concluded that "the officers had time to

United States District Court
Northern District of California

United States District Court
Northern District of California

1   deliberate while they lay on [the decedent's] back as he struggled to breathe," although it held that

2   there was evidence to support applying the purpose to harm standard as well.  *Id*. at 1108 (citing

3   *C.E.W.*, 2015 WL 1926289, at *13).

4          In a third case, *Wroth v. City of Rohnert Park*, No. 17-CV-05339-JST, 2019 WL 1766163,

5   at *2 (N.D. Cal. Apr. 22, 2019), the decedent was placed on his stomach and handcuffed behind

6   his back.  He became unresponsive two minutes later and "[f]or the final 1 minute and 50 seconds

7   of the encounter, [the decedent] was handcuffed in the prone position with officers on top of him"

8   while he said, "I can't breathe" and repeatedly asked for help.  *Id*. at *3.  After discussing the facts

9   of *Garlick* and *Greer*, the court stated its agreement with those courts that "once officers have

10  subdued a suspect to the point that there is no longer a threat, it becomes practical to deliberate

11  about the type and degree of force to use in continuing to restrain the suspect" and found that a

12  jury could reasonably find that the deliberate indifference standard applied to the plaintiffs'

13  Fourteenth Amendment claim.  *Id*. at *9.

14         So too here.  A reasonable jury could find that McKinley, Fisher, and Leahy had sufficient

15  opportunity to deliberate once Mr. Gonzalez was lying prone and in handcuffs on the basis that he

16  no longer presented an immediate threat to the officers.  In fact, a reasonable jury could find that

17  they did actually deliberate, since Fisher asked the other officers, "[t]hink we can roll him on his

18  side?" approximately 30 seconds before Mr. Gonzalez became non-responsive.  Applying the

19  deliberate indifference standard to the facts and viewing the facts in the light most favorable to

20  Plaintiffs, a reasonable jury could find that the officers were deliberately indifferent by keeping

21  Mr. Gonzalez in a prone position and continuing to apply force to his back even after he was

22  handcuffed.

23         A reasonable jury could also find that the purpose to harm standard applies given the

24  rapidly-escalating nature of the encounter between Mr. Gonzalez and the officers.  Under this

25  standard, Plaintiffs must prove that the officers' purpose "was 'to cause harm [to Mr. Gonzalez]

26  unrelated to the legitimate object of arrest.'"  *Porter*, 546 F.3d at 1140 (quoting *Lewis*, 523 U.S. at

27  836); *see also Gonzalez v. City of Anaheim*, 747 F.3d 789, 797-98 (9th Cir. 2014) ("a use of force

28  shocks the conscience only if the officers had a 'purpose to harm' the decedent for reasons

41

unrelated to legitimate law enforcement objectives.").  "The purpose to harm standard is a subjective standard of culpability." *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013).  "[A]lthough most meritorious purpose to harm claims will involve evidence of ulterior motive or bad intent separate and apart from evidence of an unreasonable use of force," the Ninth Circuit has "decline[d] to hold that such evidence is required as a matter of law." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019).  "In some cases, a use of force might be so grossly and unreasonably excessive that it alone could evidence a subjective purpose to harm." *Id.*

In *Ochoa*, the Ninth Circuit held that "[i]llegitimate objectives include when the officer had any ulterior motives for using force against the suspect, such as to bully a suspect or get even, or when an officer uses force against a clearly harmless or subdued suspect." 26 F.4th at 1056 (cleaned up).  Here, a reasonable jury could conclude that once Mr. Gonzalez was in handcuffs, he was "clearly harmless or subdued" and that the officers nonetheless continued to apply force to his back, and that the use of such force alone demonstrates that the officers had a "subjective purpose to harm" him.  *See id.*

Accordingly, the court denies summary judgment on Plaintiffs' Fourteenth Amendment claims.

