MICHAEL J. HADDAD (SBN 189114)
JULIA SHERWIN (SBN 189268)
TERESA ALLEN (SBN 264865)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, CA 94612
Telephone:     (510) 452-5500
Facsimile:     (510) 452-5510

Attorneys for Plaintiffs
MARIO GONZALEZ, Deceased, and M.G.C.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARIO GONZALEZ, Deceased, through his Successor in Interest, M.G.C., a minor through his mother and Next Friend Andrea Cortez, individually and as successor in interest for MARIO GONZALEZ, Deceased,<br><br>        Plaintiffs,<br>vs.<br><br>CITY OF ALAMEDA, a public entity; ALAMEDA POLICE OFFICERS ERIC MCKINLEY, JAMES FISHER, and CAMERON LEAHY, and DOES 1-10, Jointly and Severally,<br><br>        Defendants. | Case No. 4:21-cv-09733-DMR<br><br>**PLAINTIFFS' NOTICE AND MOTION TO APPROVE MINOR'S COMPROMISE**<br><br>**Date:  January 25, 2024**<br>**Time:  1:00 p.m.**<br>**Courtroom:  4**<br>**Honorable Donna M. Ryu** |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on January 25, 2024, at 1:00 p.m., before the Honorable Chief Magistrate Donna M. Ryu, Courtroom 4, Third Floor, in the United States District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612, Plaintiffs will move the Court to approve the minor's compromise for Plaintiff M.G.C.

Plaintiffs, by and through their counsel, Haddad & Sherwin LLP, and Plaintiff M.G.C's mother and Next Friend, Andrea Cortez, hereby move this Court to approve the settlement of seven-year-old Plaintiff M.G.C.'s claims in this action for the total present amount of $11,000,000.00 (eleven million dollars) as follows.  Defendants do not oppose the relief requested in this motion, but request an inordinately long time to provide the settlement funds.  Defendants wish to be permitted to delay payment until late February or early March 2024 (45 to 60 days after January 3, 2024).  Because Plaintiff M.G.C.'s structured settlement must be fully funded no later than March 1, 2024, Plaintiffs request the Court to decide and approve the matter without a hearing, ordering Defendants to provide cash settlement funds in the amount of $6 million no later than January 31, 2024, and to fund the $5 million structured settlement no later than February 23, 2024.

This motion is based on the following Points and Authorities, as well as the Declarations of Andrea Cortez, Michael J. Haddad, and Julia Sherwin attached hereto.

## POINTS AND AUTHORITIES

### INTRODUCTION

This Court is familiar with the facts and claims at issue, as this case settled only on the eve of trial and after this Court decided Defendants' two motions for summary judgment and Plaintiffs' motion to certify as frivolous Defendants' interlocutory appeal of the denial of qualified immunity.

This motion comes after extensive negotiations, three settlement conferences with Magistrate Judge Laurel Beeler, and a mediation with private mediator Richard Copeland, culminating in a settlement agreement between the parties on November 3, 2023, that the City of Alameda and its risk management boards approved on December 14, 2023.  Defendants' counsel has informed Plaintiffs'

counsel that Defendants do not oppose the relief sought in this motion.  However, after Defendants delayed their approval of the settlement for almost six weeks, they seek to further delay payment for another 45 to 60 days *after* January 3, 2024.  Plaintiffs' counsel extensively met and conferred with defense counsel about their inordinate delays in this case, and request that the Court order the $6 million in cash settlement funds be provided no later than January 31, 2024, and that the structured settlement annuities be funded no later than February 23, 2024.

## PROCEDURAL BACKGROUND AND SETTLEMENT

Mario Gonzalez died in the custody of Alameda police officers on April 19, 2021.  Plaintiff M.G.C., through his mother and Next Friend, Andrea Cortez, brought this action on December 17, 2021, individually and on behalf of his father, Mario Gonzalez, Deceased.  The case was scheduled for trial on November 6, 2023.  On October 2, 2023, Defendants filed an interlocutory qualified immunity appeal challenging the Court's denial of their summary judgment motions.  Plaintiffs moved to certify Defendants' appeal as frivolous.  On October 16, 2023, the Court denied the motion to certify the appeal as frivolous, and entered a stay on the remaining claims.

Plaintiffs have been represented by Michael J. Haddad and Julia Sherwin of the Oakland, California, civil rights law firm Haddad & Sherwin LLP, along with their associate attorneys, Teresa Allen and Brian Hawkinson, plus three paralegals.  Plaintiffs' counsel did not become concerned in this matter at the instance of Defendants, and counsel have not received, and do not expect to receive, any compensation for counsel's services from any person other than Plaintiff M.G.C., pursuant to the retainer agreement between counsel and Plaintiff M.G.C. through his mother and Next Friend, Andrea Cortez, and based on the settlement amount to which the parties have agreed.  (Declaration of Michael J. Haddad, ¶ 2).

Haddad & Sherwin LLP conducted extensive investigation and discovery in this case, and the case settled at an advanced stage of litigation.  Plaintiffs' counsel obtained a second autopsy, conducted by Bennet Omalu, M.D., promptly after Mario Gonzalez's death.  (Haddad Decl. ¶ 3).  The parties produced approximately 10,000 Bates-stamped pages of documents, videos, and recordings in this case.  (Haddad Decl., ¶ 3).