### 3.    Qualified Immunity

As noted, Defendants argue that they are entitled to qualified immunity on Plaintiffs' Fourteenth Amendment familial association claims.  As the Plaintiffs did not adequately brief the issue, the court ordered the parties to file supplemental briefing on qualified immunity, including addressing whether the officers' use of force violated clearly established law under the Fourteenth Amendment and discussing the following cases: *Barrera v. City of Woodland*, No. 2:18-cv-00329-JAM-KJN, 2023 WL 3977397, at *4 (E.D. Cal. June 13, 2023) (granting summary judgment on Fourteenth Amendment familial association claim based on qualified immunity); *Perkins v. Edgar*, No. 21-55552, 2022 WL 14476272, at *2 (9th Cir. Oct. 25, 2022) (reversing district court's finding that officers were not entitled to qualified immunity on Fourteenth Amendment loss of familial relations claim); and *Wroth*, 2019 WL 1766163, at *13-14 (holding officers were entitled to qualified immunity under Fourteenth Amendment claim based on deliberate

indifference).  The parties timely filed supplemental briefs.  [Docket Nos. 104, 105 (*Gonzalez*), 68, 69 (*Arenales*).]

Having determined that a reasonable jury could find that Defendants' conduct shocks the conscience under either the deliberate indifference or purpose to harm standards, the issue for qualified immunity is whether "the law was sufficiently well defined that every reasonable officer in the officers' shoes would have known that their conduct violated" Plaintiffs' substantive due process rights.  *See Martinez v. City of Clovis*, 943 F.3d 1260, 1274 (9th Cir. 2019).  "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Mullenix*, 577 U.S. at 11-12 (quoting *Reichle*, 566 U.S. at 664).  Plaintiffs "bear[ ] the burden of showing that the rights allegedly violated were clearly established" at the time of the alleged misconduct.  *Shafer*, 868 F.3d at 1118.  "To deny immunity, [the court] must conclude that every reasonable official would have understood, beyond debate, that the conduct was a violation of a constitutional right."  *Martinez*, 943 F.3d at 1275.

Here, Plaintiffs argue that Defendants are not entitled to qualified immunity on their Fourteenth Amendment familial association claims based on *Drummond*, arguing that the parallel between the facts in *Drummond* and the present case "is obvious: Defendants used deadly force on Mario Gonzalez after he was handcuffed on the ground and no threat."  Gonzalez Pls.' Opp'n 13-14; Arenales's Opp'n 14-15.

The court agrees that *Drummond* is clearly-established law regarding the use of force on a suspect who is handcuffed and lying prone on the ground, as discussed above.  However, *Drummond* addressed the reasonableness of such force in the context of a Fourth Amendment claim for excessive force.  It did not address Fourteenth Amendment claims.  The "standard of culpability" for a Fourteenth Amendment claim is different from a Fourth Amendment claim.  Whereas courts evaluate Fourth Amendment claims under a reasonableness test, *Porter*, 546 F.3d at 1141, Fourteenth Amendment substantive due process claims are evaluated under the "shocks the conscience" standard, which requires a showing that an officer acted with deliberate indifference or a purpose to harm an individual for reasons unrelated to legitimate law

enforcement objectives.  *Id*. at 1137.

Arenales argues that "[in] [the] context of law enforcement uses of force under the Fourteenth and Fourth Amendment, they are overlapping rights with merely different burdens of proof."  Arenales's Opp'n 15.  According to Arenales, the only difference between claims under the Fourteenth and Fourth Amendments is "the quantum of force."  Arenales's Supp. Br. 2 (emphasis removed).  Not so.  The Ninth Circuit has "recognized that applying the Fourth Amendment excessive-force standard to a Fourteenth Amendment claim for loss of companionship and familial association following a fatal police [use of force] might have 'surface appeal.'"  *Ochoa*, 26 F.4th at 1056 (quoting *Byrd v. Guess*, 137 F.3d 1126, 1133-34 (9th Cir. 1998)).  "The gist of the two claims is the same: an officer is accused of improperly using police power to kill someone."  *Id*.  However, "the Fourteenth Amendment standard applicable to a claim by a relative demands more of such a plaintiff than a Fourth Amendment claim by the victim of an officer's actions."  *Id*. at 1056-57.  Plaintiffs bringing Fourteenth Amendment claims must show "that the officers' actions 'shock[ed] the conscience' and thus violated [their own] Fourteenth Amendment rights."  *Id*. at 1057 (citing *Porter*, 546 F.3d at 1137)).  "Unlike the objective reasonableness standard of an excessive force claim, the 'shocks the conscience' standard requires a subjective inquiry into whether an 'official kn[ew] of and disregarded an excessive risk.'"  *Barrera v. City of Woodland*, No. 2:18-cv-00329-JAM-KJN, 2023 WL 3977397, at *3 (E.D. Cal. June 13, 2023) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The Ninth Circuit has clarified that the difference in standards applicable to Fourth and Fourteenth Amendment claims "can be dispositive": "it may be possible for an officer's conduct to be objectively unreasonable [under the Fourth Amendment] yet still not infringe the more demanding standard that governs substantive due process claims [under the Fourteenth Amendment]."  *Ochoa*, 26 F.4th at 1057 (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 n.4 (9th Cir. 1998)).