Plaintiffs' counsel deposed the following witnesses:

1.     Defendant Alameda Police Officer Eric McKinley;

2.     Defendant Alameda Police Officer James Fisher;

3.     Defendant Alameda Police Officer Cameron Leahy;

4.     Alameda city employee, Charlie Clemmons;

5.     Officer Russell Wise, Defendant City of Alameda's Person Most Knowledgeable regarding training and policies concerning positional asphyxia;

6.     Defendants' police practices expert, Chris Nielsen;

7.     Defendants' police practices expert, Don Cameron;

8.     Defendants' police practices expert, Russell Wise (again);

9.     Defendants' crime scene analyst, Alexander Jason;

10.    Defendants' child psychiatry expert, Anlee Kuo, M.D.;

11.    Defendants' first emergency medicine expert, Binh Ly, M.D.;

12.    Defendants' forensic pathology expert, Judy Melinek, M.D.;

13.    Defendants' cardiology expert, Mitul Patel, M.D.;

14.    Defendants' forensic psychiatry expert, Sarah Polfliet, M.D.;

15.    Defendants' second emergency medicine expert, Gary Vilke, M.D.;

16.    Alameda County Coroner's Office forensic pathologist, Vivian Snyder, D.O., and

17.    Fred Kolkhorst, Ph.D.

Plaintiffs' counsel also attended and/or defended the Defendants' depositions of the following witnesses:

18.    Plaintiff M.G.C.'s mother and Next Friend, Andrea Cortez;

19.    An informal, supervised interview of Plaintiff M.G.C. by defense counsel;

20.    Mario Gonzalez's mother, Edith Arenales;

21.    Plaintiffs' police practices expert, Jack Ryan;

22.    Plaintiffs' expert forensic pathologist, Bennet Omalu M.D.;

23.     Plaintiffs' internal, cardiovascular, and cardiopulmonary medicine expert, John J. Ryan, M.D.;

24.     Plaintiffs' cardiology expert, Daniel Wohlgelernter, M.D.;

25.     Plaintiffs' addiction medicine and psychiatry expert, Larissa Mooney, M.D.;

26.     Plaintiffs' emergency medicine expert, Martin Chenevert, M.D.;

27.     Plaintiffs' forensic medicine and epidemiology expert, Michael Freeman, Med.Dr., Ph.D. (Haddad Decl., ¶ 4).

Plaintiffs' counsel also conducted three focus groups with mock jurors concerning this case on May 25, 2022, May 26, 2022, and March 14, 2023, and they worked extensively with a trial consultant to help prepare for trial.  Plaintiffs' counsel also worked with an Emmy-award-winning video producer to create a video demonstrating the damages in this case.  (Haddad Decl., ¶ 5).

Plaintiffs' counsel also briefed and argued the following motions/discovery disputes:

1.     Related case Plaintiff Edith Arenales's motion to consolidate cases;

2.     Discovery dispute re: Plaintiff Arenales's improper designation of Plaintiff M.G.C.'s retained experts as her own;

3.     Discovery dispute re: defense expert Dr. Melinek's deposition;

4.     Defendants' first motion for summary judgment, of Fourteenth Amendment claim;

5.     Defendants' second motion for summary judgment, of all remaining claims;

6.     Plaintiffs' motion to certify Defendants' interlocutory qualified immunity appeal as frivolous.

Plaintiffs also completed virtually all trial documents and preparations in this case, including: joint pretrial statement, annotated trial witness list, annotated trial exhibit list, joint jury questionnaire, court voir dire, joint and separate jury instructions, verdict form, 33-page comprehensive trial brief, and eight motions in limine.  By the time this Court denied Plaintiffs' motion to certify Defendants' appeal as frivolous and stayed the rest of the claims, Plaintiffs had also prepared final responses to Defendants' thirteen motions in limine, objections to Defendants' trial exhibits, and objections to Defendants' other trial documents.  All trial documents were either filed or fully prepared.  (Haddad Decl., ¶¶ 6-7).

Following three settlement conferences with United States Magistrate Judge Laurel Beeler on June 10, 2022, April 11, 2023, and May 2, 2023, and a mediation with mediator, Richard Copeland, on October 24, 2023, the parties accepted a mediator's proposal on November 3, 2023.  The parties agreed to settle this matter for a total present value of $11,000,000.00.  (Haddad Decl., ¶ 7).  The monetary breakdown is as follows:

• A one-third contingent attorneys' fee in the amount of $3,666,666.66 (although the retainer agreement provides for an attorneys' fee of up to 40% of any recovery, as described in more detail below, Plaintiffs' counsel have agreed to reduce their attorneys' fees to one-third of the recovery, reducing the attorneys' fees by $733,333.34);

• Repayment to Plaintiff's counsel of costs advanced in the amount of $240,669.01 from the remainder (Sherwin Decl. **Exhibit C,** Case Costs Ledger, Plaintiffs' counsel are waiving $12,983.61 in interest on case costs advanced)[1];

• $5 million of the net amount to Plaintiff M.G.C. is to be paid in a structured settlement annuity for his benefit, and the remaining settlement funds shall be put into a Trust for Plaintiff M.G.C., managed by a professional fiduciary jointly selected by Plaintiff M.G.C.'s counsel, Julia Sherwin, and Plaintiff M.G.C.'s mother, Andrea Cortez.  The funds in the Trust will be used:  1) to purchase, furnish, and maintain a home for Plaintiff M.G.C.'s benefit, to be owned by his Trust and managed by a Trustee who is a professional fiduciary; 2) invested in conservative investments; and 3) to provide for M.G.C.'s health, education, maintenance, support, comfort, and welfare, in his best interests as determined by the Trustee.  (Sherwin Decl. ¶¶ 8, 13, Sherwin Decl. **Exhibits A** and **B**).

Although Plaintiff M.G.C. would legally be entitled to the entirety of his settlement proceeds upon reaching the age of majority, his mother and Next Friend, Andrea Cortez, and his counsel believe a structured settlement with tax-free payments over time would be in his best interests.