*Nicholson v. City of Los Angeles*, 935 F.3d 685, 696 (9th Cir. 2019), is instructive on the difference between a Fourth and Fourteenth Amendment claim in determining whether a right is clearly established for purposes of qualified immunity.  In *Nicholson*, the Ninth Circuit reversed the district court's denial of qualified immunity to a police officer on a Fourteenth Amendment

44

claim based on his shooting of a bystander.  The court held that "a rational finder of fact could find that [the officer's] use of deadly force shocks the conscience and was unconstitutional under the Fourteenth Amendment."  *Id*. at 693.  However, it concluded that "[b]ecause no analogous case existed at the time of the shooting . . . the district court erred" in denying the officer qualified immunity for the Fourteenth Amendment claim.  *Id*. at 695.  The court observed that "the gravamen of Plaintiffs' [qualified immunity] analysis is that the use of deadly force against [a third party] was likely unreasonable, relying principally on [Ninth Circuit] cases analyzing Fourth Amendment claims of excessive force."  *Id*. (citations omitted).  The court rejected this approach. It reasoned that while Fourth Amendment cases "may help to identify whether the use of force against [the third party] amounted to a Fourth Amendment violation, they do not clearly establish that a shooting in these circumstances constitutes deliberate indifference to Plaintiffs," who were bystanders.  *Id*. at 695-96.  The court explained that "considerations of reasonableness germane to a Fourth Amendment analysis are relevant to the substantive due process inquiry," noting "some overlap in these two constitutional protections."  *Id*. at 696 n.5.  However, the court reasoned that because "a Fourteenth Amendment claim of excessive force must be governed by a different standard than a Fourth Amendment claim of excessive force . . . our Fourth Amendment cases cannot clearly establish the contours of the Fourteenth Amendment right, despite similarities between the standards."  *Id*. (quotation marks and citation omitted).  *See also Barrera*, 2023 WL 3977397, at *4-5 (holding that "*Drummond* and *Garlick*, which relies on *Drummond*, do not clearly establish that the prolonged use of compressive force on a prone and restrained suspect violates the suspect's family's right to familial association under the Fourteenth Amendment" and granting summary judgment based on qualified immunity, reasoning that "[o]bjective reasonableness, reckless indifference, and purposes to harm fall on a continuum of culpability, with each successive standard requiring a greater presence of mind on behalf of the actor to be liable for his actions.").[12]

---

[12] In *Wroth*, the court found that the defendants were entitled to qualified immunity on the plaintiffs' Fourteenth Amendment familial association claims, holding that *Drummond* "is insufficient to carry" the plaintiffs' "burden of showing that the rights allegedly violated were clearly established."  2019 WL 1766163, at *13.  The court assumed without deciding "that

United States District Court
Northern District of California

1    The Gonzalez Plaintiffs argue that *Nicholson* cannot be reconciled with "the *Saucier* rule."

2    Gonzalez Pls.' Supp. Br. 1-2.  They cite the following language from *Saucier v. Katz*, 533 U.S.

3    194, 202 (2001), arguing that it establishes a rule that permits this court to rely on a Fourth

4    Amendment case to determine whether the contours of the Fourteenth Amendment right at issue

5    were sufficiently clear:

> Assuming . . . that various courts have agreed that certain conduct is
> a constitutional violation under facts not distinguishable in a fair way
> from the facts presented in the case at hand, the officer would not be
> entitled to qualified immunity based simply on the argument that
> courts had not agreed on one verbal formulation of the controlling
> standard.

10   Gonzalez Pls.' Supp. Br. 1-2 (quoting *Saucier*, 533 U.S. at 202-03).  Setting aside the fact that

11   *Saucier* addressed qualified immunity solely in the context of a Fourth Amendment excessive

12   force claim, the Gonzalez Plaintiffs' position ignores Ninth Circuit guidance that Fourth and

13   Fourteenth Amendment claims are governed by different standards that may be dispositive on the

14   qualified immunity question.  *See Ochoa*, 26 F.4th at 1057.