This is an unusual case with a very large sum of money available for the minor, where Plaintiffs' counsel are requesting monthly payments to be made to M.G.C.'s mother during the remainder of the

---

[1] The Retainer Agreement provides for 6% simple interest on case costs advanced, which is less than the interest charged by Plaintiffs' counsel's bank if counsel were to borrow money to pay for case costs.  The interest on case costs in this case is $12,983.61, which Plaintiffs' counsel are waiving.

minor Plaintiff's childhood, to help provide for Plaintiff M.G.C.'s needs and improve his quality of life until he reaches the age of majority.

Plaintiff M.G.C.'s mother, Andrea Cortez (a/k/a Andrea Cortez Piceno), works, but only makes approximately $25,000 per year.  After Mario Gonzalez was killed, Ms. Cortez went to school to become certified as a 911 dispatcher, and she would like to find work as a dispatcher.  (Cortez Decl. ¶¶ 4-6).

The parties have agreed to settle M.G.C.'s claim to include cash up front and a structured settlement annuity with a present value of $5,000,000.  These payments are to be made on account of personal injury or sickness pursuant to Section 104(a)(2) of the Internal Revenue Code of 1986 (as amended), and accordingly are tax-exempt.  The annuity will provide a combination of annual and periodic payments to M.G.C., summarized as follows (with payments prior to age 18 paid to Andrea Cortez, as mother and Next Friend of M.G.C., and then paid to M.G.C. upon reaching age 18):

•       $3,000 per month tax-free as child support for M.G.C., to be paid to Andrea Cortez Piceno, beginning on April 1, 2024, guaranteed for 10 years and 3 months (until M.G.C. reaches the age of 18, with the final payment on June 1, 2034), increasing by 2% annually, with the increases beginning on April 1, 2025;

•       $10,455.27 paid monthly for life beginning on M.G.C.'s 18th birthday (June 22, 2034), guaranteed for 40 years.  Payments will increase 2% annually.  Payments will continue monthly for the rest of his life, and if he dies prematurely the guaranteed payments will continue to his beneficiary, with the last payment on May 22, 2074;

•       $37,500.00 twice a year ($75,000.00 per year) beginning the summer after he reaches the age of 18 (July 15, 2034), guaranteed for four years, which he can use to help pay for college, if he so chooses;

•       $60,000.00 twice a year ($120,000.00 per year) beginning the summer after he graduates from college (July 15, 2038), guaranteed for four years, which he can use to help pay for graduate school, if he so chooses;

• $25,000.00 paid annually for four years beginning on his 18th birthday (June 22,2034), which could be used to buy a reliable vehicle and for travel during breaks from college, or to invest if he chooses;

• $50,000.00 paid annually for four years beginning on his 22nd birthday (June 22,2038), which could be used for travel during breaks from graduate school, or to invest if he chooses;

• $120,000.00 paid annually for life, beginning on his 26th birthday (June 22, 2042), guaranteed for 30 years. Payments will increase 2% annually.  Payments will continue annually for the rest of his life, and if he dies prematurely the guaranteed payments will continue to his beneficiary, with the last payment on June 22, 2071;

The payments outlined above represent the total amount to be paid to or on behalf of M.G.C., but each payment will be divided and paid by three annuity companies, the specific division of which is outlined in further detail in Sherwin Decl. **Exhibit A.** This structured settlement payment obligation will be assigned and funded by annuity contracts, and those details are also outlined in Sherwin Decl. **Exhibit A**.

The total tax-free guaranteed benefits paid are $13,931,558.92.  The total tax-free expected payments for life are $24,440,160.37, based on a normal remaining life expectancy for M.G.C. of 67 years.  (Sherwin Decl. **Exhibits A** and **B**).  The structured settlement is in addition to the $2,092,664.33 in up-front cash to be managed by a Trustee and used to purchase a home for M.G.C.'s benefit and provide for his comfort and welfare.

Plaintiff M.G.C.'s mother, Andrea Cortez, and counsel realize that it is unusual to ask for cash up front for a minor Plaintiff.  However, due to M.G.C.'s living circumstances and the very large amount of money in his settlement, both Plaintiffs' counsel and Ms. Cortez believe it is in M.G.C.'s best interests to have some of the money in structured settlement annuities and some of the money used to purchase a home for him.  The structured settlement will provide guaranteed tax-free payments for M.G.C. for life. Plaintiffs' counsel and M.G.C.s' mother believe it is in M.G.C.'s best interests to have a stable home now, that his Trust will own, and which will increase in value as he ages.

M.G.C. currently receives Medi-Cal health insurance and occasionally receives cash aid for impoverished families.  He and his mother share one bedroom in his maternal grandfather's home in Oakland.  There is no reason, with the size of the settlement, that he should be required to remain on public assistance and living in poverty until he reaches the age of majority.

A review of studies on the effect of poverty found long-ranging negative impacts on the physiologic and neurobiologic development of children from poverty.  Children in families living in poverty had reduced brain tissue, "gray matter" volumes, in the frontal and temporal cortex and the hippocampus.  When families were at 150% of the poverty level, these reductions were 3% to 4% below developmental norms.  For children in families at 100% of poverty or below, reductions in these regions were 8% to 9% below developmental norms.  (Sherwin Decl. **Exhibit D**, C. Blair and C. Raver, "Poverty, Stress, and Brain Development: New Directions for Prevention and Intervention," *Academic Pediatrics,* 16(3 Suppl):S30-S36, April 2016, p. 2).