15   Ultimately, Plaintiffs offer no authority that *Drummond* clearly established rights under the

16   Fourteenth Amendment even though it addressed only a Fourth Amendment excessive force

17   claim.  In light of the binding authority of *Nicholson*, the court concludes that the law was not

18   clearly established at the time of Mr. Gonzalez's detention and arrest that the officers violated

19   Plaintiffs' Fourteenth Amendment familial association rights by using force on Mr. Gonzalez

20   while he was handcuffed and lying prone on the ground.  Accordingly, McKinley, Fisher, and

21   Leahy are entitled to qualified immunity on the Fourteenth Amendment claims.  Summary

22   judgment is granted for Defendants on these claims.

23   **E.      Arenales's *Monell* Claim**

24   Finally, Defendants move for summary judgment on Arenales's claim for municipal

25   _____

26   *Drummond*'s Fourth Amendment excessive force holding could clearly establish rights under the
     Fourteenth Amendment Due Process Clause, despite the differing standards for constitutional
27   violations," but held that *Drummond* was readily distinguishable on its facts since it involved the
     application of the officers' full body weight on the decedent's back for most or all of 20 minutes,
28   whereas the officers in *Wroth* had the decedent handcuffed for less than two minutes and there was
     no evidence they applied their full body weight to his back or neck.  *Id*. at *13-14.

United States District Court
Northern District of California

liability under *Monell*.

### 1.  **Legal Standard for *Monell* Liability**

"A county agency is not entitled to qualified immunity and may be held liable for constitutional violations by its employees under [*Monell*] and related cases."  *Pauluk v. Savage*, 836 F.3d 1117, 1126 (9th Cir. 2016).  A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692).  However, the municipality may be held liable "only for '[its] *own* illegal acts.'"  *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).  It cannot be held vicariously liable for its employees' actions.  *Id.* (citations omitted).  To establish municipal liability, plaintiffs "must prove that 'action pursuant to official municipal policy' caused their injury."  *Id.* (quoting *Monell*, 436 U.S. at 691).  "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."  *Pembaur*, 475 U.S. at 479-80 (emphasis in original).  Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick*, 563 U.S. at 61 (citations omitted).  Such policy or practice must be a "moving force behind a violation of constitutional rights."  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694).  An official municipal policy may be either formal or informal.  *City of Saint Louis v. Praprotnik*, 485 U.S. 112, 131 (1988) (acknowledging that a plaintiff could show that "a municipality's actual policies were different from the ones that had been announced.").

In the Ninth Circuit, a municipality may be liable under section 1983 under three possible theories.  *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018).  The first is where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury."  *Id.* (quoting *Monell*, 436 U.S. at 694).  Second, "a local government can fail to train employees in a manner that amounts to 'deliberate indifference' to a constitutional right, such that 'the need for more or

different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id*. (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  Finally, a municipality may be liable under section 1983 if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id*. at 802-03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (internal quotation marks and citation omitted)).

### 2.   Analysis

Defendants move for summary judgment based on the official policy or custom; ratification; and failure-to-train theories of municipal liability that Arenales alleges in the complaint.  *See* Compl. ¶¶ 37-44.  In her opposition, Arenales addresses only the failure-to-train theory, thus conceding her *Monell* claims based on official policy or custom and ratification.  [*See generally* Docket No. 62 (Opp'n).]

Under limited circumstances, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick*, 563 U.S. at 61.  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id*.  In order to establish liability under this theory, the "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id*. (citing *Canton*, 489 U.S. at 388).  This "stringent standard of fault" requires proof that "policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights."  *Connick*, 563 U.S. at 61; *see also Canton*, 489 U.S. at 389 ("[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983.").  The training deficiency must be the "functional equivalent of a decision by the city itself to violate the Constitution."  *Id*.  "The issue is whether the training program is adequate and, if it is not, whether