Cortisol and other stress markers are also elevated in children who live in poverty.  This affects brain structures and neural circuitry, ultimately affecting executive function, which is essential for self-regulation and school readiness.  (Sherwin Decl. **Exhibit D**, Blair and Raver article, *supra,* pp. 3, 4).

"Children living in poverty have lower scores on standardized tests of academic achievement, poorer grades in school, and lower educational attainment."  (Sherwin Decl. **Exhibit E**, N. Hair, J. Hanson, B. Wolfe and S. Pollak, "Association of child poverty, brain development, and academic achievement," *JAMA Pediatrics,* p. 169:822–829, 2015. P. 823).

The physical environment of low-income children is more hazardous than that of higher-income children, because they are exposed more frequently to pollution, lower-quality homes, and dangerous neighborhoods.  This results in children from the lowest socioeconomic stratum having a death rate from unintentional injuries that is 5 times that of children from higher socioeconomic strata.  (Sherwin Decl. **Exhibit F**, J. M. Pascoe, D. L. Wood, J. H. Duffee, A. Kuo, M. Yogman and N. Bauer, "Mediators and adverse effects of child poverty in the United States," *American Academy of Pediatrics,* p. e8, 2016).

Children raised in poverty have been shown to have higher levels of depression and antisocial behavior than those raised in families with adequate incomes.  (*Id.*, p. e10).

Children living in poverty generally perform poorly in school, with markedly lower standardized test scores and lower educational attainment.  The longer children live in poverty, the greater their academic deficits.  These patterns persist into adulthood, contributing to lifetime-reduced occupational attainment.  (Sherwin Decl. **Exhibit E**, Hair, Hanson, Wolf, and Pollak article, p. 822).

A study, using data from 2013, found that 89% of fourth-grade students from low-income families read below the proficiency level, compared with 49% of students from higher-income families.  The national high school drop-out rate is more than five times higher for low-income students than for higher-income students (7.4% vs. 1.4%, respectively).  (Sherwin Decl. **Exhibit F**, Pascoe, Wood, et al. article, p. e10).

M.G.C. is a sensitive, artistic boy who is very gifted at drawing and painting.  His mother would like him to go to art classes.  He is interested in playing soccer and taking boxing classes, and his mother would like him to be able to do those things.  In addition, Ms. Cortez would like M.G.C. to receive counseling when needed and any academic help he may need as he goes through his childhood.

Furthermore, M.G.C. and his mother currently live in a rough neighborhood in Oakland, California, with Ms. Cortez's father.  Ms. Cortez would like to move M.G.C. to a quieter community where the schools are better.  In addition, Ms. Cortez wants to move M.G.C. away from gangs in Oakland, to keep him from being exposed to gangs or crime as he goes through his childhood and teenage years.

M.G.C.'s mother and counsel request that the Trustee be permitted to use funds to maintain M.G.C.'s home and for M.G.C.'s comfort and welfare, such as school trips, vacations, art classes, boxing classes, and any unforeseen healthcare expenses.

Plaintiffs' counsel are willing to stay involved in the Trust and advise the trustee as needed on a *pro bono* basis, to ensure all funds are used for M.G.C.'s benefit and in his best interests.  Plaintiffs propose that the professional fiduciary selected to be Trustee of the trust be jointly selected by Plaintiffs' counsel and Ms. Cortez.  Plaintiffs and Ms. Cortez recommend Ryan de la Fuente of Professional Fiduciary firm CSC Fiduciaries, Inc., as the Trustee.  (Sherwin Decl. ¶ 25 and **Exhibit G**).

1

**STANDARD OF REVIEW**

2

"District courts have a special duty, derived from Federal Rule of Civil Procedure 17(c), to

3

safeguard the interests of litigants who are minors." *Robidoux v. Rosengren*, 638 F. 3d 1177, 1181 (9th

4

Cir. 2011). The court must conduct its own inquiry, "to determine whether the settlement serves the best

5

interests of the minor. *Id.* (quoting *Dacaney v. Mendoza*, 573 F.2d 1075, 1080 (9th Cir. 1978)).

6

In reviewing the settlement of federal claims, the court's duty "requires only that the district court

7

determine whether the *net amount* distributed to each minor plaintiff in the proposed settlement is fair and

8

reasonable, without regard to the proportion of the total settlement value designated for adult co-Plaintiffs

9

and contracted by them with Plaintiffs' counsel. If the net recovery of each minor plaintiff under the

10

proposed settlement is fair and reasonable, the district court should approve the settlement as proposed."

11

*Robidoux*, 638 F.3d at 1179. District courts have also followed *Robidoux* when reviewing a proposed

12

settlement of pendent state law claims in a federal civil rights action. See *Nephew v. Santa Rosa Mem'l.*

13

*Hosp.*, No. 15-cv-01684-JSC, 2015 U.S. Dist. LEXIS 139361 at *5, 2015 WL 5935337 (N.D. Cal. Oct.

14

13, 2015) ("where minors' claims arise under both federal and state law and the settlement is not claim-

15

specific" the court follows *Robidoux*) (citing *Bor v. PPC WSSC LLC*, No. 11-cv-03430-LHK, 2012 U.S.

16

Dist. LEXIS 58050, 2012 WL 1438779, at *3 (N.D. Cal. Apr. 25, 2012)).

17

The Ninth Circuit limits district courts' review "to the question whether the net amount distributed

18

to each minor plaintiff in the settlement is fair and reasonable in light of [1] the facts of the case, [2] the

19

minor's specific claim, and [3] recovery in similar cases." *Id*. at 1181-82.