48

such inadequate training can justifiably be said to represent municipal policy." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *Canton*, 489 U.S. at 39). The inadequate training must have "actually caused" the deprivation of rights. *Marsh v. County of San Diego*, 680 F.3d 1148, 1159-60 (9th Cir. 2012).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference' for purposes of failure to train." *Connick*, 563 U.S. at 62. However, "a pattern of similar violations might not be necessary to show deliberate indifference" in a "narrow range of circumstances." *Id.* at 63. "Such a situation is 'rare'—'the unconstitutional consequences of failing to train' must be 'patently obvious' and the violation of a protected right must be a 'highly predictable consequence' of the decision not to train." *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (quoting *Connick*, 563 U.S. at 63). For example, "a single incident of excessive force, coupled with evidence that a city had neglected to train its armed officers on the constitutional limitations on using force against fleeing felons, might establish that the city manifested deliberate indifference in training law enforcement." *Kirkpatrick*, 843 F.3d at 794 (citing *Canton*, 489 U.S. at 390 n.10); *see also Long*, 442 F.3d at 1186 ("[a] plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where 'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997))).

Here, Arenales presents no evidence of a pattern of similar constitutional violations by untrained officers involving incidents of compression or restraint asphyxia.[13] Therefore, she must "demonstrate that the shortcomings in [Alameda's] training program are so deficient that a constitutional violation is patently obvious or highly predictable." *See Perez v. City of Fresno*, 591 F. Supp. 3d 725, 767 (E.D. Cal. 2022) (citing *Connick*, 563 U.S. at 63; *Kirkpatrick*, 843 F.3d

---

[13] Arenales references one prior incident involving compression asphyxia. She states, "APD Officers asphyxiated a Navy veteran, Shelby Gattenby, due to a combination of taser use and placing weight on the pinned person's back in 2018," citing a newspaper article that quoted a statement by an attorney about the officers' use of their weight to restrain him. Opp'n 6 & n.2. Arenales did not submit admissible evidence for any of these assertions. *See id.*

1    at 794; and *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014)).  She argues that

2    Alameda "had no explicit policy or training that advised officers on how to avoid positional

3    asphyxiation such as avoiding prolonged pressure on [a] person's back, to specifically monitor a

4    person in the prone position's respiration, [or] to immediately shift that person to a recovery

5    position of the side or sitting up once they are handcuffed and/or secure."  Opp'n 5.

6         Arenales's position ignores record evidence that Alameda trained its officers on those

7    precise subjects prior to Mr. Gonzalez's death.  Russell Wise, Alameda's person most

8    knowledgeable on the subject of police officer policies and training, testified that prior to this

9    incident, police officers were trained to "limit[ ] the amount of officers" on a prone individual and

10   to "monitor[ ] their vital signs."  Wise testified that once the officers gained control of the

11   individual or placed them in a WRAP, "we want them in an upright, seated position" so as not to

12   "restrict their breathing or their airway."  [Docket No. 61-1 (Fox Decl. June 5, 2023, "2d Fox

13   Decl.") ¶ 2, Ex. A (Wise Dep.) 53-54.]  He further testified that officers were trained to "only

14   plac[e] weight on the shoulder blades . . . avoiding the head, the neck and the spine."  *Id*. at 56; *see*

15   *also id*. at 57 (explaining the training in place in 2020); 63-64 (confirming relevant portion of

16   training outline).  Wise testified that he was familiar with the terms "restraint asphyxiation" and

17   "positional asphyxiation" and that his training addressed the risk of reducing an individual's

18   "ability to breathe" based on their body weight and body positioning.  *Id*. at 65-66.

19        Alameda submits Policy 306, "Handcuffing and Restraints," that was in place at the time

20   of the incident.  2d Fox Decl. ¶ 6, Ex. E.  The policy has a section with guidelines for the use of

21   leg restraints.  In relevant part, the guidelines instruct, "[l]imit the number of officers on top of the

22   subject while in the prone position.  Officers should position themselves on the shoulder blades

23   and legs and avoid pressure on the spine," and "[o]nce secured, the person should be placed in a

24   seated or upright position, secured with a seat belt, and shall not be placed on his/her stomach for

25   an extended period, as this could reduce the person's ability to breathe."  *Id*. at 004528.  The

26   outline for the Advance Officer Course on training from 2020 references Policy 306 as a handout

27   accompanying the training.  [Docket No. 62-1 (Buelna Decl. July 20, 2023) ¶ 6, Ex. 11 at

28   006730.]  Wise testified that he trained officers using this outline.  Wise Dep. 57-58.  The outline

1  contains a section on "Ground Control Techniques," and contains guidance about suspects in the

2  prone position, as follows:

3      "WRAP" restraint system.  Three officers is recommended.  Avoid
       keeping the suspect in the prone position for long periods of time.
4      Limit amount of officers on top of the suspect while in the prone
       position.  Officers are recommended to position themselves on the
5      shoulder blades and legs.  Avoid pressure to the spine and neck area.
       Continuously monitor the suspect's breathing and vital signs.  If the
6      suspect stops breathing, immediately provide first aid and call for
       paramedics.