20

**1.  The Facts of the Case**

21

On April 19, 2021, Defendant Alameda Police Officers Eric McKinley, James Fisher, and

22

Cameron Leahy were dispatched to Scout Park in Alameda after residents in the area called the City of

23

Alameda's non-emergency phone number for a Hispanic man talking to himself, possibly intoxicated, and

24

who may have been experiencing a mental health crisis. Mario Gonzalez was standing in the park near

25

two hand-baskets of liquor bottles, wearing a jacket inside out, trying to comb his hair over a hat, and

26

talking to himself. After approximately 10 minutes of trying to converse with Mr. Gonzalez, Officer

27

28

McKinley decided to arrest Mr. Gonzalez for PC 647(f) after Mr. Gonzalez, who had been confused, but peaceful, was unable to answer the officers' questions.

Officers McKinley and Fisher unsuccessfully attempted to handcuff Mr. Gonzalez standing up, then they forced him down to the ground in a prone position and applied body weight to Mr. Gonzalez's back, torso, and shoulder area.  An Alameda city employee, Charlie Clemmons, who had been on a ride-along with Officer Fisher, got out of Officer Fisher's patrol car and, at McKinley's direction, laid across the backs of Mr. Gonzalez's legs.  After nearly two minutes of restraining Mr. Gonzalez in a prone position, the officers successfully handcuffed him.  But they did not move off of his back or place him into a recovery position as their training required.

Officer Leahy arrived after Mr. Gonzalez was handcuffed, and took over from Mr. Clemmons, using his body weight to pin Mr. Gonzalez's legs and back down.  The officers continued holding Mr. Gonzalez in a prone position with their weight on him intermittently for 3.8 minutes after he was fully handcuffed, until he became unresponsive.  Mr. Gonzalez had committed no serious crime, was unarmed, and never posed an immediate threat of death or serious bodily injury to the officers or anyone, at any time, and deadly force was never justified.

The Alameda County Coroner ruled the manner of Mario Gonzalez's death a "homicide," and the cause of death to be "toxic effects of methamphetamine," with "physiologic stress of altercation and restraint" a significant contributing factor.  Plaintiffs' counsel commissioned a second autopsy by prominent forensic pathologist Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP, CP, FP, NP., who determined that Mario Gonzalez died from restraint asphyxia, and that the amount of methamphetamine found in his system was insufficient to cause death.

Proximate cause became a major issue in the case, with both sides naming a combined total of ten experts on that topic alone.

Defendants defended this case aggressively.  The City of Alameda first commissioned an "independent" investigation by well-known municipal defense law firm Renne Public Law Group, which found that the defendant officers acted lawfully and within Alameda Police Department policies at all times.  Throughout this litigation, Defendants asserted that the officers tried to de-escalate the situation

for several minutes before Mr. Gonzalez actively resisted their efforts to handcuff him.  Defendants claimed that no force or pressure was applied to Mr. Gonzalez's head, neck, or spine, and that the officers continually communicated with Mr. Gonzalez and monitored his breathing throughout the altercation until he became unresponsive.  Defendants stressed that the officers had the best of intentions and an absence of any spite or intent to harm Mr. Gonzalez.  Defendants maintained that Mr. Gonzalez's death was due to a sudden cardiac event caused by Mr. Gonzalez's methamphetamine intoxication, resistance to officers, and preexisting conditions, including an enlarged heart, obesity, and history of alcohol and substance abuse.

Mario Gonzalez was homeless at the time of his death.  He had a severe alcohol and methamphetamine abuse problem that especially manifested after the unexpected deaths of his father, best friend, and younger brother in 2017.  His substance use problems resulted in multiple arrests and hospitalizations for alcohol and methamphetamine intoxication, and serious alcohol withdrawal, as detailed in Plaintiffs' Motion in Limine No. 1 concerning Mario Gonzalez's prior alleged bad acts, arrests, and hospitalizations.  (Doc. 154).  At the time of the settlement, the admissibility of such information was in question, although Defendants had hired multiple experts who purported to rely on Mr. Gonzalez's substance use problems for their opinions.

M.G.C. was only four years old at the time of his father's death.  M.G.C. had a close and loving relationship with his father, who, despite suffering from severe alcohol dependence and methamphetamine use disorder, was a deeply loving and adoring parent when he was with M.G.C.

### 2.    The Minor's Specific Claims

Plaintiff M.G.C.'s claims against Defendants after summary judgment and voluntary dismissal of claims are as follows:

- Violation of Fourth Amendment – unreasonable seizure based on unlawful arrest against Defendants McKinley and Fisher;

- Violation of Fourth Amendment – unreasonable seizure based on excessive force against Defendants McKinley, Fisher, and Leahy;

- Violation of California Civil Code § 52.1 – Interference by threat, intimidation, coercion, or with reckless disregard for rights, with Mario Gonzalez's right to be free from unreasonable seizure either by unlawful arrest or excessive force, against all Defendants [survival claim only];

- Battery – against all Defendants;

- Negligence – against all Defendants.

(See Doc. 156, Joint Pretrial Statement, ECF p. 4).

Plaintiff M.G.C. claimed the following damages on behalf of himself and Mario Gonzalez, Deceased:

- Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support (wrongful death claims – non-economic damages);

- Mario Gonzalez's loss of life, pursuant to federal civil rights law (survival claims);

- Mario Gonzalez's conscious pain and suffering pursuant to federal civil rights law (survival claims);

- Punitive damages against Defendant McKinley, Fisher, and Leahy for the federal claims only, under 42 U.S.C. § 1983;

- All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 and 52.1; and as otherwise may be allowed by California and/or federal law.

(See Doc. 156, ECF p. 10).

### 3.    <u>Recovery in Similar Cases</u>

Plaintiffs' counsel are unaware of any other civil rights death case in the State of California going back at least ten years that provided a greater net recovery to a minor than the settlement proposed here. (Haddad Decl., ¶ 8).