7

8  Buelna Decl. Ex. 11 at 6742.

9      Arenales does not explain how this training was insufficient.  Instead, she appears to take

10 issue with how the information in the training was organized and presented.  For example, she

11 notes that a separate policy, Policy 300, "Use of Force," does not address positional asphyxiation,

12 even though Policy 306, "Handcuffing and Restraints," expressly covers it.  *See* Opp'n 1.  She

13 criticizes the Advance Officer Course outline for cautioning officers to be aware of keeping

14 individuals in the prone position for long periods of time as part of the WRAP restraint training,

15 and "not when generally taking a prone person into custody," but ignores that this information

16 appears in a section entitled, "Ground Control Techniques."  *Id*. at 1-2.  Arenales also notes that

17 neither Policy 300 nor the Advance Officer Course outline include any "mention of placing

18 persons in the recovery position whatsoever," *id*. at 2, but this statement overlooks the fact that the

19 information is in Policy 306.  Arenales offers no authority supporting the claim that Alameda's

20 training on avoiding prolonged pressure on an individual's back, monitoring a prone individual's

21 breathing and vital signs, and moving the individual to an upright or seated position after they are

22 secured made alleged constitutional violations "patently obvious or highly predictable."

23      Additionally, the officers testified about their training on these subjects.  McKinley

24 testified that prior to the incident, he had received training on compression, restraint, and

25 positional asphyxia.  McKinley Dep. 32.  He was trained that after an individual is "able to be

26 controlled," officers "should remove any weight that we've placed on their backs," and that "any

27 weight that we place on their backs shouldn't be all on the spinal cord or across the neck . . .

28 [b]ecause it can cause compressional asphyxia."  *Id*. at 33-34.  McKinley also testified about his

United States District Court
Northern District of California

51

1  training that "putting pressure on a person's spine or neck can impair their ability to breath[e] . . .

2  [b]ecause it . . . obstructs or . . . compresses their airway or their . . . lungs or their chest so they

3  can't inhale or exhale, they can't move air in and out of their body." *Id*. at 34.

4       Fisher testified that he was trained that when an arrest "go[es] to the ground," "we want to

5  limit it to three officers, absolutely staying away from the neck, staying away from the spine, and

6  attempting to limit any weight that's on the back."  Fisher Dep. 20-21, 32-33.  He also testified

7  that "putting substantial weight on a person's back or neck as they're handcuffed and prone on the

8  ground . . . could cause . . . serious injury to the neck or the spine, in addition to cutting off an

9  airway, depending on the position . . ." *Id*. at 28.  Additionally, he testified that he was trained to

10  avoid placing "prolonged weight" on a person's back.  *Id*. at 29-30.

11       Finally, Leahy testified that he was trained that whenever officers have restrained an

12  individual in a prone position, they should limit the number of officers on top of the individual and

13  position themselves on the shoulder blades and legs to avoid pressure on the spine.  He testified

14  that, "when possible, [officers should] avoid[ ] the head, neck, or spine," and that "[t]he shoulder

15  blades were really that only portion of . . . the rear part of the upper body that we were trained to

16  put pressure."  Leahy Dep. 29-30.  According to Leahy, he was trained that "extended pressure on

17  the individual's head, neck, or spine could have the potential to limit or restrict the individual's

18  ability to breathe."  *Id*. at 30.  Leahy also testified that he learned that "a person who is obese and

19  forced into a prone position may have even more difficulty breathing than somebody who is not

20  obese."  *Id*. at 31, 33.  He testified that "the recovery position" on a person's side "with special

21  attention to preserving their airway" is a "safer position for someone to be on the ground" than in a

22  prone position.  *Id*. at 34.  He further testified that in order to avoid restraint asphyxia, he was

23  trained to put a person in handcuffs and in a prone position "into a recovery position . . . [w]hen

24  it's safe to do so."  *Id*. at 35.