On November 13, 2023, Plaintiffs' counsel did a Lexis search for all settlements and verdicts in the State of California, from January 1, 2013 to the present, with the search terms, "1983 and death and minor." (Haddad Decl., ¶ 8). Here are the results:

| CASE | AMOUNT | SETTLEMENT/ VERDICT | COURT | YEAR | NOTES |
|---|---|---|---|---|---|
| *Martinez v. City of Pittsburg* | $7,300,000 | Settlement | CAND | 2020 | Restraint asphyxia settlement shared by decedent's two minor children (Haddad & Sherwin LLP case) |
| *Zerby v. City of Long Beach* | $6,510,000 | Verdict | CACD | 2013 | Police Shooting verdict provided $3,500,000 to minor and remainder to two adult plaintiffs |
| *Nida v. City of Downey* | $4,500,000 | Settlement | CACD | 2013 | Police shooting settlement shared by decedent's wife, parents, and four minor children |
| *Loggins v. County of Orange* | $4,400,000 | Settlement | CACD | 2013 | Police shooting settlement shared by decedent's wife, one adult child, and four minor children |
| *Osorio v. State of California* | $4,100,000 | Verdict | San Diego Superior Court | 2017 | Police shooting verdict shared by decedent's wife, parents, and two minor children |
| *Garlick v. County of Kern* | $3,400,000 | Settlement | CAED | 2016 | Restraint Asphyxia settlement shared by decedent's girlfriend and four minor children |
| *L.F. v. City of Stockton* | $3,200,000 | Settlement | CAED | 2021 | Police shooting settlement shared by four minor children |

| Cerda v. County of Los Angeles | $1,300,000 | Settlement | Los Angeles Superior Court | 2016 | Bicyclist struck and killed by Sheriff's Dep't. patrol car; settlement shared by decedent's parents, two adult children, and two minor children |
| B.R.S. v. City of Palm Springs | $700,000 | Settlement | CACD | 2015 | Restraint Asphyxia settlement shared by decedent's parents and one minor child |
| F.E.V. v. City of Anaheim | $0 Defense Verdict | Verdict | Orange County Superior Court | 2019 | Police shooting case |

(Haddad Decl., ¶ 8, and Haddad Decl. Ex. A).

In addition, Plaintiffs' counsel maintain a running table of the largest civil rights verdicts and settlements from around the country, and are aware of additional relevant case results that did not turn up in the Lexis search[2]:

| CASE | AMOUNT | SETTLEMENT/ VERDICT | COURT | YEAR | NOTES |
|---|---|---|---|---|---|
| Lucky Phounsy v. San Diego County | $12,000,000 | Settlement [Post-Verdict] | CASD | 2023 | Restraint asphyxia case won jury verdict for $85 million, then settled for $12 million before damages re-trial, shared by decedent's wife and two minor children |
| Simplis v. Culver City | $8,825,000 | Settlement | CACD | 2013 | Police shooting settlement shared by four minor children |
| McClain v. City of Pasadena | $7,500,000 | Settlement | CACD | 2021 | Police shooting settlement shared |

---

[2] Plaintiffs' counsel's table of large civil rights verdicts and settlements does not include results less than $4,000,000 within the last ten years.  (Haddad Decl., ¶ 9).

| | | | | | | by three minor children |
|---|---|---|---|---|---|---|
| *I.F. v. City of Vallejo* | $5,700,000 | Settlement | CAED/ CAND | 2020 | | Police shooting settlement shared by decedent's parents and two minor children (Haddad & Sherwin LLP case) |
| *Dela Trinidad v. County of Los Angeles* | $5,300,000 | Settlement | Los Angeles Superior Court | 2015 | | Police shooting settlement shared by decedent's wife and two minor daughters |
| *Luong v. County of Alameda* | $5,100,000 | Settlement | CAND | 2019 | | Jail death settlement shared by decedent's wife, mother, and minor son (Haddad & Sherwin LLP case) |
| *Casillas v. City of Fresno* | $4,750,000 | Verdict | CAED | 2019 | | Police shooting verdict shared by decedent's wife and five minor children |
| *Palma v. City of Inglewood* | $4,600,000 | Settlement | CACD | 2016 | | Police shooting settlement shared by decedent's wife and two minor children |
| *Glenn v. City of Los Angeles* | $4,000,000 | Settlement | CACD | 2016 | | Police shooting settlement shared by decedent's mother and minor son |

(Haddad Decl., ¶ 9).

The only California civil rights death case with minor plaintiffs in the last decade that resulted in a larger gross recovery is the *Lucky Phounsy* case, and that settlement happened only after the plaintiffs had already won an $85 million verdict. The $12 million settlement in *Phounsy* was then split between the decedent's wife and two minor children. Thus, no child-plaintiff in a California civil rights death case in at least the last decade has received a larger net recovery than Plaintiff M.G.C. will receive under the terms of the proposed settlement. With his structured settlement and up-front cash, he is guaranteed to

1   receive over $15.9 million throughout his lifetime.  With his actuarial life expectancy, he is expected to

2   receive over $26.4 million throughout his lifetime.

3   **4.   <u>Attorneys' Fees and Costs</u>**

4   As stated above, it is appropriate to follow *Robidoux* when reviewing settlements of state and

5   federal claims heard together.  See *Nephew, supra,* 2015 U.S. Dist. LEXIS 139361 at *5 (citing other

6   cases); *Frary v. Cnty. of Marin*, No. 12-cv-03928-MEJ, 2015 U.S. Dist. LEXIS 16229 at *7, 2015 WL

7   575818, at *2 (N.D. Cal. Feb. 10, 2015); *Lobaton v. City of San Diego*, Case No. 3:15-cv-1416-GPC-

8   DHB, 2017 U.S. Dist. LEXIS 93290 at *6, 2017 WL 2610038 (S.D. Cal. June 16, 2017) (applying

9   *Robidoux* to state claims heard by supplemental jurisdiction).