25       Arenales mischaracterizes portions of the officers' testimony[14] and points out that

26

27  ─────────────
    [14] For example, Arenales states that "McKinley testified that he could not recall if he was ever
    trained that pushing down on a person's back area could interfere with a person's ability to breathe
28  and cause them to asphyxiate," Opp'n 3, but he actually testified that he could not recall being
    trained about whether "pushing down" on a person's back "could interfere with the mechanism of

United States District Court
Northern District of California

1   McKinley and Fisher either did not recall or were not trained that obese persons in the prone

2   position face an increased risk of asphyxia.  *See* Opp'n 3.  Given Leahy's testimony that he was

3   trained on the risks of keeping an obese person in the prone position, this is insufficient to

4   establish a department-wide failure to train on the issue.  Arenales does not cite any authority that

5   testimony from two officers is sufficient to show that Alameda's training program amounted to

6   deliberate indifference to the rights of the individuals with whom the officers came into contact.

7   *See Perez*, 591 F. Supp. 3d at 767 (rejecting premise that testimony by one deputy demonstrated a

8   deliberately indifferent training program).  "That a particular officer may be unsatisfactorily

9   trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have

10  resulted from factors other than a faulty training program."  *Canton*, 489 U.S. at 390-91.

11  "[A]dequately trained officers occasionally make mistakes; the fact that they do says little about

12  the training program or the legal basis for holding the city liable."  *Id*. at 391.

13          Finally, Arenales offers the opinion of her police practices expert, Adam Bercovici, who

14  reviewed Alameda's training materials.  See Opp'n 2.  Bercovici states that he reviewed "the use

15  of force policy" and that it contained "[n]o policy direction on placing someone in the recovery

16  position from prone position immediately when body weight or other force has been applied to a

17  person's body, specifically their head, neck, torso and back."  According to Bercovici, "[i]f this

18  policy had existed when Officers McKinley, Fisher, and Leahy had contacted Mario Gonzalez, it

19  would have in my opinion prevented this tragic outcome."  Buelna Decl. ¶ 7, Ex. 12 at 18-19.

20  Setting aside the fact that such an opinion is impermissible as it goes to the ultimate issues in the

21  case, Bercovici is not a medical expert who is qualified to opine on the cause of Mr. Gonzalez's

22  death.  Moreover, the opinion ignores that Alameda had a policy in place that once an individual

23  was secured, officers should place the individual "in a seated or upright position, secured with a

24  seat belt, and shall not be placed on his/her stomach for an extended period, as this could reduce

25

26  _____

27  the *diaphragm*."  McKinley Dep. 35 (emphasis added).  Similarly, Arenales asserts that Leahy
    testified that he was "trained to only avoid the spine and neck in order to avoid compression

28  asphyxia rather than the entirety of the back area," Opp'n 3, but Leahy responded, "Yes, the
    potential is there" when asked if he had been trained "that putting pressure anywhere on a person's
    back in a prone position, especially if they're obese, risks restraint asphyxia."  Leahy Dep. 33.

the person's ability to breathe."  Policy 306 at 004528.

Ultimately, Arenales seeks to rely on Mr. Gonzalez's death to demonstrate that Alameda's training program amounted to deliberate indifference.  However, "an inadequate training policy itself cannot be inferred from a single incident."  *Hyde v. City of Willcox*, 23 F.4th 863, 875 (9th Cir. 2022); *see also Perez*, 591 F. Supp. 3d at 768.  As Arenales has failed to show that Alameda failed to train its officers or had a training policy that "amounts to deliberate indifference to the [constitutional] rights of persons with whom [the untrained employees] come into contact," *Connick*, 563 U.S. at 61, Alameda is entitled to summary judgment on her *Monell* claim.

## III.   CONCLUSION

For the foregoing reasons, Defendants' motions for partial summary judgment on all Plaintiffs' Fourteenth Amendment claims are granted.

Defendants' motion for partial summary judgment on the Gonzalez Plaintiffs' remaining claims is granted in part and denied in part.  Specifically, summary judgment is granted on M.G.C.'s personal claim for violation of the Bane Act.

Defendants' motion for partial summary judgment on Arenales's *Monell* claim is granted.  The clerk shall enter judgment in Defendants' favor and against Arenales, and shall close the *Arenales* case.

**IT IS SO ORDERED.**

Dated: September 22, 2023



Judge Donna M. Ryu
Chief Magistrate Judge