10   *Robidoux* reversed a district court's rejection of a minor's settlement that would have designated

11   56% of the total settlement value for attorneys' fees.  638 F.3d at 1179.  The district court had based its

12   rejection of the settlement on the local rules of several California courts, concluding that "attorneys are

13   typically awarded a maximum of 25 percent of the total settlement award of a minor's claim, less costs,

14   unless there are extraordinary circumstances warranting a greater award."  *Id*. at 1180-81.  In reversing,

15   the Ninth Circuit explained that the "typical practice" to apply state law and local rules governing an

16   award of attorneys' fees "places undue emphasis on the amount of attorneys' fees provided for in a

17   settlement instead of focusing on the net recovery of the minor plaintiffs under the proposed agreement."

18   *Id*. at 1181.  "[I]n this context, the fairness determination is an independent, not a comparative, inquiry.

19   Thus, the district court erred when it focused on the admittedly large proportion of the total settlement

20   value going to Plaintiffs' counsel, instead of reviewing the fairness of each minor's net recovery in

21   isolation."  *Id.* at 1182.

22   Notwithstanding the Ninth Circuit's requirement that district courts' review of settlements for

23   minor plaintiffs must be done "without regard to the proportion of the total settlement value designated

24   for adult co-plaintiffs and contracted by them with Plaintiffs' counsel," (*Robidoux*, 638 F.3d at 1179),

25   some district courts have failed to follow that Ninth Circuit precedent still required "good cause" to

26   approve more than a 25% attorneys' fee, in particular, where there were no federal claims by the time of

27   settlement.  For example, in *Napier v. San Diego County*, 2017 U.S. Dist. Lexis 196223 at *9-10; 2017

28

1   WL 5759893 (SD Cal. Nov. 28, 2017), where summary judgment had been granted on all federal 42

2   U.S.C. § 1983 claims and the only remaining claims were state law claims, the court noted, "'most courts

3   require a showing of 'good cause' to award more that 25% of any recovery' whereas a greater reward is

4   'rare and justified only when counsel proves that he or she provided extraordinary services.'" *Id*. (quoting

5   *Schwall v. Meadow Wood Apts.*, No. CIV. S-07-0014 LKK, 2008 U.S. Dist. LEXIS 18819, 2008 WL

6   552432, at *1-2 (E.D. Cal. Feb. 27, 2008) (quoting 2 Weil & Brown, *Cal. Practice Guide: Civ. Proc.*

7   *Before Trial* §§ 12:576-12:577, 12-17 (2007)).

8         However, in the present case, the federal claims not only survive, but predominate.  The only

9   damages sought for Plaintiff M.G.C.'s remaining state law battery and negligence claims are his non-

10  economic wrongful death damages for loss of his father's love, companionship, comfort, etc.  Plaintiff

11  M.G.C. seeks those same wrongful death damages based on his federal claims, plus survival damages

12  available only under federal civil rights law for Mario Gonzalez's loss of life and conscious pain and

13  suffering, as well as punitive damages for violations of Mario Gonzalez's federal rights.  Plaintiff M.G.C.

14  is not seeking punitive damages under California law due to the much higher standard required for an

15  award of punitive damages under state law and the potential for jury confusion based on two different

16  punitive damages instructions.

17        While not part of the *Robidoux* "fair and reasonable" analysis of this settlement, Plaintiff's

18  counsel's proposed reduced attorneys' fee of one-third of the gross settlement also is fair and reasonable.

19  First, the retainer agreement between M.G.C. (through his mother and Next Friend, Andrea Cortez) and

20  Haddad & Sherwin LLP provides for an attorneys' fee of 33-1/3% of the total recovery before a lawsuit is

21  filed or 40% of the total recovery after a lawsuit is filed, and in the case of a minor (child) at the time of

22  recovery, these percentages are subject to court approval.  (Haddad Decl., ¶ 10).  Additionally, if case

23  costs were advanced for the client as they were here, the client is responsible to repay those costs with six

24  percent simple interest from any "net recovery," defined as "funds remaining after attorneys' fees have

25  been paid from the total recovery."  (Haddad Decl., ¶ 10).  Plaintiff's counsel have agreed to reduce their

26  attorneys' fees from 40% to one-third, saving M.G.C. $733,333.34 in attorneys' fees.  (Haddad Decl., ¶

27  11).  While the six percent simple interest that is typically added to the advanced case costs is a much

28

1   lower interest rate than Plaintiff's counsel's bank would charge for a revolving line of credit, Plaintiffs'

2   counsel are waiving the $12,983.61 in interest on case costs in this case.

3   　　　　Second, the one-third fee is fair and reasonable given the work and case costs expended.  Plaintiff

4   M.G.C.'s counsel represented him for more than two and a half years in a costly and aggressively

5   defended case.  This case involved extensive discovery, 26 depositions, over 10,000 pages of documents,

6   a substantial amount of time and resources devoted to expert witnesses, multiple motions, and virtually all

7   trial preparation.  The case required Plaintiff M.G.C.'s counsel to forward more than $240,000.00 in case

8   costs over the course of two and a half years.  (Haddad Decl., ¶ 11).

9   　　　　Third, the level of work and costs were so much that Haddad & Sherwin LLP turned away other

10  viable cases in order to have sufficient resources to win M.G.C. the exceptional result here.  (Haddad

11  Decl., ¶ 12).  In light of these factors, the reduced one-third attorneys' fee also is fair and reasonable.

12  　　　　Under both *Robidoux* and state law, many district courts have approved minors' settlements with

13  attorneys' fees equal to or greater than the portion of the settlement Plaintiffs' counsel seeks here.  See

14  *Garlick v. County of Kern*, No. 1:13-cv-01051-JLO, 2016 U.S. Dist. LEXIS 97524 at *8-9 (E.D. Cal. July

15  22, 2016) (approving contracted 40% fee in restraint asphyxia case with federal and state claims); *S.A.C.*

16  *v. County of San Diego*, No. 17-cv-01893-LAB, 2020 U.S. Dist. LEXIS 209344 at *12-14, 2020 WL

17  6559139 (S.D. Cal. Nov. 9, 2020) (approving contracted 40% contingent fee as part of $1,350,000

18  settlement of police shooting case); *J.P. v. County of Alameda*, No. 17-cv-05679-LB, 2023 U.S Dist.

19  LEXIS 115131 at *4-5, 2023 WL 5004681 (N.D. Cal. July 5, 2023) (approving contracted 40% fee from

20  $3.5 million civil rights settlement); *Nephew, supra,* 2015 U.S. Dist. LEXIS 139361 at *9 ("requested

21  33% attorneys' fee award is reasonable in light of the signed contingency agreement and the early

22  resolution of this case"); *Townsend v. County of Santa Cruz*, No. 19-cv-00630-BLF, 2021 U.S. Dist.

23  LEXIS 219278 at *3-4 (N.D. Cal. Nov. 12, 2021) (approving contracted 40% fee from gross settlement of

24  $5,500,000); *District of Columbia v. County of San Diego*, No. 18-cv-0013-NLS, 2021 U.S. Dist. LEXIS

25  263611 at *15-16, 2021 WL 9928552 (S.D. Cal. Sept. 20, 2021) (approving 36% attorneys' fees; citing

26  cases approving fees between 25-40%); *R.D.G. v. City of Bakersfield*, No. 1:13-cv-02057-JLT, 2015 U.S.

27  Dist. LEXIS 131696 at *10-11, 2015 WL 5732615 (E.D. Cal. Sept. 28, 2015) (one-third contingent fee

28

approved); *Riddle v. Amtrack*, No. 3:14-cv-01231-JLS, 2014 U.S. Dist. LEXIS 157237 at *17-18, 2014 WL 5783825 (S.D. Cal. Nov. 5, 2014) (one-third contingent fee approved).

## CONCLUSION

The Ninth Circuit counsels, "[m]ost importantly, the district court should evaluate the fairness of each minor plaintiff's net recovery without regard to the proportion of the total settlement value designated for adult co-plaintiffs or plaintiffs' counsel ....   So long as the net recovery to each minor plaintiff is fair and reasonable in light of their claims and average recovery in similar cases, the district court should approve the settlement as proposed by the parties." *Robidoux*, 638 F.3d at 1182.

This case could have resulted in an historically large verdict.  While this case had strong liability and substantial damages, it was not indefensible.  It also could have been lost or have resulted in a verdict well below the amount of the proposed settlement.  It surely would have taken many more years to resolve by trial and appeal, as Defendants already had shown their inclination to appeal.

No civil rights death case in at least the last decade has resulted in a greater net recovery for a minor than Plaintiff M.G.C. would receive under the proposed settlement.  And, importantly, the settlement would provide stability for M.G.C. now, instead of years from now, while protecting him from the trauma of a trial.

Plaintiff M.G.C. respectfully submits that the proposed settlement for M.G.C. is fair and reasonable under these circumstances.  The payment stream will provide a significant monetary foundation to assist M.G.C. in paying for his education, housing expenses, and other primary financial needs throughout the course of his adult life, with guaranteed payments in excess of $15.9 million and projected payments to him of more than $26.4 million, the vast majority of which will be tax-free. Plaintiff also requests that this court approve Haddad & Sherwin LLP's requested one-third attorneys' fee in the amount of $3,666,666.66, and reimbursement of case costs in the amount of $240,669.01.  After paying these attorneys' fees and costs, Plaintiff M.G.C. will have $2,092,664.33 to put into a Trust, managed by a professional trustee for his benefit.

Plaintiff M.G.C. requests that this Court decide this matter on an expedited basis without a hearing, as the insurance companies for Plaintiff M.G.C.'s structured settlement annuities, USAA, Pacific

Life, and Prudential, have already provided firm amounts for M.G.C.'s structured settlement payments, which must be funded no later than March 1, 2024.  Plaintiff M.G.C. requests that the Court order Defendants to complete all necessary documents and fund the structured settlement annuities no later than February 23, 2024, as required.

Plaintiff M.G.C.'s counsel also request that this Court order Defendants to provide either a check or wire transfer for the remaining $6,000,000.00 in settlement proceeds that are not being structured, made payable to "Haddad & Sherwin LLP Client Trust Account f/b/o M.G.C." [using his real name], with any check to arrive at the offices of Haddad & Sherwin LLP, or any wire transfer to arrive in their Client Trust Account, no later than January 31, 2023.

For the foregoing reasons, Plaintiff M.G.C. respectfully request that this Court approve the compromise of Plaintiff M.G.C's claims and order the timely payments set forth herein.

Dated:  December 21, 2023                    HADDAD & SHERWIN LLP


                                             /s/ *Julia Sherwin*
                                             _____
                                             JULIA SHERWIN
                                             Attorneys for Plaintiffs